JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Learning Care Group, Inc.

**DEFENDANTS**
Carlene Armetta
David Armetta and
Aspira Marketing Direct, LLC

**(b)** County of Residence of First Listed Plaintiff    Oakland County, MI
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Fairfield County, CT
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stephen P. Fogerty, Esq.
Halloran & Sage, LLP
315 Post Road West, Westport, CT 06880

Attorneys *(If Known)*
Joseph M. Pastore, III
Pastore & Dailey, LLC
4 High Ridge Park, 3rd Floor, Stamford, CT 06905

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | ☐ 820 Copyrights | ☐ 450 Commerce |
|    & Enforcement of Judgment |    Slander     Personal Injury | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted |    Liability   ☐ 368 Asbestos Personal | | |     Corrupt Organizations |
|    Student Loans | ☐ 340 Marine     Injury Product | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    (Excludes Veterans) | ☐ 345 Marine Product     Liability | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** |     Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   ☒ 370 Other Fraud | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |     Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |     Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract |    Product Liability   ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| ☐ 196 Franchise |    Injury   ☐ 385 Property Damage |     Leave Act | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury -     Product Liability | ☐ 790 Other Labor Litigation | |     Act |
| |    Medical Malpractice | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** |     Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | |     or Defendant) |     Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party |     Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | |     26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | | |     State Statutes |
| ☐ 245 Tort Product Liability |    Accommodations   ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |    Employment    **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other   ☐ 550 Civil Rights |     Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |    ☐ 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC section 1332(a)(1)
Brief description of cause:
The defendants engaged in fraud and deception to the detriment of the plaintiff.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $         CHECK YES only if demanded in complaint:

JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions:)*
JUDGE   Bryant and Judge Eginton      DOCKET NUMBER   3:13-cv-1461, 3:13-cv-1464

DATE
10/22/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------x
                                            :

LEARNING CARE GROUP, INC.,
                                            :
                                            : Case No.: _____
                     Plaintiff,     :
                                            :

   vs.                                              :
                                            :

CARLENE ARMETTA,                       :
DAVID ARMETTA, and                :
ASPIRA MARKETING DIRECT, LLC.,   : OCTOBER 22, 2013
                                            :
                    Defendants.  :
----------------------------------------------------------------x

## COMPLAINT

     Plaintiff Learning Care Group, Inc. ("LCG"), by its attorneys, for its Complaint against Defendants Carlene Armetta, David Armetta and Aspira Marketing Direct, LLC ("Aspira") alleges as follows:

### Nature of Action

     1. For several years, Carlene Armetta abused her position of trust as a senior employee of LCG to cause LCG to make secret payments for the benefit of a side business, Aspira, which she co-owns with her husband, David Armetta. Specifically, Mrs. Armetta:

- Entered into undisclosed agreements with certain vendors under which Aspira would earn a secret commission on all LCG business which Mrs. Armetta could steer to the vendors;

- Caused the vendors to inflate their invoices to LCG to cover the cost of the secret commissions and other payments made to Aspira; and

- Then, in her capacity as an LCG executive, approved payment on the inflated invoices.

Through this unlawful scheme, the Armettas and Aspira secretly obtained the benefit of more than $1 million in overcharges which Mrs. Armetta caused her employer, LCG, to pay.

2.  LCG therefore brings this action, asserting claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, constructive fraud, conversion and violations of the Connecticut Unfair Trade Practices Act.  LCG seeks compensatory and punitive damages, disgorgement of Defendants' ill-gotten revenues and disgorgement of the compensation and benefits paid to Mrs. Armetta throughout the period of her faithless service.

## The Parties

3.  Plaintiff LCG is a private company organized and existing under the laws of the state of Michigan with its principal place of business located in Novi, Michigan.

4.  Defendant Carlene Armetta is an individual residing at 510 Woodbine Road, Stamford, Connecticut 06903.

5.  Defendant David Armetta is an individual residing at 510 Woodbine Road, Stamford, Connecticut 06903.

6.  Defendant Aspira Marketing Direct, LLC is a private company organized and existing under the laws of the state of Connecticut with its principal place of business

located at 510 Woodbine Road, Stamford, Connecticut 06903.

### Jurisdiction & Venue

7.  This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, Plaintiff is a company incorporated and headquartered in Michigan and Defendants Carlene Armetta and David Armetta are individuals residing in Connecticut and Defendant Aspira is incorporated and headquartered in Connecticut.

8.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

### Facts

**Background**

9.  LCG is a Michigan-based corporation which operates over 900 childcare/education centers nationwide.  One of the ways in which LCG seeks to enroll students is through direct mail marketing campaigns.

