UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEARNING CARE GROUP, INC., | : | CIVIL ACTION NO. |
| Plaintiff/Consolidated Defendant, | : | 3:13-CV-01540 (VLB) |
| | : | |
| v. | : | |
| | : | |
| CARLENE ARMETTA, DAVID ARMETTA, | : | |
| and ASPIRA MARKETING DIRECT, LLC, | : | |
| Defendants/Consolidated Plaintiffs. | : | September 30, 2014 |

MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART
CONSOLIDATED DEFENDANT'S MOTIONS TO DISMISS
CONSOLIDATED PLAINTIFFS' FIRST AMENDED COMPLAINTS [Dkts. #34 & #37]

I.      Introduction

        The Consolidated Plaintiffs ("Plaintiffs"), Carlene Armetta ("Mrs. Armetta"),

David Armetta ("Mr. Armetta") and Aspira Marketing Direct, LLC ("Aspira") bring

two related actions against Consolidated Defendant Learning Care Group, Inc.

("LCG" or "Defendant"), alleging various claims arising from Mrs. Armetta's

termination from LCG.  The Plaintiffs assert claims of defamation (as to Mrs. and

Mr. Armetta); commercial disparagement (as to Mr. Armetta and Aspira); breach

of contract and wrongful termination (as to Mrs. Armetta); violations of the

Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. 42-110b(a) *et seq.*

("CUTPA") (as to all three Plaintiffs); and quantum meruit and unjust enrichment

(as to all three Plaintiffs).  Defendant LCG has moved to dismiss both actions in

their entirety pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon

which relief may be granted.  For the reasons that follow, Defendant's Motions to Dismiss are GRANTED in part and DENIED in part.

## II.    Factual Background

The following facts and allegations are taken from the Plaintiffs' First Amended Complaints unless otherwise stated, and are deemed to be true for purpose of this motion.  [3:13-cv-01461-VLB, Dkt. #18, David Armetta and Aspira Complaint (hereinafter "DA/Aspira Compl."); 3:13-cv-01464-VLB, Dkt. #18, Carlene Armetta Complaint (hereinafter "CA Compl.")].

Plaintiffs Mr. and Mrs. Armetta are domiciliaries of Connecticut, with a principal residence at 510 Woodbine Road, Stamford, Connecticut.  [DA/Aspira Compl. at ¶ 11; CA Compl. at ¶ 10].  Plaintiff Aspira, a marketing firm owned by Mr. and Mrs. Armetta, is a Connecticut corporation with its principal place of business located at the same address.  [DA/Aspira Compl. at ¶¶ 12, 22]. Defendant LCG, a national childcare center operating over 900 daycares across the country, is a Michigan corporation with its principal place of business located at 21333 Haggerty Road, Suite 300, Novi, MI.  [DA/Aspira Compl. at ¶¶ 2, 13; CA Compl. at ¶¶ 2, 13].

The Plaintiffs allege that in February 2009, the then-Chief Marketing Officer at LCG, Stacy DeWalt ("Ms. DeWalt"), hired Mrs. Armetta as an independent contractor for LCG's marketing department.  [DA/Aspira Compl. at ¶ 15; CA Compl. at ¶ 13].  The Plaintiffs allege that Mrs. Armetta signed an independent contractor's agreement with LCG drafted by Ira Young ("Mr. Young"), LCG's General Counsel and a member of the company's Ethics Committee.  [DA/Aspira

Compl. at ¶ 17; CA Compl. at ¶ 15].  Plaintiffs allege that Mrs. Armetta signed this

agreement as the "Managing Director of Aspira Marketing Direct." [DA/Aspira

Compl. at ¶ 15; CA Compl. at ¶ 13].  Although the Complaint alleges that Aspira

both invoiced and was paid by LCG for services performed by Mrs. Armetta for

LCG, neither Mr. Armetta nor Aspira were compensated for the work Mrs. Armetta

performed for LCG as an independent contractor.  [DA/Aspira Compl. at ¶ 17; CA

Compl. at ¶ 15].

The Plaintiffs allege that as an independent contractor for LCG, Mrs.

Armetta was assigned a partnership project and later, tasked with developing a

call center.  [DA/Aspira Compl. at ¶ 16; CA Compl. at ¶ 14].  The Plaintiffs further

allege that in August 2009, Ms. DeWalt told Mrs. Armetta that LCG was

dissatisfied with LCG's current direct mail marketing vendor and enlisted Mrs.

Armetta to ensure that a new direct mail marketing project could be designed and

mailed out within two weeks.  [DA/Aspira Compl. at ¶ 18; CA Compl. at ¶ 16].  The

Plaintiffs allege that Mrs. Armetta suggested to Ms. DeWalt that her husband Mr.

Armetta and their company, Aspira, might be able to help, and at Ms. DeWalt's

direction Mrs. Armetta reached out to Mr. Armetta.  [*Id.*].

In turn, the Plaintiffs allege, Mr. Armetta reached out to Kevin Overlock

("Mr. Overlock"), one of his long-time business contacts at a printing and direct

mail marketing business called Vertis Communications ("Vertis").  [DA/Aspira

Compl. at ¶ 19; CA Compl. at ¶ 17].  The Plaintiffs allege that Mrs. Armetta, with

the assistance of Mr. Armetta and Vertis, was able to complete the direct mail

marketing project on time. [DA/Aspira Compl. at ¶ 20; CA Compl. at ¶ 18].  The

Plaintiffs do not state with whom LCG contracted for these services, but alleges that "[s]ubsequent to the completion of the above-referenced project, and as a result of its success, Vertis [not Aspira], with Mr. Armetta's assistance and oversight, began acquiring substantial printing and marketing work from LCG. . ." [DA/Aspira Compl. at ¶ 21; CA Compl. at ¶ 19]. The Plaintiffs further allege that the ultimate decision to use Vertis for LCG's printing and direct mail marketing work was not Mrs. Armetta's, but rather Ms. DeWalt's in consultation with LCG management.  [DA/Aspira Compl. at ¶ 33; CA Compl. at ¶ 31].

The Plaintiffs allege that Mr. Armetta was integral to the work Vertis did for LCG—among other things, he provided creative designs for LCG marketing campaigns, rented the direct marketing mailing lists, and established and operated LCG's direct mail marketing campaigns.  [DA/Aspira Compl. at ¶ 21; CA Compl. at ¶ 19].  The Plaintiffs do not allege the capacity in which Mr. Armetta provided the direction and oversight of the relationship between LCG and Vertis or the capacity in which he performed work for LCG.  However, they do allege that at the time, Aspira invoiced LCG for the per diem work performed by Mrs. Armetta and the additional work performed by Mr. Armetta, including renting and managing the mailing lists and arranging and overseeing Vertis's print production.  [DA/Aspira Compl. at ¶ 22; CA Compl. at ¶ 20].  The Plaintiffs allege that this invoicing structure was designed with the knowledge and approval of Ms. DeWalt.  [*Id.*].

The Plaintiffs allege that Mrs. Armetta continued to work for LCG as an independent contractor until January 2010, when she was hired by LCG as a full-

time employee.  [DA/Aspira Compl. at ¶ 23; CA Compl. at ¶ 21].  The Plaintiffs allege that at first, Mrs. Armetta was not interested in LCG's employment offer, but that she was persuaded to take the position based on her understanding that if she did not accept the offer, neither she nor Aspira would continue to receive work from LCG.  [*Id.*].  The Plaintiffs further allege that during her hiring negotiations, Mrs. Aspira inquired about the status of Mr. Armetta's work if she did take the position, and Ms. DeWalt responded that it was "no problem," and that she "want[ed] Mr. Armetta involved and to just have him paid through Vertis," because "LCG does not want to write any more checks to Aspira."  [*Id.*].  The Plaintiffs allege that Ms. DeWalt also told Mrs. Armetta, "Just get it done.  Do what you have to do.  We need to get this going."  [*Id.*].  Mrs. Armetta became a full-time at-will employee in LCG's marketing team on or around January 28, 2010.  [DA/Aspira Compl. at ¶ 23; CA Compl. at ¶¶ 21, 79].

On February 8, 2010, Mrs. Armetta learned through an email sent by Ms. DeWalt to her and Scott Smith ("Mr. Smith"), the Chief Human Resources Officer and the other member of LCG's Ethics Committee, that now that Mrs. Armetta was an employee of LCG, in order for Mr. Armetta to receive work from LCG he needed to have an agreement with LCG.  [DA/Aspira Compl. at ¶ 25; CA Compl. at ¶ 23].  Specifically, Plaintiffs allege that Mrs. DeWalt's email stated, "I spoke with Scott today in regard to continuing to contract David/Aspira.  He and I will follow up with [the C.E.O.] Bill this week, in the meantime since your official start date passed the work that David is doing on Summer needs to have a SOW and cost for his time. Please have David contact me directly with costs/agreement ASAP".

[*Id.*].  The Plaintiffs further allege that General Counsel Mr. Young drafted a confidentiality and non-disclosure agreement that Mr. Armetta, Aspira and Ms. DeWalt signed on April 20, 2010.  [DA/Aspira Compl. at ¶ 28; CA Compl. at ¶ 26].  However, Plaintiffs do not allege that an agreement between Mr. Armetta/Aspira and LCG was ever entered into.  Instead, the Plaintiffs allege that in order to comply with Ms. DeWalt's request to "just have [Mr. Armetta] paid through Vertis," Mr. Armetta negotiated an independent contractor agreement with Vertis, who would then invoice LCG for Mr. Armetta's and Aspira's services.  [DA/Aspira Compl. at ¶ 30; CA Compl. at ¶ 28].

The Plaintiffs allege that "as an outside consultant and marketing firm, LCG was certainly aware that they [Mrs. Armetta, Mr. Armetta and Aspira] were not only being compensated for their work, but that the normal industry practice of compensating such vendors for their services most often included the payment of commissions, brokerage fees, and other compensation based on the client's needs."  [DA/Aspira Compl. at ¶ 24; CA Compl. at ¶ 22].  The Plaintiffs also contend that after Mr. Armetta started receiving payment through Vertis, "Ms. DeWalt, and therefore LCG, was well aware that Mr. Armetta was an integral part of the marketing department, and was surely not volunteering his time."  [DA/Aspira Compl. at ¶ 31; CA Compl. at ¶ 29].  However neither Complaint alleges who in particular knew how Mr. Armetta and Aspira were being compensated, or that there was any written or oral agreement to pay them commissions or fees, after Mrs. Armetta became an employee of LCG and was no longer an outside consultant.  However, Plaintiffs allege that after Mrs. Armetta

6

became an employee of LCG, the prices Vertis offered LCG did not increase, but rather dropped. [*Id.*].

