UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____

|  |  |
|---|---|
| DAVID ARMETTA and ) |  |
| ASPIRA MARKETING DIRECT, LLC, ) | CONSOLIDATED CASES |
| ) | Case No. 3:13-cv-1464 (VLB) |
| Plaintiffs, ) | Case No. 3:13-cv-1540 (VLB) |
| ) | Case No. 3:13-cv-1461 (VLB) |
| vs. ) |  |
| ) |  |
| ) | July 8, 2015 |
| LEARNING CARE GROUP, INC., ) |  |
| ) |  |
| Defendant. ) |  |

_____

### SECOND AMENDED COMPLAINT

Plaintiffs David Armetta ("Mr. Armetta") and Aspira Marketing Direct, LLC ("Aspira") (collectively, "Plaintiffs"), for its First Amended Complaint against Defendant Learning Care Group, alleges as follows:

### NATURE OF ACTION

1.      This case arises from the Learning Care Group's ("Defendant" or "LCG") internal investigation into the conduct of former employee Carlene Armetta ("Mrs. Armetta"), and the resulting effect that said internal investigation had on the business relationships and reputation of Plaintiffs.  LCG's actions have been malicious, purposeful, and outrageous.

2.      LCG is a national childcare center, operating over 900 daycare centers nationally under brand names such as Childtime Learning Center, Tutor Time, La Petite Academy, The Children's Courtyard and Montessori Unlimited.  LCG is based in Novi, Michigan. While its mission may appear to be altruistic, its practices are cold-hearted economics and corporate gamesmanship.  LCG is a private equity portfolio company, backed by Morgan Stanley Private

Equity, Inc. ("Morgan Stanley")[1], and thus provides "childcare" to maximize returns to its investors, such as Morgan Stanley.

3.     Initially, Mrs. Armetta worked for LCG as a consultant in Stamford, Connecticut. Nearly three years ago, she became a full-time employee working for LCG in Stamford, Connecticut.  Mrs. Armetta was a highly skilled and valued employee, working at high levels in the LCG marketing group focused on increasing LCG's acquisition of customers for its daycare centers.  Mrs. Armetta was originally charged with developing the business-to-business relationships, and then was tasked with building a call center, before becoming responsible for the creation and supervision of the direct mail marketing program.

4.     Despite Mrs. Armetta's good work, LCG now claims that Mrs. Armetta was in violation of a corporate policy related to an undisclosed "conflict of interest."  The alleged "conflict" arose as a result of the relationship between Mrs. Armetta, LCG, and Mrs. Armetta's husband, Mr. David Armetta ("Mr. Armetta").  It was well disclosed, open and notorious that Mr. Armetta was in a business relationship with print vendors for LCG, and Mr. Armetta was asked repeatedly by LCG to handle multiple aspects of LCG's direct mail printing and creative marketing.  In fact, Mr. Armetta and his company Aspira were integral and transparent members of LCG's marketing team, despite not having a direct employer-employee relationship with LCG.  Mrs. Armetta actually worked for Aspira before being hired by LCG, a fact of which LCG was fully aware. Furthermore, Mrs. Armetta's independent contractor agreement with LCG was actually an agreement between Aspira and LCG, and LCG paid Mrs. Armetta compensation through payments to Aspira.

5.     Mr. Armetta's work was done at the direct behest of LCG.  In connection with an investigation by LCG into his business, Mr. Armetta and Aspira have provided LCG over 500

_____

[1] Now American Securities.

pages of documents demonstrating that very point.  He worked for LCG 24 hours a day, 7 days a week for 4 years. Mr. Armetta ran the production, marketing, and testing strategy, designing of the new marketing database structure and programming, logo development, outside agency oversight, the creative aspects of LCG's direct mail marketing campaign, as well as negotiated reduced national printing rates and reduced cost and list recommendations.  Mr. Armetta did all of this in an overt and transparent fashion, by participating in hundreds of conference calls with LCG and emailing with LCG offices and employees almost daily for years.

6.      Thus, there is no question that the relationship between Mrs. Armetta, Mr. Armetta, Aspira, and LCG was an open and notorious fact among members of LCG's management, as well as significant members of the LCG marketing department with whom Mr. Armetta interacted with.

7.      Mr. Armetta was included on hundreds and hundreds of emails from LCG giving him instructions and asking him to participate in LCG meetings.  At no time prior to August 2013 did LCG object to the existence of this business relationship.  In fact, the good work done by Mrs. Armetta, Mr. Armetta, and Aspira created over $280 million in profits for LCG in four years.

