UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LEARNING CARE GROUP, INC.,
        Plaintiff/Consolidated Defendant,


        v.                                        CASE NO. 3:13-cv-1540 (VAB)


CARLENE ARMETTA, DAVID
ARMETTA, and ASPIRA
MARKETING DIRECT, LLC,
        Defendants/Consolidated Plaintiffs.


## RULING ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case arises out of the dissolution of a business relationship between Learning

Care Group, Inc. ("LCG"), Carlene and David Armetta, and Aspira Marketing Direct,

LLC ("Aspira"). Aspira is a limited liability corporation owned by the Armettas. The

parties filed three Complaints arising out of this business dispute, which were

consolidated into the current action.[1]

The parties have cross-moved for summary judgment seeking to dispose of all

claims in the case. LCG seeks summary dismissal of Count Three of Mrs. Armetta's

Complaint, a claim for wrongful discharge and her only remaining affirmative claim in

---

[1] Mrs. Armetta filed a complaint against LCG in case number 3:13-cv-1464(VLB). Mr. Armetta and
Aspira filed a complaint against LCG in case number 3:13-cv-1461(VLB). LCG filed a complaint against
Mr. and Mrs. Armetta and Aspira in this case, number 3:13-cv-1540(VAB). The Court notes that none of
the parties appear to have answered any of these complaints after the Court's ruling on the motions to
dismiss. Because none of the parties has filed a default motion or otherwise raised this issue, the Court will
not address it and will decide summary judgment. *See Beckles v. City of New York*, 492 F. App'x 181, 183
(2d Cir. 2012) (holding that it was not error for a district court to decide summary judgment where answers
had not been filed, no motions for default had been filed, and no party raised the fact that there was no
answer).

the case.  LCG's Am. Mot. for Summ. J. as to Ms. Armetta, ECF No. 109[2] [hereinafter

LCG's First Motion].  LCG also seeks summary judgment on all four counts of the

Complaint filed by Mr. Armetta and Aspira, which allege claims of unjust enrichment,

quantum meruit, common law fraud, and negligent misrepresentation.  Am. Compl., ECF

No. 99; LCG's Mot for Summ. J. as to Mr. Armetta and Aspira, ECF No. 105 [hereinafter

LCG's Second Motion].[3]

　　　　　Mr. and Mrs. Armetta and Aspira collectively seek summary judgment on all of

their affirmative claims against LCG as well as on all of LCG's claims against them.

Mot. for Summ. J. by Mr. and Mrs. Armetta and Aspira as to LCG, ECF No. 107

[hereinafter The Armettas' Motion].  LCG asserts claims of breach of fiduciary duty and

constructive fraud against Mrs. Armetta; claims of aiding and abetting a breach of

fiduciary duty and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"),

Conn. Gen. Stat. §42-110a *et seq.*, against Mr. Armetta and Aspira; and claims of unjust

enrichment and conversion against Mr. and Mrs. Armetta and Aspira.  LCG's Compl.,

ECF No. 1.

　　　　　For the reasons that follow, LCG's First Motion, ECF No. 109, is **GRANTED**,

and Mrs. Armetta's wrongful termination claim is dismissed.  LCG's Second Motion,

ECF No. 105, is **DENIED**, and the Armettas' Motion, ECF No. 107, is **DENIED**,

leaving for trial Mr. Armetta's and Aspira's claims for unjust enrichment, quantum

meruit, negligent misrepresentation, and fraud as well as LCG's claims for breach of

---

[2] LCG filed a motion for summary judgment addressing Mrs. Armetta's claims by the Court's deadline.
LCG's Mot. for Summ. J. as to Ms. Armetta, ECF No. 103.  A few days later, it filed an amended version
of that motion.  LCG's Am. Mot. for Summ. J. as to Ms. Armetta, ECF No. 109.  No party has objected to
the filing of this amended version.  Accordingly, the Court has considered it.  The initial motion, ECF No.
103, is denied as moot.
[3] After its ruling on the motions to dismiss, the Court allowed Mr. Armetta and Aspira to amend their
Complaint to add the fraud and negligent misrepresentation claims.  Order, ECF No. 98.

fiduciary duty, constructive fraud, aiding and abetting a breach of fiduciary duty, CUTPA, unjust enrichment, and conversion.

## I.      STATEMENT OF FACTS

LCG, a Michigan corporation, owns and operates childcare centers.  LCG's First Local Rule 56(a)1 Stmt. ¶1, ECF No. 104.  Mr. and Mrs. Armetta are a married couple who live in Stamford, Connecticut and co-own Aspira.  *Id.* ¶¶2-3; LCG's Second Local Rule 56(a)1 Stmt. ¶2, ECF No. 106.  The Armettas and Aspira are in the business of providing various types of marketing services, including direct mail.  Direct mail marketing involves sending out mail to prospective customers, often in a targeted way. *See* LCG's Ex. 3, DeWalt Dep. 45:9-46:4, ECF No. 117 at 64-65.

LCG and Aspira initiated their business relationship in February 2009, when they entered into a contract under which Aspira agreed to provide marketing and relationship management services, as an independent contractor, to LCG.  The Armettas' Ex. 2, Independent Contractor Agreement, ECF No. 108-2; The Armettas' Local Rule 56(a)1 Stmt. ¶2, ECF No. 108; LCG's 56(a)2 Stmt. ¶2, ECF No. 117.[4]  Under this contract, Mrs. Armetta provided a range of services to LCG, including building and operating a call center and creating a direct mail marketing program.  The Armettas' Local Rule 56(a)1 Stmt. ¶5, ECF No. 108.  At this early stage of the relationship, Mr. Armetta did not provide any services to LCG.

In August 2009, Stacy DeWalt, LCG's Chief Marketing Officer, told Mrs. Armetta that LCG needed a new print vendor to design and print a direct mail marketing piece.  The Armettas' 56(a)1 Stmt. ¶6, ECF No. 108.  Ms. DeWalt and Mrs. Armetta

---

[4] Mrs. Armetta signed the contract on Aspira's behalf as a "Managing Director."  The Armettas' Ex. 2, Independent Contractor Agreement, ECF No. 108-2 at 1; The Armettas' Local Rule 56(a)1 Stmt. ¶3, ECF No. 108.

directed Mr. Armetta to locate a print vendor to work on the project. *Id.* ¶8. Mr. Armetta suggested that LCG use the print vendor Vertis Communications ("Vertis") and contacted Kevin Overlock at Vertis about the work. *Id.* ¶¶9-10. Mr. Armetta had a longstanding business relationship with Mr. Overlock. *Id.* ¶9.

LCG hired Vertis for this initial direct mail marketing project. The Armettas' Local Rule 56(a)1 Stmt. ¶¶10-11, ECF No. 108. After this initial project, LCG continued soliciting direct mail marketing projects from Vertis. *Id.* ¶13; *see also* The Armettas' Ex. 5, D. Armetta Dep. 75:23-76:16, ECF No. 108-3 at 30-31. Mr. Armetta contends that he played a significant role in completing all of these projects with Vertis, including designing the direct mail pieces, designing and testing the mailing strategy, arranging for and purchasing mailing lists, generally overseeing the operations of the direct mail marketing program, and negotiating the pricing and production of the project on Vertis's behalf. The Armettas' Local Rule 56(a)1 Stmt. ¶12, ECF No. 108; *see also* The Armettas' Ex. 6, D. Armetta Aff. ¶, ECF No. 108-3 at 55. LCG believes that Mr. Armetta overstates his role. LCG's Local Rule 56(a)2 Stmt. ¶12, ECF No. 117.