10. In February 2009, LCG engaged Aspira, a company co-owned by Mrs. and Mr. Armetta, to assist LCG in connection with its direct mail marketing efforts.  In light of the high fees charged by Aspira, however, among other factors, LCG later decided to terminate its relationship with Aspira and instead hire Mrs. Armetta as a full-time employee to handle direct mail marketing efforts.

11. LCG hired Mrs. Armetta as a full-time, at-will employee on or around January 28,

3

2010.   During most of Mrs. Armetta's employment, her title was Vice President of Integrated Marketing, and she reported to the Chief Marketing Officer.  From January 2013 to April 2013, Mrs. Armetta was LCG's Interim Chief Marketing Officer and reported directly to LCG's Chief Executive Officer.  Throughout her tenure, LCG put its faith, confidence and trust in Mrs. Armetta to administer LCG's direct mail marketing program.

**Mrs. Armetta Causes LCG To Make**
**Secret Payments To Aspira Through Vertis**

12. LCG used a vendor, Vertis Communications, Inc. ("Vertis"), to print direct mail marketing materials for LCG.

13. Unbeknownst to LCG, Mrs. and Mr. Armetta, on behalf of Aspira, negotiated a commission agreement with Vertis under which Vertis agreed to pay commissions to Aspira based on any LCG business which Aspira (that is, Mrs. and Mr. Armetta) could steer toward Vertis (the "Secret Vertis/Aspira Agreement").  Although the Secret Vertis/Aspira Agreement was entered into before Mrs. Armetta became a full-time employee of LCG, it remained in place after she became a full-time employee.  Once she became a full-time employee, she never disclosed to LCG that Aspira (the company co-owned by her and her husband) had an agreement under which it would earn commissions if she was able to steer LCG business toward a particular vendor, Vertis.

14. Pursuant to the Secret Vertis/Aspira Agreement, Vertis agreed to pay Aspira:  (a)

a per piece commission in the amount of $0.03 of the price per piece on the direct mail marketing pieces Vertis printed for LCG, and (b) a 20% commission on the data lists that Vertis sold to LCG to distribute the direct marketing mail.  Vertis made the payments owed under the Secret Vertis/Aspira Agreement and passed the cost of these payments on to LCG through inflated bills.

15. Without disclosing her conflict of interest to LCG, Mrs. Armetta worked on two sides of these transactions to facilitate passing the costs of Aspira's undisclosed payments on to LCG.  On one side, Aspira (that is, Mrs. and Mr. Armetta) directed Vertis to inflate its invoices to LCG in order to cover the costs of any payments to Aspira (but without disclosing those payments).  On the other side, Mrs. Armetta, as the executive responsible for direct mail marketing efforts at LCG, was the person at LCG who reviewed and approved payment on Vertis' inflated invoices.

16. On top of payments under the Secret Vertis/Aspira Agreement, Aspira directed Vertis to inflate its invoices to LCG by an additional 10% in order to pay a further unauthorized premium to Aspira, purportedly for "creative" services.  As with payments under the Secret Vertis/Aspira Agreement, Mrs. Armetta facilitated passing on the cost of these additional payments to LCG as well.  On one side, she and her husband, through Aspira, directed Vertis to inflate its invoices to LCG, and, on the other side, she approved LCG's payments of the inflated invoices in her capacity as an LCG executive.

17. Effective September 1, 2011, the Secret Vertis/Aspira Agreement was amended to increase the price per piece commission to $0.05.  As with the original agreement,

Mrs. Armetta never disclosed the amended agreement to LCG either.  She continued to facilitate passing the cost of the undisclosed payments on to LCG by directing Vertis to inflate its invoices to LCG and then approving LCG's payment of the inflated invoices in her capacity as an LCG executive.

18. The total amount of undisclosed payments made by Vertis to Aspira (and passed on to LCG via inflated invoices) is more than $750,000.

**Mrs. Armetta Causes LCG To Make**
**Secret Payments To Aspira Through FCL**

19. In October 2012, Vertis filed for bankruptcy protection.  The entity which purchased Vertis' assets, a company called Quad Graphics, refused to participate in Defendants' secret payment scheme.

20. Mrs. Armetta, therefore, arranged for LCG to retain a new vendor, FCL Graphics ("FCL"), to print direct mail marketing materials for LCG.  FCL's work for LCG began in or around January 2013, at around the time when Mrs. Armetta was appointed LCG's Interim Chief Marketing Officer.