Over the course of the next three years, Plaintiffs allege that Mr. Armetta and Vertis were integral parties to the development and success of LCG's marketing department. [DA/Aspira Compl. at ¶ 32; CA Compl. at ¶ 30]. The Plaintiffs reference two February 2010 emails from Ms. DeWalt—the first asking Mr. Armetta for a proposal "for leading the creative strategy," and the second characterizing Mr. Armetta as "our senior creative strategist"—and further allege that Mr. Armetta was also introduced as a "senior creative strategist" at an LCG board meeting. [DA/Aspira Compl. at ¶¶ 36-37, 46; CA Compl. at ¶¶ 34-35, 44]. The Plaintiffs allege that Mr. Armetta was in continuous communication with members of the LCG marketing team, members of other LCG departments, and LCG contractors. [DA/Aspira Compl. at ¶ 45; CA Compl. at ¶ 43]. Moreover, the Plaintiffs allege that on numerous occasions after Mrs. Armetta became a full-time LCG employee, Mr. Armetta also attended meetings at LCG's headquarters in Michigan, and interacted with several members of the LCG management team as well as the Chairman of LCG's Board. [DA/Aspira Compl. at ¶ 46; CA Compl. at ¶ 44].

The Plaintiffs allege that although Mr. Armetta's work was being billed by Vertis, Ms. DeWalt and other senior management officers at LCG, including the CEO and the General Counsel, were aware that Mr. Armetta and Aspira continued to have a business relationship with LCG after Mrs. Armetta became a full-time employee; in fact, LCG encouraged this relationship. [DA/Aspira Compl. at ¶ 26;

CA Compl. at ¶ 24].  The Plaintiffs allege that over the course of Mr. Armetta and Mrs. Armetta's relationship with LCG, there were over 275 emails between LCG employees and Mr. Armetta and Aspira pertaining to the work product Mr. Armetta and Aspira were providing to LCG, and over 193 emails that included Mrs. Armetta and discussed Mr. Armetta's and Aspira's work.  [DA/Aspira Compl. at ¶ 57; CA Compl. at ¶ 56].  The Plaintiffs cite to an email exchange in which a "sneak peak at the Fall creative" email was forwarded by Mr. and Mrs. Armetta to Ms. DeWalt and then passed on to current LCG CEO Barbara Beck.  [DA/Aspira Compl. at ¶ 47; CA Compl. at ¶ 45].  Plaintiffs also allege that Mr. Young was included on "countless" emails discussing Mr. Armetta's work, including a February, 18, 2010 discussion about the use of trademarked material in LCG's advertising; a January 26, 2011 discussion about LCG's marketing with American Express; and a June 2, 2012 discussion about legal issues involved in using certain pieces of artwork for LCG's marketing materials.  [DA/Aspira Compl. at ¶¶ 27, 29; CA Compl. at ¶¶ 25, 27].  The Plaintiffs also point to emails that suggest other employees of LCG, including the then-Director of Digital Marketing and the Interactive Content Manager, worked directly with Mr. Armetta on marketing projects and were thus aware that Mr. Armetta was working for LCG.  [DA/Aspira Compl. at ¶¶ 48-49; CA Compl. at ¶¶ 46-47].  It was well known that Mr. and Mrs. Armetta were married.  [DA/Aspira Compl. at ¶¶ 46, 51-52; CA Compl. at ¶¶ 44, 49-50].  However, the Plaintiffs do not allege that Mrs. Armetta submitted a conflict of interest disclosure and waiver request to LCG's Ethics Compliance Officer as required by LCG's Code of Business Conduct and Ethics ("Code of Conduct"), or

8

that the LCG employees who knew of Mr. Armetta's work for the company were either responsible for administrating, or were aware of whether Mrs. Armetta had complied with, LCG's conflicts policy.

In November 2012 LCG learned that Vertis, with whom they had continued to contract, was being acquired out of bankruptcy by a competitor, Quad Graphics ("Quad").  Plaintiffs allege that both Mrs. Armetta and Ms. DeWalt were concerned that this acquisition would negatively affect the vendor's ability to provide high quality and reliable services.  [DA/Aspira Compl. at ¶ 40; CA Compl. at ¶ 38].  Plaintiffs also allege that during the acquisition, the printing quality did in fact begin to suffer, at which point Mrs. Armetta and Ms. DeWalt conducted a test-print run with another printing company, FCL Graphics ("FCL").  [DA/Aspira Compl. at ¶ 41; CA Compl. at ¶ 39].  Plaintiffs allege that at some point, LCG moved its printing and direct mail marketing work from Vertis to FCL.  [DA/Aspira Compl. at ¶ 34; CA Compl. at ¶ 32].  Plaintiffs allege that this decision was not Mrs. Armetta's, but rather that Ms. DeWalt, in consultation with LCG management, determined that LCG should retain FCL and end their business relationship with Vertis/Quad.  [DA/Aspira Compl. at ¶¶ 41-42; CA Compl. at ¶¶ 39-40].[1]

The Plaintiffs allege that on or around the same time period, many Vertis employees became employees of FCL.  [DA/Aspira Compl. at ¶ 41; CA Compl. at ¶ 39].  The Plaintiffs further allege that one of the Vertis employees who moved to

---

[1] Although the Plaintiffs cite to emails between LCG executives in support of their claim that LCG management, not Mrs. Armetta, was in charge of transitioning to and maintaining a business relationship with FCL, none of the correspondence offered is directly relevant to Plaintiffs' assertions. [DA/Aspira Compl. at ¶¶ 34-35, 42; CA Compl. at ¶¶ 32-33, 40].

FCL was Mr. Overlock, Mr. Armetta's long-time business contact. [DA/Aspira Compl. at ¶ 43; CA Compl. at ¶ 41]. As a result of this business relationship, Mr. Armetta entered into an agreement with FCL to provide the same services he had previously provided to Vertis. [*Id.*]. Plaintiffs allege that, following the same invoice structure that had been in place with Vertis, Mr. Armetta invoiced FCL, who would then invoice LCG for Mr. Armetta's services along with other FCL outside vendors and other services. [DA/Aspira Compl. at ¶ 44; CA Compl. at ¶ 42]. Plaintiffs allege that meanwhile, Ms. DeWalt requested that the entire Vertis team be brought to FCL with the exception of one employee, and insisted that Mrs. Armetta work to retain them for the benefit of LCG. [DA/Aspira Compl. at ¶ 43; CA Compl. at ¶ 41].

In August 2013, for reasons unknown to Plaintiffs, LCG initiated an internal investigation of Mrs. Armetta, Mr. Armetta, and Aspira. [CA Compl. at ¶ 53; DA/Aspira Compl. at ¶ 69]. LCG subsequently terminated Mrs. Armetta's employment on September 6, 2013 for violating LCG's Code of Conduct. [DA/Aspira Compl. at ¶ 54; CA Compl. at ¶ 63]. The Plaintiffs allege that the violation in question was Mrs. Armetta's supposed failure to disclose the potential conflict of interest created by her husband's position as a paid LCG vendor, and her subsequent use of Mr. Armetta's and Aspira's services in LCG's marketing campaigns. [DA/Aspira Compl. at ¶ 52; CA Compl. at ¶¶ 50, 95]. However, the Plaintiffs allege that at all times during her employment Mrs. Armetta acted at the direction of, with the explicit approval of, LCG's management, who had instructed her to work with Mr. Armetta and established

his compensation structure.  [DA/Aspira Compl. at ¶¶ 55-56; CA Compl. at ¶¶ 54-55].  The Plaintiffs further allege that LCG ignored "clear and convincing" evidence that the alleged conflict of interest was authorized or waived by LCG, failed to properly investigate the matter, and subsequently made false statements regarding the actions of Mrs. Armetta, Mr. Armetta, and Aspira.  [DA/Aspira Compl. at ¶¶ 54, 75; CA Compl. at ¶¶ 53, 75].

The Plaintiffs allege that during the course of the internal investigation, LCG made statements to Ms. DeWalt, by that time a former employee of LCG, regarding the allegedly improper conduct of Mrs. Armetta, Mr. Armetta, and Aspira.  [DA/Aspira Compl. at ¶ 66; CA Compl. ¶ 65].  The Plaintiffs also allege that during the investigation, statements were made to unidentified individuals that Mr. Armetta improperly gained financial benefits by violating LCG company policies.  [DA/Aspira Compl. at ¶ 70].  Moreover, the Plaintiffs allege that during the investigation unspecified statements were made to unidentified LCG employees, former LCG employees and vendors who commonly deal with LCG that Aspira improperly used its business relationship with LCG to overcharge LCG and to overpay Mr. Armetta in a manner that violated LCG's company policies.  [DA/Aspira Compl. at ¶¶ 79, 81].

The Plaintiffs further allege that on the day of Mrs. Armetta's termination, LCG falsely stated in her termination letter, which was placed in her employment file, that Mrs. Armetta was "engaged in business dealing [*sic*] that were egregious and direct violations of the Company's Code of Conduct."  [DA/Aspira Compl. at ¶ 64; CA Compl. at ¶¶ 63, 69-71].

The Plaintiffs speculates upon information and belief, the source and content of which they do not allege, that LCG also communicated by company-wide email an announcement of Mrs. Armetta's departure from LCG, and that said announcement may have been communicated to other third parties.  [DA/Aspira Compl. at ¶ 61; CA Compl. at ¶ 60].  Plaintiffs do not allege the content of the email or allege that it contained any false information.   The Plaintiffs also allege that LCG instructed all its employees to cease having any contact with Mrs. Armetta.  [*Id.*].  Mr. Armetta or Aspira further allege that LCG's statement that Mrs. Armetta "engaged in business dealing [*sic*] that were egregious and direct violations of the company's Code of Conduct" and LCG's instructions to cease contact with Mrs. Armetta had the effect of imputing Mrs. Armetta's wrongful conduct to Mr. Armetta and Aspira.  [DA/Aspira Compl. at ¶¶ 61, 64].

The Plaintiffs allege upon unspecified information and belief that this statement and/or similar statements were made by LCG executives to various unidentified LCG employees, vendors, and industry professionals.  [DA/Aspira Compl. at ¶¶ 72-73; CA Compl. at ¶ 72].  The Plaintiffs also variously allege LCG made unspecified statements about the allegations against Mrs. Armetta, Mr. Armetta and Aspira to "numerous individuals who are not employees of LCG and were not involved" in conducting the internal investigation.  [DA/Aspira Compl. at ¶ 59; CA Compl. at ¶ 58].  The only such individuals Plaintiffs identify include Ms. DeWalt (by then a former LCG employee), Mr. Overlock (formerly at Vertis, now at FCL), and Steve Flood (the former senior vice-president of operations and sales at Vertis and former CEO of FCL).  [*Id.*].  The Plaintiffs do not allege what

statements were made to DeWalt, Overlook and Flood, by whom or when.  The Plaintiffs also allege that, upon unspecified information and belief, an unidentified employee at LCG told an employee at FCL, Joe Lobosco, that Mrs. Armetta had been terminated as a result of an internal investigation that was initiated when a former LCG employee informed LCG of Mrs. Armetta's alleged misconduct, and that this statement was also conveyed to another FCL employee, Marissa Marinelli.  [DA/Aspira Compl. at ¶ 60; CA Compl. at ¶ 59].