8.      Upon conclusion of the internal investigation initiated by LCG into this matter, Mrs. Armetta was wrongfully terminated from her position at LCG for an alleged "conflict of interest."  This purported "conflict of interest" is supposedly based upon the fact that while Mr. Armetta was running LCG's direct mail printing operation at the explicit direction of LCG, creating over $280 million in profit for LCG, LCG now apparently takes the position that they did not know he was being compensated by the print vendor and must have been working, 24/7 for four years, for free.  This is plainly ludicrous.  LCG apparently takes the position that because

Mrs. Armetta was employed by LCG, Mr. Armetta could not be compensated for four years of work and should have been a full-time 24/7 volunteer. Thus, the purported "conflict of interest" upon which LCG based its termination of Mrs. Armetta was (i) created by LCG for its benefit, (ii) encouraged in writing and in statements by LCG in an open, notorious, and purposeful manner, and (iii) was therefore waived by LCG for the same reasons. This determination of a purported "conflict of interest" and unlawful termination was coincidentally made approximately three weeks before the very first bonus due to Mrs. Armetta in her four years of employment. Depriving Mrs. Armetta of her earned bonus is even more egregious due to the fact that Mr. and Mrs. Armetta had openly and obviously conceptualized, built and driven the very success of the specific programs that created the profits that the bonus was to be based upon.

9. Equally appalling, the statements made by LCG employees and management as a result of the internal investigation have defamed Mr. Armetta and disparaged his professional reputation. He has been subject to wrongful public ridicule.

10. LCG has been unjustly enriched by the services provided by Plaintiffs, as it now claims that LCG never authorized any payments to Plaintiffs for their services, that any payments made to Plaintiffs were improper, and to the extent that any payments were made, they were made without the knowledge of LCG's management.

<u>THE PARTIES</u>

11. Plaintiff David Armetta is a domiciliary of the State of Connecticut, with a principal residence located at 510 Woodbine Road, Stamford, CT 06903.

12. Plaintiff Aspira Marketing Direct, LLC is a Connecticut corporation with its principal place of business located at 510 Woodbine Road, Stamford, CT 06903.

4

13.     Defendant Learning Care Group is a Michigan corporation with its principal place of business located at 21333 Haggerty Road, Suite 300, Novi, MI 48375.

JURISDICTION AND VENUE

14.     Jurisdiction is proper with the District Court for the State of Connecticut because the parties are fully diverse, and the amount in controversy exceeds $75,000.

FACTS

15.     In November 2008, Stacy DeWalt ("Ms. DeWalt"), then Chief Marketing Officer of LCG, contacted Mrs. Armetta, who was a former colleague of hers at Pitney Bowes, Inc., to inquire as to Mrs. Armetta's interest in working as an independent contractor for LCG's marketing department.  Mrs. Armetta signed an independent contractor agreement with LCG in February 2009.  Mrs. Armetta signed the acceptance letter using the title "Managing Director, Aspira Marketing Direct."

16.     Mrs. Armetta's work for LCG initially involved a partnership project.  Within two months, Ms. DeWalt expanded Mrs. Armetta's responsibilities to include the development of a call center.

17.     Mr. Armetta and Aspira were not compensated for this work.  Mrs. Armetta was compensated in the form of a per diem payment that was previously negotiated between her and Ms. DeWalt, and memorialized in an independent contractor agreement drafted by Ira Young, LCG's General Counsel and a member of the company's Ethics Committee.  Compensation paid to Mrs. Armetta was invoiced by and paid through Aspira

18.     In August 2009, Ms. DeWalt advised Mrs. Armetta that LCG was unhappy with the quality of work being completed by LCG's current vendor for direct mail marketing, and stated that she needed assistance to ensure that a new direct mail marketing piece and program

5

was to be designed and mailed within two weeks. Mrs. Armetta discussed with Ms. DeWalt the possibility of Mr. Armetta assisting with this project (through Mr. Armetta's company, Aspira), and Ms. DeWalt directed Mrs. Armetta to contact Mr. Armetta and inquire as to what assistance he could provide.  Mr. Armetta had decades of experience and many industry contacts that he could leverage to ensure the project was completed in the necessary timeframe.

19.    Mr. Armetta contacted Kevin Overlock, an employee of Vertis Communications ("Vertis"), a company in the printing and direct mail marketing business, with whom he had a business relationship over the previous several years.  Mr. Armetta has known Kevin Overlock prior to 1990, and worked with him on many projects since that time.

20.    Mrs. Armetta, with the assistance of Plaintiffs and Vertis, was able to complete the direct mail marketing project within the required two weeks, despite the fact that such a project would normally require at least an eight-week process.  Not only did he design the direct mail pieces, but he designed the mailing and testing strategy, arranged for and actually purchasing the mailing lists for LCG's use, negotiated and coordinated as an approved Vertis broker the pricing and production for the printing and mailing of the entire direct mail project, and oversaw the program since all of these services are what Aspira was in the business of providing for its clients.

21.    Subsequent to the completion of the above-referenced project, and as a result of its success, Vertis, with Mr. Armetta's assistance and oversight, began to acquire substantial printing and marketing work from LCG, all of which Mr. Armetta was an integral member in performing.  This work included, among other things, creative designs to be used in LCG marketing campaigns, the rental and use of direct marketing mailing lists from outside vendors, and the establishment and operation of LCG's direct mail marketing campaigns.