In September 2009, Vertis and Aspira signed a contract to govern the terms of their business with LCG. LCG's Ex. F, Broker Agreement between Aspira and Vertis, ECF No. 106 at 64. Consistent with the terms of that contract, when Vertis completed work for LCG, it invoiced LCG directly. *Id.*; The Armettas' Local Rule 56(a)1 Stmt. ¶20, ECF No. 108. Vertis also paid Aspira a "broker's commission" from money it received from LCG, which was due fifteen days after LCG paid Vertis in full for each invoice. LCG's Local Rule 56(a)2 Stmt. ¶9, ECF No. 106; The Armettas' Local Rule

4

56(a)1 Stmt. ¶20, ECF No. 108; LCG's Ex. F, Broker Agreement between Aspira and Vertis, ECF No. 106 at 64.

The Vertis-Aspira agreement specifically provided that "[n]o Broker Commission shall be due… until Vertis receives full payment for the invoice for that Brokered Job." LCG's Ex. F, Broker Agreement between Aspira and Vertis, ECF No. 106 at 64. Aspira calculated and invoiced Vertis for its broker's commission, based on the volume of printing Vertis had performed for LCG. LCG's Ex. G, D. Armetta Dep. 26:12-23, ECF No. 106 at 75. Generally, Vertis's invoices to LCG did not explicitly itemize the amount of this broker's fee. *See e.g.*, The Armettas' Ex. 28, Vertis Invoice dated 1/31/12, ECF No. 108-5 at 9.[5] But Mr. Armetta testified that he told Ms. DeWalt about the broker's commission in July or August of 2009. The Armettas' Ex. 5, D. Armetta Dep. 43:4-45:9, 50:3-51:23, ECF No. 108-3 at 14-16, 21-22.

In addition to the broker's fee, Mr. Armetta contends that he invoiced LCG directly for the services he provided in support of Vertis's work for LCG; in other words, his fees were included in the invoices from Aspira that Mrs. Armetta had been sending to LCG for her independent consulting work. The Armettas' Local Rule 56(a)1 Stmt. ¶¶14, 16, 20, ECF No. 108; *see also e.g.*, The Armettas' Ex. 5, D. Armetta Dep.52:13-25, ECF No. 108-3 at 23.[6] Mr. Armetta argues that, in essence, he worked directly for LCG and that Ms. DeWalt knew about his work and how he was compensated, including the broker's fee. The Armettas' Local Rule 56(a)1 Stmt. ¶¶14-15, 17, ECF No. 108. Mr.

---

[5] In support of their argument that LCG knew about the broker's fee, the Armettas cite one e-mail exchange regarding Vertis invoices that contains an attachment that mentions Aspira. The Armettas' Ex. 27, E-mail Dated Feb. 7, 2012, ECF No. 108-5 at 7. The precise meaning of the attachment is not clear from the document's face or the associated e-mail. *Id.*

[6] Aspira's invoices after September 2009 do not appear to distinguish between work performed by Mrs. and Mr. Armetta. LCG's Ex. 4, Aspira's Invoices, ECF No. 117 at 74-114.

Armetta and Aspira also have engaged an expert who has opined that Ms. DeWalt would have known that a broker's fee was the standard method of compensating a print broker, like Aspira, in its arrangement with Vertis.  *Id.* ¶22.[7]

LCG disputes Mr. Armetta's personal involvement in their dealings with Vertis and contends that Aspira, and not Mr. Armetta individually, was the party with whom it did business.  LCG's Local Rule 56(a)2 Stmt. ¶¶13-16, 20, ECF No. 117.  It also denies that Ms. DeWalt knew about Mr. Armetta's involvement in the dealings with Vertis or how Mr. Armetta was compensated.  *Id.* ¶¶17, 30.  In particular, it denies knowledge of the broker's fee and contends that this broker's fee did not compensate Aspira for any services it was actively rendering to LCG.  *Id.* ¶¶16-17, 30.  LCG also denies that the broker's fee was a standard way of compensating a print broker, like Aspira.  *Id.* ¶¶22-23.

### A.  LCG Hires Mrs. Armetta

In late 2009, to cut costs, Ms. DeWalt asked Mrs. Armetta whether she would be interested in working at LCG full-time.  The Armettas' Local Rule 56(a)1 Stmt. ¶26, ECF No. 108.  LCG believed that it could pay Mrs. Armetta less if it employed her directly, as opposed to as an independent contractor.  *Id.* ¶28.  Ms. DeWalt indicated that if Mrs. Armetta accepted the offer, LCG intended to continue working with Mr. Armetta.  *Id.* ¶27.  Mrs. Armetta testified that LCG's commitment to retaining Mr. Armetta after she was hired was crucial to her willingness to work at LCG.  LCG's Ex. 10, C. Armetta Dep. 168:17-169:2, ECF No. 117 at 140-41 ("why would I join you if I am doing very well working for your company… and [Ms. Dewalt] said to me, 'I will keep you whole… I want David to stay on board with us and to be retained.'").

---

[7] LCG contests the admissibility of this expert opinion but does not explain the precise nature of its challenge at this time.  LCG's Local Rule 56(a)2 Stmt. ¶22, ECF No. 117.  It has not filed a motion seeking to exclude the Armettas' expert testimony.

The Armettas also contend that when Ms. DeWalt was discussing the possibility of hiring Mrs. Armetta, she told them that Mr. Armetta's compensation would remain the same. The Armettas' Local Rule 56(a)1 Stmt. ¶29, ECF No. 108. They also believe that Ms. DeWalt told them that Mr. Armetta's continued relationship with LCG would not be a conflict of interest, even taking into account Aspira's broker's fee. *Id.* ¶30. LCG denies that Ms. DeWalt knew about the broker's fee or that she made any representations about Mr. Armetta's compensation. LCG's Local Rule 56(a)2 Stmt. ¶¶29-30, ECF No. 117.[8]

Mrs. Armetta testified that she discussed whether LCG's continued work with Aspira would present a conflict of interest with Ms. DeWalt in mid-January 2010. The Armettas' Ex C, C. Armetta Dep. 167:20-169:22, ECF No. 108-2 at 63-65. LCG's Employee Code prohibits conflicts of interest, unless they are approved by the company. *See* The Armettas' Local Rule 56(a)1 Stmt. ¶31, ECF No. 108. "Any request for approval must be in writing to the Executive Officer." The Armettas' Ex. 12, LCG's Employee Handbook, ECF No. 108-2 at 47. The code provides that if an employee becomes aware of a possible conflict of interest, he must inform the Ethics Compliance Officer or an Ethics Compliance Committee Member. *Id.* The code also prohibits an employee or any member of his or her immediate family from directly having a financial interest in a competitor, customer, or supplier if that employee or his subordinates deal

---

[8] Ms. DeWalt testified that she recalls having some discussion about Mr. Armetta's compensation around the time Mrs. Armetta was hired, but cannot recall the specifics of that conversation. The Armettas' Local Rule 56(a)1 Stmt. ¶44, ECF No. 108; The Armettas' Ex. 1, DeWalt Dep. 51:12-16, ECF No. 108-1 at 8. She testified that she did not know about the broker's fee and would have found that fee problematic. The Armettas' Ex. 1, DeWalt Dep. 103:14-105:9, ECF No. 108-1 at 35-37. On the other hand, she believed that Mr. Armetta was actively working for LCG, that he was paid in some way for that work, and that he deserved that compensation. *Id.* at 84:20-85:6, ECF No. 108-1 at 18-19; LCG's Local Rule 56(a)2 Stmt. ¶56, ECF No. 117.

with that customer or supplier in the course of his job, unless such relationships are approved by the Ethics Compliance Officer in advance. The Armettas' Ex. 12, LCG's Employee Handbook, ECF No. 108-2 at 48. Mrs. Armetta signed a document acknowledging that she received LCG's employee handbook containing the conflict of interest policy. LCG's Ex. 3, C. Armetta's Dep. 196:18-25, ECF No. 108-2 at 75.