21. Mrs. and Mr. Armetta immediately put into place the same arrangement with FCL as they had previously enjoyed with Vertis, except that Defendants nearly doubled the size of the secret commissions.  Specifically, without disclosing to LCG, Mrs. and Mr. Armetta negotiated a commission arrangement with FCL under which their company, Aspira, would be paid a per piece commission of $0.095 on all LCG business steered toward FCL, as well as a 10% premium for Aspira's purported "creative" work.

6

22. The cost of FCL's payments to Aspira were passed on to LCG in the same way that the Vertis payments had been.  Mrs. and Mr. Armetta directed FCL to inflate its invoices to LCG in order to cover the cost of undisclosed payments to Aspira, and, on the other side of the transaction, Mrs. Armetta approved LCG's payment of the inflated invoices in her capacity as Interim Chief Marketing Officer for LCG.

23. The total amount of undisclosed payments made by FCL to Aspira (and passed on to LCG via inflated invoices) is approximately $350,000.

**Internal Investigation and Termination**

24. In August 2013, LCG engaged a prominent law firm to conduct an objective and independent investigation of whether Mrs. Armetta had violated LCG policies or any applicable laws.   Following a thorough investigation, including multiple witness interviews (including interviews with Mrs. Armetta herself) and review of voluminous relevant documentation (including documentation provided by Mrs. Armetta and her counsel), LCG terminated Mrs. Armetta's employment, concluding that she had "engaged in business dealings that were egregious and direct violations of the Company's Code of Conduct, specifically the prohibition against conflicts of interests, the improper release of confidential information, and financial interests in other businesses."  A copy of Carlene Armetta's Termination Letter dated September 6, 2013 is attached hereto as Exhibit A.

25. The policies which Mrs. Armetta violated are set forth in LCG's Employee Handbook, which contains a "Code of Business Conduct and Ethics" ("Code").  The

Code provides:

> [This Code] reflects the Company's commitment to honest and ethical conduct, and uncompromising integrity at all level of the organization and in all of its business relationships and transactions, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

Employee Handbook at 12, attached hereto as Exhibit B.

26. LCG's express "Conflicts of Interest" policy contained in the Code states as follows:

> A conflict of interest may arise in any situation in which an employee's loyalties are divided between interests that, to some degree, are incompatible with the interests of the Company. This includes private and personal interests that might interfere with the company as a whole. All such conflicts should be avoided. The Company demands absolute integrity from all its employees and will not tolerate any conduct that falls short of that standard. The Company expects that no employee will knowingly place himself or herself in a position that would have the appearance of being, or could be construed to be, in conflict with the interests of the Company.

*Id.* at 13.

27. Additionally, the policy specifically addressed "Interests in Other Businesses" as follows:

> Unless approved in advance by the Ethics Compliance Officer, neither an *employee nor his or her spouse,* domestic partner, or any other member of the employee's immediate family may directly or indirectly have a financial interest (whether as an investor, lender, employee, or other service provider) in a competitor, customer, or supplier if that employee or his/her subordinates deal directly or indirectly

> with that customer or supplier in the course of his/her job
> with the Company.

*Id.* at 15.

28. The Code expressly provides that "[e]mployees with actual or apparent conflict(s) of interest are required to make full disclosure to the Company's Ethics Compliance Officer." *Id.*

29. Mrs. Armetta signed an "Employee Handbook Acknowledgement of Receipt," thereby acknowledging the following: "I received a copy of the Company Employee Handbook. I fully understand the guidelines governing my employment with the Company and I agree that I will conform to these guidelines." A copy of the Employee Handbook Acknowledgement of Receipt is attached hereto as Exhibit C.

## Mrs. Armetta's Admissions

30. In a related action which Mrs. Armetta has filed against LCG, now also pending in this Court, she admits that she and her husband owned a side business (Aspira) and that money which LCG nominally paid to third-party vendors (Vertis and FCL) was actually being passed through to the business owned by her and her husband. Although Mrs. Armetta contends that at least some people at LCG knew about her conflict of interest, she cannot seriously dispute that she had a conflict of interest which violated the Code.

31. Although she contends in her lawsuit that her supervisor and unnamed others were aware of her conflict of interest, she does not – and cannot – allege that the

**9**

conflict was approved in advance by the Ethics Compliance Officer or that she ever made full disclosure to the Ethics Compliance Officer, as required by the Code.