The Plaintiffs categorically allege, without citation to particularized facts, that the statements made by LCG have tarnished Mrs. Armetta's personal reputation, lowered her coworkers' views of and esteem for her, severely limited her ability to market herself as a professional and obtain gainful employment within the industry, disparaged her trade, and diminished her future earning potential as an expert marketing professional.  [CA Compl. at ¶¶ 59, 64-66, 74]. The Plaintiffs also allege that the statements LCG made to Ms. DeWalt have defamed Mrs. Armetta's, Mr. Armetta's, and Aspira's name and reputation, and negatively impacted their future business prospects, by destroying their relationship with Ms. DeWalt.  [DA/Aspira Compl. at ¶ 66; CA Compl. at ¶ 65].   The Plaintiffs further allege that Mr. Armetta's and Aspira's reputations were tarnished as a result of statements made by LCG about their role in Mrs. Armetta's misconduct.  [DA/Aspira Compl. at ¶ 67, 74].  The Complaints do not cite any specific instances in which any of the Plaintiffs was scorned, denied a business opportunity or suffered any other harm as a result of the alleged comments.

The Plaintiffs do allege that as of November 2013, LCG refused to remit payment to FCL for services rendered by FCL,[2] including services provided by Mr. Armetta and Aspira in the sum of several hundred thousand dollars. [DA/Aspira Compl. at ¶ 53; CA Compl. at ¶ 51].  The Plaintiffs also allege that LCG breached its contract with Mrs. Armetta by refusing to remit a $50,000 bonus that they allege Mrs. Armetta earned for her work during the previous fiscal year which ended in June 2013.  [CA Compl. at ¶ 52].  The Plaintiffs allege that LCG's bonus policy states that if certain departments meet predetermined targets set by management, and LCG as a company achieves a specified level of earnings, employees are entitled to a bonus calculated as a percentage of their annual salaries.  [*Id.*].  Plaintiffs allege that Mrs. Armetta and LCG achieved these targets during the previous fiscal year ending June 2013.  [*Id.*].  Upon information and belief, LCG intended on paying bonuses for fiscal year 2013 during the first week of October 2013, the month after Mrs. Armetta was terminated.  [*Id.*].

III.    Standard of Review

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"

---

[2] FCL is not a party to this action, nor any other action in this district.

*Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  The Court may also consider

"matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

IV.   <u>Discussion</u>

A.  **Defamation**

Mr. and Mrs. Armetta both allege that Defendant LCG made numerous false statements claiming that they violated LCG company policy and engaged in misconduct, and that as a result of these false statements, Mr. and Mrs. Armetta's personal and professional reputations in the industry have been harmed. [DA/Aspira Compl., ¶¶ 68-76; CA Compl., ¶¶ 68-76].  Defendant moves to dismiss these claims on the ground that Mr. and Mrs. Armetta have both failed to sufficiently allege any defamatory statements, and that any statements that were made were within the course of LCG's internal investigation of Mrs. Armetta and are thus protected from liability under the intracorporate communications privilege.  [Dkt. #34, Defendant's Motion to Dismiss David Armetta and Aspira's First Amended Complaint (hereinafter "DA/Aspira MTD") at 5-8; Dkt. #37, Defendant's Motion to Dismiss Carlene Armetta's First Amended Complaint (hereinafter "CA MTD") at 6-10].

To establish a prima facie claim for defamation under Connecticut law, a plaintiff must demonstrate that: (1) the defendant published a defamatory

statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement.  *See Hopkins v. O'Connor*, 282 Conn. 821, 838 (2007); *Iosa v. Gentiva Health Services, Inc.*, 299 F. Supp. 2d 29, 37–38 (D.Conn. 2004).  In sum, "in order to state a claim for defamation, a plaintiff must allege that a defendant published false statements that harmed the plaintiff when the defendant was not otherwise privileged by law to do so." *Devone v. Finley*, 2014 WL 1153773, at *7 (D. Conn. Mar. 20, 2014).

Federal law, not Connecticut law, governs pleading in diversity cases. *Barbusin v. E. Connecticut State Univ.*, 2006 WL 1313337, at *1 (D. Conn. May 11, 2006) (citing *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir.1986)).  Thus, in a defamation case the liberal pleading standard of Fed. R. Civ. P. 8 is satisfied "if the complaint provides sufficient notice of the communications complained of to enable the defendant to prepare a defense." *Id.*  Although the Second Circuit does not require pleading of the exact defamatory words, a defamation complaint "must at least plead the content of the alleged communications, when they were made, the context in which they were made, or by and to whom they were made" to satisfy the requirements of notice pleading.  *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 109 (D. Conn. 2006); *see also Kloth v. Citibank (South Dakota), N.A.*, 33 F. Supp. 2d 115, 121 (D. Conn. 1998).

A defamation claim may be defeated by a showing that the defamatory statement is privileged.  The Connecticut Supreme Court has recognized that "communications between company managers regarding an employee's job

17

performance, or the preparation of documents regarding an employee's termination," are protected by such a privilege, known as the "intracorporate communications" privilege. *Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 234 Conn. 1, 29 (1995). When considering whether a defamatory statement is shielded by the intracorporate communications privilege, the Court must determine (1) whether the privilege applies, and (2) whether the privilege has been defeated through its abuse. *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 628 (2009). Specifically, the privilege may be defeated by a finding that the speaker acted with malice in publishing the defamatory statement. *Id.* at 630. The Connecticut Supreme Court has interpreted malice to include both actual malice—which requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false—and malice in fact, which is "sufficiently shown by proof that the publications were made with improper and unjustifiable motives." *Devone v. Finley*, 2014 WL 1153773, at *11 n. 7 (citing *Hopkins v. O'Connor*, 282 Conn. at 845).

"Whether a privilege is available for a particular communication is a question of law for the court . . . but whether the privilege is nevertheless defeated through its abuse is a question of fact for the jury." *Blake-McIntosh v. Cadbury Beverages, Inc.*, 1999 WL 464529, at *6 (D. Conn. June 25, 1999) (internal citations and quotations omitted). However, this does not shield all claims of defamation based on privilege from dismissal at the pleadings stage: if a defamation claim is based on statements that are, as pled, privileged, the plaintiff

must allege facts demonstrating malice in order to survive a motion to dismiss. *See Devone v. Finley*, 2014 WL 1153773, at *12 (dismissing defamation claim that, on its face, was entitled to a qualified privilege from defamation, where plaintiff failed to make any allegation of malice whatsoever within his complaint); *see also McClain v. Pfizer, Inc.*, 2008 WL 681481, at **7-8 and n. 2 (D. Conn. Mar. 7, 2008) (dismissing plaintiff's defamation claim because, *inter alia*, plaintiff failed to counter defendant's claim that the allegedly defamatory comments were subject to the intracorporate communications privilege).

### 1. Mrs. Armetta's Defamation Claim

The Court first considers the merits of Mrs. Armetta's allegations.  Liberally construed, Mrs. Armetta's defamation claim, which comprises paragraphs 1 through 76 of her Complaint, makes 8 allegations of defamatory statements by LCG. These are:

 i. statements made during the course of the internal investigation regarding her alleged misconduct to Ms. DeWalt, by then a former employee of LCG  [CA Compl. at ¶ 65];

 ii. a company-wide email announcing Mrs. Armetta's departure from LCG, the content of which Plaintiffs do not allege [*Id.* at ¶ 60];

 iii. the possible re-communication of this departure email to unidentified third parties [*Id.*];

 iv. LCG's instruction to all its employees that they cease having any contact with Mrs. Armetta  [*Id.*];

 v. statements in Mrs. Armetta's termination letter, which was copied to LCG's Chief of HR and placed in Mrs. Armetta's employment file, that Mrs. Armetta was "engaged in business dealing [*sic*] that were egregious and direct violations of the Company's Code of Conduct" [*Id.* at ¶¶ 69-71];

19

vi.     similar unspecified statements to various unidentified LCG employees, vendors, and industry professionals  [*Id*. at ¶ 72];

vii.    statements about the allegations against Mrs. Armetta to Ms. DeWalt, Mr. Overlock, Steve Flood and numerous other unspecified individuals who were not employees of LCG and not involved in conducting the internal investigation [*Id*. at ¶ 58]; and

viii.   statements by LCG to an employee at FCL, Joe Lobosco, which were subsequently relayed to another FCL employee, Marissa Marinelli, that Mrs. Armetta had been terminated as a result of an internal investigation that was initiated when a former LCG employee informed LCG of Mrs. Armetta's alleged misconduct  [*Id*. at ¶ 59].

The sufficiency of each of Mrs. Armetta's allegations is examined below.

i.    **Statements during the internal investigation regarding Mrs. Armetta's alleged misconduct to Ms. DeWalt**

In her Complaint, Mrs. Armetta alleges that "LCG spoke with Ms. DeWalt, who at the time was a former employee of LCG, during the course of the internal investigation, and made statements to her regarding the allegedly improper conduct of Mrs. Armetta . . ."  [CA Compl. at ¶ 65].  Mrs. Armetta's allegation regarding statements made to Ms. DeWalt must be dismissed, as the allegation does not sufficiently put LCG on notice of the basic elements of Mrs. Armetta's claim.  Rather than identify the content of any particular defamatory statements, Mrs. Armetta's Complaint refers only to a general topic of conversation— "statements regarding … allegedly improper conduct"—and as such, it fails to "provide sufficient notice of the communications complained of to enable the defendant to prepare a defense."  *Barbusin*, 2006 WL 1313337, at *1; *see also McClain v. Pfizer*, 2008 WL 681481, at *7 ("In as much as the allegations are topical rather than particular the notice pleading requirement is not satisfied.")

20

Furthermore, the Complaint explicitly alleges that LCG made these statements to Mrs. DeWalt in the course of LCG's internal investigation into Mrs. Armetta's performance of her employment duties. [CA Compl. at ¶ 65]. As pled, these statements fall squarely within the intracorporate communications privilege. As previously noted, "in order to state a claim for defamation, a plaintiff must allege that a defendant published false statements that harmed the plaintiff *when the defendant was not otherwise privileged by law to do so.*" *Devone v. Finley*, 2014 WL 1153773, at *7, *supra* (emphasis added). In determining whether a qualified privilege exists, Connecticut follows the Restatement of Torts. *Torosyan*, 234 Conn. at 29. The Restatement (Second) of Torts provides that "[a]n occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." Restatement 2d. Torts § 596. The Connecticut Supreme Court has found that such a common interest exists in determining whether an employee has violated his employer's policies and in communicating information to protect the interests of the company. *Torosyan*, 234 Conn. at 29. Here, statements made to a former employee in the course of a company investigation into one of her colleagues' conduct are squarely within the ambit of communications sufficient to invoke that privilege.