22.     At this time, Aspira, the company owned by Mr. Armetta and Mrs. Armetta, was invoicing LCG for the per diem work undertaken by Mrs. Armetta, as well as the additional work being completed by Mr. Armetta.  Aspira was also responsible for renting and billing LCG for the mailing lists as a list manager; and arranging and overseeing the print production through Vertis as a marketing agency.  This invoicing structure was designed with the knowledge and approval of Ms. DeWalt.

23.     As a result of the substantial and high quality work being performed by Mrs. Armetta, and in an effort to reduce their own costs, LCG, through Ms. DeWalt, inquired as to Mrs. Armetta's interest in joining the LCG marketing team as a full-time employee.  Although not interested in the offer initially, Mrs. Armetta was persuaded to enter into this relationship as an employee since she understood that if she didn't become a full-time employee, neither she nor Aspira would be receiving future work from LCG.  During negotiations regarding this employment relationship, taking place between December 2009 and January 2010, Mrs. Armetta inquired as to the status of Mr. Armetta's work if she decided to take the position in LCG's marketing department. Ms. DeWalt responded that it was "no problem," and that she "want[ed] Mr. Armetta involved and to just have him paid through Vertis," because "LCG does not want to write any more checks to Aspira."  She concluded this verbal exchange with the statement "Just get it done. Do what you have to do. We need to get this going."  Mrs. Armetta became an employee of LCG on or around January 28, 2010.

24.     As Mr. Armetta, Mrs. Armetta and Aspira were initially hired as an outside consultant and marketing firm, LCG was certainly aware that they were not only being compensated for their work, but that the normal industry practice of compensating such vendors

for their services most often included the payment of commissions, brokerage fees, and other compensation based on the client's needs.

25.    On February 8, 2010, Ms. DeWalt wrote to Mrs. Armetta and Scott Smith ("Mr. Smith"), the Chief Human Resources Officer and one of two members of LCG's Ethics Committee, stating:

> "I spoke with Scott today in regard to continuing to contract David/Aspira. He and I will follow up with [the C.E.O.] Bill this week, in the meantime since your official start date passed the work that David is doing on Summer needs to have a SOW and cost for his time. Please have David contact me directly with costs/agreement ASAP"

26.    The above-referenced communication illustrates that Ms. DeWalt, the chief marketing officer, Mr. Smith, the chief human resources officer and a member of the Ethics Committee, and Bill Davis, the then-current C.E.O. of LCG, were not only aware that Mr. Armetta and Aspira had a business relationship with LCG, which continued after Mrs. Armetta became an employee, but also that the relationship was encouraged by LCG.

27.    The second of the two members of LCG's Ethics Committee, the company's General Counsel Ira Young ("Mr. Young"), was also well aware of the relationship between Mr. Armetta, Aspira, and LCG, as evidenced by the fact that he is included on countless e-mails that specifically discussed the work of Mr. Armetta, including on June 2, 2012, where both Mr. Young and Mr. Armetta participated in a conversation regarding the legal issues involved in using certain pieces of artwork in LCG's marketing materials.

28.    On April 20, 2010, Mr. Armetta and Aspira signed a confidentiality and non-disclosure agreement with LCG, provided by LCG's legal department and drafted by Ira Young, the General Counsel and member of the Ethics Committee.  Mrs. DeWalt was the LCG officer

who counter-signed.  This again shows that Mr. Young was well aware of the relationship that existed between Mr. Armetta, Aspira, and LCG.

29.     It was not an uncommon occurrence for Mr. Young to participate in e-mail communications that Mr. Armetta was clearly involved in, or even directly related to his work for LCG, including a February 18, 2010 email conversation between Mrs. Armetta, Mr. Armetta, Mr. Young, and three other individuals discussing the use of trademarked material in LCG's advertising, and a January 26, 2011 email conversation discussing LCG's marketing with American Express (and for which the email author began his communication with "Hi Carlene [Armetta], Dave [Armetta], Ira [Young] & Shari [Corona]."

30.     In order to comply with Ms. DeWalt's request regarding the invoicing of Mr. Armetta's work, Mr. Armetta negotiated an independent contractor agreement with Vertis, who was to invoice LCG for Mr. Armetta's and Aspira's providing substantial and varied services.

31.     Although Mr. Armetta's work was being billed by Vertis to LCG, Ms. DeWalt, and therefore LCG, was well aware that Mr. Armetta was an integral part of the marketing department, and was surely not volunteering his time.  The costs of Vertis' printing prices did not increase to LCG, but rather were actually reduced in price from the initial print prices that had been negotiated before Mrs. Armetta became an employee of LCG.