Mrs. Armetta began work as an LCG employee in January 2010. *See* LCG's Local Rule 56(a)1 Stmt. ¶2, ECF No. 104. In early February 2010, Ms. DeWalt told Mrs. Armetta that she had spoken to Scott Smith, LCG's Ethics Compliance Officer, "in regard to continuing to contract David/Aspira" and that they planned to follow up with LCG's Chief Executive Officer ("C.E.O.") that week. The Armettas' Local Rule 56(a)1 Stmt. ¶36, ECF No. 108. That follow-up conversation with the C.E.O. never took place, and no employee ever followed up with the Armettas about this possible conflict. *Id.* ¶¶39-40. Instead, Ms. DeWalt continued to solicit business on LCG's behalf from Mr. Armetta. *Id.* ¶¶41, 43.

Ms. DeWalt testified that she told Mrs. Armetta that she could not hire Mr. Armetta or Aspira directly, because it was a conflict of interest. The Armettas' Ex. 1, DeWalt Dep. 51:12-22, 52:5-24, 53:19-54:6, ECF No. 108-1 at 8-11. Ms. DeWalt indicated that she alone could make the decision to hire Mr. Armetta and Aspira to avoid this problem. *See id.* Ms. DeWalt does not recall Mr. Smith ever informing her that she was not permitted to use Mr. Armetta's services after LCG hired Mrs. Armetta. The Armettas' Local Rule 56(a)1 Stmt. ¶46, ECF No. 108. However, Mr. Smith testified that he told Ms. DeWalt that she could not do business with Mr. Armetta because such an arrangement would create a conflict of interest. *Id.* ¶47. Ultimately, Ms. DeWalt has

testified that she did not believe that Mr. Armetta's continued work for LCG constituted a conflict of interest.  *Id.* ¶57.

In late February 2010, Ms. DeWalt suggested that Mr. Armetta be "rolled" into Vertis, or, in other words, that Vertis compensate him for his work for LCG.  *Id.* ¶¶50-52. The parties agreed to this arrangement, and Vertis began compensating Mr. Armetta for his services.  *Id.* ¶¶53-54.  Mr. Armetta testified that, after LCG hired his wife, he continued to provide the same services he had provided to LCG previously.  *See* The Armettas' Ex. 6, D. Armetta Aff. ¶¶1, 6, 9, ECF No. 108-3 at 55-56.  He also testified that, beginning in July and August of 2010 through the date of his wife's termination, he was working hard and exclusively for LCG.  The Armettas' Ex. 5, D. Armetta Dep. 87:6-25, ECF No. 108-3 at 40.  During this time, Aspira appears to have sent at least one bill to Vertis.  LCG's Ex. 5, Aspira Invoice dated 12/7/2012, ECF No. 117 at 116.

### B.  Replacing Vertis with FCL

The relationship between the Armettas, LCG, and Vertis continued in this manner until late 2012, when another company, Quad Graphics, acquired Vertis.  The Armettas' Local Rule 56(a)1 Stmt. ¶¶69-70, ECF No. 108.  Concerned about the quality of Vertis's services under its new management, LCG decided to initiate a transition to a new print vendor, FCL.  *Id.* ¶¶71-73.  In making this change, Ms. DeWalt directed Mrs. Armetta to ensure that "key members" of the LCG team at Vertis moved to FCL.  *Id.* ¶72.

In accordance with Ms. DeWalt's directive, Mr. Armetta and Mr. Overlock continued to work with LCG at FCL in the same roles they had at Vertis.  *Id.* ¶¶77; The Armettas' Ex. 8, Overlock Dep. 53:18-54:9, ECF No. 108-3 at 98-99.  FCL's fee arrangement, including Mr. Armetta's compensation, was "virtually identical" to the one

that had been in place with Vertis.  The Armettas' Local Rule 56(a)1 Stmt. ¶¶77, 82, ECF No. 108; *see also* LCG's Ex. I, Flood Dep. 48:3-5, ECF No. 106 at 84.  Aspira also continued to bill FCL for certain expenses associated with Mr. Armetta's work for LCG, including the broker's fee.  *See* LCG's Ex. 13, Aspira Invoices, ECF No. 117 at 150-155.

After the transition to FCL, LCG initiated an open bidding process to determine whether there was another vendor who could provide better quality and quantity for a lower price.  The Armetta's Local Rule 56(a)1 Stmt. ¶¶91-92, ECF No. 108.  FCL participated in the process.  *Id.* ¶93.  Mrs. Armetta guided FCL through the bidding process and provided it with information about competing bids.  *Id.* ¶¶80, 96.  Mrs. Armetta contends that LCG expected her to "assist FCL through the process" and provide it with information, including other bids, so that FCL could provide the best bid possible. *Id.* ¶¶80, 96-98; *see also* LCG's Ex. 9, C. Armetta Dep. 66:14-24, ECF No. 117 at 137 ("she [ ] left it up to me to negotiate and work with folks like this to try to get them the right proposal that she wanted.  Anything financial she did work with [Mr. Overlock] or [Mr. Armetta] specifically on, but this is [Ms. DeWalt] being very comfortable with me working with the vendor… she was well aware of the fact that I would be sharing information and talking with them.").

LCG contends that Mrs. Armetta acted inappropriately during the bidding process and that she had a conflict of interest because she was receiving a commission from FCL in her capacity as Aspira's co-owner.  LCG's Local Rule 56(a)2 Stmt. ¶¶96-98, ECF No. 117.  That said, LCG also admits that none of its representatives ever told Mrs. Armetta that she could not share information with FCL regarding the bidding process. *Id.* ¶100. Nor did anyone from LCG provide guidance to Mrs. Armetta on what types of

information were appropriate to share during the bidding process.  *Id.*  Ultimately, FCL provided the best bid and continued its business relationship with LCG.  The Armettas' Local Rule 56(a)1 Stmt. ¶99, ECF No. 108.

While employed at LCG, Mrs. Armetta had some authority to approve FCL and Vertis's bills, but she testifies that she could not approve those in excess of $10,000.  The Armettas' Ex. 7, C. Armetta Aff. ¶15, ECF No. 108-3 at 63; The Armettas' Ex. 3, C. Armetta Dep. 191:15-192:10, ECF No. 108-2 at 70-71 (describing the nature of her authority and explaining that she reviewed bills to make sure they were accurate).  She contends that this dollar amount limit precluded her from approving "virtually every invoice" from FCL.  The Armettas' Ex. 7, C. Armetta Aff. ¶15, ECF No. 108-3 at 63. Ms. DeWalt testified that she and Mrs. Armetta were both responsible for approving the print bills for LCG but that Ms. DeWalt had "final" approval authority.  The Armettas' Ex. 1, DeWalt Dep. 99:15-25, ECF No. 108-1 at 32.  LCG's Rule 30(b)(6) witness testified that he was not aware of any limitations on Mrs. Armetta's abilities to approve invoices.  The Armettas' Ex. 4, Smith Dep. 27:17-22, ECF No. 108-3 at 9; Fed. R. Civ. P. 30(b)(6).  In addition, some of FCL's invoices were directly addressed to Mrs. Armetta. *See e.g.*, LCG's Ex. 17, Invoice dated Jan. 31 2013, ECF No. 117 at 185-86.  Notably, FCL's bills do not contain any reference to Aspira or any line items corresponding to the amounts owed to Aspira.  *See e.g.*, LCG's Ex. 17, Invoices dated Jan. 3, 2013 and Jan. 31, 2013, ECF No. 117 at 184-86.

Mr. Armetta and Aspira contend that LCG was fully aware of Mr. Armetta's role after Mrs. Armetta was hired.  In particular, they note that Ms. DeWalt forwarded an e-mail including Mr. Armetta to LCG's C.E.O. and that Mr. Armetta was involved in

meetings with LCG employees.  The Armettas' Local Rule 56(a)1 Stmt. ¶¶62-65, ECF

No. 108.  In addition, during this time, Mr. Armetta and LCG signed a non-disclosure

agreement, in which Aspira promised to keep certain material received from LCG

confidential.  *Id.* ¶60; The Armettas' Ex. 21, Non-Disclosure Letter Agreement, ECF No.