32. Further, although she alleges at length that people at LCG should have or must have known that Aspira did work for Vertis and FCL, she does not – and cannot – allege that anyone at LCG knew (a) about the secret commission agreements which Aspira had negotiated with Vertis and FCL, (b) that Aspira was directing the vendors to inflate their invoices to cover those costs (without disclosing the costs), or (c) that Mrs. Armetta was approving payment of the invoices in her capacity as an LCG executive despite her knowledge that they were inflated and that the overcharge was to cover a benefit going directly to the company she co-owned with her husband.

### First Cause of Action:
### <u>Breach of Fiduciary Duty</u>
### (Against Carlene Armetta)

33. LCG repeats and realleges all of the allegations above.

34. Mrs. Armetta owed LCG fiduciary duties of care and undivided loyalty throughout the three-year period during which she was a highly paid employee of LCG.

35. LCG placed its faith, trust, and confidence in Mrs. Armetta as its agent.

36. Mrs. Armetta failed to fulfill her duties to LCG and breached LCG's faith, trust and confidence by, among other things, (a) failing to disclose the existence of her conflict of interest to LCG, (b) awarding LCG's business to Vertis and FCL despite the conflict of interest, and (c) authorizing inflated payments by LCG to Vertis and FCL that were passed to her company, Aspira.

37. Mrs. Armetta's conduct constitutes a breach of her fiduciary duties as detailed above, and LCG has been damaged thereby.

38. As a direct and proximate cause of such conduct, LCG has suffered compensatory damages and is also entitled to disgorgement of all of Defendants' ill-gotten revenues and all of the compensation that Mrs. Armetta earned during the period in which she was breaching her duties to LCG.

**Second Cause of Action:**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Aspira and David Armetta)**

39. LCG repeats and realleges all of the allegations above.

40. Mrs. Armetta owed fiduciary duties to LCG, which she breached.

41. Mr. Armetta and Aspira were undeniably aware of the fiduciary duties which Mrs. Armetta owed to LCG.

42. As co-owner of Aspira, involved in the day-to-day business and operations of Aspira, Mr. Armetta, and Aspira itself, substantially assisted in Mrs. Armetta's breach of her fiduciary duties to LCG.

43. LCG suffered harm as a result of the conduct of Mr. Armetta and Aspira.

44. As a direct and proximate cause of such conduct, LCG has suffered compensatory damages and is also entitled to disgorgement of all of Defendants' ill-gotten revenues.

### Third Cause of Action:
### <u>Constructive Fraud</u>
### (Against Mrs. Armetta)

45. LCG repeats and realleges all of the allegations above.

46. At all material times alleged herein, Mrs. Armetta had a fiduciary, trusted and confidential relationship with LCG and was in a position of superiority and influence over it.

47. Mrs. Armetta's representations to LCG regarding the nature of Vertis's and FCL's invoices were false, and she knew they were false:  Aspira received commissions to which it was not entitled by receiving payments from Vertis and FCL at LCG's expense.

48. Ms. Armetta made her representations – and failed to disclose her conflict of interest – knowing that LCG would rely on her misrepresentations and concealment in paying the invoices submitted to LCG by Vertis and FCL, and it was absolutely vital that LCG have knowledge of the services for which it was being billed.

49. Each of the above representations was made for the purpose of inducing LCG to rely on them.

50. LCG did in fact rely on such representations, in ignorance of the representations' falsity, and the Company has been damaged as a result of the belated discovery of the facts regarding the unauthorized commissions and unauthorized amounts that Mrs. Armetta granted Aspira and Mr. Armetta as commissions and purported compensation.

**Fourth Cause of Action:**
**Conversion**
**(Against All Defendants)**

51. LCG repeats and realleges all of the allegations above.

52. Defendants, both directly and through the actions of others taken with the Defendants' approval, came to exercise unauthorized dominion and control over more than $1 million of LCG funds obtained as a result of the improper arrangement it negotiated with Vertis and FCL.

53. The Defendants' dominion and control over the funds has been to the exclusion of, and in defiance of, LCG's rights, or has otherwise interfered with the rights of LCG in and to such funds.

54. LCG has been damaged by the Defendants' conversion of LCG funds in the amount of ill-gotten revenues passed from Vertis and FCL to Defendants.

**Fifth Cause of Action:**
**Connecticut Unfair Trade Practices Act**
**(Against Aspira and David Armetta)**

55. LCG repeats and realleges all of the allegations above.

56. The wrongful conduct and actions of Aspira and Mr. Armetta violate the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110b(a) et seq. ("CUTPA"), which prohibits unfair or deceptive acts or practices in the conduct of any trade or business.