Mrs. Armetta nevertheless asserts that LCG's privilege was lost because this statement, and all of LCG's statements, were made "with malicious intent, as

LCG's total and reckless disregard for the truth in failing to properly investigate the potential conflict of interest resulted in them taking an adverse position against Mrs. Armetta that was contrary to the facts."  [CA Compl. at ¶ 75].  In fact, Mrs. Armetta argues that all of LCG's statements regarding her conflict of interest and subsequent termination were "contrary to the facts" because any conflict of interest she may have had was a conflict in name only and "clearly waived."  [*Id.* at ¶ 54].  She also argues that, in effect, LCG should be estopped from enforcing its conflicts policy against her, because LCG "courted and encouraged Mrs. Armetta and Mr. Armetta to work for LCG, then proceeded to establish the structure of Mr. Armetta's compensation… only to later terminate the relationship … on the basis of that structure while never admitting the fact that it was designed at LCG's explicit direction."  [*Id.* at ¶ 55].  LCG argues that Mrs. Armetta cannot argue that LCG acted in reckless disregard for the truth in reaching a conclusion that Mrs. Armetta admits is true—that is, that Mrs. Armetta's financial interest in, and marriage to, a vendor of LCG constituted a violation of LCG's policy, and that Mrs. Armetta failed to disclose this conflict as required by LCG's Code of Conduct.  [CA MTD at 10-11].

The Court agrees that Mrs. Armetta has not adequately pled malice with regard to any of LCG's alleged statements.  Mrs. Armetta's vague and conclusory allegations fail to assert facts tending to show that LCG believed its determination that Mrs. Armetta had violated company policies was unfounded. Mrs. Armetta's Complaint effectively concedes that she was covered by LCG's conflicts policy, which required her to disclose to LCG's Ethics Compliance

Officer the conflict of interest resulting from her husband's work for LCG.  [CA Compl. at ¶¶ 8, 53-54].  However, Mrs. Armetta's Complaint disregards without disavowing the fact that Mrs. Armetta failed to comply with this policy.  [*Id.*]   Mrs. Armetta's complaint also alleges that she was told that Mr. Armetta needed to submit a statement of work and a proposed contract to continue working with LCG after Mrs. Armetta became an employee of LCG.  [*Id.* at ¶ 23].  However, Mrs. Armetta does not allege that she complied with these requirements; instead, she alleges that Mr. Armetta entered into a contract with LCG's vendor Vertis and submitted invoices for his work through that vendor, apparently concealing the capacity in which he was working on LCG matters and the way he received compensation for that work.  [*Id.* at ¶ 28].

Furthermore, Mrs. Armetta fails to allege any facts that would allow the Court to find that her duty to disclose her conflict of interest, or the conflict itself, was knowingly waived by LCG.  "Waiver is the intentional relinquishment or abandonment of a known right or privilege."  *C.R. Klewin Ne., LLC v. City of Bridgeport*, 282 Conn. 54, 87 (2007).  The general rule of waiver "is that a party for whose benefit a provision in a contract is intended may waive his rights under such provision."  *Lanna v. Greene*, 175 Conn. 453, 458 (1998).  However, only the party who benefits from or is protected by the right may waive that right.  *See* 28 Am.Jur.2d 662, Estoppel and Waiver § 196 (2011).  Where, as here, the party is a corporation acting through its agents, "[i]t is a familiar and acknowledged principle of the law of agency that . . . an agent cannot bind his principal beyond the limits of his authority by contract, estoppel, or waiver, to those who know the

limitations of his power." *Gustave Fischer Co. v. Morrison*, 137 Conn. 399, 402

(1951) (internal quotation and citation omitted).

It is clear from the language of LCG's Code of Conduct that the corporate

agent vested with the authority to approve and therefore waive conflicts of

interest on behalf of LCG was its Ethics Compliance Officer:

> "<u>Unless approved in advance by the Ethics Compliance Officer</u>,
> neither an employee nor his or her spouse . . . may directly or
> indirectly have a financial interest (whether as an investor, lender,
> employee, or other service provider) in a competitor, customer, or
> supplier if that employee or his/her subordinates deal directly or
> indirectly with that customer or supplier in the course of his/her
> business with the Company.
>
> Employees with actual or apparent conflict(s) of interest <u>are required</u>
> <u>to make full disclosure to the Company's Ethics Compliance Officer.</u>
> <u>The Ethics Compliance Officer will review each disclosure on a case</u>
> <u>by case basis and make a determination</u> as to which conflict [sic]
> warrant a waiver."

[CA MTD at Ex. B].[3]  However, nowhere in her Complaint does Mrs. Armetta allege

that the Ethics Compliance Officer, listed in the policy as Chief Human Resources

Officer Mr. Smith, knew about the conflict and waived it or Mrs. Armetta's duty to

---

[3] The Defendant attached a copy of the Code of Conduct, which is part of the LCG
Employee Handbook, to its motion papers.  [CA MTD at Ex. B]. The Court may
consider a document outside of pleadings on a motion to dismiss if "[1] there
was undisputed notice to plaintiffs of [the document's] contents and [2] [the
document] was integral to plaintiffs' claim." *Degrooth v. Gen. Dynamics Corp.*,
837 F. Supp. 485, 487 (D. Conn. 1993) *aff'd*, 28 F.3d 103 (2d Cir. 1994) (quoting
*Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991)). This
test is satisfied here.  First, Mrs. Armetta concedes the existence and applicability
of the Code of Conduct in her Complaint, and is therefore found to be on notice of
its contents.  [CA Compl. at ¶¶ 4, 8, 53-54].  The copy of the Code of Conduct
submitted by Defendant also appears to be signed by Mrs. Armetta.  [CA MTD at
Ex. B].  Second, the Code of Conduct is integral to Mrs. Armetta's Complaint: all
of Mrs. Armetta's claims pertain in some way to Defendant's interpretation and
application of its Code of Conduct.

disclose it.[4]  Nor does Mrs. Armetta allege any facts suggesting that the people who were aware that Mr. Armetta continued to produce work for LCG through Vertis and FCL had the authority to waive Mrs. Armetta's duties under the policy or any conflict disclosed pursuant to the policy: all of the other individuals Mrs. Armetta identifies in her complaint are employees and executives whose primary work pertained to the marketing and business aspects of LCG, not compliance. [CA Compl. at ¶¶ 24-25, 34-35, 43-47].  Furthermore, Mrs. Armetta does not (and cannot) allege that she believed in good faith that any of these individuals did have such authority, in light of the fact that she admits she was told that Mr. Armetta required a contract for his work, and in light of the fact that she was aware the Code of Conduct required written disclosure of his involvement to a particular officer within the company.  [*Id.* at ¶¶ 23; 53-54].

Mrs. Armetta also fails to allege any facts that would estop LCG as a corporation from enforcing its conflicts policy.  "[A]ny claim of estoppel is

---

[4] The only facts Mrs. Armetta offers regarding Mr. Smith's awareness of Mr. Armetta and Aspira's relationship with LCG are by reference to an email Mrs. Armetta alleges she received at the beginning of her tenure as a full-time LCG employee. [CA Compl. at ¶ 23].  Even making all reasonable inferences in favor of the Plaintiff, the email suggests only that Mr. Smith was aware that Mr. Armetta and Aspira were working on a project with LCG at the time Mrs. Armetta was hired, and that they were to continue work on that project subject to Mr. Armetta's submission of a statement of work and cost for his time.  [*Id.*].  Although Mrs. Armetta conclusorily alleges that this email "illustrates that . . . Mr. Smith . . . [was] not only aware that Mr. Armetta and Aspira had a business relationship with LCG, which continued after Mrs. Armetta became an employee, but also that the relationship was encouraged by LCG," the Complaint does not offer any facts to support the conclusion that Mr. Smith was aware of the fact that Mr. Armetta and Aspira ultimately continued to work with LCG through Vertis and FCL after the date of this email, or that Mr. Smith represented to Mrs. Armetta that he was waiving any conflict of interest with regards to that arrangement on behalf of LCG.  [*Id.* at ¶ 24].

predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury." *Kimberly–Clark Corp. v. Dubno*, 204 Conn. 137, 148 (1987). The person claiming estoppel "must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." *Id.* As in the context of waiver, a corporation can only be estopped when the action in question has been induced by a duly authorized agent. *See Gustave Fischer Co.*, 137 Conn. at 402, *supra*.

Once again, Mrs. Armetta does not allege any facts suggesting that the Ethics Compliance Officer, or any other LCG official with actual or apparent authority to waive the conflict, represented to her that the conflict was waived and induced her to act in reliance on such waiver. While she alleges that she acted "at the direction of, [and] with the explicit approval of, LCG's management," there is nothing in Mrs. Armetta's Complaint to indicate that any of those superiors, including Ms. DeWalt, had the authority to endorse, approve or excuse Mrs. Armetta's conflict of interest sufficient to bind LCG under an estoppel theory. Nor does Mrs. Armetta allege that she exercised due diligence to determine whether any of these individuals had waiver authority, or that she had no way of determining who did in fact have that authority. In fact, the "true state of things" was explicitly set forth in the Code of Conduct contained within her

Employee Handbook.  Furthermore, nowhere in her Complaint does Mrs. Armetta

allege that Ms. DeWalt, or other people who knew of Mr. Armetta's work for LCG,

were actually aware that she had not complied with the policy.

In sum, Mrs. Armetta's Complaint fails to allege facts tending to show that

LCG published statements about Mrs. Armetta's actions despite the fact that they

believed the accusations were false, and as a result, fails to allege malice.  Where

a defamation claim is based on statements that are, as pled, privileged, and the

plaintiff does not adequately allege facts demonstrating malice, the claim will be

dismissed.  *See Devone v. Finley*, 2014 WL 1153773, at *12, *supra*; *McClain v.

Pfizer, Inc.*, 2008 WL 681481, at **7-8 and n. 2, *supra*.  Accordingly, Mrs. Armetta's

defamation claim is dismissed as to this statement.

ii.  The company-wide email announcing Mrs. Armetta's departure

Mrs. Armetta alleges that "[u]pon information and belief, LCG

communicated by company-wide email an announcement of Mrs. Armetta's

departure from LCG. . ."  [CA Compl. at ¶ 60].  This allegation is also plainly

deficient and fails to state a claim for defamation.  The Complaint does not put

forth any facts about the content of the email announcement.  Instead, Mrs.