32.     Over the course of the next three years, Mr. Armetta and Vertis were integral parties to the development and success of LCG's marketing department, in particular the direct mail marketing campaigns, as well as a proactive "trigger" marketing campaigns, data and analytics that drove all of the success of their marketing efforts for LCG.

33.     The final decision to place printing and direct mail marketing work with Vertis was not the decision of Mrs. Armetta, but rather a determination made by Ms. DeWalt, the Chief Marketing Officer, in consultation with LCG management.

34.     Likewise, the decision to subsequently move the printing and direct mail marketing work from Vertis to FCL Graphics ("FCL") was not the decision of Mrs. Armetta. That Mrs. Armetta was not the decision-maker with regard to LCG's moving of the print business to FCL is illustrated in a communication from the current C.E.O., Barbara Beck ("Ms. Beck"), to an executive at FCL, stating that she was "happy we're shifting business to FCL, our recent Vertis/Quad experience has not been a happy one!"  Clearly, the C.E.O played a role in the selection process for the new vendor, as would Ms. DeWalt, as a c-level executive and supervisor to Mrs. Armetta.

35.     Mr. Lichtenberg stated to Mrs. Armetta in an email on July 24, 2013 "[g]iven that FCL came down to the [price] level of contenders, it does not make sense to change at this point. We already have a learning curve with FCL and I don't want us losing that level of comfort and experience."  This statement is only further evidence that the decision to retain FCL as LCG's print vendor was not the decision of Mrs. Armetta.

36.     On February 24, 2010, in an email communication from Ms. DeWalt and Mr. Armetta, Ms. DeWalt stated "We [LCG] need you fully engaged in [the] fall, so let's connect ASAP and get me a proposal for leading the creative strategy."

37.     On February 26, 2010, in an email communication between Ms. DeWalt and an outside consultant of LCG (former a President of an LCG division), Ms. DeWalt referred to Mr. Armetta as "our senior creative strategist."  Mr. Armetta interacted directly with this person and her peers, as Ms. DeWalt couldn't attend the meeting and had Mr. Armetta act in her place.

Certainly, a "senior creative strategist" is not a volunteer, and thus would be compensated for his/her work.

38.     As a result of the efforts of Plaintiffs and Vertis, LCG was able to increase its direct mail enrollment rate for students from approximately 8,000 in 2009, to over 32,000 in 2013. In total, this represents a 400% increase in the effectiveness of the direct mailing campaign with the exact same or even slightly reduced annual budget.

39.     As a result of the efforts of Plaintiffs and Vertis, LCG was able to increase its direct mail related profits from approximately $22.5 million in 2009, to approximately $132 million in 2013.  In total, LCG earned more than $280 million in profits as a result of Plaintiffs' and Vertis' achievements.

40.     In October 2012, LCG became aware of the fact that Vertis was in the process of being acquired out of Chapter 11 bankruptcy by a competitor, Quad Graphics ("Quad").  Mrs. Armetta and Ms. DeWalt were concerned with what effect this acquisition would have on the vendor's ability to provide high quality and reliable services to LCG subsequent to the acquisition.

41.     During the same period of time, many of the employees of Vertis were disillusioned with the prospect of working for Quad, and soon thereafter becomes employees of another printing company, FCL.  While Vertis was being acquired by Quad, the printing quality began to suffer and Mrs. Armetta and Ms. DeWalt conducted a test-print run with FCL.  Due to its success, Ms. DeWalt, in consultation with LCG management, determined that LCG should retain FCL to provide printing services going forward, rather than continue their business relationship with Vertis (now Quad).

42.     On a January 10, 2013 email from Ms. DeWalt to C.E.O. Ms. Beck, Ms. DeWalt writes "I met with Stephen Flood and Kevin Overlock today – Stephen is the CEO of FCL Graphics, the new firm handling our direct mail program and print.  As part of my transition I asked that he meet with you directly, which he was very excited to do – really just to shake your hand thank you for the business but most importantly to assure that there is continuity for future campaigns – they are handling winter very well and Carlene is on top of all of the elements." Once again, this email is further evidence that the Chief Marketing Officer and C.E.O. were integral to the decision to shift the printing business to FCL, and the decision was clearly not made by Mrs. Armetta.

43.     Mr. Armetta, because of his existing business relationship with Kevin Overlock of FCL (previously of Vertis), entered into a business relationship with FCL to provide similar services as to those he was previously providing to Vertis.  Ms. DeWalt inquired if key members of the old Vertis team were moving to FCL.  She specifically requested the entire Vertis team be brought to FCL with the exception of Shannon Heaman.  This illustrates that her request was specific and not a blanket statement.  Mr. Armetta had been a driving force of that team since the inception of this program, so there was no reason to believe that Ms. DeWalt was not inclusive of him being involved.  Ms. DeWalt insisted that Mrs. Armetta work to retain the services of such key members for the benefit of LCG.  As Mr. Armetta was an integral member of the marketing team, Mrs. Armetta understood this directive from Ms. DeWalt to also include retaining the services of Mr. Armetta and Aspira through FCL.