108-4 at 96.  LCG does not deny that these events occurred but denies that they show that

LCG was aware of Mr. Armetta's continuing role.  LCG's Local Rule 56(a)2 Stmt. ¶¶60,

62-65, ECF No. 117.

### C.  Mrs. Armetta's Compensation and Termination

As an employee at LCG, Mrs. Armetta began as Vice President of Integrating

Marketing but also served as Interim Chief Marketing Office from January 24, 2013 to

April 15, 2013.  *Id.* ¶4-5.  In her role at LCG, Mrs. Armetta was eligible for a bonus

under the terms of the "LCG Support Central Fiscal Year 2013 Bonus Plan, Vice

President Level."  *Id.* ¶6.  Under the plan, bonuses were "typically distributed 60-90 days

from the end of the fiscal year."  LCG's Ex. A, LCG Fiscal Year 2013 Bonus Plan, ECF

No. 104 at 46.  In 2013, bonus checks were processed in October.  LCG's Ex. B, E-mails

dated June 14, 2013, ECF No. 104 at 36.

The parties dispute the precise contours of the bonus program.  *See* C. Armetta's

Local Rule 56(a)2 Stmt. ¶¶5-6, 12, 14, ECF No. 121.  In particular, LCG contends that

Mrs. Armetta's eligibility for a bonus depended on LCG's overall financial performance,

not on an individual's personal productivity.  LCG's Local Rule 56(a)1 Stmt. ¶6, ECF

No. 104.  Mrs. Armetta contends that personal performance played a role in determining

bonuses.  C. Armetta's Local Rule 56(a)2 Stmt. ¶6, ECF No. 121.

In June 2013, Mrs. Armetta and Barbara Beck, LCG's C.E.O. at the time, corresponded by e-mail about her bonus for fiscal year 2013. LCG's Local Rule 56(a)1 Stmt. ¶5, ECF No. 104; LCG's Ex. E, Beck Aff. ¶1, ECF No. 104 at 57 (identifying Ms. Beck as LCG's C.E.O. when the e-mails were sent). Mrs. Armetta contends that, in the e-mails, Ms. Beck unequivocally promised to pay her a bonus. C. Armetta's Local Rule 56(a)2 Stmt. ¶5, ECF No. 121; *see also* LCG's Ex. B, E-mails dated June 14, 2013, ECF No. 104 at 35. LCG contends that the e-mails merely established Mrs. Armetta's eligibility to receive a bonus, but that ultimately bonuses were discretionary and that Ms. Beck did not promise her a bonus unequivocally. LCG's Local Rule 56(a)1 Stmt. ¶¶5, 14, ECF No. 104.

In July 2013, LCG received e-mails from a former employee and an employee of a former print vendor raising concerns that Mrs. Armetta had violated LCG's conflict of interest policy. LCG's Local Rule 56(a)1 Stmt. ¶7, ECF No. 104. In response, LCG retained a law firm to investigate the matter and provide advice. *Id.* ¶8. LCG terminated Mrs. Armetta the day after this law firm issued the results of its investigation, on September 6, 2013. *Id.* ¶¶9-10.

In a termination letter sent to Mrs. Armetta, LCG indicated that it decided to terminate her because she "engaged in business dealings that were egregious and direct violations of the Company's Code of Conduct, specifically the prohibition against conflicts of interests, the improper release of confidential information, and financial interests in other businesses." The Armettas' Ex. 33, Termination Letter dated Sept. 6, 2013, ECF No. 108-7 at 13. Ms. Beck testified that Mrs. Armetta was not terminated to avoid paying her a bonus. LCG's Ex. E, Beck Aff. ¶7, ECF No. 104 at 58. Mrs. Armetta

admits that she was terminated because LCG believed she had violated its conflict of interest policy but contests whether she actually did so.  C. Armetta's Local Rule 56(a)2 Stmt. ¶¶11, ECF No. 121.  She also admits, as a matter of fact, that her termination was not related to her eligibility for a bonus.  *Id.* ¶12.

Beginning in November 2013, LCG refused to pay a portion of the money due on FCL's invoices.  LCG's Local Rule 56(a)2 Stmt. ¶¶103, ECF No. 117.  In particular, LCG contends that it has not paid FCL a sum representing the undisclosed "brokers fee" for Aspira.  *Id.*   As a result of LCG's non-payment, FCL has not paid Aspira its broker's commission.  The Armettas' Ex. 10, Flood Dep. 71:6-16, ECF No. 108-4 at 39.  The Armettas contend that LCG owes Aspira this money and that LCG was well-aware of the nature of their business relationship, including the broker's fee.

## II.    STANDARD

The Court shall grant summary judgment, if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party carries the burden of demonstrating that there is no genuine material dispute of fact by citing to "particular parts of materials in the record."  *See* Fed. R. Civ. P. 56(c)(1)(A)-(B); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000).  A dispute regarding a fact is "'genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" and material if the substantive law governing the case identifies those facts as material.  *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamid Co.,* 158 F.3d 622, 626 (2d Cir. 1998)); *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In assessing a summary judgment motion, the Court must resolve all ambiguities and draw all inferences from the record as a whole in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted).

### III.     MRS. ARMETTA'S CLAIM AGAINST LCG

Mrs. Armetta's only remaining claim against LCG is for wrongful discharge. LCG's Ex. A, C. Armetta's Compl. at Third Count, ECF No. 104 at 27.  As this Court noted in its prior ruling on the motions to dismiss, a plaintiff may only sustain a cause of action for wrongful discharge at common law, if "'the reason for the discharge involved impropriety derived from some important violation of public policy.'"  *Thibodeau v. Design Grp. One Architects LLC*, 260 Conn. 691, 698 (2002) (quoting *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 475 (1980)).  In this case, Mrs. Armetta claims that LCG terminated her to avoid paying her a bonus.  LCG's Ex. A, C. Armetta's Compl. at Third Count, ECF No. 104 at 27-28; Memo. of Decision on Mots. to Dismiss 44, ECF No. 71.  LCG and Mrs. Armetta have cross-moved for summary judgment on this claim.

Common law wrongful discharge claims are analyzed under the burden-shifting framework set out by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Li Li v. Canberra Indus.*, 134 Conn. App. 448, 454-55 (2012).  Under this framework, initially, the plaintiff has a "minimal burden" of making out a *prima facie* case.  *Id.* at 454.  If the plaintiff meets that burden, the employer must "demonstrate a permissible reason for the termination of employment."  *Id.*  The burden then shifts back to the

plaintiff to show that the employer's reason is "pretextual or, even if true, the improper reason likely motivated the employer in the decision to terminate." *Id.* at 454-55 (citations omitted). A legitimate reason is pretextual if the improper motive, in this case a desire to violate Connecticut's public policy, was the real reason the plaintiff was terminated. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446-47 (2d Cir. 1999).

LCG argues that summary judgment is appropriate on this claim, because the bonus was "discretionary" and, therefore, that not paying it did not offend Connecticut public policy. LCG's First Motion Br. 8, ECF No. 109. Second, it argues that Mrs. Armetta admits that was not terminated to avoid paying her bonus. *Id.* at 12-14. Mrs. Armetta argues that the bonus was not "discretionary" and, therefore, that failing to pay the bonus did violate Connecticut public policy. C. Armetta Opp. Br. 4-8, ECF No. 120. She also argues that LCG improperly reads an intent requirement into the law of wrongful termination. *Id.* at 9-10. In other words, Mrs. Armetta argues that to survive summary judgment, she only must show that the effect of her termination was to deprive her of compensation, in violation of public policy, not that LCG's purpose was to achieve this effect.