57. Aspira and Mr. Armetta deceived LCG by entering into and implementing the Secret Vertis/Aspira Agreement and a similar secret arrangement with FCL to

misappropriate funds from LCG.

58. The misconduct of Aspira and Mr. Armetta, as detailed in this Complaint, offends public policy and is immoral, unethical and unscrupulous.

59. The misconduct of Aspira and Mr. Armetta, as detailed in this Complaint, has caused substantial financial injury to LCG.

60. Aspira and Mr. Armetta engaged in a continuous course of misconduct in the operation of their business in violation of CUTPA, which prohibits unfair or deceptive acts or practices in the conduct of any trade or business.

61. The continuing and repeated wrongful conduct, actions, and inactions of Aspira and Mr. Armetta violate CUTPA.

62. LCG has been greatly damaged by the immoral, unethical and unscrupulous misconduct of Aspira and Mr. Armetta in an amount to be determined at trial.

## Sixth Cause of Action:
## <u>Unjust Enrichment</u>
## (Against All Defendants)

63. LCG repeats and realleges all of the allegations above.

64. At all material times alleged herein, Defendants have been unjustly enriched by their unauthorized misappropriation of funds which were concealed from LCG.

65. Defendants have been unjustly enriched to the detriment of LCG, which has been significantly damaged by its overpayments.

66. It is against equity and good conscience to permit Defendants to retain the

proceeds of these misappropriations from LCG.

## Prayer for Relief

WHEREFORE, LCG respectfully requests that judgment be entered in its favor and against Mrs. Armetta, Mr. Armetta and Aspira as follows:

a. That LCG be awarded damages, including compensatory and punitive damages, in an amount to be determined at trial;

b. That LCG be awarded disgorgement of the revenues that Defendants received through the payment and commission arrangements involving LCG;

c. That LCG be awarded disgorgement of the compensation that Mrs. Armetta received as a full-time employee of LCG;

d. That LCG be awarded its attorneys' fees, costs and expenses;

e. That LCG be awarded pre-judgment and post-judgment interest; and

f. That LCG be awarded such other and further relief as the Court may deem just and proper.

## Demand for Jury Trial

LCG hereby demands a trial by jury on all issues as to which a jury trial may be had.

Dated:  October 22, 2013

Respectfully submitted,

By:  /s/_____
Stephen P. Fogerty
Halloran & Sage, LLP
315 Post Road West
Westport, CT  06880
Telephone (203) 227-2855
Facsimile (203) 227-6992
fogerty@halloransage.com
Federal Bar No.:  ct01398

Attorneys for Defendant
Learning Care Group, Inc.


Jyotin Hamid
Tricia B. Sherno
Debevoise & Plimpton, LLP
919 Third Avenue
New York, NY  10022
Telephone (212) 909-1031
Facsimile (212) 909-6836

Of Counsel

## CERTIFICATION

This is to certify that on this 22nd day of October, 2013, a copy of the foregoing was filed electronically on the Court's CM/ECF system.  Notice of this filing will be sent to all counsel of record for viewing via the Court's ECF system.

Joseph M. Pastore, III
Pastore & Dailey, LLC
4 High Ridge Park, 3rd Floor
Stamford, CT  06905

/s/_____
Stephen P. Fogerty

# EXHIBIT A



21333 Haggerty Road
Suite 300
Novi, MI 48375
248.697.9000
www.learningcaregroup.com



**VIA ELECTRONIC MAIL: carlenearmetta@armetta.com**
**VIA UPS OVERNIGHT DELIVERY-SIGNATURE REQUIRED**
**VIA U.S. MAIL-CERTIFIED-RETURN RECEIPT REQUESTED**
**&**
**VIA U.S. MAIL**

September 6, 2013

Ms. Carlene T. Armetta
510 Woodbine Road
Stamford CT 06903

RE:    Termination of Employment with Learning Care Group, Inc.

Dear Ms. Armetta:

This letter is to notify you that your employment with Learning Care Group, Inc. is terminated for cause, effective immediately.

On August 15, 2013 you were placed on paid administrative leave pending investigation of allegations of conflicts of interest. The Company has completed its investigation and concludes that you engaged in business dealings that were egregious and direct violations of the Company's Code of Conduct, specifically the prohibition against conflicts of interests, the improper release of confidential information, and financial interests in other businesses. The Company reserves all rights and remedies it may have.