Armetta alleges that "insofar as LCG employees (and external parties privy to the

announcement) were told that Mrs. Armetta was on administrative leave and may

have been aware that the administrative leave included an internal investigation,

said parties may [have] deduce[d]" that Mrs. Armetta's termination was pursuant

to a finding that she had acted improperly.  [*Id.*].  However, Mrs. Armetta does not

allege that the company-wide email disclosed the fact that Mrs. Armetta was

being placed on leave or that this leave was pursuant to a finding of wrongdoing.[5]
Plaintiff cannot use a chain of assumptions to carry her claim across the "line
between possibility and plausibility."  *Iqbal*, 556 U.S. at 678.  As such, these
allegations cannot sustain a claim of defamation and must be dismissed.

   iii. The possible re-communication of the departure announcement to
        unidentified third parties

   Mrs. Armetta also speculatively claims that the departure announcement
"may have been communicated to other third-parties."  [CA Compl. at ¶ 60].  This
portion of the claim must also be dismissed, not only because the content of the
departure announcement is vaguely pled, but because the basic fact of its re-
communication is utterly conjectural.  Mrs. Armetta does not allege that the
departure email was re-communicated, nor does she identify which third parties
might have received the email and in what context they might have received it, if
they received it at all.  Instead, Mrs. Armetta merely alleges that she received an
email from a former colleague who wrote, "The announcement just came out that
you have left LCG! I am sad to see you go and hope this is a good thing for you.
You are an incredibly talented and professional woman…"  [*Id.* at ¶ 62].  While
this email suggests that at least one third party was *aware* that Mrs. Armetta had

---

[5] Mrs. Armetta alleges that after the announcement, she received emails from her
LCG colleagues stating, among other things, "just checking in to make sure your
[*sic*] OK," "thinking of you and hope you are OK," and "just wanted to check how
are you doing…and…haven't been able to stop thinking about everything.  I know
that you are strong and will get through this just fine."  [CA Compl. at ¶ 61].  She
makes no allegation that these comments were made in reaction or reference to
defamatory statements within the departure email, but merely that the colleagues'
remarks demonstrated that they "were clearly aware of the situation that Mrs.
Armetta and Mr. Armetta were subjected to, as a result of the improper actions
taken by LCG."  [*Id.*].  This fact is irrelevant to a defamation claim.

left LCG, it does nothing to cure the central deficiencies of Mrs. Armetta's pleading, namely whether LCG actually communicated this information—in the form of a departure announcement or otherwise—to third parties, and what defamatory statements, if any, were made within it.  In fact, the quoted email seems to defeat all of Mrs. Armetta's claims about the content of the departure email: the statement ". . . hope this is a good thing for you" suggests that the email, if received, was not disparaging.

### iv. The statement instructing all LCG employees to cease contact with Mrs. Armetta

Mrs. Armetta also claims that LCG defamed her by "instruct[ing] all of its employees to cease having any contact with Mrs. Armetta whatsoever" in the wake of her departure.  [CA Compl. at ¶ 60].  Defendant LCG does not specifically address this allegation, instead putting forth a general argument that all of LCG's communications to its employees regarding Mrs. Armetta are shielded by the intracorporate communications privilege because they were made in the context of Mrs. Armetta's termination, and that to the extent Mrs. Armetta alleges statements made outside the scope of the privilege, the allegations fail because they are not sufficiently pled.  [CA MTD at 8-9].

As an initial matter, the Court finds that the complaint does not allege that LCG's instruction to its employees contained an assertion of fact.   In addition, the claim as alleged does not provide sufficient content or context to establish whether it was defamatory.  However, to the extent that facts are alleged, they suggest that such a statement would be covered by the intracorporate privilege.

An employer's statement to employees instructing them to cease contact with a terminated employee is a statement that appears to have been made to protect the company's interests in the context of an internal investigation into a possible violation of company policy and/or the termination of Mrs. Armetta.  As discussed above, Mrs. Armetta has not adequately pled that LCG acted with malice in making its statements; thus, her defamation claim as to this statement is dismissed.

> v. **Statements in Mrs. Armetta's termination letter citing the reason for her termination**

Mrs. Armetta alleges that on September 6, 2013, LCG falsely stated that she had "engaged in business dealing [*sic*] that were egregious and direct violations of the Company's Code of Conduct," and "published the statement by including it in a termination letter, which … was copied to Scott Smith, Chief of Human Resources at LCG [and] plac[ed] in Mrs. Armetta's employment file."  [CA Compl. at ¶¶ 69-71].  LCG argues that the statements in Mrs. Armetta's employment file, which were made in the course of effectuating her termination, are clearly protected by the intracorporate communications privilege, and furthermore, that they were not false, and thus could not have been stated with malice.  [CA MTD at 7-8, 10-11].

The Court finds that the statements in Mrs. Armetta's termination letter, as alleged, are covered by the intracorporate communication privilege, and that, consistent with the analysis above, Mrs. Armetta has not pled malice sufficient to

defeat that privilege.  Accordingly, Mrs. Armetta's defamation claim as to this statement must be dismissed.

> ### vi.  Similar unspecified statements to various unidentified LCG employees, vendors, and industry professionals

Mrs. Armetta further alleges that the statements contained in her termination letter "and/or similar statements have been made by LCG executives to various LCG employees and/or related individuals, vendors, print and marketing industry professionals, and other third parties…" [CA Compl. at ¶ 72]. These allegations once again fail to put LCG on notice of the basic elements of Mrs. Armetta's claim or provide sufficient notice to enable LCG to determine the applicability of any defenses.  They do not adequately identify who made the statements, to whom the statements were made, the context in which they were made, or their timing.  Accordingly this portion of Mrs. Armetta's Complaint is also dismissed.

> ### vii. Statements about the allegations against Mrs. Armetta to Ms. DeWalt, Mr. Overlock, Mr. Flood, and numerous other third parties not involved in the investigation

Mrs. Armetta alleges that "numerous individuals who are not employees of LCG and were not involved in LCG management's conduct of the internal investigation have been made aware of the allegations by LCG against Mrs. Armetta . . . includ[ing] Ms. De Walt (former Chief Marketing Officer of LCG), Kevin Overlock (a former employee of Vertis, now an employee at FCL), and Steve Flood (former senior V.P. of operations and sales at Vertis, and former C.E.O. of FCL)."  [CA Compl. at ¶ 58].  Once again, these conclusory allegations fail to

identify the content, speaker, context or timing of any particular defamatory statements.  Furthermore, Defendant contends that the named individuals were spoken to as part of its investigation, a fact which the Plaintiffs do not challenge in their Opposition to the Motion to Dismiss.  [CA MTD at 8].  This claim is dismissed.

### viii. Statements about the reason for Mrs. Armetta's termination to FCL employees

Mrs. Armetta also alleges that "an employee of LCG communicated to Mr. Joe Lobosco and then conveyed to Ms. Marissa Marinelli (both employees at FCL) that Mrs. Armetta had been terminated as a result of an internal investigation that was initiated when a former LCG employee informed LCG of Mrs. Armetta's alleged misconduct."  [CA Compl. at ¶ 59].  Defendant also fails to specifically address this claim in its opposition, but argues that "[t]o the extent Mrs. Armetta alleges that defamatory statements were made to persons outside the scope of LCG's investigation of her conduct, these allegations fail because they have not been plead [sic] with sufficient particularity . . . Mrs. Armetta does not identify any particular individual outside of the scope of the investigation that made or heard the statements, nor does she allege what was supposedly said."  [CA MTD at 9].

Although the Court notes that Mrs. Armetta does identify at least one person who heard the alleged statement from an LCG employee—that is, Joe Lobosco—and that this communication does not appear to be privileged on its face, Mrs. Armetta's failure to allege any facts relating to the identity of the speaker makes it impossible to determine whether LCG is liable for this statement

under principles of *respondeat superior*.  An employer is only liable for the

defamatory conduct of an employee if the employee was acting within the scope

of his employment.  50 Am. Jur. 2d Libel and Slander § 342; *see, e.g.*, *Woods v.*

*Connection, Inc.*, 2012 WL 1592162, at **5-6 (Conn. Super. Ct. Apr. 11, 2012).  The

Complaint does not offer any facts to suggest that this anonymous employee

made his or her statement to Mr. Lobosco in the course of his or her employment

with LCG, and as a result, the claim as against LCG must be dismissed.

### 2.  Mr. Armetta's Defamation Claim

The Court next turns to Mr. Armetta's allegations that LCG made:

i.    statements during the course of the internal investigation regarding his
      alleged misconduct to Ms. DeWalt, a former employee of LCG
      [DA/Aspira Compl. at ¶ 66];

ii.   statements about the allegations against Mr. Armetta to numerous other
      individuals who were not employees of LCG and who were not involved
      in conducting the internal investigation, including Mr. Overlock and
      Steve Flood  [*Id.* at ¶ 59].

iii.  statements during the investigation that Mr. Armetta improperly gained
      financial benefits by violating LCG company policies [*Id.* at ¶ 70]; and

iv.   statements about Mrs. Armetta's misconduct that had the effect of
      imputing her actions to Mr. Armetta  [*Id.* at ¶¶ 61, 64].

The sufficiency of each of Mr. Armetta's allegations is examined below.

i.    Statements during the internal investigation regarding Mr. Armetta's
      alleged misconduct to Ms. DeWalt

In his Complaint, Mr. Armetta echos Mrs. Armetta's allegation that "LCG

spoke with Ms. DeWalt, who at the time was a former employee of LCG, during

the course of the internal investigation, and made statements to her regarding the allegedly improper conduct of . . . Mr. Armetta . . ." [DA/Aspira Compl. ¶ 66]. In turn, the Court reiterates its finding that this allegation is devoid of meaningful content and does not put LCG on sufficient notice of the elements of the claim or the applicability of any defenses or privileges. Mr. Armetta's claim as to this statement is dismissed.

    ii.  **Statements about the allegations against Mr. Armetta to Mr. Overlock, Mr. Flood, and numerous other third parties not involved in the investigation**

    Mr. Armetta also repeats Mrs. Armetta's allegations that "numerous individuals who are not employees of LCG and were not involved in LCG management's conducting of the internal investigation have been made aware of the allegations by LCG against . . . Mr. Armetta . . . includ[ing] Ms. De Walt (former Chief Marketing Officer of LCG), Kevin Overlock (a former employee of Vertis, now an employee at FCL), and Steve Flood (former senior V.P. of operations and sales at Vertis, and former C.E.O. of FCL)." [DA/Aspira Compl. at ¶ 58]. Once again, these allegations are conclusory and fail to identify the content, speaker, context or timing of any particular defamatory statements. They are dismissed.

    iii.  **Statements during the investigation that Mr. Armetta improperly gained financial benefits by violating LCG company policies**

    Mr. Armetta alleges that during the investigation, "statements were made that Mr. Armetta improperly gained financial benefits by violating LCG company policies." [DA/Aspira Compl. at ¶ 70]. The Complaint fails to allege who made the statements or who heard them, making it impossible for Defendant to determine

the applicability of the intracorporate communications privilege or any defense. Although later in his complaint Mr. Armetta alleges that "upon information and belief, false and defamatory statements have been made to Mr. Overlock, Mr. Flood, Mr. Marinelli, Ms. DeWalt, and Mr. Lobosco, among other LCG employees and former employees, vendors, industry professionals, and other third parties," there is nothing that would enable the Court to infer that these two allegations are connected in any way.  [DA/Aspira Compl. at ¶ 73].  Mr. Armetta's claim as to these statements must therefore be dismissed as well.

iv.    Imputed statements about Mrs. Armetta's misconduct

In his Complaint, Mr. Armetta alleges that when LCG falsely stated that Mrs. Armetta had "engaged in business dealing [sic] that were egregious and direct violations of the Company's Code of Conduct," the statement, "without expressly saying so, attribute[d] the wrongful conduct to not just Mrs. Armetta, but also to Plaintiffs." [DA/Aspira Compl. at ¶ 64].  Defendant LCG argues that alleged defamatory statements about Mrs. Armetta cannot support a defamation claim by Mr. Armetta.  [Dkt. #41, Defendant's Reply to David Armetta and Aspira's Opposition to Defendant's Motion to Dismiss (hereinafter "DA/Aspira Reply") at 2].  The Court agrees.  To establish a prima facie case of defamation, a plaintiff must allege a defamatory statement that identifies *the plaintiff* to a third party. *See Simms v. Seaman*, 308 Conn. 523, 547-48 (2013) (quoting *Gambardella*, 291 Conn. at 627-28).  Where the defamatory statement is not made about the plaintiff, the defamation claim must fail.  *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 355-56 (2001).  Indeed, the Connecticut Supreme Court has observed that proving

35

that a defamatory statement was made "of and concerning" the plaintiff is a constitutional prerequisite to recovery for defamation.  *Id.* at 356 n. 14 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 267 (1964) and *Rosenblatt v. Baer*, 383 U.S. 75, 80-82 (1966)).  Although a defamatory statement may be "of and concerning" the plaintiff even though on its face it refers to another person, more is required than a mere pleading of defamation by association; rather, a reasonable recipient must understand that the defamatory statement is "in substance, actually about" the third party.  *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 399 (2d. Cir. 2006); *see also QSP, Inc.*, 256 Conn. at 356 (quoting Restatement (Second), Torts § 564 and comment (a) (1976) ("[a] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer").