44.     As with Vertis, the work being performed by Mr. Armetta was invoiced to FCL, as a vendor who would then invoice LCG for Mr. Armetta's services along with many other FCL outside vendors and other provided services.

12

45.     During the time period in which Mr. Armetta was providing services to LCG, regardless of whether such services were being billed to LCG by Aspira, Vertis, or FCL, Mr. Armetta remained a fully integrated member of the LCG marketing team.  Mr. Armetta was in continuous phone and email communication with many if not all members of the LCG marketing team, as well as members of other LCG departments (e.g. information technology and business intelligence departments), and certain external parties, such as many other LCG contractors, including those introduced to him by other LCG employees, including Ms. DeWalt.

46.     On numerous occasions, Mr. Armetta was invited to and attended meetings at LCG's headquarters in Michigan, which included meeting or interacting with such management employees as former Chief Marketing Officer Ms. DeWalt, former Chief Financial Officer Robert Van Hees, current Senior Vice President of Finance Tim Truly, former Chief Information Officer John Hegener, and Vice President of Technology Ahmed Malik.  Furthermore, on at least one occasion Mr. Armetta was in contact with Jim Howland, Chairman of the Board of Directors of LCG, whom he met during in-person meetings at Morgan Stanley involving LCG's marketing campaigns.  At this meeting, Mr. Armetta was introduced as a senior creative strategist, and that he happened to be Mrs. Armetta's husband.

47.     On April 29, 2011, Mrs. Armetta, Ms. DeWalt, and C.E.O. Ms. Beck were involved in an email exchange that clearly illustrates that Ms. Beck was not only aware of Mr. Armetta's business relationship with LCG, but was personally involved in reviewing creative and marketing related work that he was completing on LCG's behalf.  This includes the "sneak peak at the Fall creative" email forwarded by Mrs. Armetta and Mr. Armetta to their supervisor, Ms. DeWalt, and subsequently passed on to Ms. Beck for her review.

48.     Other management employees of LCG, such as then-Director of Digital Marketing Ellen Bale, were provided creative work directly from Mr. Armetta, which not only exemplifies the open and notorious nature of their business relationship, but also speaks to the quality and value that Mr. Armetta's work was providing, as evidenced by Ellen Bale's reply of "Thanks. I really like it."

49.     Similarly, for example, LCG Interactive Content Manager Dan Sanborn sent an email to both Mrs. Armetta and Mr. Armetta on June 8, 2011, regarding a new project, and stated "Since I know that you two are heading this initiative up…"  This statement clearly demonstrates the widespread knowledge among LCG employees that Mr. Armetta was not only working for LCG, but that he, along with Mrs. Armetta, held a significant and integral role in running the operations of the marketing department.

50.     In addition to the communications of LCG's employees providing incontrovertible evidence of the open and notorious nature of the business relationship between Mrs. Armetta, Mr. Armetta, Aspira, and LCG, the emails also serve the purpose of exemplifying the high quality of work being completed on behalf of LCG.  In an email from Jodi Johnson, Regional Director of Marketing and Business Development for LCG, to Mrs. Armetta, and courtesy copied to Ms. DeWalt, Ms. Johnson states that she "Wanted to give you some great feedback from South California Directors. They loved the direct mail creative…," and noted that it was "the best they've ever seen."

51.     Throughout Plaintiffs' business relationship with LCG, the management of LCG was well aware that Mr. Armetta, who was clearly the husband of Mrs. Armetta, was providing substantial services to LCG for which he was undoubtedly being compensated.  Moreover, they were aware that Mr. Armetta and Mrs. Armetta were working in the same office space in

Stamford, CT, and that they completed substantial work for LCG as a team out of said Stamford, CT office.

52.      At no time prior to August 2013 did any employee of LCG raise the issue of a potential conflict of interest due to Mr. Armetta's position as a paid vendor and as Mrs. Armetta's husband.  This arrangement was not only known to the members of LCG's management, but was in fact a direct result of Ms. DeWalt's and management's express directives to establish such a business relationship.

53.      As of November 2013, LCG is refusing to remit payment to FCL for services rendered by FCL, which includes services provided by Mr. Armetta and Aspira, and is therefore withholding payment to Mr. Armetta and Aspira for services provided to LCG.  This refusal to remit payment to FCL, Mr. Armetta and Aspira is without justification, as these parties have provided LCG with a benefit for which they have not been compensated.  Upon information and belief, the amount of compensation due to Mr. Armetta and Aspira from LCG, by way of FCL's invoices to LCG, is several hundred thousand dollars.