The Court finds that it not need address LCG's first argument, because Mrs. Armetta's claim should be dismissed on LCG's second argument. To survive summary judgment on a wrongful termination claim, Mrs. Armetta must introduce evidence showing some causal connection between her discharge and the claimed violation of public policy. *See Sheets*, 179 Conn. at 475 (allowing plaintiff's claim for wrongful termination which, he argued, required a "demonstrably improper reason for dismissal, a

16

reason whose impropriety is derived from some important violation of public policy"); *Li Li*, 134 Conn. App. at 455 ("A common-law action brought pursuant to *Sheets* includes a causation element.") (citation omitted); *see also e.g.*, *Carr v. Devereux Found., Inc.*, No. CV 95-0067464, 1995 WL 541799, at *3 (Conn. Super. Ct. Sept. 6, 1995) (granting a motion to strike a wrongful discharge claim because "[t]hese facts fail to show how the alleged public policy violation caused or resulted in the plaintiff's termination"); *Lebow v. Am. Chem. & Ref. Co.*, No. 112554, 1994 WL 411331, at *3 (Conn. Super. Ct. July 29, 1994) (noting that the "critical issue" in resolving a wrongful discharge claim was the supervisor's "motivation for terminating the plaintiff").

In this case, Mrs. Armetta has produced evidence indicating that she was terminated one month before her bonus was due.  But she has provided no other evidence of a causal link between her termination and LCG's desire to avoid paying her bonus.  In fact, Mrs. Armetta admits that LCG fired her because it believed that she violated the conflict of interest policy and not for any other reason.  C. Armetta's Local Rule 56(a)2 Stmt. ¶¶11-12, ECF No. 121 (admitting that "LCG's termination of Carlene Armetta was not related to her eligibility for a [ ] bonus.").  In other words, she admits that the real reason she was terminated was because of LCG's belief that she engaged in a relationship that was a conflict of interest.

Although Mrs. Armetta argues that LCG's reason was pretext, the only evidence that supports this theory is that the bonus was due one month after she was terminated. The Armettas' Motion Br. 23-24, ECF No. 107-1.  This showing is not sufficient at this stage of the proceedings.  *See generally St. Mary's Honor Ctr.*, 509 U.S. at 515; *Bickerstaff*, 196 F.3d at 446-47 (noting that in evaluating pretext, the plaintiff has the

"ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal [ ] reason played a motivating role in the adverse employment decision)"); *see also Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 73 (2d Cir. 2014) (affirming a grant of summary judgment on a Title VII wrongful termination claim because "conclusory and nonspecific" evidence of racial discrimination cannot show pretext); *see cf. Li Li*, 134 Conn. App. at 454, 456 (noting that a fact finder may consider temporal proximity in evaluating causation for a wrongful termination claim but also that "'[e]ven with respect to questions of motive, intent and good faith, the party opposing summary judgment must present a factual predicate for his argument in order to raise a genuine issue of fact.'") (quoting *Yancey v. Conn. Life & Cas. Ins. Co.*, 68 Conn. App. 556, 559-60 (2002)); *see also Carbone v. Atl. Richfield Co.*, 204 Conn. 460 (1987) (noting that "courts should not lightly intervene to impair the exercise of managerial discretion" but recognizing that "employees who are discharged for reasons that violate public policy are entitled to a modicum of judicial protection") (citing *Sheets*, 179 Conn. at 477).

Because Mrs. Armetta cannot show a causal link between her termination and any desire on LCG's part to avoid paying her bonus, LCG's Motion for Summary Judgment, ECF No. 109, on her wrongful termination claim must be granted. Accordingly, Mrs. Armetta's motion seeking summary judgment on this claim in her favor, ECF No. 107, is denied.

## IV.    MR. ARMETTA'S AND ASPIRA'S CLAIMS AGAINST LCG

Mr. Armetta and Aspira have four remaining claims against LCG in this case, for unjust enrichment, quantum meruit, common law fraud, and negligent misrepresentation.

18

*See* Memo. of Decision on Mots. to Dismiss 55-56, ECF No. 71; Mr. Armetta's and Aspira's Am. Compl. at First, Second, Third, and Fourth Counts, ECF No. 99.   Mr. Armetta and Aspira claim that, beginning in November 2013, LCG failed to pay FCL in full and, as a result, FCL has not paid Aspira or Mr. Armetta the broker's fee.   Mr. Armetta and Aspira contend that they are owed this money for work performed for LCG in furtherance of its direct mail marketing program.

LCG, Mr. Armetta, and Aspira have cross-moved for summary judgment on these four claims.   LCG makes a number of claim-specific arguments that the Court will address below, but its general theme is that LCG cannot be held responsible for the money Mr. Armetta and Aspira claim it owes them.   LCG's Second Motion Br. 11-14, ECF No. 105-1.   It argues that the proper party to this action is FCL and that all of Aspira's complaints pertain to FCL's conduct.   *Id.*   Aspira and Mr. Armetta argue that LCG is the responsible party, because the only reason FCL did not pay the commission is because LCG paid it less than it owed.   D. Armetta and Aspira Opp. Br. 4, ECF No. 118.

### A.   Unjust Enrichment/Quantum Meruit

Aspira and Mr. Armetta claim that, by failing to pay FCL the full amount it was due, LCG has improperly retained a benefit that was owed to them.   The Armettas' Motion Br. 26, ECF No. 107-1.   They contend that they are entitled to recover this money under the theories of unjust enrichment and quantum meruit.   *Id.* at 25-27.   They also argue that they are entitled to summary judgment on these claims because Aspira and Mr. Armetta provided valuable services to LCG and have not received payment.   *Id.*   LCG argues that it is entitled to summary judgment in its favor on these claims, because a contract governed the relationship between Aspira and FCL.   LCG's Second Motion Br.

14-15, ECF No. 105-1. It also argues that LCG was not unjustly enriched because it paid FCL for all of the work performed. *Id.* at 14-16. In other words, LCG contends that the money owed to Aspira does not reflect payment for work it did for LCG and that, therefore, LCG should not pay.

Quantum meruit and unjust enrichment enable "recovery on the theory of restitution, that is, the restoration to a party of something of which he was deprived because of the unjust enrichment of another at his expense." *Burns v. Koellmer*, 11 Conn. App. 375, 383 (1987) (citation omitted). A party may succeed on a quantum meruit claim where a fact finder determines that an implied contract for services existed between the parties and that the plaintiff is entitled to the reasonable value of the services he rendered. *Id.* (citing *Rossetti v. New Britain*, 163 Conn. 282, 292 (1972)). A claim of unjust enrichment requires proving "'(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment.'" *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 283 (1994) (citation omitted).

As LCG argues, summary judgment generally should be granted on quantum meruit and unjust enrichment claims where the claimed benefit was rendered under a contract. *See Burns*, 11 Conn. App. at 385 (citations omitted); *Meaney v. Conn. Hosp. Ass'n, Inc.*, 250 Conn. 500, 517-18 (1999) (collecting cases); *see also Gagne v. Vaccaro*, 255 Conn. 390, 401 (2001). Here, the parties agree that when LCG underpaid FCL, there was no contract between Aspira, Mr. Armetta, and LCG. Even if there were a contract between Aspira and FCL or between FCL and LCG, that contract does not cover the relationship between LCG and Aspira. Moreover, the contract purported to cover FCL

20

and Aspira, if it is indeed identical to the one between Aspira and Vertis, indicates that FCL need not pay Aspira until it receives full payment from LCG.  LCG's Ex. F, Broker Agreement between Aspira and Vertis, ECF No. 106 at 64.  Thus, under that contract, Aspira has no contractual remedy against FCL.