Your final paycheck has been directly deposited in accordance with normal payroll protocols. All health and medical benefits terminate at the end of the pay period ending September 6, 2013. If you are currently enrolled in the health insurance programs you will be eligible to continue insurance coverage under the company's health plan in accordance with COBRA at your own expense. Electing COBRA coverage will provide you with your current or a similar level of coverage. In the event that benefit plans and or insurance carriers change during the period you are eligible for COBRA coverage, you will be converted to similar benefit plans under any new programs. This includes medical, dental, vision and flexible spending accounts (FSA) benefit programs only. It does not include any other insurance and or benefit programs. You will receive COBRA information under separate cover.

Any questions pertaining to your 401(k) account should be directed to Wells Fargo at 866-640-5138.

During your tenure with the Company you have received or been given access to certain information of one or more entities of the Company, which the Company deems confidential business information or trade secrets, such information being related to the Company's business at the School/Center and Corporate levels (collectively, the "*Confidential Information*").

September 6, 2013
Page 2.



Confidential Information may include without limitation, information of or about the Company relating to the systems and operations of the Corporate headquarters and/or field operations, curricula, accounting information, operating, marketing, standards and policies for pricing of services, promotions, advertising, financial performance, human resources and training manuals; memoranda, video and audio tapes, slide presentations and other materials; characters, systems, logos and other similar property creations, programs, studies, software, agreements, correspondence, records, plans and reports used or created by the Company or supplied to the Company, customer lists, identities of suppliers; and operational, accounting and quality control procedures. "Confidential Information" does not include information which (1) becomes generally available to the public (other than through any action by you or your agents); (2) was available to you prior to its disclosure by the Company, on a non-confidential basis from sources having the legal right to disclose such information; or (3) becomes available to you on a non-confidential basis from a source other than the Company that is not bound by a confidentiality agreement with the Company prohibiting such disclosure.  Your obligation to maintain the confidentiality of such information continues after your separation from employment by the Company.

Please send all company equipment and proprietary assets including but not limited to your laptop computer-Dell E 5430-tag 3Q55CW1 (with all LCG data intact), printer, camera, air card, flash drives, security badge, purchase card, educational curricula and marketing collateral/materials, along with any other documents or materials belonging to the Company, via UPS ground or FedEx ground, properly insured, to the Novi Support Central Office for arrival by Tuesday September 10, 2013. Receipt(s) for such shipping should be included with reimbursable expenses.

Any outstanding reimbursable expenses should be submitted by end of day Tuesday, September 10, 2013.  The statement of outstanding expenses along with the receipts should be sent via electronic mail to Scott Smith. The expenses will be reviewed and processed through the standard approval process.  Sums due to you will be deposited via direct deposit during the next expense reimbursement cycle.

You are asked to keep the Company informed of any changes in address for purposes of delivery of tax information for calendar year 2013.

Should you have any further questions, please contact Scott Smith, Chief Human Resource Officer for the company.

Very truly yours,

Barbara J. Beck
Chief Executive Officer


C: S. Smith

**U.S. Postal Service**™

**CERTIFIED MAIL**™ **RECEIPT**

*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

7012 1010 0003 3328 1754

Sent To  Carlene Armetta
Street, Apt. No.; or PO Box No.  510 Woodbine Rd
City, State, ZIP+4  Stamfort  CT  06903

PS Form 3800, August 2006                    See Reverse for Instructions

# EXHIBIT B





www.learningcaregroup.com

# EMPLOYEE
# HANDBOOK



# CODE OF BUSINESS CONDUCT AND ETHICS




## INTRODUCTION

The following Code of Business Conduct and Ethics (this "Code") reflects the Company's commitment to honest and ethical conduct, and uncompromising integrity at all levels of the organization and in all of its business relationships and transactions, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. This Code applies to all employees at all levels within the Company.

Our Company's success depends upon our reputation for integrity and fairness. Accordingly, the Company has developed this Code of Business Conduct and Ethics to explain the standards of behavior that we expect from our employees. The purpose of the Code is to:

- Promote honest and ethical conduct, including the appropriate handling of actual or apparent conflicts of interest between personal and professional relationships.
- Promote compliance with all applicable governmental rules and regulations.
- Provide guidance to employees so that they can recognize and report issues that may have ethical implications.
- Provide mechanisms to report unethical conduct.
- Foster a culture of honesty and accountability and an atmosphere where employees can report their concerns and cooperate fully with investigations without fear of retaliation.

The Code reflects general principles to guide employees in making ethical decisions and providing behavioral guidance. It cannot and is not intended to address every specific situation. In order to impress upon everyone involved with the Company of the seriousness of appropriate and ethical business conduct and behavior, each employee of the Company will be asked to acknowledge his or her agreement to be bound by the Code, and that acknowledgment will be a condition to ongoing employment with the Company. Any person within the Company who violates this Code will be held accountable through prompt corrective action.