Here, Mr. Armetta fails to plead any facts suggesting that when LCG articulated the reasons for Mrs. Armetta's termination in her termination letter, LCG was actually referring to Mr. Armetta.  Nor is it plausible that anyone would reasonably believe that this letter to Mrs. Armetta, describing her violations of LCG company policy, was in fact about Mr. Armetta, a non-employee.  Mr. Armetta's claim that his reputation in the industry has been harmed as a result of LCG's statements about Mrs. Armetta is insufficient to satisfy the "of and concerning" requirement.  Injury is not the touchstone of this standard.  *See Kirch,* 449 F.3d at 398 ("a false disparaging statement about IBM, for example, would not, we think, ordinarily be a defamatory statement "of and concerning" all

of IBM's suppliers, employees and dealers, however much they may be injured as a result.")

Accordingly, the Defendant's Motion to Dismiss Mrs. Armetta's defamation claim is GRANTED in its entirety.  The motion to dismiss Mr. Armetta's defamation claim is also GRANTED in its entirety.

B.  Commercial Disparagement  (as to Aspira)

Plaintiff Aspira alleges that during LCG's internal investigation, "statements were made that Aspira improperly used its business relationship with LCG to overcharge LCG and overpay Mr. Armetta in a manner that violated LCG's company policies . . . to a number of LCG employees, past LCG employees such as Ms. DeWalt, and to vendors who commonly deal with LCG, Mr. Armetta, and Aspira." [DA/Aspira Compl. ¶¶ 79, 81].  Aspira further alleges that "such false statements have harmed the business reputation of Aspira and have caused damage to future business opportunities for Aspira." [*Id.* at ¶ 82].  Defendant LCG argues that Plaintiffs have failed to adequately plead who made the statements and what, particularly, was said, and that therefore this claim should be dismissed for the same reason as Plaintiffs' defamation claim.  [DA/Aspira MTD at 8-9].

In Connecticut, commercial disparagement is "akin to the torts of injurious falsehood and slander of title."  *Doctor's Associates, Inc. v. QIP Holder LLC*, 2010 WL 669870, at *24 (D. Conn. Feb. 19, 2010), quoting *Valtec Int'l, Inc. v. Allied*

*Signal Aerospace Co.*, 1997 WL 288627, at \*6 (D. Conn. Mar. 7, 1997).[6]  To prove commercial disparagement, the plaintiff must establish 1) publication of a statement of fact that casts doubt upon the quality, utility or value of the plaintiff's products or services; 2) the falsity of the statement; 3) that the statement was made with malice; and 4) that special damages were incurred as a result of the statement.  1 D. Pope, Connecticut Actions and Remedies: Tort Law (1996) §§ 13:03–04, pp 13-6–13-7; *see, e.g., Rogers Corp. v. Arlon, Inc.,* 855 F. Supp. 560, 571 (D. Conn. 1994).

The allegation of special damages is a necessary element of this category of torts.  *See, e.g., Nat'l Distrib. Sys., Inc. v. Steinis*, 1999 WL 476686, at \*2 (Conn. Super. Ct. June 25, 1999) (holding that trade libel and injurious falsehood causes of action require the pleading of special damages).  To establish special damages, the plaintiff must show that he suffered economic loss that was proximately caused by the disparaging statements.  *See, e.g., Wilcox v. Schmidt*, 2010 WL 2817490, at \*12 (Conn. Super. Ct. Jun. 3, 2010).  In the context of a commercial disparagement claim, this means that a plaintiff must show "pecuniary loss that has been realized or liquidated, such as lost sales, or the loss of prospective contracts with customers," and establish that the allegedly disparaging communication played a substantial part in inducing others not to deal with him.  53 C.J.S. Libel and Slander § 322 (June 2014).

---

[6] The term "trade libel" has also been applied to cases involving the disparagement of the quality, utility or value of another's products or services.  1 D. Pope, Connecticut Actions and Remedies: Tort Law (1996) §§ 13:03-04, pp 13-6 – 13-7; *see, e.g., QSP, Inc.,* 256 Conn. at 358 (2001) ("Defamation or disparagement of a business' goods and services may be considered trade libel").

The Court finds that Aspira has not adequately pled a statement sufficient to establish a commercial disparagement claim, but for a different reason than that posited by Defendant.  Although commercial disparagement is considered a "species of defamation," it differs from it in that "where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies . . . But where, however, the statement is confined to denigrating the quality of the business, goods or services, it could support an action for disparagement ." *QSP, Inc.,* 256 Conn. at 359 n. 15 (internal quotation marks and citation omitted).  The alleged statement that "Aspira improperly used its business relationship with LCG to overcharge LCG and overpay Mr. Armetta" goes to Aspira's integrity and reputation, not the quality or value of its services.  As such, it does not state a claim for commercial disparagement.

Aspira has also failed to adequately allege special damages.  Although the Court need not reach this issue, it will be addressed for completeness.   Aspira's allegations that LCG's statements harmed Aspira's business reputation and have caused damage to Aspira's future business opportunities are too vague and imprecise to rise above speculation.  Read liberally, the most specific statement articulated in the Complaint regarding any actual economic loss suffered by Aspira is that the defamatory statements "have negatively impacted [Mrs. Armetta's, Mr. Armetta's, and Aspira's] future business prospects as a result of destroying the working relationship that existed between Ms. DeWalt and Mrs. and Mr. Armetta."  [DA/Aspira Compl. at ¶ 66].  The Complaint does not allege facts that would enable the Court to discern how the breakdown of this

relationship has proximately led to "pecuniary loss that has been realized or liquidated."  The Complaint fails to plead any particular business opportunity it lost as a result of the statement, or to identify any actual lost sales, contract or customer proximately caused by any statement alleged.  Defendant's Motion to Dismiss Aspira's claim for commercial disparagement is GRANTED.

### C.  Breach of Contract (as to Mrs. Armetta)

Mrs. Armetta alleges that the Defendant's failure to pay her a $50,000 bonus constitutes a breach of contract.  [CA Compl. at ¶ 78].  The Defendant moves to dismiss this claim on the grounds that under LCG's bonus policy bonuses are discretionary, and that according to the language of the policy, Mrs. Armetta was not eligible for a bonus because she was terminated before bonus payments were distributed.  [CA MTD at 11].  Although Mrs. Armetta concedes that LCG's policy was for "discretionary bonuses," she maintains that "Defendant's bonus policy details a specific set of objectives that must be achieved to become eligible for the bonus . . . . The preconditions regarding performance . . . were satisfied, and therefore Armetta was contractually entitled to receive her performance bonus."  [CA Compl. at ¶ 52].

To establish a breach of contract claim, a plaintiff must allege "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."  *Hawley Avenue Assoc., LLC v. Robert D. Russo, M.D. & Assoc. Radiology, P.C.*, 130 Conn.App. 823, 832 (2011).  Mrs. Armetta asserts that an agreement existed between her and LCG regarding bonus payments.  [CA Compl. at ¶¶ 77-87].  Mrs. Armetta also alleges that she performed

under the terms of LCG's policy by achieving the predetermined targets established therein, and that LCG has breached its agreement to compensate her accordingly.  [*Id.*]  Defendant argues that Mrs. Armetta did not fully perform under the policy because she was not an employee on the day bonus payments were distributed, as required to maintain her eligibility.  [CA MTD at 11].

The Court agrees that under the terms of the bonus policy, Mrs. Armetta was disqualified from eligibility to receive a bonus when LCG terminated her employment for violating its Code of Conduct.  According to the bonus policy, "[a]ny participant, whose employment is terminated . . . before bonus payments are distributed, is not eligible for a bonus payment."  [CA MTD at Ex. D].[7]  Mrs. Armetta admits that she was terminated before bonus payments were distributed, and consequently she has not established that she fully performed on the contract.  [CA Compl. at ¶¶ 52-53].

The Court notes that the sustainability of Defendant's position rests on the validity of Defendant's termination decision; however, Mrs. Armetta has not adequately pled that Defendant improperly prevented her from performing on the contract and should therefore be estopped from asserting her nonperformance as a defense to her claim of breach.  Instead, Mrs. Armetta only claims, in a conclusory fashion, that "LCG implicitly and explicitly directed Mrs. Armetta, as an LCG employee, to undertake all of the stated actions with regard to Mr.

---

[7] **The Defendant attached a copy of the bonus policy to its motion papers.  [CA MTD at Ex. D]. The Court may consider this document at the pleadings stage because by Mrs. Armetta's own admission, her bonus payment is governed by this policy and its terms are clearly integral to her Complaint.  *See Degrooth v. Gen. Dynamics Corp.*, 837 F. Supp. at 487, *supra* at n. 3.**

Armetta and Aspira, and is now estopped from denying the existence of the Bonus Contract." [CA Compl. at ¶ 82]. To establish a viable estoppel claim a plaintiff must show that 1) the party against whom estoppel is claimed did or said something calculated or intended to induce another party to believe that certain facts existed and to act on that belief; and 2) the other party changed its position in reliance on those facts, thereby incurring some injury. *Kimberly–Clark Corp.*, 204 Conn. at 148, *supra*. Mrs. Armetta's claim that she is owed a bonus payment does not put forth sufficient facts to sustain such a cause of action. Defendant's Motion to Dismiss Mrs. Armetta's breach of contract claim is GRANTED. The Court grants Mrs. Armetta leave to replead a viable claim within 14 days of the date of this Decision.

### D.  Wrongful termination (Mrs. Armetta)

Mrs. Armetta alleges that Defendant wrongfully terminated her for following her supervisor's instructions to retain Mr. Armetta and Aspira for various projects, and that her pretextual termination violates public policy. [CA Compl. at ¶¶ 92-96]. Defendant moves to dismiss this claim on the ground that LCG was in its right to terminate Mrs. Armetta, an at-will employee, for no reason and at any time, and that Mrs. Armetta has failed to adequately allege that her termination violated an important public policy sufficient to defeat the at-will employment rule. [CA MTD at 12-13].