54.      In August 2013, for reasons unknown to Plaintiffs, LCG initiated an internal investigation, directed at Mrs. Armetta and involving the alleged conflict of interest. Notwithstanding the clear and convincing evidence that the alleged conflict of interest was expressly authorized by LCG, or in the alternative, that LCG waived the right to challenge said conflict of interest due to the open and notorious nature of Mr. Armetta's relationship with LCG, Mrs. Armetta was wrongfully terminated from her employment with LCG on September 6, 2013.

55.      Mrs. Armetta's termination was without regard to the fact that she not only complied with LCG's corporate policies regarding potential conflicts of interest, but that at all

times during her employment she acted at the direction of, with the explicit approval of, LCG's management.  Any purported conflict of interest was nonsense, and clearly waived.

56.     In essence, LCG courted and encouraged Mr. Armetta and Mrs. Armetta to work for LCG, then proceeded to establish the structure of Mr. Armetta's compensation passing through Vertis, only to later terminate the relationship with both parties on the basis of that structure while never admitting the fact that it was designed at LCG's explicit direction.

57.     Over the course of Mr. Armetta and Mrs. Armetta's relationship with LCG, there were over 275 emails between LCG employees and Mr. Armetta and Aspira pertaining to work product that Mr. Armetta and Aspira were providing to LCG, over 193 emails that included Mrs. Armetta and discussed Mr. Armetta's and Aspira's work, along with countless additional emails that related to everything from the transition from Vertis to FCL as a print vendor (for which Mrs. Armetta was not the decision-maker), Mr. Armetta's role in the LCG marketing department, and the exceptionally high quality of work that Mr. Armetta and Aspira were producing, as well evidence of the success of their initiatives.  For LCG to claim that somehow the management of the firm, and in particular, the Ethics Committee members Mr. Young and Mr. Smith, were unaware of the relationship between Mr. Armetta, Mrs. Armetta, Aspira, and LCG, is simply ludicrous and disingenuous.

58.     As a result of the internal investigation, and the statements made to employees of LCG and external third-parties regarding Mrs. Armetta's and Plaintiffs' alleged misconduct, Plaintiffs were defamed and their reputation tarnished by the false accusation that they acted improperly in the course of their business relationship with LCG.

59.     Numerous individuals who are not employees of LCG and were not involved in LCG management's conducting of the internal investigation have been made aware of the

allegations by LCG against Mrs. Armetta, Mr. Armetta and Aspira. These individuals include Ms. DeWalt (former Chief Marketing Officer of LCG), Kevin Overlock (a former employee of Vertis, now an employee at FCL), and Steve Flood (former senior V.P. of operations sales at Vertis, and former C.E.O. of FCL). As a result of LCG's communication of utterly false and defamatory information regarding the termination of Mrs. Armetta from LCG to these individuals and others, Mrs. Armetta, Mr. Armetta and Aspira have been defamed and their reputations tarnished.

60. Upon information and belief, an employee of LCG communicated to Mr. Joe Lobosco and then conveyed to Ms. Marissa Marinelli (both employees at FCL) that Mrs. Armetta had been terminated as a result of an internal investigation that was initiated when a former LCG employee informed LCG of Mrs. Armetta's alleged misconduct. Despite the information relating to Mrs. Armetta's alleged misconduct, as communicated by LCG, having absolutely no merit, the fact that LCG is communicating such information to third-parties has not only defamed Mrs. Armetta and tarnished her personal reputation, but has severely limited her ability to market herself as a professional and thereby obtain gainful employment.

61. Upon information and belief, LCG communicated by company-wide email an announcement of Mrs. Armetta's departure from LCG, and said announcement may have been communicated to other third-parties. Insofar as employees of LCG (and external parties privy to the announcement) were explicitly told that Mrs. Armetta was on administrative leave and may have been aware that the administrative leave included an internal investigation, said parties may deduce that her termination was a result of the internal investigation's finding that Mrs. Armetta and Plaintiffs had acted improperly, thereby further tarnishing their reputation despite the fact that the stated allegations were utterly false. This is further evidenced by the fact that LCG

instructed all of its employees to cease having any contact with Mrs. Armetta whatsoever, leaving said employees with the implication that Mrs. Armetta had acted improperly and that they should refrain from communicating or doing business with Mrs. Armetta, Mr. Armetta, and Aspira as a result of their purportedly improper conduct.

62.     Several of Mrs. Armetta's colleagues at LCG reached out to her via their personal email accounts, despite LCG's demand that they not contact her, and stated, among other things, "just checking in to make sure your OK," "thinking of you and hope you are OK," and "Just wanted to check how are you doing…and…haven't been able to stop thinking about everything. I know that you are strong and will get through this just fine."  These colleagues were clearly aware of the situation that Mrs. Armetta and Mr. Armetta were being subjected to, as a result of the improper actions taken by LCG.

63.     Mrs. Armetta was informed of the above-referenced announcement from a former colleague at LCG, who stated:

> The announcement just came out that you have left LCG! I am sad to see you go and hope this is a good thing for you. You are an incredibly talented and professional woman and I appreciate your support over the years. I wish you only the best and will be watching for your continued success. If I can ever support you in any way, please don't hesitate. You never know when our paths may cross again. Thanks again for everything and take care!