Because there is no contract governing the substance of the benefit Aspira and Mr. Armetta seek to recover from LCG, the existence of a contract cannot bar Mr. Armetta's and Aspira's quantum meruit or unjust enrichment claims.  *See Burns*, 11 Conn. App. at 385 (citations omitted); *see also Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 455 (2009) (citations omitted) (noting that the existence of a contract only precludes equitable remedies when the contract "fully address[es] a subject").

The Court also rejects LCG's second argument, that it has not been unjustly enriched, because Mr. Armetta and Aspira did no work for LCG. There is record evidence from which a reasonable juror could conclude LCG was unjustly enriched. LCG did not pay fully the invoices it received from FCL. There also is record evidence indicating that Mr. Armetta performed labor for LCG's benefit for which he expected and was owed compensation from LCG.  An unjust enrichment claim is appropriate in such a circumstance.  *See Burns*, 11 Conn. App. at 383 ("Quantum meruit is the remedy available to a party when the trier of fact determines that an implied contract for services existed between the parties, and that, therefore, the plaintiff is entitled to the reasonable value of services rendered.") (citing *Rosetti*, 163 Conn. at 292); *see also e.g.*, *Garwood & Sons Constr. Co. v. Centos Assocs. Ltd. P'ship*, 8 Conn. App. 185, 187-88 (1986) (recognizing that a sub-contractor may have an unjust enrichment claim against a

21

property owner where the sub-contractor performed labor under a contract with a developer to improve the owner's property but never received payment).

Even if Mr. Armetta was not actively performing labor for LCG's benefit, a reasonable juror could conclude that the broker's commission reflected some benefit that Mr. Armetta conferred to LCG when he introduced LCG to Vertis/FCL. The fact that LCG does not find the broker's commission to be fair or reasonable does not mean it was entitled to pay FCL less than it owed. Accordingly, LCG's Motion for Summary Judgment, ECF No. 105, on these counts must be denied.

Mr. Armetta and Aspira also have also moved for summary judgment on their unjust enrichment and quantum meruit claims, arguing that the only conclusion that can be reasonably drawn from the evidence is that LCG is liable. The Armettas' Motion Br. 25-27, ECF No. 107-1. There is record evidence indicating that LCG did not know about the broker's commission. Thus, a juror could conclude that its actions in withholding payment were not unjust. *See e.g.*, *Garwood & Sons Constr. Co.*, 8 Conn. App. at 188 (affirming a trial court's finding in favor of defendant on an unjust enrichment claim because plaintiff failed to show that the enrichment was unjust). There also is a factual dispute about whether Mr. Armetta, through Aspira, provided services to LCG and the extent of those services. Accordingly, the Court cannot find that LCG is liable to Aspira and Mr. Armetta as a matter of law and must deny Aspira's and Mr. Armetta's Motion for Summary Judgment, ECF No. 107, on these claims.

### B. Common Law Fraud/Negligent Misrepresentation

Mr. Armetta and Aspira claim that Ms. DeWalt misrepresented the status of Aspira's relationship with LCG. They contend that she knew continuing to do business

with Aspira after hiring Mrs. Armetta presented a conflict of interest but told them otherwise.  The Armettas' Motion Br. 27-29, 31, ECF No. 107-1.

To sustain a common law fraud claim past summary judgment, a plaintiff must show a genuine issue of material fact exists with respect to the following: "'(1) a false representation was made [by the defendant] as a statement of fact; (2) the statement was untrue and known to be so by [the defendant]; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment.'"  *Stuart v. Freiberg*, 316 Conn. 809, 821 (2015) (quoting *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 628 (2006)) (alterations in original).  At trial, Mr. Armetta and Aspira must prove all four of these elements by clear and convincing evidence. *Mitchell v. Mitchell*, 31 Conn. App. 331, 336-37 (1993) (citing *Alaimo v. Royer*, 188 Conn. 366, 39 (1982)).

For a negligent misrepresentation claim to move past summary judgment, a plaintiff must show a genuine question of material fact exists with respect to the following: "'(1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result.'"  *Stuart*, 316 Conn. at 821-22 (quoting *Nazami*, 280 Conn. at 626).  At trial, Mr. Armetta and Aspira need only prove these elements by a preponderance of the evidence.  *Id.*

LCG argues that both claims must fail because there is no evidence that a false statement was made.  LCG's Second Motion 17-18, ECF No. 105-1.  It argues that Ms. DeWalt told the Armettas that Aspira could perform work for LCG and that it did exactly that from January 2010 to July 2013.  *Id.*

23

The Court disagrees and believes that LCG oversimplifies the situation.  First, there is record evidence indicating that Ms. DeWalt specifically told Mr. and Mrs. Armetta that there was no conflict of interest in Aspira continuing to work with LCG. The Armettas' Local Rule 56(a)1 Stmt. ¶30, ECF No. 108 (citing the Armettas' Ex. 3, C. Armetta Dep. 167-69, 195, ECF No. 108-2 at 63-5, 74).  Second, even if Ms. DeWalt never affirmatively stated that there was no conflict of interest, she may have deceived the Armettas by omission.  "[A] failure to disclose can be deceptive [ ] if, in light of all the circumstances, there is a duty disclose."  *Olson v. Accessory Controls & Equip. Corp.*, 254 Conn. 145, 180 (2000) (citation and internal quotation marks omitted).  That duty is triggered where an individual voluntarily speaks about a subject.  *Johnnycake Mountain Assocs. v. Ochs*, 104 Conn. App. 194, 206 (2007), *cert. denied*, 286 Conn. 906 (2008) (citation omitted). Thus, when an individual takes up a subject, he must "make full and fair disclosure" about that subject.  *Id.* (citation and internal quotation marks omitted).  Record evidence indicates that Ms. DeWalt had discussions with at least one person at LCG, Mr. Smith, who told her that Aspira could not do business with LCG. She then continued to solicit business from Aspira without disclosing this fact.  She also had discussions with the Armettas about the conflict of interest issue and did not disclose this fact.  This evidence raises a question of fact as to whether such an omission was a false statement.

LCG also argues that, at most, LCG approved of Vertis/FCL paying Aspira's broker's fee and that it made no representations at all about its willingness to pay that fee. LCG's Second Motion18, ECF No. 105-1.  Again, the Court disagrees with this oversimplified view of the facts.  Aspira has pointed to record evidence that Ms. DeWalt

discussed the future of Mr. Armetta's compensation.  Given the business arrangement among the parties, LCG could not have approved of the broker's fee without implicitly representing that it agreed to pay that fee.  For all of these reasons, LCG's Motion for Summary Judgment, ECF No. 105, on Mr. Armetta's and Aspira's common law fraud and negligent misrepresentation claims must be denied.

Mr. Armetta and Aspira also moved for summary judgment on these claims in their favor.  The Armettas' Motion, ECF No. 107.  As discussed above, there are numerous open factual questions at issue with respect to these claims.  At this stage, the Court cannot conclude that the only reasonable inference to be drawn from the evidence is that LCG engaged in fraud and negligent misrepresentation through its representative Ms. DeWalt.  Accordingly, it must deny the Armettas' Motion for Summary Judgment, ECF No. 107, on these claims.

## V.     LCG'S CLAIMS AGAINST MR. AND MRS. ARMETTA AND ASPIRA

LCG also alleges six claims against Mr. and Mrs. Armetta and Aspira.  Compl., ECF No. 1.  The Armettas and Aspira have moved for summary judgment on all of these claims.  The Armettas' Motion, ECF No. 107.  LCG opposes their motion and contends that its claims must be tried to a jury.  LCG's Opp. Br., ECF No. 122.  For the reasons that follow, the Court denies the Armettas' motion in its entirety.