All references in this Code to the "Company" will mean and include Learning Care Group, Inc., its subsidiaries, Childtime Childcare, Inc., Tutor Time Learning Centers, LLC, The Children's Courtyard, La Petite Holdings, Inc. and its subsidiaries La Petite Academy, and Montessori Unlimited as well as any subsidiary of any of them from time to time. This Code is available on the Company's internal website/Portal and may also be accessed through the Company's Human Resources Department.

## COMPLYING WITH LAW

It is the Company's policy that all Company employees, Officers and Directors will comply with local, state and federal laws, rules and regulations that are applicable to the Company, including laws prohibiting discrimination and harassment, those relating to licensing, and health and safety issues. The Company and its employees are also responsible for making a good-faith effort to comply with contractual obligations that the Company may have with third parties.

## CONFLICTS OF INTEREST

A conflict of interest may arise in any situation in which an employee's loyalties are divided between interests that, to some degree, are incompatible with the interests of the Company. This includes private and personal interests that might interfere with the company as a whole. All such conflicts should be avoided. The Company demands absolute integrity from all its employees and will not tolerate any conduct that falls short of that standard. The Company expects that no employee will knowingly place himself or herself in a position that would have the appearance of being, or could be construed to be, in conflict with the interests of the Company.

Under guidelines approved by the Board or committees of the Board, certain conflicts of interest may be approved by the Company. The resolution of a potential conflict of interest is not always simple, and employees, directors and officers are required to consult with an Executive Officer, or the Ethics Compliance Officer, if they are contemplating action which may result in a conflict or potential conflict. If an employee, Officer or Director becomes aware of a conflict or potential conflict, the employee, Officer or Director is required to consult the procedures described in this Code and to inform the Ethics Compliance Officer or an Ethics Compliance Committee Member of the transaction or relationship giving rise to such conflict or potential conflict. Any request for approval must be in writing to the Executive Officer. All approvals must be in writing and signed by the Ethics Compliance Officer.

Ethics Compliance Officer:
Scott W. Smith, Chief Human Resources Officer

Ethics Compliance Committee Members:
Ira Young, General Counsel
Amanda Davis, Internal Controls Manager

Any of the above members can be reached by contacting the Human Resources Employee Hotline at 1-800-475-8295. Some of the more sensitive areas of "conflicts of interest" and the Company's related guidelines are as follows:

### A. Accepting Gifts, Gratuities and Entertainment

Gifts, gratuities and entertainment include material goods, services, or activities offered to Company employees, or directors either free or at reduced costs, with the purpose (either direct, indirect, or implied) of influencing organizational decisions, such as the selection of employees, the hiring of vendors, favorable treatment or the purchase of goods and services. The Company believes that the acceptance of gifts in any form, monetary or otherwise, can potentially be perceived as a conflict of interest. We also



acknowledged in an environment such as ours gifts are more prevalent particularly in our Schools between families and employees.

Employees must use extreme caution in accepting gifts, gratuities, services and entertainment, following these general guidelines:

- Employees may not solicit any form of personal gift or gratuity.
- Employees shall not accept personal gifts of money, credits, or purchasing discounts in any amount from vendors or donors.
- Employees may accept non-monetary personal gifts (including meals, product samples, event tickets, etc.) if such gifts have small nominal value (less than $100) strictly as a gesture of goodwill, in the spirit of seasonal giving, or for public relations purposes, and only if such gifts are given and received with no expectation of reciprocal obligation.
- if an employee receives an unsolicited gift exceeding nominal value, the employee should either return the gift to the sender, pay the sender full market value for the gift, or donate the gift to a charitable organization. An employee who wishes to attend any vendor-sponsored event's involving an overnight stay, plane travel, or other significant expense must: Receive prior approval from the Ethics Committee or, in the case of an Officer of the Company, the Chairman of the Board, and within 15 days prior to the event, provide written disclosure on an Ethics Disclosure Form. Approval of such events will require evidence that the employee's attendance provides a value or benefit to the Company.

Employees accepting gifts, entertainment and gratuities exceeding the nominal amount must contact the Ethics Compliance Officer for Disclosure Forms and Approval.

### B. Personal Loans within the Company

The company discourages employees, Officers, and Directors from giving or receiving any type of monetary or material loans or guarantees. Furthermore, monetary or material loans cannot be used in exchange for personal/professional favors, services, etc.