At common law, an employer may terminate an at-will employee for "any reason, or no reason, at any time without fear of legal liability." *Thibodeau v. Design Grp. One Architects, LLC*, 260 Conn. 691, 697-98 (2002). However, the

Connecticut Supreme Court has carved out a narrow cause of action for wrongful discharge "in situations in which the reason for the discharge involved impropriety derived from some important violation of public policy." *Id.* at 698 (citing *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471 (1980)).  To determine whether a public policy exception applies, courts consider "whether the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy."  *Id.* at 699.

Mrs. Armetta admits that she was an at-will employee at LCG.  [CA Compl. at ¶ 79].  However, she contends that her termination violated public policy by contravening "the public's interest to prevent [*sic*] employers from terminating employees for nothing more than following the direction of their supervisors, particularly when the employer's intent is to deprive the employee of a benefit that had already been promised and earned, such as with Mrs. Armetta's bonus payment."  [*Id.* at ¶ 96].  She alleges that "at no time prior to August 2013 did any employee of LCG raise the issue of a potential conflict of interest due to Mr. Armetta's position as a paid vendor and as Mrs. Armetta's husband," and then Defendant proceeded to "unfairly and deceptively use[ ] the alleged conflict of interest as a pretext for terminating Mrs. Armetta without paying her the just compensation…" [CA Compl. at ¶¶ 50, 102].  Defendant argues that Mrs. Armetta has failed to articulate an important public policy, and that "[t]his case involves a private employment dispute in which . . . the employee contends that her

termination was unfair because some people at the company allegedly knew she had a conflict of interest and did not object."  [CA MTD at 13-14].

The Court disagrees with Defendant's characterization of Mrs. Armetta's allegations and finds that Mrs. Armetta's Complaint articulates a public policy: to wit, a policy against the pretextual termination of employees to avoid paying out a bonus.  Indeed, Connecticut courts have allowed wrongful discharge claims to proceed where employees claimed that they were terminated by employers to avoid paying wages or other compensation that would have accrued.  *Leue v. Computer Sciences Corp.*, 2002 WL 521345, at *1 (Conn. Super. Ct. Mar. 15, 2002) ("a plaintiff may plead a wrongful discharge claim by alleging that the plaintiff was discharged so as to avoid the payment of other compensation that, if vested, would have accrued"); *see also Cook v. Alexander and Alexander of Connecticut, Inc.*, 40 Conn.Supp. 246, 248 (Conn. Super. Ct. 1985) ("By alleging that the plaintiff was discharged in order to avoid payment of bonuses and the vesting of thrift plan benefits, the plaintiff has sufficiently alleged a wrongful discharge within the contemplation of *Sheets*.").  Mrs. Armetta claims that she met the targets set forth in LCG's bonus plan for the fiscal year ending June 2013 and was therefore eligible for a bonus.  [CA Compl. at ¶ 52].  She also claims that LCG intended on paying out said bonus in the first week of October 2013—about a month after she was terminated.  [*Id.* at ¶¶ 52-53].  Thus, the Court finds that Mrs. Armetta has adequately pled that her bonus "would have accrued" had she not been terminated on September 6, 2013, and that Mrs. Armetta has sufficiently alleged that LCG discharged her to avoid payment of the bonus.

Accordingly, Defendant's Motion to Dismiss Mrs. Armetta's wrongful termination claim is DENIED.

### E.  Violations of the Connecticut Unfair Trade Practices Act (all Plaintiffs)

All three Plaintiffs allege that LCG's actions toward them constitute violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a) *et seq.* ("CUTPA").  The Defendant moves to dismiss each of their claims on the ground that the statute is not applicable to Plaintiffs' allegations.

CUTPA makes it unlawful for a person to engage in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Con. Gen. § 42–110b(a).  To determine whether a practice is unfair or deceptive, courts examine whether the practice "(1) offends public policy; (2) is immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to consumers, competitors or other business men."  *Van Law v. Proficio Mortgage Ventures, LLC*, 2010 WL 3926064, at *6 (D. Conn. Oct. 1, 2010), quoting *Hartford Elec. Supply Co. V. Allen–Bradley Co.*, 250 Conn. 343, 367-68 (1998).  The plaintiff must also establish that the practice at issue was performed in the conduct of "trade or commerce," which is broadly defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value . . ." Con. Gen. § 42-110a(4).  The Supreme Court of Connecticut has held that CUTPA does not apply to conduct that occurs within the scope of an employment relationship on the ground that such conduct is not in trade or commerce.  *Quimby v. Kimberly Clark Corp.,* 28

Conn. App. 660, 670 (1992).  Connecticut courts have also interpreted "trade or commerce" to exclude activities that are merely incidental to an entity's primary trade or commerce.  *See McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 523 (2006).

### 1.  Mrs. Armetta's CUTPA Claim

Mrs. Armetta alleges that LCG violated CUTPA when it "unfairly and deceptively used the alleged conflict of interest [between her and Mr. Armetta] as a pretext for terminating Mrs. Armetta without paying her the just compensation for which she is entitled."  [CA Compl. at ¶¶ 100-102].  Defendant LCG contends that Mrs. Armetta's CUTPA claim fails as a matter of law because her alleged injury occurred within the scope of her employment relationship with LCG.  [CA MTD at 14].  Mrs. Armetta argues that "the damage caused to [her] extend[s] well beyond her scope of employment (and unpaid bonus) to the defamation of her reputation among LCG employees, vendors, and the direct mail marketing industry" and further argues that LCG's conduct is beyond the scope of her employment relationship because her termination "resulted from a purported conflict of interest that had little to do with her actual responsibilities as an employee of LCG's marketing department."  [Dkt. #38, Carlene Armetta's Opposition to Defendant's Motion to Dismiss (hereinafter "CA Opp.") at 14-15].  In sum, Plaintiff appears to argue that because the consequences of Defendant's alleged actions go outside of their employer-employee relationship, the actions themselves are also beyond the scope of that relationship.

46

Plaintiff misconstrues the parameters of the statute.  CUTPA targets deceptive or anticompetitive behavior that occurs "*in the conduct of trade or commerce*"—which encompasses both a business's practices towards consumers and practices between businesses that affect consumers. Accordingly, Connecticut courts' rationale for holding that CUTPA does not apply to the employer-employee relationship is that unless there is "an allegation in the complaint that the [employer] advertised, sold, leased or distributed any services or property to the [employee]," or that the employer took actions "to prevent [the employee] from competing with [the employer] once he was terminated," the employer's actions toward his employee are not "in the conduct of any trade or commerce."  *Quimby*, 28 Conn. App. at 670 (1992); *Drybrough v. Acxiom Corp.*, 172 F. Supp. 2d 366, 370 (D. Conn. 2001).  This is true regardless of whether the employer's actions occurred before, during, or after the employee's term of employment.  *See, e.g., Kintner v. Nidec*, 662 F. Supp. 112, 113 (D. Conn. 1987) (dismissing CUTPA claim based on employment relationship in which the defendant employer made fraudulent misrepresentations to induce the plaintiff employee to work for him); *see also Richter v. Danbury Hosp.*, 1998 WL 321853, at *9 (Conn. Super. Ct. June 9, 1998) *rev'd in part on other grounds*, 60 Conn. App. 280 (2000) (dismissing CUTPA claim based on employment relationship in which plaintiff doctor claimed that after his discharge, the defendant employer dissuaded patients at the hospital who requested his services from reaching him or knowing of his whereabouts).

Mrs. Armetta's claims against Defendant all arise out of or are related to Defendant's behavior as Mrs. Armetta's employer.  Mrs. Armetta has made no allegations that suggest LCG contracted to engage her in trade or commerce, making the cases cited by Plaintiff inapposite.  *See U.S. ex rel. Polied Envtl. Servs., Inc. v. Incor Grp., Inc.*, 238 F. Supp. 2d 456, 462-63 (D. Conn. 2002) (sustaining a CUTPA claim regarding a dispute over suppliers' payment rights on federal construction projects); *Saturn Const. Co. v. Premier Roofing Co.*, 238 Conn. 293, 310-11 (1996) (sustaining a CUTPA claim arising out of failure to comply with statute relating to public work construction contracts).  Nor has Mrs. Armetta alleged that LCG took actions to usurp her business, and Mrs. Armetta's allegation that LCG's behavior has had the *effect* of damaging her business cannot support a CUTPA claim where Mrs. Armetta "has failed to allege that [she and LCG] were in a consumer relationship, that they were in direct competition in the same marketplace, or that they had any other relationship in the same marketplace."  *Time Was Garage, LLC v. Giant Steps, Inc.*, 2011 WL 1888096, at *5 (Conn. Super. Ct. Apr. 29, 2011).  Defendant's Motion to Dismiss Mrs. Armetta's CUTPA claim is therefore GRANTED.

### 2.  Mr. Armetta and Aspira's CUTPA Claim

In their Complaint, Mr. Armetta and Aspira claim that LCG violated CUTPA when it "improperly used its employee, Carlene Armetta's, relationship with her husband to gain professional services for which it expects to utilize at no cost to themselves [*sic*]."  [DA/Aspira Compl. at ¶ 107].  LCG moves to dismiss Mr. Armetta and Aspira's claim on the grounds that they have failed to allege any

unfair or deceptive conduct, and in any case, that the alleged injury arises out of conduct that is incidental to LCG's primary business.  [DA MTD at 10-12].

The Court agrees that the injuries alleged by Mr. Armetta and Aspira do not arise out of activities constituting LCG's "primary trade or commerce" and therefore cannot form the basis of a CUTPA claim against Defendant.  As discussed above, Connecticut courts have held that a CUTPA violation cannot be alleged for activities that are merely incidental to an entity's primary trade or commerce.  *See McCann Real Equities Series XXII, LLC*, 93 Conn. App. at 523.  "In the context of defining the scope of the term trade or commerce under CUTPA, the term 'incidental to' does not mean 'unimportant to', but rather 'collateral to.'" *AmBase Corp. v. SDG Inc.*, 2005 WL 1860260, at *27 n. 9 (D. Conn. Aug. 3, 2005). Mr. Armetta and Aspira allege that LCG is "a national childcare center that operates over 900 daycare centers" across the country.  [DA/Aspira Compl. at ¶ 2].  The marketing services Mr. Armetta and Aspira provided LCG are clearly collateral to this business.  In similar cases, courts have found that other professional services such as fundraising and expenditure review were also beyond the scope of CUTPA's reach.  The Court finds the cases cited by Defendant persuasive on this point.  *See Buying Triangle LLC v. Hartford Fire Ins.* 2011 WL 3483469, at *5 (Conn. Super. Ct. July 7, 2011) (dismissing CUTPA claim based on an agreement for "professional services, which would aid the defendant in the conduct of its primary business, but cannot be defined as more than incidental to that business"); *see also Kelly v. Noble Env't Power, LLC,* 2009 WL 3087217, at *9 (Conn. Super. Ct. Sept. 2, 2009) ("alleged misconduct in the present

case relates to the employment activities of the defendant which are incidental to its primary trade of designing and building windparks, especially in this case where the plaintiff has not alleged that the defendant's conduct constituted any anti-competitive behavior related to that trade.").  Defendant's Motion to Dismiss Mr. Armetta and Aspira's CUTPA claim is hereby GRANTED.