64.     On or about September 6, 2013, LCG falsely stated that Mrs. Armetta "engaged in business dealing that were egregious and direct violations of the Company's Code of Conduct." This statement, without expressly saying so, attributes the wrongful conduct to not just Mrs. Armetta, but also to Plaintiffs.

65.     Additionally, due to the communication of said defamatory statements to external parties, including printing industry related vendors of LCG, Plaintiffs' business was disparaged

insofar as their ability to promote their qualifications within the industry are now tarnished by the false allegations of impropriety.

66.     Specifically, LCG spoke with Ms. DeWalt, who at the time was a former employee of LCG, during the course of the internal investigation, and made statements to her regarding the allegedly improper conduct of Mrs. Armetta, Mr. Armetta and Aspira.  These statements have defamed the name and reputation of Mrs. Armetta, Mr. Armetta, and Aspira, and have negatively impacted their future business prospects as a result of destroying the working relationship that existed between Ms. DeWalt and Mrs. and Mr. Armetta.

67.     LCG is solely responsible for this unfair and unjust treatment of Mr. Armetta and Aspira, and thereafter has sullied the reputation of and diminished the future earning of these parties as expert marketing professionals.

<u>FIRST COUNT</u>

<u>(Unjust Enrichment)</u>

68.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 67 with the same force and effect as if fully set forth herein.

69.     LCG was unjustly enriched by Plaintiffs.

70.     LCG gained as a direct result of the work performed by Mr. Armetta and Aspira, and the scheme orchestrated by LCG.

71.     LCG's decision to deprive Mrs. Armetta of her employment based on the allegation that she was not acting at the direction of LCG management when working with Mr. Armetta and Aspira must result in LCG also being deprived of the benefits for which Mr. Armetta and Aspira provided to LCG.  LCG claims that it did not authorize Mr. Armetta and

Aspira to provide services to LCG, and it did not agree to pay Mr. Armetta or Aspira for the services they provided.

72.     LCG claims that any such payments, to the extent they were made, were made without knowledge they were going to Aspira and/or Mr. Armetta.

73.     LCG claims these payments were improper for Mr. Armetta to receive due to LCG's company policies.

74.     In the event that work performed by Mrs. Armetta, Mr. Armetta and Aspira was somehow deemed to be unauthorized and a basis for legal action against Mrs. Armetta in the form of termination, LCG must return the benefit it unjustly received from Mr. Armetta and Aspira.

75.     LCG's unjust enrichment has been to the detriment of Mr. Armetta and Aspira, as LCG has retained the benefit conferred upon it by Mr. Armetta and Aspira, but at the same time refused to compensate them for those services

76.     LCG has been unjustly enriched in an amount equal to the value of the services provided by Mr. Armetta and Aspira, and retained by LCG, or an amount to be determined at trial.

<u>SECOND COUNT</u>

<u>(Quantum Meruit)</u>

77.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 67 with the same force and effect as if fully set forth herein.

78.     LCG was unjustly enriched by Plaintiffs.

79.     LCG gained as a direct result of the work performed by Mr. Armetta and Aspira, and the scheme orchestrated by LCG.

80.     LCG's decision to deprive Mrs. Armetta of her employment based on the allegation that she was not acting at the direction of LCG management when working with Mr. Armetta and Aspira must result in LCG also being deprived of the benefits for which Mr. Armetta and Aspira provided to LCG.

81.     LCG claims that it did not authorize Mr. Armetta and Aspira to provide services to LCG, and it did not agree to pay Mr. Armetta or Aspira for the services they provided.

82.     LCG claims that any such payments, to the extent they were made, were made without knowledge they were going to Aspira and/or Mr. Armetta.

83.     LCG claims these payments were improper for Mr. Armetta to receive due to LCG's company policies.

84.     In the event that work performed by Mrs. Armetta, Mr. Armetta and Aspira was somehow deemed to be unauthorized and a basis for legal action against Mrs. Armetta in the form of termination, LCG must return the benefit it unjustly received from Mr. Armetta and Aspira.

85.     LCG's unjust enrichment has been to the detriment of Mr. Armetta and Aspira, as LCG has retained the benefit conferred upon it by Mr. Armetta and Aspira, but at the same time refused to compensate them for those services.

86.     LCG has been unjustly enriched in an amount equal to the value of the services provided by Mr. Armetta and Aspira, and retained by LCG, or an amount to be determined at trial.

## THIRD COUNT

### (Common Law Fraud)

87.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 67 with the same force and effect as if fully set forth herein.