### A.  Breach of Fiduciary Duty against Mrs. Armetta

LCG claims that Mrs. Armetta breached her fiduciary duty by failing to disclose her conflict of interest, giving LCG's business to Vertis and FCL, and authorizing "inflated" payments to Vertis and FCL, which were passed on to Aspira.  Compl. at First Cause of Action, ECF No. 1; Memo. on Mot. to Dismiss 8, ECF No. 73.  Mrs. Armetta

25

admits that a fiduciary relationship existed between her and LCG.  The Armettas' Motion

Br. 32, ECF No. 107-1.  But she argues that summary judgment is appropriate on this

claim because LCG cannot show that it was actually harmed by her conduct.  *Id.* at 32-

33.  She argues that LCG obtained good pricing for good work from FCL and that there is

no evidence it could have obtained a better price for better service.  *Id.*  LCG does not

contest her points about pricing or service quality but argues that it need not prove actual

harm where an employee has breached his fiduciary duty.  LCG's Opp. Br. 8-12, ECF

No. 122.  LCG cites no Connecticut law in support of its position.  *Id.*

To survive summary judgment on a breach of fiduciary duty claim under

Connecticut law, LCG must show that a genuine question of material fact exists with

respect to all of the following elements: "(1) [t]hat a fiduciary relationship existed which

gave rise to (a) a duty of loyalty on the part of [Mrs. Armetta] to [LCG], (b) an obligation

on the part of [Mrs. Armetta] to act in the best interest of [LCG], and (c) an obligation on

the part of [Mrs. Armetta] to act in good faith in any matter relating to [LCG]; (2) [t]hat

[Mrs. Armetta] advance[d her] own interests to the detriment of [LCG]; (3) [t]hat the

[LCG] sustained damages; (4) [t]hat the damages were proximately caused by the

fiduciary's breach of [ ] her fiduciary duty.'"  *AW Power Hldgs., LLC v. FirstLight

Waterbury Hldgs., LLC*, No. CV146047836S, 2015 WL 897785, at *4 (Conn. Super. Ct.

Feb. 17, 2015) (citation omitted).

Under Connecticut tort law, intentional and negligent acts require different

showings to sustain liability.  *See Right v. Breen*, 277 Conn. 364, 376 (2006).  As with all

torts, a showing of actual harm is not required to sustain liability where the claimed

violation of fiduciary duty is intentional.  *Conn. Student Loan Found. v. Enter. Recovery*

*Sys., Inc.*, No. 3:04-CV-00712 (DJS), 2011 WL 1363772, at *3 n.6 (D. Conn. Apr. 11, 2011); *see also Breen*, 277 Conn. at 376.  In a case involving intentional conduct, a court may award nominal damages.  *Conn. Student Loan Found.*, 2011 WL 1363772, at *3 n.6 (collecting Connecticut cases upholding an award of nominal damages for a breach of fiduciary duty).  However, where the claimed violation is merely negligent, a plaintiff must show actual harm.  *Id.*; *see also e.g.*, *Fazzone, Baillie, Ryan & Seadale, LLC v. Baillie, Hall & Hershman, P.C.*, No. CV040833143S, 2007 WL 155161, at *6 (Conn. Super. Ct. Jan. 2, 2007) ("The plaintiffs were required to prove at trial by a fair preponderance of the evidence, that they incurred actual financial harm as a result of Baillie's breach of fiduciary duty.").

There is sufficient record evidence for a jury to conclude that Mrs. Armetta acted intentionally.  She was aware of the conflict of interest policy but worked directly with Aspira.  Accordingly, the Court agrees with LCG that an inability to prove actual harm in this case does not preclude a finding that Mrs. Armetta is liable at least for nominal damages.  In addition, LCG may be able to prove that it has been harmed by the amount it paid in broker's commissions, if it can show that it did not authorize or agree to these payments.  For all of these reasons, summary judgment must be denied.

### B. Aiding and Abetting a Breach of Fiduciary Duty against Mr. Armetta and Aspira

LCG claims that Mr. Armetta and Aspira knowingly assisted Mrs. Armetta in breaching her fiduciary duty by working with her to secure LCG's business, negotiating the broker's fee, and directing Vertis and later FCL to provide "inflated" invoices that included the amount of the broker's fee without disclosing it.  Compl. at Second Cause of Action, ECF No. 1; Memo. on Mot. to Dismiss 11, ECF No. 73.  To prevail on this claim,

LCG needs to prove the following elements "'(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation…'" *Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 295 n.12 (2014) (quoting *Efthimiou v. Smith*, 268 Conn. 499, 505 (2004)).

Mr. Armetta and Aspira argue that they are entitled to summary judgment on this claim, because Mrs. Armetta did not breach her fiduciary duty to LCG.  The Armettas' Motion Br. 34, ECF No. 107-1.  Since the Court already has determined that the breach of fiduciary duty claim against Mrs. Armetta will go forward, the Court disagrees.  Accordingly, it cannot grant summary judgment on this ground.

Mr. Armetta and Aspira also conclusorily argue that LCG cannot meet any of the required elements for this cause of action.  The Armettas' Motion Br. 34-35, ECF No. 107-1.  Because their reasoning is based on the assumption that Mrs. Armetta did not breach her fiduciary duty, *id.* at 34-35, the Court cannot accept their arguments.  In any case, at this stage, the Court finds that facts crucial to the analysis of all three necessary elements of this cause of action are disputed.  Accordingly, summary judgment must be denied.

### C.  Constructive Fraud against Mrs. Armetta

LCG claims that Mrs. Armetta committed constructive fraud when, as LCG's employee, she failed to disclose her conflict of interest and failed to inform LCG that the invoices it received from Vertis and FCL were inflated to include Aspira's broker's commission.  Compl. at Third Cause of Action, ECF No. 1; Memo. on Mot. to Dismiss

15, ECF No. 73.  Mrs. Armetta argues that LCG is unable to demonstrate that the invoices constitute a misrepresentation or that she failed to disclose the conflict of interest.  The Armettas' Motion Br. 35, ECF No. 107-1.  LCG argues that summary judgment is inappropriate because the parties contest whether Mrs. Armetta disclosed the nature of the commission and her relationship with Aspira and FCL.  LCG's Opp. Br. 12, ECF No. 122.  The Court agrees with LCG.

To make out a claim of constructive fraud, LCG must show "the existence of a confidential or special relationship."  *Mitchell v. Mitchell*, 31 Conn. App. 331, 335 (1993) (citing *Dunham v. Dunham*, 204 Conn. 303, 322 (1987)).  Once it has made that showing, "the burden shifts to the fiduciary to prove fair dealing by clear and convincing evidence." *Id.* (citing *Dunham*, 204 Conn. at 322-23); *see also HSB Grp., Inc. v. SVB Underwriting, Ltd.*, 664 F. Supp. 2d 158, 179 (D. Conn. 2009) (observing that constructive fraud depends on the showing of the breach of a special or confidential relationship) (citations omitted).

Mrs. Armetta admits that she is a fiduciary of LCG.  The Armettas' Motion Br. 32, ECF No. 107-1.  Accordingly, at this stage, the burden shifts to her to prove fair dealing.  The Court agrees with LCG that the nature and extent to which she disclosed her relationship with FCL and Aspira's compensation are disputed facts.  Because these facts are essential to determining whether Mrs. Armetta is liable for constructive fraud, the Armettas' summary judgment motion on this claim must be denied.

### D.  Unjust Enrichment against Mr. and Mrs. Armetta and Aspira

LCG contends that Mr. and Mrs. Armetta and Aspira have been unjustly enriched at LCG's expense by taking the broker's fee.  Memo. on Mot. to Dismiss 21, ECF No.

73; Compl. at Sixth Cause of Action, ECF No. 1.  The Armettas believe summary judgment is appropriate on this claim because they disclosed the broker's fee.  The Armettas' Motion Br. 38, ECF No. 107-1.  LCG opposes this motion because it contends that liability depends on contested facts.  Opp. Br. 14, ECF No. 122.