### C. Outside Activities

It is the policy of the Company that no employee shall engage in any other activity that will materially encroach on the time or attention which should be devoted to the employee's duties, adversely affect the quality of work performed, compete with the Company's activities, imply sponsorship or support by the Company of the outside activity, or adversely affect the good name of the Company. For hourly or non-exempt employees, any outside activity which does or might give the impression of the above listed conflicts shall require the prior written approval of the employee's manager. By way of example, an employee who has a second job at a retail facility would not necessarily fall into the described conflicts. An employee who performs daytime babysitting services would be in conflict with the business of the Company. All secondary activities for any, Manager, or exempt level employee

that does or might give the impression of the above listed conflicts require the prior written approval of an Executive Officer of the Company. No employee may use Company time, facilities, resources, or supplies in the furtherance of any secondary activities whether or not any apparent conflict exists.

No employee with responsibilities and duties for the Child and Adult Care Food Program (CACFP) shall have any other employment outside of Learning Care Group, Inc. that interferes with the completion of CACFP responsibilities and duties. In addition, any employment outside of the CACFP responsibilities and duties may not constitute a real or apparent conflict of interest with the CACFP. Any employee considering or having outside employment will need written approval from the District Manager.

To engage in this behavior may lead to corrective action up to and including separation from employment.

### D. Interests in Other Businesses

Unless approved in advance by the Ethics Compliance Officer, neither an employee nor his or her spouse, domestic partner, or any other member of the employee's immediate family may directly or indirectly have a financial interest (whether as an investor, lender, employee, or other service provider) in a competitor, customer, or supplier if that employee or his/her subordinates deal directly or indirectly with that customer or supplier in the course of his/her job with the Company.

Employees with actual or apparent conflict(s) of interest are required to make full disclosure to the Company's Ethics Compliance Officer. The Ethics Compliance Officer will review each disclosure on a case by case basis and make a determination as to which conflict warrant a waiver. Even if a waiver is granted, an employee will be required to abide by the Company's Conflict of Interest, Non-Solicitation, Non-Competition and Confidentiality Policies. See your Human Resources Manager for a copy of the Conflict of Interest Disclosure and Waiver Request form.

### E. Giving Gifts to Suppliers, Vendors and Other Third Parties

Gifts and other gratuities, personal favors, or benefits provided to third parties from Company funds or other Company assets are prohibited. Where lawful and appropriate, items of nominal value (i.e., calendars or office supplies worth less than $25) and reasonable, business-related expenses (i.e., meals) are acceptable. Gifts of any kind or amount to government officials are absolutely forbidden. Government officials include employees of governmental agencies and authorities (i.e., Licensing or Compliance officials, Child Protective Services or Law Enforcement Personnel, etc.).

If a conflict develops, the Company reserves the right to take action to protect its business interests and to ensure confidentiality. Any conflict of interest or perceived conflict of interest that may arise is very serious and such conflicts may

# EXHIBIT C

PAGE  01/01

ASPIRA MARKETING DIR

2033808024

11/22/2010  13:37



**EMPLOYEE HANDBOOK**

*Learning Care group*

Employee Handbook 2010 Cover 8-23-10.indd  1

1-28-10   Hire Date

## EMPLOYEE HANDBOOK
## ACKNOWLEDGEMENT OF RECEIPT

Please sign this form, detach, and return it to your Manager.

I have received a copy of the Company Employee Handbook. I fully understand the guidelines governing my employment with the Company and I agree that I will conform to these guidelines. I have had an opportunity to ask questions about and discuss the guidelines with my Manager and/or the Human Resources department. I understand that this Employee Handbook is not a contract of employment, express or implied, between me and the Company and that I should not view it as a contract of employment. I further understand that edits in the form of added, or deleted or altered text made by myself to this handbook are invalid.

I understand that this Employee Handbook takes precedence over any previous handbooks or guidelines issued. I also understand and agree that the Company reserves the right to change or alter polices at any time with or without notice.

In addition to the Employee Handbook, I have also received written copies of the following documents specific to my position with the Company (please initial on the line provided for each document received).

- Job Description: _____
- Performance Review Sample: _____ *CJA* _____

Employee Name: _Carlene T. Armetta_

Date: _11/22/10_ _____ School #: _N/A_

Employee Signature: _Cllumitta_

Manager Name: _Stacy DeVoit_ Date: _11/22/2010_

HR Manager _Nancy Scott_

Manager Signature: _____

2484/22071                    8/23/2010  2:00:00 PM