### F.  Quantum Meruit and Unjust Enrichment (all Plaintiffs)

The Plaintiffs each make various allegations that Defendant has not fully compensated them for their work, and has therefore been unjustly enriched by the marketing services it received.  [CA Compl. at ¶¶ 85-104; DA/Aspira Compl. at ¶¶ 111-127].  Plaintiffs allege both that LCG has failed to pay them in full for their services, and that they are entitled to a portion of the profits LCG has earned as a result of their work.  [*Id.*]  The Defendant moves to dismiss these claims on the grounds that the Plaintiffs have been paid in full, and that Plaintiffs' claim to a portion of LCG's profits is not supported by the law.  [CA MTD at 13-14; DA/Aspira MTD at 16-17].

Unjust enrichment and quantum meruit are equitable remedies that apply where a plaintiff cannot recover under an express contract.  Quantum meruit is a theory of recovery that allows a plaintiff to recover the benefit conferred on a defendant where no express contract has been entered into.  *Burns v. Koellmer*, 11 Conn. App. 375, 385 (1987).  In effect, it governs recovery where the parties have formed a contractual relationship, but an enforceable contract was never created or has been deemed unenforceable.  To establish a claim under quantum meruit, "[t]he pleadings must allege facts to support the theory that the

50

defendant, by knowingly accepting the services of the plaintiff and representing to [him] that [he] would be compensated in the future, impliedly promised to pay ... for services ... rendered." *Id.* at 383-84.

Unjust enrichment is a theory of recovery that applies "whenever justice requires compensation to be given for services rendered under a contract, and no remedy is available by an action on the contract."  *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282 (1994) (internal quotation and citation omitted).  Rather than turning on the expectations of or the relationship between the parties, the remedy is based on the equitable principle that "it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  *Id.*  A plaintiff seeking recovery for unjust enrichment must establish that "(1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of the payment was to the plaintiff's detriment."  *Id.* at 283.

1.  Mrs. Armetta's Quantum Meruit and Unjust Enrichment Claims

In both her unjust enrichment claim and her quantum meruit claim (which is a verbatim recitation of the unjust enrichment claim), Mrs. Armetta alleges that LCG was unjustly enriched by Mrs. Armetta in the amount of a) "$50,000 for her Bonus Contract," and b) "a portion of the $284,000,000 in profits that LCG obtained as a direct result of her work establishing and supervising the direct mail marketing program." [CA Compl. at ¶¶ 112, 120].  The Court analyzes each contention in turn.

Mrs. Armetta's equitable claims to her $50,000 bonus are premised on the argument that "LCG would be unjustly enriched if they failed to pay Mrs. Armetta the amount of her bonus due under her Bonus Contract." [*Id.* at ¶¶ 114, 122]. Both claims also "repeat and reallege each and every allegation" in Mrs. Armetta's Complaint, including her breach of contract claim, where she alleges that her bonus was owed to her under "a valid and enforceable contract." [*Id.* at ¶¶ 81, 111, 119]. Defendant LCG argues that because Mrs. Armetta contends that her entitlement to a bonus is a matter of contract, she may not also pursue claims for unjust enrichment or quantum meruit. [CA MTD at 16].

While a plaintiff cannot *collect* under both a breach of contract claim and an unjust enrichment or quantum meruit claim, she may certainly *pursue* all of these claims in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2). *See Diamond Contractors, Inc. v. IPT, LLC*, 2013 WL 331235 at **5-6 (D. Conn. Jan. 25, 2013); *see also, e.g., Landeen Transp., LLC v. Tuccinardi Topsoil, Inc.*, 2009 WL 4069572, at **2-3 (Conn. Super. Ct. Oct. 21, 2009) (an equitable claim could be brought as an alternative count to ensure that the shipper received some recovery in the event that the contract claim failed). However, Defendant is correct that unjust enrichment and quantum meruit can apply only when no remedy is available by an action on the contract: indeed, this lack of remedy is "a precondition to recovery" under both doctrines. *Advanced Envtl. Interface, Inc. v. Archer Cissell Assoc., LLC*, 2006 WL 1893171, at *3 (Conn. Super. Ct. June 20, 2006) (internal quotations and citations omitted). Therefore, a proper pleading of unjust enrichment or quantum meruit must include the allegation that no remedy

is available to the claimant by action on a contract, and alternative pleadings must be set forth in separate counts that do not incorporate inconsistent claims. *Id.*; *see also N. Am. Technical Servs., Inc. v. V.J. Technologies, Inc.*, 2011 WL 4538069, at *6 (D. Conn. Sept. 29, 2011) (holding that "lack of an express contract is a precondition to recovery based on unjust enrichment and quantum meruit," and holding that "allegations to the contrary incorporated into the count require dismissal."); *Bridgeport Harbor Place, I, LLC v. Ganim*, 2007 WL 3121672, at **8-9 (Conn. Super. Ct. Oct. 5, 2007) (observing that the plaintiff's quantum meruit count incorporated all the substantive allegations asserted in the contract count and therefore asserted the existence of a contract, and granting the defendant's motion to strike the quantum meruit count as legally inconsistent with the breach of contract count).  This portion of the claim is therefore dismissed on that ground.

Mrs. Armetta also claims that LCG has been unjustly enriched in the amount of a portion of the $284,000,000 in profits LCG allegedly made over the course of Mrs. Armetta's employment.  [CA Compl. at ¶¶ 115-17].  Essentially, Mrs. Armetta argues that LCG's failure to pay her a bonus creates an obligation on the part of LCG to share their profits instead.  In response, Defendant reiterates that Mrs. Armetta has already been paid in full for her work and that therefore "LCG cannot have been unjustly enriched or improperly benefitted by Mrs. Armetta's performance of duties for which she was paid."  [CA MTD at 17].  Defendant is correct that as a matter of law, Mrs. Armetta cannot claim a portion of LCG's profits as a remedy for nonpayment; however, this is true even if Mrs.

Armetta has not been paid in full for her services.  Under the equitable doctrines of both quantum meruit and unjust enrichment, the plaintiff is confined to the reasonable value of her services, not the amount of benefit which actually accrued to the defendant.  *Meaney v. Connecticut Hosp. Ass'n, Inc.*, 250 Conn. 500, 520 (1999) (quoting *Kearns v. Andree*, 107 Conn. 181 (1928)); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 31 ("there is no unjust enrichment if the claimant receives the counterperformance specified by the parties' unenforceable agreement.").  Mrs. Armetta does not allege that LCG ever promised or otherwise represented to her that she would be compensated for her work with a portion of LCG's profits; therefore there is no set of facts under which Mrs. Armetta is owed these profits.  The most Mrs. Armetta can claim under either theory is the amount LCG allegedly promised to pay for her services rendered—which was the only "counterperformance specified by the parties' . . . agreement."

Mrs. Armetta's claims for unjust enrichment and quantum meruit based on LCG's failure to pay her a bonus are insufficient as pled, and Defendant's Motion to Dismiss is GRANTED.  However, the Court grants Mrs. Armetta leave to replead viable unjust enrichment and quantum meruit claims regarding the bonus payment within 14 days of the date of this Decision.  Defendant's Motion to Dismiss Mrs. Armetta's claims for unjust enrichment and quantum meruit as they relate to LCG's failure to pay her a portion of the company's profits is GRANTED without leave to replead.

**2.  Mr. Armetta and Aspira's Unjust Enrichment and Quantum Meruit Claims**

Mr. Armetta and Aspira's unjust enrichment claim and quantum meruit claim (which, like Mrs. Armetta's, are identical to one another) repeat Mrs. Armetta's argument that LCG has been unjustly enriched to the tune of a portion of the $284,000,000 LCG earned in profits during the course of Mr. Armetta and Aspira's business relationship with the company.  [DA/Aspira Compl. at ¶¶ 86-87]. Mr. Armetta and Aspira contend that "Mr. Armetta was either a valued contractor, growing LCG's acquisition of customers . . . or his actions were not authorized by LCG.  If it is the latter, then LCG has been unjustly enriched by the services he has provided, due to its withholding of payment of his invoices, and they need to give him the monies that were created as a result of his efforts . . ."  [DA/Aspira Compl. at ¶92].  In opposition, Defendant once again responds that Plaintiffs "do not – and cannot – allege that LCG failed to pay them for their work."  [DA/Aspira MTD at 13].

As already discussed, the profits realized by LCG as a result of Mr. Armetta and Aspira's work are not the proper measure of damages under the doctrines of unjust enrichment and quantum meruit.  However, contrary to Defendant's contention, Mr. Armetta and Aspira *have* alleged that LCG has failed to pay them for their work.  Specifically, they state that "[a]s of November 2013, LCG is refusing to remit payment to FCL for services rendered by FCL, which includes services provided by Mr. Armetta and Aspira, and is therefore withholding payment to Mr. Armetta and Aspira for services provided to LCG."  [DA/Aspira Compl. at ¶ 53].  This allegation is sufficient to state causes of action for quantum

meruit and unjust enrichment.  Mr. Armetta and Aspira have pled that they were engaged to provide marketing services to LCG at the behest of LCG, with LCG's knowledge and by persons within LCG that had the actual or apparent authority to engage them; that they expected to be paid for these services; and that LCG has failed to fully compensate them by withholding payment to FCL, therefore making out a sufficiently pled claim for quantum meruit.  Plaintiffs' allegations also state a cause of action for unjust enrichment: they claim that LCG was benefited by Plaintiffs' work and unjustly failed to pay the Plaintiffs to their detriment.  Furthermore, unlike Mrs. Armetta, Mr. Armetta and Aspira's Complaint does not allege the existence of any type of contract that would govern their relationship with LCG and defeat these claims.

Therefore, Mr. Armetta and Aspira's claim for quantum meruit and unjust enrichment, limited to the amount of either the promised payment or the reasonable value of their services, is sustained, and Defendant's Motion to Dismiss is DENIED.

## V.   <u>Conclusion</u>

For the foregoing reasons, Defendant's [Dkts. 34 and 37] Motions to Dismiss Plaintiffs' First Amended Complaints are GRANTED in part and DENIED in part.  Mrs. Armetta's claim for wrongful termination is sufficiently pled and Defendant's Motion to Dismiss that claim is DENIED; Mrs. Armetta is also granted a leave of 14 days from the date of this decision to replead viable breach of contract, quantum meruit and unjust enrichment claims.  Defendant's Motion to Dismiss Mr. Armetta and Aspira's claims for quantum meruit and unjust

enrichment, limited to the amount of either the promised payment or the reasonable value of their services, is also DENIED.   Defendant's Motions to Dismiss all other claims are GRANTED without leave to replead.

IT IS SO ORDERED.


_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: September 30, 2014

57