88.     LCG and its employees, in particular Ms. DeWalt, knowingly made false representations which were made as a statement of fact regarding the work and payment structure of Mr. Armetta and Aspira by explicitly and expressly authorizing Mr. Armetta and Aspira to provide services to LCG.  Specifically, Ms. DeWalt stated to Mr. Armetta that he and/or Aspira work for LCG but should "be paid by the printer" but according to the LCG Director of Human Resources Scott Smith ("Mr. Smith") and confirmed by Ms. Beck, Ms. DeWalt knew she was not allowed by LCG to make such statements.  Ms. DeWalt was an officer of LCG and could bind the Company. Thus, an officer of LCG who can bind it, made statements to Mr. Armetta and Aspira that LCG admits were not true.

89.     Said false representations made by Ms. DeWalt, on behalf of LCG, were untrue and known to be untrue at the time they were made because Ms. DeWalt was allegedly told by LCG that she was not free to request Mr. Armetta or Aspira to work for LCG after Mrs. Armetta joined LCG as an employee, yet she made such an offer to Mr. Armetta and Aspira, as they knew Ms. DeWalt was an officer of the company, and did in fact induce Mr. Armetta and Aspira to provide such services.

90.     Said false representations made by Ms. DeWalt, on behalf of LCG, were made with the intent to induce Mr. Armetta and by extension, Aspira, to provide substantial services to LCG.

91.     Mr. Armetta and Aspira relied on the false statements made by Ms. DeWalt, on behalf of LCG, in performing services for the benefit of LCG, to their detriment.  Specifically, Mr. Armetta and Aspira have suffered the loss of hundreds of thousands of dollars in commissions and other payments due to the false and fraudulent representations, and Mr. Armetta and Aspira dedicated four years exclusively working for LCG only to be accused by LCG of improperly charging third parties for their work, terminating Mr. Armetta's wife from her employment with LCG and damaging his business reputation. Certainly, Mr. Armetta and Aspira would have rather done other work for other clients during that period had they known that LCG was not authorizing their work.

## FOURTH COUNT

### (Negligent Misrepresentation)

92.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 67 with the same force and effect as if fully set forth herein.

93.     LCG and its employees, in particular Ms. DeWalt, made misrepresentations of fact regarding the employment and payment structure of Mr. Armetta and Aspira by explicitly and expressly authorizing Mr. Armetta and Aspira to provide services to LCG.  Specifically, Ms. DeWalt stated to Mr. Armetta that he and/or Aspira work for LCG but should "be paid by the printer" but according to the LCG Director of Human Resources Scott Smith and confirmed by Ms. Beck, Ms. DeWalt knew she was not allowed by LCG to make such statements.  Ms. DeWalt was an officer of LCG who could bind the Company. Thus, an officer of LCG who can bind it, made statements to Mr. Armetta and Aspira that LCG admits were not true.

94.     Said false representations made by Ms. DeWalt, on behalf of LCG, were justifiably relied upon by Mr. Armetta and by extension, Aspira, to provide substantial services to LCG, as they knew Ms. DeWalt was an officer of the Company.

95.     Said false representations made by Ms. DeWalt, on behalf of LCG, were untrue and known to be untrue at the time they were made because Ms. DeWalt was allegedly told by LCG that she was not free to request Mr. Armetta or Aspira to work for LCG after Mrs. Armetta joined LCG as an employee, yet she made such an offer to Mr. Armetta and Aspira, as they knew Ms. DeWalt was an officer of the company, and did in fact induce Mr. Armetta and Aspira to provide such services.

96.     Mr. Armetta and Aspira relied on the misrepresentations made by Ms. DeWalt, on behalf of LCG, in performing services for the benefit of LCG, to their detriment.  Specifically, Mr. Armetta and Aspira have suffered the loss of hundreds of thousands of dollars in commissions and other payments due to the misrepresentations, and Mr. Armetta and Aspira spent four years exclusively working for LCG only to be accused by LCG of improperly charging third parties for their work, improperly terminating Mr. Armetta's wife from her employment at LCG and damaging his business reputation. Certainly, Mr. Armetta and Aspira would have rather done other work for other clients during that period had they known that LCG was not authorizing their work.

WHEREFORE, Plaintiffs seek:

1.     Damages;

2.     Costs;

3.     Interest; and

4.     Such other and further relief as this Court deems appropriate.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial on all issues so triable.

*COUNSEL FOR PLAINTIFFS*
*DAVID ARMETTA AND ASPIRA*
*MARKETING DIRECT, LLC*

By: <u>*/s/ Joseph M. Pastore III*</u>
    Joseph M. Pastore III (ct11431)
    Michele Martin (*Admitted pro hac vice*)
    PASTORE & DAILEY LLC
    4 High Ridge Park
    Stamford, CT 06905
    (P) 203.658.8454
    (F) 203.348.0852
    jpastore@psdlaw.net

<u>CERTIFICATION</u>

The undersigned certifies that on the 8th day of July, 2015, the foregoing was filed electronically and notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Joseph M. Pastore III*