As noted above, a cause of action for unjust enrichment lies where a reasonable juror could find "'(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiff's detriment.'"  *Hartford Whalers Hockey Club*, 231 Conn. at 283 (citation omitted).  "[C]onsistent with the principles of equity," unjust enrichment is a "broad and flexible" remedy that "has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff."  *Id.* (citation and internal quotation marks omitted); *Gagne v. Vaccaro*, 255 Conn. 390, 409 (2001).

At this time, the Court finds that there are too many unresolved questions of fact to determine that LCG's unjust enrichment claim fails as a matter of law.  If Mr. and Mrs. Armetta and Aspira failed to properly disclose Aspira's commission, a jury could find that such commission payments unjustly enriched Aspira at LCG's expense.  *See e.g.*, *Godina v. Resinall Int'l, Inc.*, 677 F. Supp. 2d 560, 575-76 (D. Conn. 2009) (denying summary judgment on an unjust enrichment claim where questions of fact remained on whether plaintiff was entitled to benefits he received from former employer); *Vissa v. Pagano*, No. CV 980168124S, 1999 WL 810528, at *4 (Conn. Super. Ct. Sept. 29, 1999) (denying summary judgment on an unjust enrichment claim where plaintiff corporation introduced evidence that defendant took the assets of the corporation and used them for

his own personal benefit); *see also e.g.*, *Carney v. Lopez*, 933 F. Supp. 2d 365, 384 (D. Conn. 2013) (holding that allegations that corporate insiders received payments to which they were not entitled stated a claim of unjust enrichment that survived a motion to dismiss).

Accordingly, the Armettas' Motion for Summary Judgment on LCG's unjust enrichment claim is denied.

### E. Conversion against Mr. and Mrs. Armetta and Aspira

LCG claims that, by failing to disclose the broker's fee, Mr. and Mrs. Armetta and Aspira collectively and improperly took more than $1 million of LCG's funds. It contends that this conduct constitutes conversion. Compl. at Fourth Cause of Action, ECF No. 1; Memo. on Mot. to Dismiss 16, ECF No. 73. The Armettas argue that summary judgment is appropriate on this claim because, again, the commission payments were disclosed to and authorized by LCG. The Armettas' Motion Br. 36, ECF No. 107-1. They also argue that the commissions were rolled into the FCL and Vertis invoices, which were approved by LCG. *Id.* LCG counters that various factual disputes surround this claim, including whether LCG knew and approved of the commission payment. LCG's Opp. Br. 13, ECF No. 122.

To survive summary judgment on a conversion claim, LCG must show that a genuine question of material fact exists with respect to the following elements: "1) the funds at issue belonged to [LCG], 2) [the Armettas and Aspira] deprived [LCG] of its funds for an indefinite period of time, 3) [the Armettas' and Aspira's] conduct was unauthorized, 4) their conduct harmed [LCG]." *Celentano v. Oaks Condo. Ass'n*, No. X01CV940159297, 2001 WL 83944, at *22-23 (Conn. Super. Ct. Jan. 11, 2001)

(citations omitted); *Label Sys. Corp. v. Aghamohammadi*, 270 Conn. 291, 330-31 (2004); *accord Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 43-44 (2000) ("The tort of conversion occurs when one, *without authorization*, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights.") (internal quotation marks and citation omitted) (emphasis in original).

"The essence of the wrong [of conversion] is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm…" *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 770-71 (2006) (citation and internal quotation marks omitted).  Conversion claims may arise in the employment context, *see e.g.*, *Label Sys. Corp.*, 270 Conn. at 331 (holding that trial court reasonably could have found conversion where plaintiff company's employees took insurance proceeds that belonged to the company, without its prior authorization);  *Fleet Dev. Ventures, LLC v. Brisker*, Civ. No. 3:06CV570(RNC), 2006 WL 3254480, at *3 (D. Conn. Sept 15, 2006) (finding that plaintiff established a likelihood of success on the merits on conversion claim against its employee where that employee had taken corporate funds and property for his personal use) (Recommended Ruling), and with respect to hidden fees, *see also e.g. Evans v. BBG Commc'ns, Inc.*, No. 10-CV-0542 H(NLS), 2010 WL 5901096, at *5 (S.D. Cal. Nov. 17, 2010) (holding that defendant's alleged application of undisclosed fees stated a claim of conversion under California law).

The Court agrees with LCG that the issue of whether it approved of the commission and, therefore, authorized its payment is disputed.  Because the Armettas and Aspira do not argue that summary judgment is appropriate for any other reason, their motion is denied.

### F. CUTPA against Mr. Armetta and Aspira

LCG claims that Mr. Armetta and Aspira violated CUTPA when they failed to disclose the existence of the broker's fee to LCG.  Compl. at Fifth Cause of Action, ECF No. 1; Memo. on Mot. to Dismiss 18, ECF No. 73.  Mr. Armetta and Aspira argue that summary judgment is appropriate on this claim because they did not engage in an unfair or deceptive trade practice and properly disclosed the broker's fee.  The Armettas' Motion Br. 37, ECF No. 107-1.  The Court disagrees.

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. §42-110b(a).  To survive summary judgment on a CUTPA claim, LCG must show that it (1) suffered an ascertainable loss of money or property, (2) that was caused by, (3) an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce.  *See id.* §§42-110b(a), 42-110g(a).

To determine whether conduct is unfair under CUTPA, Connecticut courts apply the cigarette rule and look to "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – in other words, is it within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]."  *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227-28 (2010)(citation and internal quotation marks omitted) (alterations in original).  A practice need not meet all three criteria to constitute an unfair practice under CUTPA, and "[a] practice may be unfair because of the degree to which it

meets one of the criteria or because to a lesser extent it meets all three." *Id.* (citation and internal quotation marks omitted)

For an act or practice to be deceptive (1) "there must be a representation, omission or other practice likely to mislead consumers," (2) "consumers must interpret the message reasonably under the circumstances," and (3) "the misleading representation, omission or practice must be material – that is, likely to affect consumer decisions or conduct." *Bank of New York v. Nat'l Funding*, No. X01CV000171525S, 2005 WL 527749, at *5 (Conn. Super. Ct. Jan. 21, 2005)(citing *Southington Savings Bank v. Rodgers*, 40 Conn. App. 23, 28 (1995)); *see also Caldor, Inc. v. Heslin,* 215 Conn. 590, 597 (1990) (citation omitted).

The Court finds that LCG has provided enough evidence to raise a question of fact on whether Aspira and Mr. Armetta were engaged in an unfair or deceptive trade practice.  LCG's awareness of the broker's commission is highly disputed.  Whether charging an undisclosed broker's fee is an unfair or deceptive trade practice is a question for the jury to decide.  *See Naples*, 295 Conn. at 228 (2010) ("It is well settled that whether a defendant's acts constitute… deceptive or unfair trade practices under CUTPA, is a question of fact for the trier.") (citation and internal quotation marks omitted and alteration in original).  Accordingly, the Armettas' motion seeking summary judgment on LCG's CUTPA claims must be denied.

## VI.    CONCLUSION

For all of the foregoing reasons, LCG's First Motion, ECF No. 109, is **GRANTED**, and Mrs. Armetta's wrongful termination claim is dismissed.  LCG's Second Motion, ECF No. 105, is **DENIED**, and the Armettas' Motion, ECF No. 107, is

**DENIED**.  This case will proceed to trial on Mr. Armetta's and Aspira's claims for unjust enrichment, quantum meruit, negligent misrepresentation, and fraud as well as LCG's claims for breach of fiduciary duty, constructive fraud, aiding and abetting a breach of fiduciary duty, CUTPA, unjust enrichment, and conversion.

   **SO ORDERED** this 11th day of March 2016, at Bridgeport, Connecticut.

                              /s/ Victor A. Bolden
                              Victor A. Bolden
                              United States District Judge