## UNITED STATES DISTRICT COURT
## DISTRICT COURT OF CONNECTICUT

**LEARING CARE GROUP, INC.,**
     **Plaintiff/Consolidated Defendant,**       **CASE NO. 3:13-CV-1540 (VAB)**

**v.**

**CARLENE ARMETTA, DAVID ARMETTA,**     **MAY 24, 2016**
**And ASPIRA MARKETING DIRECT, LLC,**
     **Defendants/Consolidated Plaintiffs**

### MOTION IN LIMINE TO PRECLUDE DAMAGES OF ASPIRA'S "LOST PROFITS" AND DISGORGEMENT OF LCG PROFITS

Learning Care Group, Inc. ("LCG") seeks an Order of the Court precluding any claims or evidence of damages based on alleged "lost profits" of Aspira Marketing Direct, LLC ("Aspira") or disgorgement of LCG's "profits".

Aspira and David Armetta ("D. Armetta") (collectively "Armetta Parties") commenced this action in October, 2013.    Aspira and D. Armetta originally asserted claims of defamation as to D. Armetta, Commercial Disparagement as to Aspira, Violation of the Connecticut Unfair Trade Practices Act ("CUPTA") as to both and claims of Quantum Meruit and Unjust Enrichment as to both.

On August 25, 2014, Aspira and D. Armetta disclosed an "Assessment of Damages" of their claims, which included an assessment of damages of the claims of Carlene Armetta.  The assessment was calculated by Mr. Daniel Cenatempo of Fair Value Advisers ("Cenatempo").  (A copy of the report is attached hereto as Exhibit 1). Cenatempo opined that Aspira had "lost profits of $1,467,860 through May 15, 2015 and would sustain additional lost profits after May 15, 2015 of $926,735 for a total lost profits

1

claim of $2,394,598.  He attributed those losses to LCG's defamation of D. Armetta and Commercial Disparagement of Aspira and also attributed them to LCG's violation of CUPTA as to both parties.  In addition, Cenatempo opined that Aspira and D. Armetta were entitled to a disgorgement of LCG's profits attributable to Aspira's contribution to the Direct Mail Marketing Program of thirty eight million dollars ($38,000,000) plus prejudgment of six million dollars ($6,000,000) for total disgorgement damages of forty four million dollars ($44,000,000) collectable on Aspira and D. Armetta's claims of Unjust Enrichment, Quantum Meruit and CUPTA.

Approximately one month later, the Court dismissed the Defamation Claim of D. Armetta, the Commercial Disparagement Claim of Aspira, and the CUTPA claims of both.  In sustaining their claims of Unjust Enrichment and Quantum Meruit the Court explicitly stated "the profits realized by LCG as a result of Mr. Armetta and Aspira's work <u>are not</u> the proper measure of damages under the doctrines of Unjust Enrichment and Quantum Meruit (emphasis added) and, "Mr. Armetta and Aspira's claims of Quantum Meruit and Unjust Enrichment, **limited to the amount of either the promised payment or the reasonable value of the services**" So, as of September 30, 2014 LCG was apprised of the claims asserted by Aspira and D. Armetta and the proper scope of damages.

On October 23, 2014, Aspira and D. Armetta sought leave to amend their complaint to add claims of Fraud and Negligent Misrepresentation – basically relying on the same facts upon which they previously alleged the claims of Unjust Enrichment and Quantum Meruit.  The court granted the Motion to Amend on July 1, 2015.

2

Because the proper measure for damages for Fraud and Negligent Misrepresentation are either the "benefit of the bargain" or "out of pocket damages", the damages of these two new claims would be duplicative of the Unjust Enrichment and Quantum Meruit claims as limited by the Court's ruling on the Motion to Dismiss. The damage claims were merged, except for potential common law punitive damages on the Fraud claim.

Now, on May 12, 2016, five weeks before trial, Aspira and D. Armetta have disclosed an "Amended Assessment of Damages" wherein Cenatempo recasts the disgorgement damages of forty-one million dollars ($41mm) as damages recoverable on Unjust Enrichment (despite the Courts Memorandum of Decision of July 30, 2014) and fraud (a copy of the Amended Assessment is attached hereto as Exhibit 2).

LCG seeks to preclude any claims or evidence of Aspira's "lost profits" and disgorgement of LCG's "profits" for the following reasons:

1.     The disclosure of Mr. Cenatempo's Amended Assessment is untimely.

2.     Aspira's "lost profits" are not recoverable damages under Unjust Enrichment, Quantum Meruit, Fraud or Negligent Misrepresentation.

3.     Disgorgement of LCG "profits" are not recoverable damages under Fraud or Negligent Misrepresentation.

1.     **The Disclosure Of Cenatempo's Amended Assessment Is Untimely**

On July 1st, 2015 the Court permitted Aspira and D. Armetta to amend their Complaint to add Claims for Fraud and Negligent Misrepresentation. Those parties did not disclose Mr. Cenatempo's Amended Assessment of Damages until May 12, 2016, eleven (11) months after the Amended Complaint and five weeks before trial. There is

no reason why the Amended Disclosure could not have could not have been filed within thirty (30) days of the Amended Complaint as the Amended Assessment contains almost no data that was not in the original assessment.  But it contains new theories of recovery and a recasting of previously discredited claims for damages based on wild speculation, unproven assumptions, and unaccounted methodology.

The late disclosure by Aspira and D. Armetta will work incredible prejudice against LCG.  If permitted, LCG will need to prepare and take the deposition of Mr. Cenatempo, file a comprehensive <u>Daubert</u> Motion, potentially retain a rebuttal expert and be required to substantially alter its plans for trial preparation and trial including a significant alteration in the scope and number of trial exhibits and trial witnesses.

Even if the Court permits the late disclosure of the Amended Assessment, permits additional discovery and postpones the trial, all that additional time and expense and disruption of the Court's calendar would be for naught as the type and scope of damages upon which Mr. Cenatempo bases his Amended Assessment are not recoverable in this case and his methodology is highly speculative and will likely not survive a <u>Daubert</u> challenge.

2.    <u>**Aspira's Lost Profits Are Not Recoverable Damages Under Unjust Enrichment, Quantum Meruit, Fraud Or Negligent Misrepresentation**</u>

Aspira and D. Armetta[1] are attempting to assert damage claims for "lost profits"; that is, a complete cessation of Aspira's business operations after LCG severed its business relationship with the print vendor FCL and concomitantly with Aspira. Originally, Aspira and D. Armetta cast these "lost profits" as damages for their claims of

---

[1] LCG maintains that D. Armetta, as an owner of Aspira, has no standing to assert claims independent of the claims of Aspira.

Defamation, Commercial Disparagement and CUTPA.  Now, months after those claims were dismissed, they seek to resurrect those damages under theories of Fraud and Negligent Misrepresentation.

First, LCG notes that Aspira and D. Armetta's Complaint does not articulate any such claim of damages.  In the Amended Complaint they state in Paragraph 91 (Fraud) and Paragraph 96 (Negligent Misrepresentation) as follows:

> 91.    Mr. Armetta and Aspira relied on the false statements made by Ms. DeWalt, on behalf of LCG, in performing services for the benefit of LCG, to their detriment. Specifically, Mr. Armetta and Aspira <u>have suffered the loss of hundreds of thousands of dollars in commissions and other payments</u> due to the false and fraudulent representations, and Mr. Armetta and Aspira dedicated four years exclusively working for LCG only to be accused by LCG of improperly charging third parties for their work, terminating Mr. Armetta's wife from her employment with LCG and damaging his business reputation. Certainly, Mr. Armetta and Aspira would have rather done other work for other clients during that period had they know that LCG was not authorizing their work. (Emphasis added).

> 96.    Mr. Armetta and Aspira relied on the misrepresentation made by Ms. DeWalt, on behalf of LCG, in performing services for the benefit of LCG, to their detriment.  Specifically, Mr. Armetta and Aspira <u>have suffered the loss of hundreds of thousands of dollars in commissions and other payments</u> due to the misrepresentations, and Mr. Armetta and Aspira spent four years exclusively working for LCG only to be accused by LCG of improperly charging third parties for their work, improperly terminating Mr. Armetta's wife from her employment at LCG and damaging his business reputation. Certainly, Mr. Armetta and Aspira would have rather done other work for other clients during that period had they know that LCG was not authorizing their work. (Emphasis added).

LCG does not dispute that Aspira and D. Armetta articulated a claim for "hundreds of thousands of dollars" in unpaid commissions and other payments

5

($364,681 per Cenatempo) due to the "False and Fraudulent Misrepresentations" (Paragraph 91) or "Negligent Misrepresentation" (Paragraph 96). Certainly Aspira and D. Armetta cannot be heard to be claiming damages because they were "accused by LCG of improperly charging third parties for the work" or "terminating Mrs. Armetta" or "damaging (his) business reputation" as all those claims have been dismissed by the Court in its Memorandum and Decision on the Motion to Dismiss and the Court's Ruling on the Parties Cross-Motions for Summary Judgment (Doc. Nos. 71 and 126).

Aspira and D. Armetta claim that they were wrongfully induced into performing work for LCG after Carlene Armetta became an employee of LCG in January, 2010. Cenatempo's analysis reveals that in 2010, Aspira had income, which is solely attributed to income derived on the LCG account of $771.955 and thereafter received $469,627 in 2011, $878,094 in 2012 and $924,023 in 2013. Certainly Aspira received substantial compensation, over three million dollars ($3,000,000) for whatever services it performed and this dispute relates only to the amount allegedly outstanding and unpaid – which it asserts is $364,681.

**The "Lost Profits" Are Too Speculative**

A party is not entitled to recover damages that are speculative in nature – no matter the theory of recovery. Yet, here, that is exactly what the Armetta Parties seek to do. The Armetta Parties now claim that they are entitled to "lost profits" based upon future contracts that never existed, with customers they do not have and never had. And there can be no dispute that these non-existent contracts do not contain any terms as to quantity, quality, or price such that any profit could even be calculated. There is no evidence of any of this, nor any evidence of a causal connection between LCG's

conduct and these hypothetical "lost profits." This "lost profit" claim of damages based upon hypothetical future developments is nothing more than contingent, conjectural and improbable – which is the literal definition of Speculative Damages:

> Prospective or anticipated damages from the same acts or facts constituting the present cause of action, but which depend upon future developments which are contingent, conjectural, or improbable.

Black's Law Dictionary.

And this is why courts universally preclude a party from recovering speculative damages as a matter of law. Bridgeport Harbour Place I, LLC v. Ganim, 131 Conn. App. 99, 123 (2011)("The trial court 'has discretion to exclude speculative evidence, expert or otherwise [citation omitted'"); Meadowbrook Ctr., Inc. v. Buchman, 149 Conn. App. 177, 191 (2014)("Put simply, the trial court '*must have evidence* by which it can calculate the damages, which is not merely subjective or speculative....' (Emphasis added.)") citing Bronson & Townsend Co. v. Battistoni, 167 Conn. 321, 326–27 (1974); Harper Machinery Co. v. Ryan–Unmack Co., 85 Conn. 359, 364, (1912) (A claim of damages is speculative where "the right to recover them was still to be determined. The calculation of such damages would proceed upon a contingency which might not happen."); Wyatt Energy, Inc. v. Motiva Enterprises, LLC, 2010 WL 532514 *16 (CT Supr. Crt Jan. 11, 2010) (""[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits." citing Texas Law); Malissa Co., Inc. v. U.S., 11 Cl.Ct. 389, 392 (1986)("Lost profits on future contracts are too speculative in nature"); Olin Jones Sand Co. v. United States, 225 Ct.Cl. 741 (1980) at 744 (without assurances that plaintiff would have received additional contracts or work,

the claim for lost profits from future contract is too speculative and dependent upon too many factors not related to dispute between the parties)

Here, Judge Bryant has already held, in dismissing the Armetta Parties' Commercial Disparagement claim as a matter of law, that the Armetta Parties have not identified any particular business opportunity lost as a result of LCG's conduct, nor identified any "actual lost sales, contract or customer" proximately caused by LCG conduct. September 30, 2014 Decision, p.40 (Doc. No. 71).[2]  And the Armetta Parties have not disclosed any new information on these topics:  They have not identified any prospective clients, they have not identified any contract or contract terms; they have not provided any basis for calculating lost profits on these non-existent contracts.

And this is the very issue the Connecticut Supreme Court addressed in Leisure Resort Tech, Inc. v. Trading Cove Associates, 277 Conn. 21 (2006) when it affirmed that "lost profits" on a contingent future contract were an improper measure of damages. There, the plaintiff claimed he was the victim of fraud with respect to the sale of his interest in a company.  In puffing up his fraud damages calculation, the plaintiff claimed that his interest in the company was more valuable because of the potential sale of the company.  In addressing the plaintiff's damage claim based upon lost profits from a potential future contract, the Supreme Court affirmed and held that damages based upon a potential contract were improper as they were speculative because they depended upon two contingencies:  that an agreement would ultimately be reached; and the final agreed upon financial terms of the contract (which had a direct bearing on profits).

---

[2]        "The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" see DiLaura v. Power Authority of State of N.Y., 982 F.2d 73, 76 (2d Cir. 1992)

> Proof of damages "should be established with reasonable certainty and not speculatively and problematically." Johnson v. Flammia, 169 Conn. 491, 500, 363 A.2d 1048 (1975); 22 Am.Jur.2d 302, Damages § 328 (2003) ("[r]ecovery of damages will not be allowed when the evidence leaves the existence of damages uncertain or speculative"). Damages may not be calculated based on a contingency or conjecture. See Harper Machinery Co. v. Ryan–Unmack Co., 85 Conn. 359, 364, 82 A. 1027 (1912). In the early case of Lewis v. Hartford Dredging Co., 68 Conn. 221, 232, 235, 35 A. 1127 (1896), the plaintiff, in a breach of contract action, sought damages based on the difference between the actual value of its oyster beds and the projected market value of the oyster beds had the defendant not breached its contract. This court rejected this measure of damages as speculative because the projected market value of the plaintiff's oyster beds was based on the contingency of a successful cultivation of oysters in those beds. Id., at 235–36, 35 A. 1127.

Id. at 35

A similar result was reached in Powerweb Energy, Inc. v. Hubbell Lighting, Inc., 2014 WL 1784082 (D. Conn. 2014).  There, the plaintiff and the defendant entered into a licensing agreement wherein the defendant would pay royalties to the plaintiff for sales of its technology.  The plaintiff claimed that the defendant stole the plaintiff's technology and marketed a similar product under its own brand.  The plaintiff sued for, inter alia, bad faith and sought as a measure of damages lost profits on future contracts.

In reviewing the plaintiff's claim for these "lost profits", the District Court held that the plaintiff was precluded from seeking recovery for lost profits on future contracts as the "lost profits" were speculative and remote.  In this regard, the court determined that "a plaintiff cannot recover for the mere potential of profitability" and that a "claim for the right to recover is speculative where the calculation of such damages depends upon a contingency that might not happen." Id. *8 (citations omitted).  Specifically, the District Court held that:

9

> Without objective verifiable facts to support plaintiff's projected
> future profits claim, the Court must find that such claim falls within
> the realm of speculation.

Id. at *9

Also instructive is Bridgeport Harbour Place I, LLC v. Ganim, 131 Conn. App. 99

(2011).  There, the trial court precluded expert testimony on lost profits on a future

contract as the terms of that future contract had not yet been agreed upon – which

terms directly impacted the measure of profitability of the hypothetical contract.  The trial

court held that:

> deficiency of the plaintiff's claim for lost profits is fundamental. The
> plaintiff bases the lost profits claim on a nonexistent contract whose
> potential realization and returns are remote as a matter of law
> because its evidentiary support is contingent and speculative....

Id. at 118

On appeal, the Appellate Court agreed and affirmed that the plaintiff was

precluded from offering any evidence – expert or otherwise – on the issue of lost profits

on future contract:

> On the basis of the plain language of the development agreement
> that the costs, timetables and specifications of the project had not
> yet been agreed upon, we conclude that the trial court properly
> determined that the plaintiff's proffered experts could not provide
> evidence of lost profits with a reasonable degree of certainty.

Id. at 124

Finally, the scope and extent of damages that the Armetta Parties may seek

based upon their Unjust Enrichment and Quantum Meruit claims has already been

adjudicated by this Court and it does not include "lost profits" on hypothetical contracts:

> "Mr. Armetta and Aspira's claim for quantum meruit and unjust
> enrichment [are] limited to the amount of either the promised
> payment or the reasonable value of their services."

10

September 30, 2014 Decision, p. 54 (Doc. 71); see DiLaura v. Power Authority of State of N.Y., 982 F.2d 73, 76 (2d Cir. 1992)("The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'").

Accordingly, the Armetta Parties should be precluded from seeking damages based upon "lost profits" from future contracts.

3.   **Disgorgement of LCG "Profits" Are Not Recoverable Damages Under Fraud or Negligent Misrepresentation**

Likewise, LCG's "profits" are not subject to disgorgement under Aspira or D. Armetta's claims of Fraud or Negligent Misrepresentation.  A plaintiff in a fraud action is entitled to any consequential damages directly resulting from the fraud.

The disgorgement theory advanced by Aspira and D. Armetta are not appropriate damages in this case. LCG's profits, or any allocation thereof, are not a measure of damages to Aspira or David Armetta.  The only measure of damages is the money they claim they were not paid for their services.  Here, Aspira claims LCG agreed to compensate Aspira and its print vendors for a Direct Mail Marketing Program.  LCG maintains that it has paid in full for that Direct Mail Marketing Program.  Aspira claims that LCG has not paid in full, because it failed to pay FCL in full.  Under these circumstances, the only viable theory of damages would be the sum allegedly due Aspira under what it claims were false representations of LCG to pay in full for the marketing services, printing services and per piece commissions to Aspira.

Aspira's claim for disgorgement of an allocation of LCG's profits is not recognized under any controlling precedent.  The claim is also fraught with speculation and uncertainties.  LCG also notes that it paid Aspira, Vertis and FCL in excess of fifteen

million dollars ($15,000,000) for the Direct Mail Marketing Program.  The outstanding (unpaid) claims of Aspira are, at best $365,000.  So, if a speculative claim to wrongfully realized profits were to be permitted, another level of speculation would then ensue to determine what profits were related to the Direct Mail Marketing Program that LCG had paid for in full and what profits are attributed to the "unpaid" or partial payment outstanding.

LCG notes that calculating "profits" attributable to the Direct Mail Marketing Program would involve wild speculation.  This wild speculation would then be multiplied by any attempt to allocate the contribution of Aspira to the Direct Mail Marketing Program.

There is no reason to engage in these various speculative exercises when Aspira has already determined the value of its services, and stated them in the invoices submitted first to LCG, then to Vertis and then to FCL over a three and a half year period of time.  The damages are properly limited to the value of the services as claimed by Aspira.  Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co. 231 Conn 277 (1994).

Damages are awarded to compensate the inured party for harm caused by the tort, whereas restitution is aimed at depriving the fraudulent party of benefits obtained by the tort.  A plaintiff may seek restitution if the defendant has committed a civil wrong, usually a tort or breach of contract, and the plaintiff prefers to recover the amount the defendant was enriched by its wrongful conduct as opposed to damages.

If a plaintiff was fraudulently induced to enter into a contract and seeks to recover restitution, the plaintiff must rescind the contract.  Here, Aspira has received over

$3,000,000 under the allegedly fraudulent arrangement to provide services to LCG through its print vendors.  Aspira has not offered to rescind that arrangement or return the $3,000,000 to LCG and is therefore barred from seeking restitution as a measure of damages.  Leisure Resort Technology, Inc. v. Trading Cove Associates, 277 Conn 21, 40-41 (2006).

The alleged "fraud" is premised on the allegation that LCG represented to Aspira that LCG was agreeable to Aspira providing services for the benefit of LCG, but that Aspira would not bill LCG directly; rather, it would bill LCG's print vendors, and LCG would pay the print vendors (who in turn would pay Aspira), and that LCG knowingly approved that the print vendors would also pay a per piece commission to Aspira on all LCG print jobs.  Aspira also claims that it performed the services based on LCG's representations concerning the fees for services and commissions, and that LCG ultimately did not pay the final invoices from the print vendors in full, who in turn did not pay Aspira the final outstanding two invoices totaling $365,000.

So, at best, Aspira was "defrauded" out of the services valued at $365,000.

Now, Aspira seeks not only the $365,000 but $2,800.000 because it lost LCG as a "client" and $6,000,000 - $48,000,000 that it claims are the profits LCG earned as a result of the services rendered by Aspira.  Aspira does so with no basis and law.

LCG is not aware of any legal authority in Connecticut, or elsewhere, which endorses the claims of Aspira and David Armetta that because LCG fraudulently induced them to provide services, and they only received 90% of the anticipated payment for those services, that LCG is liable to disgorge profits related to those services, let alone some wildly speculative allocation of profits in the range of

13

$6,000,000 – to $48,000,000.  The Case of <u>Meaney v. Connecticut Hospital Association</u>, 250 Conn 500 (1999) is instructive here.  Although a decision relating to a claim for unjust enrichment, it speaks in terms of "restitution" of damages.   Such as those sought by Aspira on the fraud claim.  That is, that LCG should not be entitled to retain profits because it failed to fully pay FCL and then not fully pay Aspira.  In determining the "benefit" wrongfully obtained, the Court determined that it should be measured "not by their benefit in gross, but by their benefit in having been relieved of the obligation of providing proper compensation to the plaintiff.  <u>Meaney at 515.</u>

**Conclusion**

For all the reasons set forth above, LCG requests an Order of the Court either precluding Mr. Cenatempo's Amended Assessment based on late disclosure or preclude any evidence or claim of damages of Aspira's "lost profits" or disgorgement of LCG's "profits".

Respectfully submitted,

THE PLAINTIFF
LEARNING CARE GROUP, INC.

BY: _____
Stephen P. Fogerty
Halloran & Sage, LLP
315 Post Road West
Westport, CT  06880
Telephone (203) 227-2855
Facsimile (203) 227-6992
Fogerty@halloransage.com
Federal Bar No.:  ct23259

## **CERTIFICATION**

This is to certify that on this 24th day of May, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing

BY: _____
Stephen P. Fogerty

# EXHIBIT 1



FairValue Advisors, LLC
3455 Peachtree Road NE, Ste. 500
Atlanta, Georgia 30326
Phone: 888.212.0495
www.fairvalueadvisors.com

**Assessment of Damages in
Carlene Armetta vs. Learning Care Group, Inc.
and David Armetta and Aspira Marketing Direct, LLC
vs. Learning Care Group, Inc.**

**CONFIDENTIAL – Subject To Court Protective Order**

| | |
|---|---|
| Prepared On: | August 25, 2014 |
| Prepared By: | Daniel Cenatempo CVA, MAFF<br>Executive Director<br>FairValue Advisors, LLC |
| Submitted To: | Pastore & Dailey LLC<br>4 High Ridge Park, Third Floor<br>Stamford, CT 06905 |

## TABLE OF CONTENTS

I.      Introduction            1

II.     Summary of Opinions           4

III.    The Counts and Recovery Principles        9

IV.     Carlene Armetta's Lost Compensation           12

V.      Aspira and David Armetta Lost Income          20

VI.     LCG's Unjust Profits        27

Appendices:

A – Qualifications            41

B – Certification            47

C – Statement of Contingent and Limiting Conditions        48

D – Documents Considered          49

E – Complaint - Carlene Armetta vs. LCG          52

F – Complaint - David Armetta and Aspira vs. LCG            81

G –Lost Compensation and Profits          108

H – Direct Mail Program Analysis          134

CONFIDENTIAL - Subject to Court Protective Order

# I.   INTRODUCTION

## 1.1   ASSIGNMENT

I, Daniel Cenatempo of FairValue Advisors, LLC, was retained by Aspira Marketing Direct, LLC to assist in quantifying compensatory damages and restitution, if any, in the matters of

- Carlene Armetta vs. Learning Care Group, Inc. - Case No. 3:13-cv-1464(VLB) in the United States District Court for the District Court of Connecticut (hereinafter "Carlene Armetta's Case");

- David Armetta and Aspira Marketing Direct, LLC vs. Learning Care Group, Inc. - Case No. 3:13-cv-1461(VLB) in the United States District Court for the District Court of Connecticut, respectively (hereinafter "David Armetta's Case").

This report was prepared in accordance with Rule 26(a)(2)(B) Federal Rules of Civil Procedure. It describes my work to date and summarizes my opinions and the basis for those opinions. My opinions and findings expressed in this report are based upon information obtained during my investigation. Unless otherwise stated, I assumed the information I obtained from public sources, interviews and the discovery process was accurate. It is my understanding that discovery in Carlene Armetta's Case and David Armetta's Case (collectively hereinafter the "Cases") is ongoing. I reserve the right and intend to issue a supplemental report responding to new information and new opinions that become available to me between the date of this report and the date that I may testify.

This report has been prepared solely to assist the fact finder and the parties to determine the amount of compensatory damages in the Cases. This Report is not intended for any other use. Further, this report is subject to the Certification in Appendix B and Statement of Contingent and Limiting Conditions in Appendix C.

I anticipate preparing various demonstrative exhibits for use at trial as an aid to the fact finder to present my analysis and opinions. The specific exhibits to be used have not been prepared or determined as of the date of this report. At this time, I expect that any trial exhibits prepared

CONFIDENTIAL - Subject to Court Protective Order

will be supported by the information contained in this report and / or future amended and supplemental versions of this report, any report on damages that may be submitted on behalf of the defendant, the documents produced to date, and / or documents yet to be produced.

For Brevity, I will refer to:

- Mr. David Armetta as "David Armetta";

- Mrs. Carlene Armetta as "Carlene Armetta";

- Aspira Marketing Direct, LLC as "Aspira";

- Learning Care Group, Inc. and Childtime Learning Centers as "LCG";

- LCG's fiscal year that runs from July 1st of a given calendar year to June 30th of the following calendar year as "FY."

### 1.2    QUALIFICATIONS AND TESTIMONY

My curriculum vitae ("CV") is provided in Appendix A - Qualifications.

### 1.3    COMPENSATION

FairValue Advisors, LLC is compensated on an hourly basis for the preparation of this Report, and associated depositions and testimony, at a rate not to exceed $350 per hour.  Direct project expenses are charged at cost.  The specific schedule of tasks and associated hourly rates is as follows:

CONFIDENTIAL - Subject to Court Protective Order

**Compensation Schedule**

| Activity | Hourly Rate |
|---|---|
| Research and administrative activities | $200 |
| Document review and analyses | $275 |
| Deposition and testimony related activities | $350 |

## 1.4    SCOPE OF WORK

The following summarizes the scope of work I performed:

- Reviewed and considered the documents listed in Appendix D – Documents Considered;

- Re-reviewed the literature on calculation of compensatory damages for the counts in the Cases;

- Made inquires to and had discussions with David Armetta and Carlene Armetta;

- Performed independent research;

- Analyzed all of this information and determined compensatory damages;

- Documented my opinions and the bases for my opinions in this report.

CONFIDENTIAL - Subject to Court Protective Order

## II.    SUMMARY OF OPINIONS

### 2.1    SUMMARY OF OPINIONS

The following summarizes my opinions.   My opinions are based on the investigation, assumptions and methods detailed in the remainder of this report.   I have assumed, as is normal practice when analyzing damages, that LCG would be found liable for the counts in the complaints.  Based on this assumption, my review and analysis:

1. Carlene Armetta lost compensation due to the wrongful acts of LCG;

2. Aspira and David Armetta lost profits and income due to the wrongful acts of LCG;

3. Carlene Armetta and David Armetta, among others, established a direct mail program for LCG.  This program consisted in part of three seasonal mailings to prospective student families.  These mailings were done in fall, winter and summer.  Collectively I refer to this overall program as the "Direct Mail Program."  The individual seasonal mailings I refer to as a "Campaign" or as "Campaigns."

4. LCG benefited from the Direct Mail Program between from its inception in 2009 through 2014;

5. It enrolled over 97,000 new students which it attributed to the Direct Mail Program;

6. LCG generated $634 million in sales on these enrollments;

7. It generated $314 million in incremental profits on these enrollments and sales;

8. Is expected to generate an additional 12,899 enrollments, $85 million in sales and $44 million in incremental profits on its ongoing Fall FY 2014 Campaign.

9. Carlene Armetta, David Armetta, and Aspira were unlawfully treated and not fully compensated for their work on the Direct Mail Program.

CONFIDENTIAL - Subject to Court Protective Order

10. LCG was unjustly enriched by the taking the benefits of the Direct Mail Program without fully compensating Carlene Armetta, David Armetta and Aspira;

11. The resulting compensatory damages and prejudgment interest for Carlene Armetta are summarized in the following table. I calculated Carlene Armetta's lost compensation under two scenarios:

   a. Her income recovers as if she suffered a normal job loss (mitigating income starts in 2015 - 1.7 years from her termination date and following the trial);

   b. She recovers no income through 2016 – 3.3 three years from her termination date and the duration of her tenure at LCG but for their wrongful acts.

### Carlene Armetta's Damages Summary

| Line Item | Compensatory Damages | Prejudgment Interest | Total |
|---|---|---|---|
| Carlene Armetta | | | |
| A) Lost compensation | | | |
|    i) Normal Job Loss recovery | $649,599 | $39,903 | $689,501 |
|    ii) No Recovery During Her Expected Tenure at LCG | $827,160 | $39,903 | $867,063 |
| B) LCG's Unjust Profits | | | |
|    i) Total Direct Mail Program | $6,267,749 | $1,153,626 | $7,421,375 |
|    ii) Fall FY '13 to Fall FY '14 Campaigns | $3,039,685 | $559,477 | $3,599,161 |
| Total | | | |
|   Compensatory damages | From: | $649,599 to | $6,267,749 |
|   Interest | From: | $39,903 to | $1,153,626 |
| **Total Carlene Armetta** | **From:** | **$689,501 to** | **$7,421,375** |

12. Carlene Armetta's lost compensation damages (A) described above would apply to any of the following causes of action, both individually and collectively:

   • First Count – Defamation;

   • Second Count - Breach of Contract;

CONFIDENTIAL - Subject to Court Protective Order

- Third Count – Wrongful Termination;

- Fourth Count – Connecticut Unfair Trade Practices Act.

13. LCG's Unjust Profits (B) damages described above would apply to the Fourth Count – Connecticut Unfair Trade Practices Act, Fifth Count – Unjust Enrichment and the Sixth Count – Quantum Meruit both individually and collectively. LCG's Unjust Profits would apply in the alternative to lost compensation damages unless the fact finder found that the lost compensation damages did not adequately compensate Carlene Armetta.

14. The compensatory damages for David Armetta and Aspira are summarized on the following table. Lost compensation and profits are net of mitigating income and for the period from October 28, 2013 through December 31, 2016 – a period of 3.2 years.

### David Armetta's and Aspira's Damages Summary

| Line Item | Compensatory Damages | Prejudgment Interest | Total |
|---|---|---|---|
| David Armetta | | | |
|    A) Lost Compensation | $1,197,297 | $64,605 | $1,261,902 |
| Aspira | | | |
|    B) Lost profits | $2,394,595 | $129,210 | $2,523,804 |
| David Armetta and Aspira | | | |
|    C) LCG's Unjust Profits | | | |
|       Total Direct Mail Program | $38,175,818 | $6,057,402 | $44,233,220 |
|       Fall FY '14 Campaigns | $6,207,885 | $985,012 | $7,192,898 |
| Total David Armetta | | From: | To: |
|   Compensatory damages | | $1,197,297 | $19,087,909 |
|   Interest | | $64,605 | $3,028,701 |
| **Total David Armetta** | | **$1,261,902** | **$22,116,610** |
| Total Aspira | | | |
|   Compensatory damages | From: | $2,394,595 to | $38,175,818 |
|   Interest | From: | $129,210 to | $6,057,402 |
| **Total Aspira** | **From:** | **$2,523,804 to** | **$44,233,220** |

15. David Armetta's lost compensation damages (A) described above would apply to any of the following causes of action, both individually and collectively:

CONFIDENTIAL - Subject to Court Protective Order

- First Count – Defamation;

- Fifth Count – Connecticut Unfair Trade Practices Act.

16. Aspira's lost profit damages (B) described above would apply to any of the following causes of action, both individually and collectively:

- Second Count – Commercial Disparagement;

- Fifth Count – Connecticut Unfair Trade Practices Act.

17. LCG's Unjust Profits (C) damages described above would apply to the Third Count – Unjust Enrichment, the Fourth Count – Quantum Meruit and Fifth Count – Connecticut Unfair Trade Practices Act both individually and collectively.  LCG's Unjust Profits would apply in the alternative to lost compensation and profits unless the fact finder found that the lost compensation and profit damages did not adequately compensate David Armetta and Aspira.

## 2.2   ASSUMPTIONS

I made the following key assumptions when developing my opinions:

- LCG will be found liable for the Counts in the Complaints;

- Carlene Armetta had bonus contract with LCG and an implied covenant of good faith and fair dealing;

- The fact finder will agree with the Plaintiffs on the proportion of their contributions to the Direct Mail Program relative to others;

- The trial will be completed and the judgment made on May 15, 2015;

- The Court will award prejudgment interest as described under Connecticut general statute Sec. 37-3a. at a rate of 10% per year.

CONFIDENTIAL - Subject to Court Protective Order

The basis for my opinions are presented in the remainder of this report.  In order to assist the fact finder, I have provided information on the damages by individual plaintiff, time period and campaign.

CONFIDENTIAL - Subject to Court Protective Order

## III.   THE COUNTS & RECOVERY PRINCIPLES

### 3.1   THE COUNTS

The Counts in Carlene Armetta's Case against LCG include the following:

1. Defamation;

2. Breach of Contract;

3. Wrongful Termination;

4. Connecticut Unfair Trade Practices Act;

5. Unjust Enrichment;

6. Quantum Meruit.

The Counts in the David Armetta Case against LCG include the following:

1. Defamation;

2. Commercial Disparagement;

3. Unjust Enrichment;

4. Quantum Meruit;

5. Connecticut Unfair Trade Practices Act.

Copies of the complaints, with details on the nature of the actions, parties, facts and counts, are provided in Appendix E – Complaint – Carlene Armetta vs. LCG and Appendix – F – Complaint – David Armetta and Aspira vs. LCG.

CONFIDENTIAL - Subject to Court Protective Order

## 3.2    RECOVERY PRINCIPLES

The preceding counts include both contract and tort claims and a request for restitution.  The goal of compensatory damages in:

- <u>Tort claims</u> is to place the injured party in substantially as good a positions as they occupied prior to the wrong;

- <u>Contract claims</u> is to place the injured party in substantially as good a position as they would have if the contract had been performed.

There are several general principles for recovery of compensatory damages for contract and tort claims including the following;

- Proximate Cause – Damages must be proximately caused by the wrongful conduct of LCG (contract and tort claims);

- Reasonable Certainty – Damages must be proven with reasonable certainty and without undue speculation (contract and tort claims);

- Foreseeability:   LCG must have known, or should have known, that his actions would injure the Defendant (contract claims only);

- Mitigation:  The defendants must have acted reasonably to mitigate damages (contract and tort).

Compensatory damages are generally measured by the difference between the plaintiff's performance "but for" the injurious acts of the defendant (But For World) and their actual experience (Actual World).   But For World less Actual World = Damage.[1]

_____

[1] "Recovery of Lost Profits – 6[th] Edition" and annual supplements by Robert L. Dunn, Law Press Corporation, Westport, CT, 2005 to 2014 at §1.1 to §1.8, §6.33 to §6.36, §7.15, and §7.22.  Pollack, Richard, A, Bouchner, Scott M., Enos, Craig M., Johns, Colin A. and Moyl, John D., "Calculating Lost Profits", AICPA Practice Aid 06-4. American Institute of Certified Public Accountants, New York, NY, 2006.  Bauman, John A., York, Kenneth H. and Bauman John, H., "Gilbert Law Summaries, Remedies", The BarBri Group, Chicago, IL, 2003.

CONFIDENTIAL - Subject to Court Protective Order

Restitution restores to the plaintiff any benefit that the defendant may have gained from their misconduct (i.e. unjust enrichment).  Economic value to the recipient is generally the standard for measuring restitution.[2]

---

[2] Ibid.

CONFIDENTIAL - Subject to Court Protective Order

## IV.   CARLENE ARMETTA'S LOST COMPENSATION

### 4.1   CARLENE ARMETTA LOST COMPENSATION DUE TO LCG'S WRONGFUL ACTS

Carlene Armetta lost compensation due to the wrongful acts of LCG.  My review indicates that Carlene Armetta:

- Holds a Bachelors of Science degree in Business Management from Eastern Connecticut State University with an economics major and psychology minor;

- Holds a Masters of Business Administration from the Iona College Hagan School of Business with a focus on business management and organizational behavior;

- Has approximately 18 years of work experience, with no record of disciplinary action, or allegations of unlawful or unethical activity during her previous employments;

- Worked in various sales and marketing related Vice President positions for Pitney Bowes in Stamford, CT for approximately 7 years from 2001 to 2008;

- Was compensated $265,000 excluding benefits in 2007 – her final full year of employment with Pitney Bowes;[3]

- Next worked as a marketing consultant with Aspira in Stamford, CT including working as an independent contractor for LCG's marketing department starting in February 2009;

- Was hired as an employee of LCG on January 28, 2010 – approximately 1.5 years after leaving Pitney Bowes;

- Was paid a $175,000 salary by LCG which represents a pay decrease versus her former employment at Pitney Bowes;

- Was paid a $10,000 signing bonus for joining LCG;

---

[3] Carlene Armetta was compensated $316,066, excluding benefits, by Pitney Bowes in 2013.  However this amount includes severance payments.

CONFIDENTIAL - Subject to Court Protective Order

- Was paid a bonus of $16,000 in 2011;

- Received pay increases that resulted in a base salary of $200,000 by 2013;

- This represents a compound average growth rate of 3.4% (calculated between Carlene Armetta's starting and ending calendar years of January 1, 2010 and December 31, 2013);

- Was terminated by LCG after 3.6 years on September 6, 2013;

- Was discharged without being paid a $50,000 bonus for her work in LCG FY 2013 (which ended June 30, 2013);

- Was 50 years old on the date of her discharge;

- Has looked for employment and replacement income without success;

- Has not made any income since her discharge from LCG (as of this report date);

- Does not anticipate obtaining new employment for the foreseeable future due to the wrongful acts of LCG.

Carlene Armetta was damaged by the wrongful acts of FCL because:

- There is no cause for Carlene Armetta's loss of bonus income other than LCG's breach of contract;

- It was foreseeable by LCG that Carlene Armetta would lose $50,000 in bonus income if they breached her contract;

- There is no cause for Carlene Armetta's loss of employment and income other than LCG's wrongful termination, defamation and violation of the Connecticut Unfair Trade Practices Act;

- Carlene Armetta has attempted to mitigate these losses.

- Therefore, Carlene Armetta's lost compensation was proximately caused by LCG's wrongful acts, was foreseeable and is recoverable.

CONFIDENTIAL - Subject to Court Protective Order

**4.2    LOST COMPENSATION DAMAGES**

Carlene Armetta's lost compensation damages and prejudgment interest are summarized in the following table.   Details are provided by year and cumulatively in Appendix G – Lost Compensation and Profits.

**Carlene Armetta's Lost Compensation Damages & Prejudgment Interest Range are $689,500 to $867,000**

| Line Item | Back Pay (through trial) | Front Pay (discounted to trial date) | Total |
|---|---|---|---|
| **A - Normal Job Loss Recovery (Mitigating income starting 2015)** | | | |
| Total lost compensation | $429,357 | $220,241 | $649,599 |
| + Prejudgment interest | $39,903 | $0 | $39,903 |
| = Total lost compensation and interest | $469,260 | $220,241 | $689,501 |
| **B - No Recovery During Her Expected Tenure at LCG (No income through 2016)** | | | |
| Total lost compensation | $429,357 | $397,803 | $827,160 |
| + Prejudgment interest | $39,903 | $0 | $39,903 |
| = Total lost compensation and interest | $469,260 | $397,803 | $867,063 |

The following summarizes the key inputs into my lost compensation analysis.

**Trial and Judgment Date:**

Plaintiffs' counsel asked me to assume that the trial will conclude and a judgment will be made on May 15, 2015.  Further:

- Lost compensation between Carlene Armetta's termination date and the judgment date is referred to as "back pay";

- Lost compensation after the trial and judgment date is referred to as "front pay";

- It is my understanding that prejudgment interest is to be calculated from the date money was owed to the plaintiff until the date of judgment;

CONFIDENTIAL - Subject to Court Protective Order

- Therefore, I calculated lost compensation using the ex post method;[4]

- Further, I intend to review Carlene Armetta's actual and expected earnings prior to trial and will update my damages to reflect changes, if any.

**Income But-For the LCG's Wrongful Acts:**

- Carlene Armetta's base salary was $200,000 per year based on her LCG compensation at the time of her termination;

- She was denied a $50,000 bonus earned for FY 2013 due to LCG's wrongful acts[5];

- Her expected bonus was $16,500 per year thereafter. This represents her average incentive bonus over the four bonus period she was employed by LCG (the average of $0 in FY 2010, $16,000 in FY 2011, $0 in FY 2012 and $50,000 in FY 2013);

- Expected benefits are $8,234 per year based on the difference between Carlene Armetta's 2013 COBRA payments and the amount she paid for benefits while employed at LCG;

- Total compensation increases, including benefits, were escalated 2.5% per year based on LCG's "2.4% to 2.6% average company increase."[6] This is less than Carlene Armetta's 3.4% annualized pay increases while at LCG. However, her rate of increases was higher than LCG average in recognition of her "acting CMO stint."[7] A 2.5% per year increase is also more consistent with the Bureau of Labor statistics Employment Cost index.

---

[4] The ex post method is a generally accepted methodology for calculating damages. For example, see Pollack, Richard A., Bouchner M. Scott, Enos, Craig M., Johns, Colin A. and Moyl, John D., "Calculating Lost Profits", AICPA Business Valuation and Forensic & Litigation Services Section, Practice Aid 06-4, pp. 36 and 61.

[5] $50,000 equals 25% of Carlene Armetta's base salary of $200,000.   See LEG-EM00048660.pdf for LCG's projected FY 2013 EBITDA of $56 million to $57 million. See Exhibit 6 to Carlene Armetta's deposition for the Fiscal Year 2013 bonus plan that established at least 100% of a 25% bonus at this EBITDA level.  See LEG-EM0077378 and LCG-EM000036761 to 36762 indicating that the bonus should be paid on Carlene Armetta's $200,000 salary.

[6] LCG-EM00036762.

[7] Ibd.

CONFIDENTIAL - Subject to Court Protective Order

- Carlene Armetta was expected to continued to be employed by LCG through January of 2017 - 7 years - due to the following;

    o She held her previous position at Pitney Bowes for 7 years;

    o She indicated that a number of senior personnel at LCG stayed for 5 or more years;

    o The median tenure of all women between the ages of 45 and 54 is 7.3 years;[8]

    o The median tenure of women between the ages of 45 and 54 with master's degrees is 8.4 years;[9]

    o The success of the Direct Mail Program;

    o LCG's expectation of growing sales and profitability through 2018;[10]

    o Childcare industry expectations of continued growth;[11]

    o Expectations of a growing economy and falling unemployment rates through 2017.[12]

**Actual Income:**

- Carlene Armetta has not earned any income since her termination (11[+] months as of this report date);

- She does not anticipate obtaining new employment for the foreseeable future due to the wrongful acts of LCG;

---

[8]Employee Tenure Summary, U.S Bureau of Labor Statistics. January 2012. Table 1 for 2012.

[9]Ibid. Table 4.

[10] LCG-EM00048660.pdf.

[11] Lerman, Sally, "Taking care:  Parent will demand child care again as employment rises, boosting revenue", Day Care In the US, IBISWorld Industry Report 62441.

[12] "Survey of Professional Forecasters", Federal Reserve Bank of Philadelphia, August 15,2014.  "The Livingston Survey", Federal Reserve Bank of Philadelphia, June 4, 2014.

CONFIDENTIAL - Subject to Court Protective Order

- Long-tenured employees are displaced on a regular basis because of a plant or company closing or moving, insufficient work or a position or shift had been abolished ("Normal Job Loss");[13]

- Between 2009 and 2011, 30.9% of women 25 to 54 years old who suffered Normal Job Losses in the previous 1 month to 3 years were still unemployed.  An additional 14.5% had left the labor force for a combined total of 45.4% ;[14]

- Between 2009 and 2011, 26.7% of women 25 to 54 years old who suffered Normal Job Losses from business management positions in the previous 1 month to 3 years were still unemployed. An additional 13.1% had left the labor force for a combined total of 39.8%;[15]

- I analyzed the pay for people who were reemployed after suffering a Normal Job Loss from: a) private non-agricultural wage and salary jobs; b) professional and business services; and c) education and health services.   I found;

  o  18% found part-time work;

  o  82% found full-time work;

  o  10% of those who found full-time work were self employed or were unpaid family workers;

  o  53% of those who found full-time work had a decrease in pay in their new job;

- If Carlene Armetta's discharge from LCG was a Normal Job Loss, then:

  o  The probability of her finding another job within 1 month to three years would be 57.4%;

---

[13] Long-tenured workers are individuals over 20 years of age that have been employed in a position for at least three years.
[14] Worker Displacement Statistics, U.S. Bureau of Labor Statistics, January 2012, Table 1.  This is the most recent survey.  Most of this 2009 to 2011 period was characterized by modest employment growth.
[15] Ibid. Table 5.

CONFIDENTIAL - Subject to Court Protective Order

- o If she found a new job, then her compensation would be expected to be $189,919 per year (salary, bonus and benefits);

- o Her expected compensation is $109,013 ($189,919 per year if she was re-employed x 57.4% probability of being reemployed in 1 month to 3 years);

- However:

  - o  Carlene Armetta's job loss was not normal due to the wrongful acts of LCG;

  - o The time required for her to find replacement employment, if possible, is expected to be longer than is she suffered a Normal Job Loss;

  - o It is probable that Carlene Armetta will not find employment through January 2017 – the period when her expected tenure with LCG ends;

  - o The pay at her replacement job is expected to be lower than it would have been if she suffered a Normal Job Loss;

  - o Current labor market conditions are mixed relative to the 2009 to 2011 time period;

  - o Local compensation for marketing positions in the Stamford, CT area are less than Carlene Armetta was making at LCG or Pitney Bowes.

Given these factors, I determined Carlene Armetta's lost compensation under two scenarios:

A. Normal Job Loss Recovery:  Actual mitigating income of $109,013 starting after the expected trial judgment date (1.7 years after her termination);[16]

---

[16] This is an expected value.  Although possible, it does not mean the Carlene Armetta is expected to be reemployed starting in 1.5 years with total compensation of $109,013.   Rather, it considers a number of possibilities ranging from her not finding any employment within 3 years to finding employment at a higher than LCG level of compensation within less than  1.5 years.  As such, it is the expected value based on the probability of alternative possible outcomes.

CONFIDENTIAL - Subject to Court Protective Order

B.  No Recovery During Her Expected Tenure at LCG: Actual income is $0 through the end of 2016.

Details are provided in Appendix G – Lost Compensation and Profits.

**Carlene Armetta's Lost Salary and Bonus Due to LCG's Wrongful Acts – Normal Job Loss Recovery**



**Carlene Armetta's Lost Salary and Bonus Due to LCG's Wrongful Acts – No Recovery During Her Expected Tenure at LCG**



CONFIDENTIAL - Subject to Court Protective Order

## V.     ASPIRA AND DAVID ARMETTA LOST INCOME

### 5.1    PROFITS AND INCOME WERE LOST DUE TO LCG'S WRONGFUL ACTS

Aspira lost profits and David Armetta lost compensation due to the wrongful acts of LCG. Aspira is a direct marketing firm self-described as follows:

> "*Aspira Marketing Direct is a premier marketing and business services firm, specializing in the creation of innovative and results-driven direct marketing and programs. Our primary objective is to increase your revenue, and expand your customer base through direct response marketing. Simply stated, our business is to grow your business. Our clients have utilized our focused efforts, our strategic capabilities, our state-of-the-art tools and techniques, and our many decades of professional experience to achieve their required and expected results. The high-profile nature of our clientele attests to our effectiveness, creativity, professionalism and attention to detail.*"[17]

My review indicates that:

- David Armetta was an independent design and marketing consultant for approximately 20 years;[18]

- He was 55 years old in September / October 2013;

- He started Aspira on January 14, 2009;[19]

- Since early 2010, Mr. Armetta was the only one working in the Aspira business;

- In 2012, Aspira's revenue and profits had grown to $878,000 and $814,490, respectively;[20]

- Aspira is a domestic limited liability company;[21]

_____

[17] www.aspiradirect.com
[18] Based on discussions with David Armetta.
[19] CARMSUPP-00026067.
[20] Ibid.
[21] Online business inquiry to the Connecticut Secretary of State.

CONFIDENTIAL - Subject to Court Protective Order

- David Armetta's personal share of Aspira's profits, losses and capital is 50%;

- Therefore, his personal share of 2012 profits were $407,425 (50% of Aspira's total $814,490 income);[22]

- Aspira's business status remains "active" as of the writing of this report;[23]

- Aspira's website, www.aspiradirect.com, remains active as of the writing of this report;

- Aspira hast two outstanding invoices totaling $364,681 that FCL will not pay due to the wrongful acts of LCG ;[24]

- Aspira's revenue and profits fell to $0 for the year through August 25, 2014;

- In turn, David Armetta's personal income fell to $0 to for the year through August 25, 2014; [25]

- Aspira and David Armetta lost relationships with companies and individuals they used to work with to serve customers;

- David Armetta continues to do business development;

- However, he does not expect to generate any revenue from new clients or business within the upcoming year.

Aspira and David Armetta were damaged by the wrongful acts of FCL because:

- There is no cause for Aspira's uncollectible invoices and loss of business other than LCG's commercial disparagement and violation of the Connecticut Unfair Trade Practices Act;

---

[22] CARMSUPP-00026075.
[23] Connecticut Secretary of State online.
[24] CARMSUPP-00026432 and CARMSUPP-00026431.
[25] Based on discussions with David Armetta.

CONFIDENTIAL - Subject to Court Protective Order

- There is no cause for David Armetta's loss of income other than LCG's defamation and violation of the Connecticut Unfair Trade Practices Act;

- Further, David Armetta and Aspira have attempted to mitigate these losses;

- Therefore, Aspira's lost profits and David Armetta's lost profits were proximately caused by LCG's wrongful acts and are recoverable damages.

**5.2    ASPIRA AND DAVID ARMETTA LOST INCOME DAMAGES**

Aspira's lost profits, David Armetta's lost income and prejudgment interest are summarized in the following table.   Details are provided by year and cumulatively in Appendix G – Lost Compensation and Profits.  Note that David Armetta's lost income damages are duplicative with Aspira's lost profits (i.e., they are not additive if both parties prevail and are awarded damages).

**Aspira and David Armetta's Lost Income and Prejudgment Interest Total $2.5 Million and $1.26 Million, Respectively (Non-Additive)**

| Line Item | Pre-trial | Post-trial | Total |
|---|---:|---:|---:|
| **Aspira** | | | |
| Total lost profits | $1,467,860 | $926,735 | $2,394,595 |
| + Prejudgment interest | $129,210 | $0 | $129,210 |
| = Total lost profits and interest | $1,597,070 | $926,735 | $2,523,804 |
| **David Armetta** | | | |
| Total lost income | $733,930 | $463,367 | $1,197,297 |
| + Prejudgment interest | $64,605 | $0 | $64,605 |
| = Total lost income and interest | $798,535 | $463,367 | $1,261,902 |

CONFIDENTIAL - Subject to Court Protective Order

I used the before-and-after method within the "but-for" vs. "actual" approach to determine Aspira's and David Armetta's lost profits and income.[26]   The following summarizes the key inputs into my lost compensation analysis.

**Trial and Judgment Date:**

Plaintiffs' counsel asked me to assume that the trial will conclude and a judgment will be made on May 15, 2015.  Further:

- I calculated lost profits and income using the ex post method;

- Therefore, I intend to review Aspira's and David Armetta's actual and expected profits and income prior to trial and will update my damages to reflect changes, if any.

**Profits and Income But-For the LCG's Wrongful Acts:**

- LCG was Aspira's sole client in the time leading up to the wrongful acts;

- Aspira and David Armetta were expected to work on the LCG Direct Mail Program on an an ongoing basis given:

    o   The positive results of the program (see the upcoming section for discussion of the program's results);

    o   LCG's expectations of continued sales and profit growth through 2018;[27]

    o   The childcare industry was expected to grow through 2019[28]

    o   The economy was expected to continue to grow and the unemployment rate fall through  2017;[29]

---

[26] This is a generally accepted approach / method.  For example, see , see Pollack, Richard A., Bouchner M. Scott, Enos, Craig M., Johns, Colin A. and Moyl, John D., "Calculating Lost Profits", AICPA Business Valuation and Forensic & Litigation Services Section, Practice Aid 06-4, p. 25
[27] LCG-EM00048660.pdf.

CONFIDENTIAL - Subject to Court Protective Order

- The number of LCG Direct Mail Program mailings were generally increasing over time;

- Aspira's revenue and profits were generally increasing over time;

- David Armetta's annual income was half of Aspira's annual profits;

- Therefore, David Armetta's annual income was generally growing over time;

- David Armetta and Aspira expected to generate new clients based on their results with LCG;

- For example, David Armetta and Aspira were pursuing similar business with Isle of Capri Casinos at the time LCG's wrongful acts occurred;[30]

- Going forward, David Armettta's and Aspira's income was expected to be at least as high as its 2012 and 2013, before September 6, levels;

- Carlene Armetta was expected to continue to be employed by LCG through January 2017;

- Aspira, David Armetta and Carlene Armetta worked together on the Direct Mail Program;

- Therefore, I limited Aspira's and David Armetta's "but-for" income to the end of 2016 – the end of Carlene Armetta's expected tenure;

- Further, I limited Aspira's and David Armetta's sales, profits and income to 2012 to 2013 levels out of an abundance of caution to not overstate damages.[31]

**Actual Income:**

- Aspira's and David Armetta's actual income fell to $0 in 2014;

---

[28] Lerman, Sally, "Taking care:  Parents will demand child care again as employment rises, boosting revenue", Day Care In the US, IBISWorld Industry Report 62441.

[29] "Survey of Professional Forecasters", Federal Reserve Bank of Philadelphia, August 15,2014.  "The Livingston Survey", Federal Reserve Bank of Philadelphia, June 4, 2014.

[30] Discussions with David Armetta.

CONFIDENTIAL - Subject to Court Protective Order

- David Armetta and Aspira are not expecting to generate any new business for the next 12 months based on current prospects and the length of the cycle from selling to income generation (as of the August 25, 2014 date of this report);

- David Armetta and Aspira are expected to find a replacement client or clients for LCG starting in the fourth quarter of 2015 and ramp-up sales and profits in the same pattern as exhibited with LCG.

My but-for versus actual findings are illustrated in the following charts.



**Aspira's Lost Profits Due to LCG's Wrongful Acts**

---

[31] It is my understanding that companies and individuals like David Armetta and Aspira are typically paid on a commission basis. However, I also checked their compensation and sales on an hourly consulting basis for reasonableness.

CONFIDENTIAL - Subject to Court Protective Order

### David Armetta's Lost Income Due To LCG's Wrongful Acts



CONFIDENTIAL - Subject to Court Protective Order

# VI.   LCG'S UNJUST PROFITS

## 6.1   LCG Had A Number of Marketing Initiatives

LCG used a number of marketing initiatives and tools to attract, enroll and retain new students including:

- LCG's Direct Mail Program;

- Websites – LCG and its sub-brands including Childtime, Tutor Time, The Children's Courtyard, La Petite Academy, Montessori Unlimited;

- Social media;

- Call center operations;

- Corporate and affinity partnerships;

- Customer relationship management (CRM) software;

- Customer communications and surveys;

- A portfolio of school locations and brands;

- School based initiatives / local marketing;

- School frontage and signage.[32]

---

[32] Discussions with the Arnettas, a review of LCG and related websites and social media sites and a review of LCG's presentations.  For example, see CARMSUPP-025814 to 025825 and CARMSUPP-00026144 to 026146.

**6.2     LCG ATTRIBUTED STUDENT ENROLLMENTS TO THE DIRECT MAIL PROGRAM**

LCG tracked and reported student enrollments attributable to the Direct Mail Program. Tracking was done through both a matching process and local school entry of information into LCG's CRM system. To match enrollment to the Direct Mail Program, LCG compared the names of recipients of direct mail pieces to the names of new students enrolled from its billing system. This process was performed weekly.[33] Bridget Pietrowicz, who performed internal analytics for LCG, described this matching process as follows:

> *"While I agree that the matching process is not entirely accurate, I think it is also understated overall. The swing we have seen in new enrollments since we launched direct mail more than covers the total enrollments we have matched."*[34]

Further, LCG management reported the number of enrollments attributable to the Direct Mail Program in presentations. For example:

- LCG proposed a transaction to refinance its existing Senior Secured Revolving Credit Facility and Senior Secured Notes with $255 million of New Senior Secured Credit Facilities. The transaction was to be financed through a $35 million Revolving Credit Facility and a $220 million term loan;

- In its April 2013 rating agency presentation related to this refinancing transaction, LCG:

  o Identified the Direct Mail Program among the "Key Action Items" for the "Key Initiative(s)" of "Customer Acquisition";

  o Indicated that it "Built industry leading sales and marketing capabilities to drive enrollment" and "Designed sophisticated direct mail strategy, with over 5 million pieces mailed annually";

---

[33] Discussions with the Arnettas and a review of LCG documents and presentations. For example, see CARMSUPP-025753.

[34] CARMSUPP 25847. Ms. Pietrowicz did not recall this email during her deposition or exactly what the meaning of her statement was at the time. However, she did not expressly contradict the accuracy of the statement. See her deposition dated 8/4/2014 at pages 25-26.

CONFIDENTIAL - Subject to Court Protective Order

- o   Informed the rating agency that "LCG Is Executing A Multi-Faceted Strategy To Drive Lead Generation Enrollments and Retention";

- o    Represented to the rating agency that "Direct mail campaigns generated 25k enrollments year to date;"[35]

- LCG had an objective of refinancing and increasing its $36 million Senior Secured Revolving Credit Facility to $40 million to $45 million circa June 2013;

- In its lender presentation for this refinancing transaction, LCG:

  - o   Identified the Direct Mail Program as a "strategic initiative"

  - o   Listed it first among "key initiatives"

  - o   Indicated that management actions included "Customer Acquisition:  Developed sophisticated, response-driven marketing competency", "Built industry leading sales and marketing capabilities to drive enrollment", "Designed sophisticated direct mail strategy, with over 3 million pieces mailed annually";

  - o   Presented the enrollment attributable to the Direct Mail Program for Fall and Winter for fiscal years 2010 through 2012 in a slide titled "Improved direct mail tactics are resulting in greater new enrollments";

  - o   Also presented the enrollment conversion rate and cost per acquisition;[36]

- Expected and actual enrollments attributable to the Direct Mail Program were presented in the "Learning Care Group Q3 & 9 + 3 Outlook Review" dated 4/26/2013.[37]

I summarized the student enrollment that LCG attributed to the Direct Mail Program (hereinafter "DM Students").  The results are summarize in the following table and detailed in Appendix H – Direct Mail Program Analysis.

---

[35] LCG-EM00048660.pdf.
[36] CARMSUPP 0025789, -025796, -025803 and -025814 to 025816.
[37] CARMSUPP-00026132, -26145 and -26160.

CONFIDENTIAL - Subject to Court Protective Order

**Student Enrollments Attributed to the Direct Mail Program by LCG Increased Each Year Between FY 2010 and  FY 2013**



**Cumulative Student Enrollments Attributed to the Direct Mail Program by LCG Exceed 97,000 Between the Fall FY 2010 and Fall FY 2014 Campaigns[38]**



---

[38] F = Fall, W = Winter and S = Summer.  Fall 2014 is a partial period (1 of 5 to 7 months).

CONFIDENTIAL - Subject to Court Protective Order

A review of the mailings and students enrolled by Campaign by year indicates:

- Three campaigns were done each fiscal year between 2010 and 2013 - fall, winter and summer;

- The fall and winter Campaigns were each three- to five-times (3x to 5xs) the size of the summer Campaign in terms of total mailings and unique prospects mailed;

- The fall and winter Campaigns each enrolled two-times (2x) as many students as the summer Campaign;

- The number of unique prospects mailed declined over time;

- The number of total mailings increased over time (i.e. more mailings per unique prospect);

- The total students enrolled that were attributed to the Direct Mail Program increased over time;

- The direct mail conversion rate (students enrolled divided by unique prospects mailed) generally increased over time;

- The direct mail cost of acquiring a student generally decreased over time;

- The direct mail cost per mailing generally increased over time.

Further, the student enrollments from the Direct Mail Program were incremental volume to LCG:

- LCG schools experienced student churn – an ongoing cycle of losing existing and adding new students;

- The monthly churn rate at LCG was 9.8% in FY 2013;[39]

- The students that enrolled due to the Direct Mail Program were a fraction of the total enrollees;

---

[39] CARMPSUPP-0026142.  Churn rate = 1 – retention rate = 1 – 90.2% = 9.8%.

CONFIDENTIAL - Subject to Court Protective Order

- For example, students enrolled from the Winter FY 2013 Campaign represented 26% of total LCG enrollment during that period;[40]

- LCG's school utilization rate was 52% in FY 2013;[41]

- Therefore, new students from the Direct Mail Program could be added to existing schools without the addition of new schools capacity;

- LCG schools would incur only incremental, or variable, costs to serve DM Students;[42]

- Categories of expenses that might increase with incremental DM Students include additional labor and school supplies.

---

[40] CARNSUPP-00026433
[41] CARMSUPP-00026136
[42] For example, see LCG's accounting / finance department incremental profit analysis for DM Sales in CARMSUPP00026433.

CONFIDENTIAL - Subject to Court Protective Order

## 6.3    LCG's Profits from Direct Mail Students

Carlene Armetta, David Armetta and Aspira worked to develop and implement LCG's Direct Mail Program.  Carlene Armetta worked on the program as both a consultant with Aspira and as an employee of LCG.  Other individuals and organizations worked with the Armettas and Aspira on the Direct Mail Program.  LCG generated enrollment, revenue and profits from the Direct Marketing Program.   As a result, the Direct Mail Program is a benefit conferred to LCG, in part, by Carlene Armetta, David Armetta and Aspira.

The overall Direct Mail Program was implemented in a series of three seasonal Campaigns.  I determined the sales (hereinafter "DM Sales") and profits (hereinafter ("DM Profits") that LCG generated from the overall Direct Mail Program and these individual Campaigns.  The results are summarized in the following table and detailed in Appendix H – Direct Mail Program Analysis.



LCG Generated $716 Million in Sales from the Direct Mail Program
(Actual and Expected for Fall FY 2014)

CONFIDENTIAL - Subject to Court Protective Order

**LCG Generated $364 Million in Incremental Profits from the Direct Mail Program
(Actual and Expected for Fall FY 2014)**



However, Carlene and Aspira were not fully compensated for their work on the Direct Mail Program. If the fact finder determined that the entire Direct Mail Program was a single benefit conferred to LCG, then LCG's total $364 million in DM Profits would be unjustly taken (subject to apportionment).

Alternatively, if the fact finder viewed each Campaign as an individual benefit conferred to LCG, then the $168 million in DM Profit from the Fall FY 2013 through Fall FY 2014 Campaigns would be unjustly taken (subject to apportionment). More specifically;

- Carlene was not paid a $50,000 FY 2013 bonus;

- Carlene Armetta was discharged from LCG on September 6, 2013[43];

- The Fall, Winter and Summer FY 2013 and Fall FY 2014 Campaigns were implemented during these pay periods;

---

[43] The Complaint in Carlene Armetta's Case and discussions with the Armettas.

CONFIDENTIAL - Subject to Court Protective Order

- David Armetta and Aspira were compensated by LCG for their work on the Direct Mail Campaign through FCL Graphics, Inc.;

- As of November 2013, LCG refused to remit payment to FCL for Aspira's portion of services rendered on the Direct Mail Campaign;[44]

- Aspira continues to have two outstanding invoices to FCL totaling $364,681;[45]

- These invoices are primarily for work performed on the fall Campaign (performed in calendar year 2013 for the FY 2014 fall mailing).[46]

Note that I requested additional information on LCG's financial and operating performance and the performance of the Direct Mail Program and Campaigns. The plaintiffs' counsel informed me that:

- They have requested this information from LCG;

- LCG has not produced additional LCG financial or operating information;

- LCG either stopped tracking or did not produce the ongoing results of the Fall FY 2014 Campaign.

It is my understanding that the courts generally allow negative inferences to be made against defendants, like LCG, in situations where they fail to maintain adequate documentation. However, I did not make any negative inferences against LCG in my sales and profit determination. Rather, I used the best data available to calculate sales, costs and profits. This data is the kind that a typical economist, financial analyst or valuation analyst would normally use in their practice when quantifying past and expected sales and profitability.

---

[44] The Complaint in David Armetta's Case and discussions with the Armettas.
[45] CARMSUPP-00026432 and CARMSUPP-00026431.
[46] Ibid.

CONFIDENTIAL - Subject to Court Protective Order

**6.4    APPORTIONMENT**

There were factors other than the Direct Mail Program that contributed to the DM Sales and DM Profits identified in the previous section.   There were people and organizations other than Carlene Armetta, David Armetta and Aspira that contributed to these sales and profits. Therefore, the DM Profits need to be apportioned to isolate Carlene Armetta's, David Armetta's and Aspira's contributions.  Apportionment in this case is analogous to Copyright infringement cases where an infringed work is used to advertise another product or service.   Within this context, apportionment of LCG's profits only needs to be reasonably supportable as opposed to mathematically exact.[47]

**<u>Factors Other Than the Direct Mail Campaign</u>**

Given this background, I apportioned DM profits between the Direct Mail Program and other factors.  LCG' presentations, including those that were used in attempts to raise $40 million to $255 million in financing, identify three factors that drive the new student sales and profit cycle: 1) Lead generation; 2) Conversion; and 3) Retention.   These three factors lead new student-families to find, enroll in, and remain in LCG schools so that the DM Sales and DM profits were realized. More specifically;

1. <u>Lead generation</u> – The Direct Mail Program was used to identify potential new students and families and made a call to action for student-families to schedule a tour.

2. <u>Conversion</u> – The student-families called to action by the Direct Mail Program scheduled a tour through LCG's call center or made contact directly with a local school.  The local school tour, personnel, facilities and programs and follow up communications were used to obtain enrollment.

---

[47] Intellectual Property Law: Damages and Remedies, § 2.02 Recovery of Monetary Damages, 2 The Infringer's Profits Attributable to the Infringement, Law Journal Press, New York, NY, February 20, 2013 online edition.

CONFIDENTIAL - Subject to Court Protective Order

3. <u>Retention</u> – LCG provided services and enacted retention programs that were sufficient to retain DM Students over the period DM Sales and DM profits were generated.[48]

LCG could not generate DM Sales and DM Profits from new student enrollments without any one of these three factors. They are interdependent and, therefore, equally important to LCG's DM Sales and DM Profits as follows;

- Without leads from the Direct Mail Program being generated, LCG would not have the opportunity to convert a lead into new student enrollments;

- Without new student enrollments, there would be no new students to retain long enough to generate significant sales and profits;

- Conversely, without retention, the sales and profits from newly enrolled students would be diminished; and

- Leads would not be translated into sales and profits if LCG did not have an ability to convert them into enrollments.

As a result, I reduced the DM Profits by 67% to account for the contribution of LCG's conversion and retention assets and programs (one-third [1/3] was attributed to Direct Mail Campaign lead generation and the remaining two-thirds [2/3] was attributed to LCG's conversion and retention assets and programs). Note that Carlene Armetta was also involved in developing LCG's call center – which was a part of LCG's conversion capability. However, LCG's wrongful acts in the case do not pertain to, and I did not credit the Direct Marketing Program for, profits related to the call center.

---

[48] For example, see CARMSUPP-025815 to 025823, LCG-EM00048660 and CARMSUPP-026142-26146.

CONFIDENTIAL - Subject to Court Protective Order

**Participants Other than Aspira and the Armettas**

Organizations and individuals other than Aspira and the Armettas contributed to the Direct Mail Program. Therefore, it is appropriate to further apportion the Direct Mail Sales and Profits for the relative efforts of these other program participants.

It is my understanding that the Armettas will testify at trial to their relative contributions to the Direct Mail Program.   They have produced this information in CARMSUPP-000263434.xls which indicates:

- David Armetta and Aspira contributed 34.14% or 42.26% of the Direct Mail Program effort;

- Carlene Armetta contributed 5.75% or 7.12% of the effort of the Direct Mail Program as an employee of LCG.

I have requested, but the parties have not produced, information that would allow me to verify the contents of this file.  However:

- I have assumed that the information is correct in order to assist the fact finder;

- I further apportioned the DM Profits for David Armetta's /Aspira's and Carlene Armetta's relative contributions at 34.14% and 5.75%, respectively.

Note that I used the lower of the two percentages for David Armetta's / Aspira's and Carlene Armetta's contributions out of an abundance of caution to not overstate the damages.

The results are summarized in the following table.

38

CONFIDENTIAL - Subject to Court Protective Order

### LCG's Unjust Profits for the Overall Direct Mail Program[49]

| The Total Direct Mail Program | Profits Attributable to: | |
| --- | --- | --- |
| | Aspira & David Armetta | Carlene Armetta at LCG |
| Total profits attributable to the plaintiffs | $41,422,908 | $6,976,618 |
| Less partial compensation | $3,247,090 | $708,868 |
| **Equals LCG's Unjust Profits (total program)** | **$38,175,818** | **$6,267,749** |
| Date of enrichment | 10/28/2013 | 8/6/2013 |
| Trial-judgment date | 5/15/2015 | 5/15/2015 |
| Years of interest | 1.5 | 1.8 |
| Interest rate | 10.0% | 10.0% |
| **Prejudgment interest** | **$6,057,402** | **$1,153,626** |
| **Total LCG Unjust Profits and interest** | **$44,233,220** | **$7,421,375** |

I repeated this process for the Fall FY 2013 through Fall FY 2014 Campaigns in the event that the fact finder determined it was appropriate to limit recovery of LCG's unjust profits to the specific Campaigns for which the plaintiffs were not fully compensated. My findings are summarized in the following table. Additional information by Campaign is provided in Appendix H – Direct Mail Program Analysis.

---

[49] Carlene Armetta's partial compensation is her total compensation at LCG from 2010 through 2013. I set Aspira's partial compensation to its total revenue for 2009 through 2013.

CONFIDENTIAL - Subject to Court Protective Order

**LCG's Unjust Profits for the Fall FY 2013 through Fall FY 2014 Campaigns[50]**

| Individual Campaigns | Profits Attributable to: | |
| --- | --- | --- |
| | Aspira and David Armetta | Carlene Armetta at LCG |
| Fall FY 2013 | | $1,139,126 |
| Winter FY 2013 | | $945,323 |
| Summer FY 2013 | | $89,816 |
| Partial Fall FY 2014 | $1,193,000 | $200,930 |
| Remainder Fall FY 2014 | $5,014,885 | $844,628 |
| **Total profits attributable to Aspira and C.A.** | **$6,207,885** | **$3,219,823** |
| Less partial compensation | $0 | $180,139 |
| **Equals LCG's Unjust Profits** | **$6,207,885** | **$3,039,685** |
| Date of enrichment | 10/28/2013 | 8/6/2013 |
| Trial Date | 5/15/2015 | 5/15/2015 |
| Years of interest | 1.5 | 1.8 |
| Interest rate | 10.0% | 10.0% |
| **Prejudgment interest** | **$985,012** | **$559,477** |
| **Total LCG Unjust Profits and interest** | **$7,192,898** | **$3,599,161** |

My findings and their applicability to the specific counts in the complaints are presented in Section II – Summary of Opinions. Appendices follow.

---

[50] Carlene Armetta's partial compensation is all of her 2013 plus ¼ of her 2012 total LCG compensation. I set Aspira's partial compensation to all of its 2013 plus ¼ of its 2012 revenue.

CONFIDENTIAL - Subject to Court Protective Order

# A - QUALIFICATIONS

CONFIDENTIAL - Subject to Court Protective Order

# DANIEL J. CENATEMPO CVA, MAFF
## Curriculum Vitae
### (1 of 5)

**CAREER SYNOPSIS:**

Mr. Cenatempo has over 25 years of experience in economics, valuation and finance. He has testified on intellectual property and business damages and values in U.S. District, state, and local courts in a range of patent, trademark, copyright, trade secret, contract, tort, shareholder, partnership, and tax cases. His experience includes, but is not limited to, the following:

- Economic damages, lost profits, reasonable royalties, price erosion, diminution of value, lost goodwill, and unjust enrichment;

- Valuation of intellectual property, intangibles, businesses, business interests, real property, derivatives, and financial instruments;

- Corporate procurement, budgeting, planning and investment analysis;

- Economic, industry and business research and analysis;

- Technology and intellectual property licensing;

- Negotiation support;

- Due diligence and business investigation;

- Mergers, acquisitions, divestitures, joint-ventures, financing and re-capitalization.

**CERTIFICATIONS:**

2009      **REGISTERED APPRAISER** with the State of Oregon, Department of Administrative Services, Human Resources Division.

2007      **MASTER ANALYST IN FINANCIAL FORENSICS (MAFF)** with the National Association of Certified Valuators and Analysts (NACVA) with dual concentration in Business and Intellectual Property Damages and Financial Litigation (formerly CFFA).

2002      **CERTIFIED VALUATION ANALYST (CVA)** with the National Association of Certified Valuators and Analysts (NACVA).

**EDUCATION:**

1990-1992      **DUKE UNIVERSITY, FUQUA SCHOOL OF BUSINESS, Durham, NC**

Master of Business Administration with focus on Finance, May 1992.

1984-1988      **VILLANOVA UNIVERSITY, Villanova, PA**

Bachelor of Arts in Economics, May 1988 with honors (Cum Laude). Economics Department Research Assistant.

CONFIDENTIAL - Subject to Court Protective Order

**DANIEL J. CENATEMPO CVA, MAFF**
**(2 of 5)**

**EMPLOYMENT HISTORY:**

| | |
|---|---|
| 2003 - Present | **FAIRVALUE ADVISORS, LLC, Atlanta, GA** |
| | Executive Director (2006 – Present) |
| | Managing Director (2003 – 2006) of predecessor company. |

| | |
|---|---|
| 1995 - 2002 | **JACOBS ENGINEERING GROUP, INC., Atlanta, GA** |
| | Managing Director – Consultancy (2000-2002) |
| | Group Manager – Consultancy Financial & Planning Services (1998-1999) |
| | Senior Consultant (1996-1998) |
| | Consultant (1995-1996). |

| | |
|---|---|
| 1994 - 1995 | **THE MEAD CORPORATION, Atlanta, GA** |
| | Senior Marketing Analyst. |

| | |
|---|---|
| 1992 - 1994 | **FLAGSTAR HOLDINGS INC., Spartanburg, SC** |
| | Senior Analyst, Headquarters (1993-1994) |
| | Assistant Division Controller, Secaucus, NJ (1992-1993). |

| | |
|---|---|
| 1988 - 1990 | **DELOITTE & TOUCHE, Stamford, CT** |
| | Research Associate, Management Consulting Division. |

| | |
|---|---|
| 1984-1988 | **JOSEPH J. CENATEMPO, CPA, Norwalk, CT** |
| | Book Keeper (Summers & Weekends). |

**LITIGATION EXPERIENCE - PAST 10 YEARS:**

- "Gregory Gorno v. American Global Logistics, LLC. et. al.", United States District Court for the Northern District of Georgia, Atlanta Division;

- "Virtual Studios, Inc. v. Royalty Carpet Mills, Inc.", United States District Court for the Northern District of Georgia, Rome Division;

- "Chamber of Industry and Commerce Wuppertal-Solingen-Remscheid vs. Martha Stewart, Martha Stewart Living Omnimedia, Inc., Emeril Lagasse, et. al.", United States District Court for the Southern District of Florida;

- "Bernice Abrams, et al. v. Charles A. Aiken et. al."  United States District Court for the Northern District of Georgia, Atlanta Division;

- "Glock, Inc. v. Maxsell Corporation and Vico Confino", United States District Court, Northern District of Georgia, Rome Division;

- "Virtual Studios, Inc. v. Beaulieu Group, Inc.", United States District Court for the Eastern District of Tennessee at Chattanooga;

CONFIDENTIAL - Subject to Court Protective Order

## DANIEL J. CENATEMPO CVA, MAFF
### (3 of 5)

- "Rapha Products, LLC v. Skullcandy, Inc.", United States District Court, Northern District of Georgia, Atlanta Division;

- "Judy M. Bloom v. Bronwyn Cosgrove and Docu-Code, Inc.", Superior Court of Fulton County in the State of Georgia.

- "Ramsey Khalidi; Pamela Khalidi; RK Construction & Development Company; and Khalidi Properties, LLC v. Terracon Consultants, Inc. successor in interest of WPC Engineering Inc.; and William S. Anderson III", State Court of Chatham County, Savannah, Georgia;

- "Mattress Safe, Inc. v. Just Encase My Mattress, Inc.; and Deborah Sloane", United States District Court, Northern District of Georgia, Atlanta Division;

- "In re The Coca-Cola Co. Shareholder Litigation", Superior Court of Fulton Country, State of Georgia;

- "Judy Kauffman Goldstein et al. v. Zoran Corporation et al.', In the Court of Chancery of the State of Delaware;

- "Georgia-Pacific Consumer Products, LP v. Clatsop County Assessor and the Oregon Department of Revenue", Oregon State Tax Court;

- "Angela Brown et al., Plaintiffs v. Moe's Southwest Grill, LLC, et al", U.S. District Court for the Northern District of Georgia, Atlanta Division;

- "Prima Technologies LTD and Daran Nair v. Prima Tech USA Inc., KMQ Inc. and Kimberley Quinn", High Court of New Zealand, Auckland Registry;

- "The Loyalton Group, Inc. vs. Burton Energy Group, Inc.", United States District Court District of Minnesota;

- "Freres Lumber Company v. Department of Revenue", Oregon State Tax Court;

- "Swanson Manufacturing Group, LLC v. Department of Revenue", Oregon State Tax Court;

- "William A. Hoskyns, LLC, et al. v. Debra Gray King, D.D.S., et al.", The Superior Court of Fulton County of the State of Georgia;

- "Shepherd Management Group, Inc. v. Michael Wilkov, Cantoni LP, Cantoni Properties – Houston, LTD, Cantoni Orange County, Inc. and Cantoni Atlanta, Inc.", US District Court for the Northern District of Georgia, Atlanta Division;

- "KRC Rolls v. Lane County Assessor and the Department of Revenue", Oregon State Tax Court;

- "Discrete Wireless, Inc. v. Coleman Technologies, Inc.", US District Court for the Northern District of Georgia, Atlanta Division;

- "Michael Putnam and WEP Enterprises, Inc. v. Henkel Consumer Adhesives, Inc.", U.S. District Court For The Northern District of Georgia, Atlanta Division;

- "SP Newsprint v. Yamhill County Tax Assessor", Oregon State Tax Court;

- "Auction Management Solutions Inc. v. Manheim Auctions, Inc. et al.", U.S. District Court For The Northern District of Georgia, Atlanta Division;

- "FHP Holdings, LLC v. Health Insurance Plans of Greater New York, Inc., et al", Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, FL;

CONFIDENTIAL - Subject to Court Protective Order

### DANIEL J. CENATEMPO CVA, MAFF
#### (4 of 5)

- "National Century Financial Enterprises, Inc. et al. v. Steven M. Scott, Rebecca J. Scott, Scott Family Holdings, Beacon Health Plans et al.",  U.S. Bankruptcy Court, Southern District of Ohio, Eastern Division;

- "Optimum Technologies, Inc. v. Home Depot, Inc. et al", U.S. District Court For The Northern District of Georgia, Atlanta Division;

- DOJ Tax & Finance Division v. Pope & Talbot, dispute resolution proceedings, Oregon State Tax Court;

- "Optimum Technologies Inc. v. Henkel Consumer Adhesives, Inc., et al", U.S. District Court For The Northern District of Georgia, Atlanta Division;

- U.S. Department of Labor v. Confidential Trustee, U.S. Department of Labor proceedings, Chicago, IL;

- "Boise-Cascade Corp. v. Columbia County Assessor & The Department of Revenue", Oregon State Tax Court;

- "Georgia-Pacific v. Lincoln County Assessor", Oregon State Tax Court.

**ARTICLES & PRESENTATIONS – PAST 13 YEARS:**

- "Damages Update and the Entire Market Value Rule", Atlanta Bar Associations' Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2014 (co-author);

- "Patent Infringement Remedies:  Damages", Patent Litigation Class 11, Emory University School of Law;

- "Valuing Intellectual Property – Key Concepts for Counseling Legal Clients", November 2013;

- "Navigating the Entire Market Value Rule: Which Sales Are Really At Risk", Atlanta Bar Association CLE Session, October 2013 (co-author);

- "IP Valuation – Business and Litigation Applications", Atlanta Bar Associations' Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2013;

- "Intellectual Property Valuation – a Tool for Maximizing Returns", the Association of Intellectual Property Firms (AIPF) 2012 Annual Meeting, September 2012;

- "Recent Developments in Damages Law", Atlanta Bar Associations' Eighth Annual Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2012 (co-author);

- "Effective Use of Experts in Patent Litigation", Atlanta Bar Associations' Seventh Annual Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2011 (co-author);

- "2011 Global Industry Outlook – An Economic and Financial Perspective", Paper360º, January / February 2011;

- "State of the Global Paper & Forest Products Industry", TAPPI Press, Q1 and Q3, 2010;

- "Strategic Decision Making Under Uncertainty", Georgia Institute of Technology's Management Development for Enhanced Performance program, 2003 to 2008;

- "Court Clarifies Entire Market Value Rule for Patent Damages – Expert Excluded - Cornell University v. Hewlett Packard Co., Case No. 01-01974 (USD ND NY)", *The Fair Value Examiner,* Summer 2009;

- "Latest FLP Case Yields Mixed Ruling on Bona Fide Transfer Exception: Estate of Valeria M. Miller, Deceased, Virgil G. Miller, Executer, Petitioner, v. Commissioner of Internal Revenue, Respondent. T.C. Memo 2009-119" - *The Fair Value Examiner,* Summer 2009;

CONFIDENTIAL - Subject to Court Protective Order

## DANIEL J. CENATEMPO CVA, MAFF
### (5 of 5)

- How Much Are Your Clients' Auction Rate Securities (ARS) Worth?", *The Fair Value Examiner*, September 2008;

- "Terminal Value Not Speculative in Indefinite Life Licensing Agreement - Matrix Group Limited, Inc. v. Rawlings Sporting Goods Co., 477 F.3d 583 (8th Cir. 2007) (DE law)", *The Fair Value Examiner*, September 2008;

- "State of the North American Pulp & Paper Industry", Georgia Institute of Technology, annually for 2002 through 2008 (co-author);

- "Clear Value: A Guide to Quantifying, Creating & Capturing Business Values In the Paper & Packaging Industries", 2008;

- "Industry Economic Perspective and Outlook", 2008 ASPI Spring Meeting,  2008;

- "Economic Damages in Commercial Litigation: An Overview",  2007;

- "Patent Valuation: What It Is, And Why It Has Emerged As An Essential Management Tool", *Intellectual Property and The Law,* Troutman Sanders LLP, Spring 2006 Volume XVIII No. 1;

- "Patent Valuation – Key Concepts and Tools For Counseling Clients", State Bar of Georgia, Intellectual Property Law Section, January 2005;

- "Pulp & Paper Industry Update – Financial Performance and the Innovation Imperative", Paper Summit 2004, Georgia World Congress Center, May 2004 (co-author);

- "Industry Competitiveness and The Innovation Imperative", ASPI Annual Conference, March 2004;

- "Pulp & Paper Industry Update and Outlook", TAPPI Conference, November 2003 (co-author);

- "Intellectual Property Valuation Essentials", March 2003;

- "Is Heavy Industry Nudging Its Stakeholders Toward Their Graves", Global Finance Conference, February 2003;

- "Value Creation and The Innovation Imperative", January 2003;

- "Doing the Right Projects", Thornblade Technical Seminar, May 2002;

- "Creating Value In Turbulent Times", Georgia Institute of Technology,  January 2002;

- "Entering New Markets – A Proven Approach", June 2001;

- "Real Options:  Overview & Investment Management Implications", February 2001;

- "Packaging Trends and The Plastics / PET Advantage", North American Polyester Industry Conference, February 2001;

- "Finance Fundamentals and Process Economics Short Course", 1998-2000;

- "Competitive Cost Benchmarking", October 2000;

- "Improving The Business Results of Capital Projects", July 2000;

- "Real Options – The Next Wave in Strategic Investing & Management', June 2000.

CONFIDENTIAL - Subject to Court Protective Order

## B - CERTIFICATION

I certify that:

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and Statement of Contingent and Limiting Conditions in Appendix C, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions;

- I have no present or prospective interest in the parties related to this matter;

- I have no bias with respect to any product, service, or party related to this matter;

- My engagement in this assignment was not contingent upon developing or reporting predetermined results;

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined damages amount or direction in damages amount that favors the cause of the plaintiff or defendant, the amount of the damages calculated, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this memorandum.

Signed:

*Daniel J. Cenatempo*

Daniel J. Cenatempo
Executive Director
FairValue Advisors, LLC

CONFIDENTIAL - Subject to Court Protective Order

# C – STATEMENT OF CONTINGENT AND LIMITING CONDITIONS

This report and related work was performed subject to the following contingent and limiting conditions:

- Except as may be required by law, regulation, or judicial or administrative process, we will not disclose to anyone any information or documents related to the litigation that are identified as confidential.

- FairValue Advisors, LLC (hereinafter "FVA") warrants that it will perform its services in a professional manner.  We make no further warranty of any kind, expressed or implied.

- FVA's maximum liability relating to services rendered under this engagement (regardless of form of action, whether in contract, negligence, or otherwise) shall be limited to the fee paid to FVA for the portion of its services or work product giving rise to liability.  In no event shall FVA be liable for consequential, special, incidental, or punitive losses, damages, or expenses (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

- Please see our engagement letter for additional commercial terms and conditions.

48

CONFIDENTIAL - Subject to Court Protective Order

## D – DOCUMENTS CONSIDERED

### COURT DOCUMENTS

1. The First Amended Complaint in *Carlene Armetta vs. Learning Care Group, Inc.* - Case No. 3:13-cv-1464(VLB) in the United States District Court for the District Court of Connecticut.

2. The First Amended Complaint in *David Armetta and Aspira Marketing Direct, LLC vs. Learning Care Group, Inc.* - Case No. 3:13-cv-1461(VLB) in the United States District Court for the District Court of Connecticut.

### DEPOSITIONS

3. Kevin Overlock, July 23, 2014.

4. Bridget Pietrowicz, August 4, 2014.

5. Kathy Lyn Calata, August 5, 2014.

6. Steven Flood, 8/7/2014.

7. Carlene Armetta, 5/6/2014.

8. David Armetta, 5/7/2014.

### DISCOVERY DOCUMENTS

9. CARMSUPP-025747-788.pdf.

10. CARMSUPP-025789-841 OCR.pdf.

11. CARMSUPP-025789-841.pdf.

12. CARMSUPP-00026132-00026178.pdf.

13. CARMSUPP-00026179-00026392 OCR.pdf.

14. CARMSUPP-00026179-00026392.pdf.

15. CARMSUPP-00026433 Winter 2013 Direct Mail reporting ENHANCED.xlsx 8.xlsx.

16. CARMSUPP-00026432.pdf.

17. CARMSUPP-00026434 Direct Mail Program Contributor Calculation (1).xlsx.

18. CARMSUPP-00026435-00026438 (1).pdf.

19. CARMSUPP - 026393 - 418.pdf.

20. CARMSUPP-25847.pdf.

21. CARMSUPP-00025851-00025876.pdf.

22. CARMSUPP-00025877-00025907.pdf.

23. CARMSUPP-00025908-00025935.pdf.

24. CARMSUPP-00025936-00025991.pdf.

CONFIDENTIAL - Subject to Court Protective Order

25. CARMSUPP-00025992-00026036.pdf.

26. CARMSUPP-00026037-00026092.pdf.

27. CARMSUPP-00026093-00026131.pdf.

28. CARMSUPP-00026419-24.pdf.

29. CARMSUPP-00026425-27.pdf.

30. CARMSUPP-00026428-30.pdf.

31. CARMSUPP-00026431.pdf.

32. LCG_Fiscal Year Overview Spreadsheet_Updated 1.15.13.xls.

33. LCG-EM00018803.ppt.

34. LCG-EM00019709.xlsx.

35. LCG-EM00023934.pdf.

36. LCG-EM00035679.pdf.

37. LCG-EM000036761-2.pdf.

38. LCG-EM00048660.pdf.

39. LCG-EM00063325.xlsx.

40. LCG-EM00065304.xlsx.

41. LCG-EM00077378.pdf.

42. LCG-EM00078256.pdf.


**RESEARCH**

43. Connecticut Secretary of State Business Inquiry online.

44. www.aspiradirect.com.

45. www.childtime.com.

46. www.childrenscourtyard.com.

47. www.lapetitie.com.

48. www.Montessori.com.

49. Bureau of Labor Statistics ("BLS") Occupation Employment Statistics – Occupational Employment and Wages, Marketing Managers, May 2013.

50. BLS Economic News Release, Employment Situation Summary, August 1, 2014 and associated tables.

51. BLS Economic News Release – Tenure, Table 1, 2002-2012.

52. BLS Economic News Release, Worker Displacement, 2003-2005, 2007-2009 and 2009-2011.

CONFIDENTIAL - Subject to Court Protective Order

53. BLS  historic data 2000(3) to present:

    a.   Employment Cost Index;

    b.   Employment.

    c.   Unemployment.

    d.   Unemployment rates.

    e.   Labor force participation.

    f.   Weeks of unemployment.

54. Alternative Measures of Labor Underutilization for States, 2009 through Q2 2014, Local Unemployment Statistics by the Bureau of Labor Statistics.

55. Shane, Scott, "The Job Satisfaction Paradox for the Self-Employed", Bloomberg Businessweek, April 1, 2010.

56. Salary.com salary data for Stamford, CT

57. Federal Reserve Statistical Release H.15 – Selected Interest Rates.

58. "2014 Valuation Handbook, Guide To Cost of Capital", Preview Version, Duff & Phelps, 2014.

59. "The Livingston Survey", Federal Reserve Bank of Philadelphia, June 2, 2014.

60. "Survey of Professional Forecasters", Federal Reserve Bank of Philadelphia, August 15, 2014.

61. "U.S. Business Cycle Expansions and Contractions", The National Bureau of Economic Research, www.nber.org/cycles.

62. Biery, Mary Ellen, "Growth in the U.S. Day Care Businesses", Forbes.com, 6/15/2014.

63. Lerman, Sally, "Taking care: Parent will demand child care again as employment rises, boosting revenue"; Day Care in the US, IBIS World Industry Report 62441, July 2014.

CONFIDENTIAL - Subject to Court Protective Order

# E – COMPLAINT – CARLENE ARMETTA VS. LCG

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 71 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 1 of 28
CONFIDENTIAL - Subject to Court Protective Order

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CARLENE ARMETTA, | ) | |
| | ) | Case No. 3:13-cv-1464 (VLB) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | November 9, 2013 |
| LEARNING CARE GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Carlene Armetta, for its First Amended Complaint against Defendant Learning Care Group, alleges as follows:

### NATURE OF ACTION

1.      This case arises from the Learning Care Group's ("Defendant" or "LCG") wrongful termination of Carlene Armetta ("Plaintiff" or "Mrs. Armetta"), as well as the defamatory and disparaging statements made in connection therein. LCG's actions have been malicious, purposeful, and outrageous. The story that LCG has promulgated in connection with Mrs. Armetta's wrongful termination is pure unadulterated fiction.

2.      LCG is a national childcare center, operating over 900 daycare centers nationally under brand names such as Childtime Learning Center, Tutor Time, La Petite Academy, The Children's Courtyard and Montessori Unlimited. LCG is based in Novi, Michigan. While its mission may appear to be altruistic, its practices are cold-hearted economics and corporate gamesmanship. LCG is a private equity portfolio company, backed by Morgan Stanley Private

CONFIDENTIAL - Subject to Court Protective Order

Equity, Inc. ("Morgan Stanley"), and thus provides "childcare" to maximize returns to its investors, such as Morgan Stanley.

3.      Initially, Mrs. Armetta worked for LCG as a consultant in Stamford, Connecticut. Nearly three years ago, she became a full-time employee working for LCG in Stamford, Connecticut. Mrs. Armetta was a highly skilled and valued employee, working at high levels in the LCG marketing group focused on increasing LCG's acquisition of customers for its daycare centers. Mrs. Armetta was originally charged with developing the business-to-business relationships, and then was tasked with building a call center, before becoming responsible for the creation and supervision of the direct mail marketing program.

4.      Despite Mrs. Armetta's good work, LCG now claims that Mrs. Armetta was in violation of a corporate policy related to an undisclosed "conflict of interest." The alleged "conflict" arose as a result of the relationship between Mrs. Armetta, LCG, and Mrs. Armetta's husband, Mr. David Armetta ("Mr. Armetta"). It was well disclosed, open and notorious that Mr. Armetta was in a business relationship with print vendors for LCG, and Mr. Armetta was asked repeatedly by LCG to handle multiple aspects of LCG's direct mail printing and creative marketing. In fact, Mr. Armetta and his company Aspira Marketing Direct, LLC ("Aspira") were integral and transparent members of LCG's marketing team, despite not having a direct employer-employee relationship with LCG. Mrs. Armetta actually worked for Aspira before being hired by LCG, a fact of which LCG was fully aware. Furthermore, Mrs. Armetta's independent contractor agreement with LCG was actually an agreement between Aspira and LCG, and LCG paid Mrs. Armetta compensation through payments to Aspira.

5.      Mr. Armetta's work was done at the direct behest of LCG. In connection with an investigation by LCG into his business, Mr. Armetta and Aspira have provided LCG over 500

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 73 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 3 of 28
CONFIDENTIAL - Subject to Court Protective Order

pages of documents demonstrating that very point.  He worked for LCG 24 hours a day, 7 days a week for 4 years.  Mr. Armetta ran the production, marketing, and testing strategy, designing of the new marketing database structure and programming, logo development, outside agency oversight, the creative aspects of LCG's direct mail marketing campaign, as well as negotiated reduced national printing rates and reduced cost and list recommendations.  Mr. Armetta did all of this in an overt and transparent fashion, by participating in hundreds of conference calls with LCG and emailing with LCG offices and employees almost daily for years.

6.      Thus, there is no question that the relationship between Mrs. Armetta, Mr. Armetta, Aspira, and LCG was an open and notorious fact among members of LCG's management, as well as significant members of the LCG marketing department with whom Mr. Armetta interacted with.

7.      Mr. Armetta was included on hundreds and hundreds of emails from LCG giving him instructions and asking him to participate in LCG meetings. At no time prior to August 2013 did LCG object to the existence of this business relationship.  In fact, the good work done by Mrs. Armetta, Mr. Armetta, and Aspira created over $280 million in profits for LCG in four years.

8.      Upon conclusion of the internal investigation initiated by LCG into this matter, Mrs. Armetta was wrongfully terminated from her position at LCG for an alleged "conflict of interest."  This purported "conflict of interest" is supposedly based upon the fact that while Mr. Armetta was running LCG's direct mail printing operation at the explicit direction of LCG, creating over $280 million in profit for LCG, LCG now apparently takes the position that they did not know he was being compensated by the print vendor and must have been working, 24/7 for four years, for free.  This is plainly ludicrous.  LCG apparently takes the position that because

3

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 74 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 4 of 28
CONFIDENTIAL - Subject to Court Protective Order

Mrs. Armetta was employed by LCG, Mr. Armetta could not be compensated for four years of work and should have been a full-time 24/7 volunteer.  Thus, the purported "conflict of interest" upon which LCG based its termination of Mrs. Armetta was (i) created by LCG for its benefit, (ii) encouraged in writing and in statements by LCG in an open, notorious, and purposeful manner, and (iii) was therefore waived by LCG for the same reasons.  This determination of a purported "conflict of interest" and unlawful termination was coincidentally made approximately three weeks before the very first bonus due to Mrs. Armetta in her four years of employment.  Depriving Mrs. Armetta of her earned bonus is even more egregious due to the fact that Mr. and Mrs. Armetta had openly and obviously conceptualized, built and driven the very success of the specific programs that created the profits that the bonus was to be based upon.

9.      Equally appalling, the statements made by LCG employees and management as a result of the internal investigation have defamed Mrs. Armetta and disparaged her professional reputation.  She has been subject to wrongful public ridicule.

## THE PARTIES

10.      Plaintiff Carlene Armetta is a domiciliary of the State of Connecticut, with a principal residence located at 510 Woodbine Road, Stamford, CT 06903.

11.      Defendant Learning Care Group is a Michigan corporation with its principal place of business located at 21333 Haggerty Road, Suite 300, Novi, MI 48375.

## JURISDICTION AND VENUE

12.      Jurisdiction is proper with the District Court for the State of Connecticut because the parties are fully diverse, and the amount in controversy exceeds $75,000.

CONFIDENTIAL - Subject to Court Protective Order

## FACTS

13.    In November 2008, Stacy DeWalt ("Ms. DeWalt"), then Chief Marketing Officer

of LCG, contacted Mrs. Armetta, who was a former colleague of hers at Pitney Bowes, Inc., to

inquire as to Mrs. Armetta's interest in working as an independent contractor for LCG's

marketing department.  Mrs. Armetta signed an independent contractor agreement with LCG in

February 2009.  Mrs. Armetta signed the acceptance letter using the title "Managing Director,

Aspira Marketing Direct."

14.    Mrs. Armetta's work for LCG initially involved a partnership project.  Within two

months, Ms. DeWalt expanded Mrs. Armetta's responsibilities to include the development of a

call center.

15.    Mr. Armetta and Aspira were not compensated for this work.  Mrs. Armetta was

compensated in the form of a per diem payment that was previously negotiated between her and

Ms. DeWalt, and memorialized in an independent contractor agreement drafted by Ira Young,

LCG's General Counsel and a member of the company's Ethics Committee.  Compensation paid

to Mrs. Armetta was invoiced by and paid through Aspira.

16.    In August 2009, Ms. DeWalt advised Mrs. Armetta that LCG was unhappy with

the quality of work being completed by LCG's current vendor for direct mail marketing, and

stated that she needed assistance to ensure that a new direct mail marketing piece and program

was to be designed and mailed within two weeks. Mrs. Armetta discussed with Ms. DeWalt the

possibility of Mr. Armetta assisting with this project (through Mr. Armetta's company, Aspira),

and Ms. DeWalt directed Mrs. Armetta to contact Mr. Armetta and inquire as to what assistance

he could provide.  Mr. Armetta had decades of experience and many industry contacts that he

could leverage to ensure the project was completed in the necessary timeframe.

CONFIDENTIAL - Subject to Court Protective Order

17.     Mr. Armetta contacted Kevin Overlock, an employee of Vertis Communications ("Vertis"), a company in the printing and direct mail marketing business, with whom he had a business relationship over the previous several years.  Mr. Armetta has known Kevin Overlock prior to 1990, and worked with him on many projects since that time.

18.     Mrs. Armetta, with the assistance of Mr. Armetta and Vertis, was able to complete the direct mail marketing project within the required two weeks, despite the fact that such a project would normally require at least an eight-week process.  Not only did Mr. Armetta design the direct mail pieces, but he designed the mailing and testing strategy, arranged for and actually purchased the mailing lists for LCG's use, negotiated and coordinated as an approved Vertis broker the pricing and production for the printing and mailing of the entire direct mail project, and oversaw the program since all of these services are what Aspira was in the business of providing for its clients.

19.     Subsequent to the completion of the above-referenced project, and as a result of its success, Vertis, with Mr. Armetta's assistance and oversight, began to acquire substantial printing and marketing work from LCG, all of which Mr. Armetta was an integral member in performing.  This work included, among other things, creative designs to be used in LCG marketing campaigns, the rental and use of direct marketing mailing lists from outside vendors, and the establishment and operation of LCG's direct mail marketing campaigns.

20.     At this time, Aspira, the company owned by Mr. Armetta and Mrs. Armetta, was invoicing LCG for the per diem work undertaken by Mrs. Armetta, as well as the additional work being completed by Mr. Armetta.  Aspira was also responsible for renting and billing LCG for the mailing lists as a list manager; and arranging and overseeing the print production through

CONFIDENTIAL - Subject to Court Protective Order

Vertis as a marketing agency.  This invoicing structure was designed with the knowledge and approval of Ms. DeWalt.

21.     As a result of the substantial and high quality work being performed by Mrs. Armetta, and in an effort to reduce their own costs, LCG, through Ms. DeWalt, inquired as to Mrs. Armetta's interest in joining the LCG marketing team as a full-time employee.  Although not interested in the offer initially, Mrs. Armetta was persuaded to enter into this relationship as an employee since she understood that if she didn't become a full-time employee, neither she nor Aspira would be receiving future work from LCG.  During negotiations regarding this employment relationship, taking place between December 2009 and January 2010, Mrs. Armetta inquired as to the status of Mr. Armetta's work if she decided to take the position in LCG's marketing department. Ms. DeWalt responded that it was "no problem," and that she "want[ed] Mr. Armetta involved and to just have him paid through Vertis," because "LCG does not want to write any more checks to Aspira."   She concluded this verbal exchange with the statement "Just get it done. Do what you have to do. We need to get this going."  Mrs. Armetta became an employee of LCG on or around January 28, 2010.

22.     As Mr. Armetta, Mrs. Armetta, and Aspira were initially hired as an outside consultant and marketing firm, LCG was certainly aware that they were not only being compensated for their work, but that the normal industry practice of compensating such vendors for their services most often included the payment of commissions, brokerage fees, and other compensation based on the client's needs.

23.     On February 8, 2010, Ms. DeWalt wrote to Mrs. Armetta and Scott Smith ("Mr. Smith"), the Chief Human Resources Officer and one of two members of LCG's Ethics Committee, stating:

CONFIDENTIAL - Subject to Court Protective Order

> **"I spoke with Scott today in regard to continuing to contract David/Aspira.
> He and I will follow up with [the C.E.O.] Bill this week, in the meantime
> since your official start date passed the work that David is doing on Summer
> needs to have a SOW and cost for his time. Please have David contact me
> directly with costs/agreement ASAP"**

24.     The above-referenced communication illustrates that Ms. DeWalt, the chief

marketing officer, Mr. Smith, the chief human resources officer and a member of the Ethics

Committee, and the then-current C.E.O. of LCG, Bill Davis, were not only aware that Mr.

Armetta and Aspira had a business relationship with LCG, which continued after Mrs. Armetta

became an employee, but also that the relationship was encouraged by LCG.

25.     The second of the two members of LCG's Ethics Committee, the company's

General Counsel Ira Young ("Mr. Young"), was also well aware of the relationship between Mr.

Armetta, Aspira, and LCG, as evidenced by the fact that he is included on countless e-mails that

specifically discussed the work of Mr. Armetta, including on June 2, 2012, where both Mr.

Young and Mr. Armetta participated in a conversation regarding the legal issues involved in

using certain pieces of artwork in LCG's marketing materials.

26.     On April 20, 2010, Mr. Armetta and Aspira signed a confidentiality and non-

disclosure agreement with LCG, provided by LCG's legal department and drafted by Ira Young,

the General Counsel and member of the Ethics Committee.  Mrs. DeWalt was the LCG officer

who counter-signed.  This again shows that Mr. Young was well aware of the relationship that

existed between Mr. Armetta, Aspira, and LCG.

27.     It was not an uncommon occurrence for Mr. Young to participate in e-mail

communications that Mr. Armetta was clearly involved in, or even directly related to his work

for LCG, including a February 18, 2010 email conversation between Mrs. Armetta, Mr. Armetta,

Mr. Young, and three other individuals discussing the use of trademarked material in LCG's

8

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 79 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 9 of 28
CONFIDENTIAL - Subject to Court Protective Order

advertising, and a January 26, 2011 email conversation discussing LCG's marketing with American Express (and for which the email author began his communication with "Hi Carlene [Armetta], Dave [Armetta], Ira [Young] & Shari [Corona]."

28.     In order to comply with Ms. DeWalt's request regarding the invoicing of Mr. Armetta's work, Mr. Armetta negotiated an independent contractor agreement with Vertis, who was to invoice LCG for Mr. Armetta's and Aspira's providing substantial and varied services.

29.     Although Mr. Armetta's work was being billed by Vertis to LCG, Ms. DeWalt, and therefore LCG, was well aware that Mr. Armetta was an integral part of the marketing department, and was surely not volunteering his time.  The costs of Vertis' printing prices did not increase to LCG, but rather were actually reduced in price from the initial print prices that had been negotiated before Mrs. Armetta became an employee of LCG.

30.     Over the course of the next three years, Mr. Armetta and Vertis were integral parties to the development and success of LCG's marketing department, in particular the direct mail marketing campaigns, as well as a proactive "trigger" marketing campaigns, data and analytics that drove all of the success of their marketing efforts for LCG.

31.     The final decision to place printing and direct mail marketing work with Vertis was not the decision of Mrs. Armetta, but rather a determination made by Ms. DeWalt, the Chief Marketing Officer, in consultation with LCG management.

32.     Likewise, the decision to subsequently move the printing and direct mail marketing work from Vertis to FCL Graphics ("FCL") was not the decision of Mrs. Armetta. That Mrs. Armetta was not the decision-maker with regard to LCG's moving of the print business to FCL is illustrated in a communication from the current C.E.O., Barbara Beck, to an executive at FCL, stating that she was "happy we're shifting business to FCL, our recent

9

61

CONFIDENTIAL - Subject to Court Protective Order

Vertis/Quad experience has not been a happy one!" Clearly, the C.E.O played a role in the selection process for the new vendor, as would then-Chief Marketing Officer John Lichtenberg ("Mr. Lichtenberg"), as a c-level executive and supervisor to Mrs. Armetta.

33.     Mr. Lichtenberg stated to Mrs. Armetta in an email on July 24, 2013 "[g]iven that FCL came down to the [price] level of contenders, it does not make sense to change at this point. We already have a learning curve with FCL and I don't want us losing that level of comfort and experience." This statement is only further evidence that the decision to retain FCL as LCG's print vendor was not the decision of Mrs. Armetta.

34.     On February 24, 2010, in an email communication from Ms. DeWalt to Mr. Armetta, Ms. DeWalt stated **"We [LCG] need you fully engaged in [the] fall, so let's connect ASAP and get me a proposal for leading the creative strategy."**

35.     On February 26, 2010, in an email communication between Ms. DeWalt and an outside consultant of LCG (formerly a President of an LCG division), Ms. DeWalt referred to Mr. Armetta as "**our senior creative strategist.**"   Mr. Armetta interacted directly with this person and her peers, as Ms. DeWalt couldn't attend the meeting and had Mr. Armetta act in her place. Certainly, a "senior creative strategist" is not a volunteer, and thus would be compensated for his/her work.

36.     As a result of the efforts of Mrs. Armetta, Mr. Armetta and Vertis, LCG was able to increase its direct mail enrollment rate for students from approximately 8,000 in 2009, to over 32,000 in 2013. In total, this represents a 400% increase in the effectiveness of the direct mailing campaign with approximately the exact same or even slightly reduced annual budget.

37.     As a result of the efforts of Mrs. Armetta, Mr. Armetta and Vertis, LCG was able to increase its direct mail related profits from approximately $22.5 million in 2009, to

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 81 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 11 of 28
CONFIDENTIAL - Subject to Court Protective Order

approximately $132 million in 2013. In total, LCG earned more than $280 million in profits as a result of Mrs. Armetta, Mr. Armetta, and Aspira's achievements.

38.     In October 2012, LCG became aware of the fact that Vertis was in the process of being acquired out of Chapter 11 bankruptcy by a competitor, Quad Graphics ("Quad"). Mrs. Armetta and Ms. DeWalt were concerned with what effect this acquisition would have on the vendor's ability to provide high quality and reliable services to LCG subsequent to the acquisition.

39.     During the same period of time, many of the employees of Vertis were disillusioned with the prospect of working for Quad, and soon thereafter becomes employees of another printing company, FCL. While Vertis was being acquired by Quad, the printing quality began to suffer and Mrs. Armetta and Ms. DeWalt conducted a test-print run with FCL. Due to its success, Ms. DeWalt, in consultation with LCG management, determined that LCG should retain FCL to provide printing services going forward, rather than continue their business relationship with Vertis (now Quad).

40.     On a January 10, 2013 email from Ms. DeWalt to C.E.O. Barbara Beck, Ms. DeWalt writes "I met with Stephen Flood and Kevin Overlock today – Stephen is the CEO of FCL Graphics, the new firm handling our direct mail program and print. As part of my transition I asked that he meet with you directly, which he was very excited to do – really just to shake your hand thank you for the business but most importantly to assure that there is continuity for future campaigns – they are handling winter very well and Carlene is on top of all of the elements." Once again, this email is further evidence that the Chief Marketing Officer and C.E.O. were integral to the decision to shift the printing business to FCL, and the decision was clearly not made by Mrs. Armetta.

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 82 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 12 of 28
CONFIDENTIAL - Subject to Court Protective Order

41.     Mr. Armetta, because of his existing business relationship with Kevin Overlock of

FCL (previously of Vertis), entered into a business relationship with FCL to provide similar

services as to those he was previously providing to Vertis.  Ms. DeWalt inquired if key members

of the old Vertis team were moving to FCL.  She specifically requested the entire Vertis team be

brought to FCL with the exception of Shannon Heaman.  This illustrates that her request was

specific and not a blanket statement.  Mr. Armetta had been a driving force of that team since the

inception of this program, so there was no reason to believe that Ms. DeWalt was not inclusive

of him being involved.  Ms. DeWalt insisted that Mrs. Armetta work to retain the services of

such key members for the benefit of LCG.  As Mr. Armetta was an integral member of the

marketing team, Mrs. Armetta understood this directive from Ms. DeWalt to also include

retaining the services of Mr. Armetta and Aspira through FCL.

42.     As with Vertis, the work being performed by Mr. Armetta was invoiced to FCL,

as a vendor who would then invoice LCG for Mr. Armetta's services along with many other FCL

outside vendors and other provided services.

43.     During the time period in which Mr. Armetta was providing services to LCG,

regardless of whether such services were being billed to LCG by Aspira, Vertis, or FCL, Mr.

Armetta remained a fully integrated member of the LCG marketing team.  Mr. Armetta was in

continuous phone and email communication with many if not all members of the LCG marketing

team, as well as members of other LCG departments (e.g. information technology and business

intelligence departments), and certain external parties, such as many other LCG contractors,

including those introduced to him by other LCG employees, including Ms. DeWalt.

44.     On numerous occasions, after Mrs. Armetta had become an employee of LCG,

Mr. Armetta was invited to and attended meetings at LCG's headquarters in Michigan, which

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 83 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 13 of 28
CONFIDENTIAL - Subject to Court Protective Order

included meeting or interacting with such management employees as former Chief Marketing

Officer Ms. DeWalt, former Chief Financial Officer Robert Van Hees, current Senior Vice

President of Finance Tim Truly, former Chief Information Officer John Hegener, and Vice

President of Technology Ahmed Malik.  Furthermore, on at least one occasion Mr. Armetta was

in contact with Jim Howland, Chairman of the Board of Directors of LCG, whom he met during

in-person meetings at Morgan Stanley involving LCG's marketing campaigns. At this meeting,

Mr. Armetta was introduced as a senior creative strategist, and that he happened to be Mrs.

Armetta's husband.

     45.    On April 29, 2011, Mrs. Armetta, Ms. DeWalt, and C.E.O. Ms. Beck were

involved in an email exchange that clearly illustrates that Ms. Beck was not only aware of Mr.

Armetta's business relationship with LCG, but was personally involved in reviewing creative

and marketing related work that he was completing on LCG's behalf.  This includes the "sneak

peak at the Fall creative" email forwarded by Mrs. Armetta and Mr. Armetta to their supervisor,

Ms. DeWalt, and subsequently passed on to Ms. Beck for her review.

     46.    Other management employees of LCG, such as then-Director of Digital

Marketing Ellen Bale, were provided creative work directly from Mr. Armetta, which not only

exemplifies the open and notorious nature of their business relationship, but also speaks to the

quality and value that Mr. Armetta's work was providing, as evidenced by Ellen Bale's reply of

"Thanks. I really like it."

     47.    Similarly, for example, LCG Interactive Content Manager Dan Sanborn sent an

email to both Mrs. Armetta and Mr. Armetta on June 8, 2011, regarding a new project, and stated

"Since I know that you two are heading this initiative up…"  This statement clearly demonstrates

the widespread knowledge among LCG employees that Mr. Armetta was not only working for

CONFIDENTIAL - Subject to Court Protective Order

LCG, but that he, along with Mrs. Armetta, held a significant and integral role in running the operations of the marketing department.

48.     In addition to the communications of LCG's employees providing incontrovertible evidence of the open and notorious nature of the business relationship between Mrs. Armetta, Mr. Armetta, Aspira, and LCG, the emails also serve the purpose of exemplifying the high quality of work being completed on behalf of LCG.  In an email from Jodi Johnson, Regional Director of Marketing and Business Development for LCG, to Mrs. Armetta, and courtesy copied to Ms. DeWalt, Ms. Johnson states that she "Wanted to give you some great feedback from South California Directors. They loved the direct mail creative…," and noted that it was "the best they've ever seen."

49.     Throughout Mr. Armetta's business relationship with LCG, the management of LCG was well aware that Mr. Armetta, who was clearly the husband of Mrs. Armetta, was providing substantial services to LCG for which he was undoubtedly being compensated. Moreover, they were aware that Mr. Armetta and Mrs. Armetta were working in the same office space in Stamford, CT, and that they completed substantial work for LCG as a team out of said Stamford, CT office.

50.     At no time prior to August 2013 did any employee of LCG raise the issue of a potential conflict of interest due to Mr. Armetta's position as a paid vendor and as Mrs. Armetta's husband.  This arrangement was not only known to the members of LCG's management, but was in fact a direct result of Ms. DeWalt's and management's express directives to establish such a business relationship.

51.     As of November 2013, LCG is refusing to remit payment to FCL for services rendered by FCL, which includes services provided by Mr. Armetta and Aspira, and is therefore

14

CONFIDENTIAL - Subject to Court Protective Order

withholding payment to Mr. Armetta and Aspira for services provided to LCG.  This refusal to

remit payment to FCL, Mr. Armetta and Aspira is without justification, as these parties have

provided LCG with a benefit for which they have not been compensated.  Upon information and

belief, the amount of compensation due to Mr. Armetta and Aspira from LCG, by way of FCL's

invoices to LCG, is several hundred thousand dollars.

52.     LCG maintained an internal policy regarding discretionary bonuses to employees

for fiscal year 2013.  This policy stated if certain departments met certain targets determined by

management, and LCG as company achieved a specified level of earnings, that employees would

be entitled to a bonus calculated as a percentage of their annual salaries (the "Bonus Contract").

Upon information and belief, Mrs. Armetta as an individual, and LCG as a company, achieved

the predetermined targets set by management, and therefore Mrs. Armetta is entitled to a bonus.

The fiscal year for calculating such bonuses was from July 1, 2012, to June 20, 2013, and, upon

information and belief, LCG intended on paying out said bonuses in the first week of October

2013.

53.     In August 2013, for reasons unknown to Plaintiff, LCG initiated an internal

investigation, directed at Mrs. Armetta and involving the alleged conflict of interest.

Notwithstanding the clear and convincing evidence that the alleged conflict of interest was

expressly authorized by LCG, or in the alternative, that LCG waived the right to challenge said

conflict of interest due to the open and notorious nature of Mr. Armetta's relationship with LCG,

Mrs. Armetta was wrongfully terminated from her employment with LCG on September 6, 2013.

54.     Mrs. Armetta's termination was without regard to the fact that she not only

complied with LCG's corporate policies regarding potential conflicts of interest, but that at all

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 86 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 16 of 28
CONFIDENTIAL - Subject to Court Protective Order

times during her employment she acted at the direction of, with the explicit approval of, LCG's

management. Any purported conflict of interest was nonsense, and clearly waived.

55.     In essence, LCG courted and encouraged Mrs. Armetta and Mr. Armetta to work

for LCG, then proceeded to establish the structure of Mr. Armetta's compensation passing

through Vertis, only to later terminate the relationship with both parties on the basis of that

structure while never admitting the fact that it was designed at LCG's explicit direction.

56.     Over the course of Mr. Armetta and Mrs. Armetta's relationship with LCG, there

were over 275 emails between LCG employees and Mr. Armetta and Aspira pertaining to work

product that Mr. Armetta and Aspira were providing to LCG, over 193 emails that included Mrs.

Armetta and discussed Mr. Armetta's and Aspira's work, along with countless additional emails

that related to everything from the transition from Vertis to FCL as a print vendor (for which

Mrs. Armetta was not the decision-maker), Mr. Armetta's role in the LCG marketing

department, and the exceptionally high quality of work that Mr. Armetta and Aspira were

producing, as well as evidence of the success of their initiatives. For LCG to claim that

somehow the management of the firm, and in particular, the Ethics Committee members Mr.

Young and Mr. Smith, were unaware of the relationship between Mr. Armetta, Mrs. Armetta,

Aspira, and LCG, is simply ludicrous and disingenuous.

57.     As a result of the internal investigation, and the statements made to employees of

LCG and external third-parties regarding Mrs. Armetta's alleged misconduct, Mrs. Armetta was

defamed and her reputation tarnished by the false accusation that she acted improperly in the

course of her employment.

58.     Numerous individuals who are not employees of LCG and were not involved in

LCG management's conducting of the internal investigation have been made aware of the

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 87 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 17 of 28
CONFIDENTIAL - Subject to Court Protective Order

allegations by LCG against Mrs. Armetta, Mr. Armetta and Aspira. These individuals include

Ms. DeWalt (former Chief Marketing Officer of LCG), Kevin Overlock (a former employee of

Vertis, now an employee at FCL), and Steve Flood (former senior V.P. of operations and sales at

Vertis, and former C.E.O. of FCL). As a result of LCG's communication of utterly false and

defamatory information regarding the termination of Mrs. Armetta from LCG to these

individuals and others, Mrs. Armetta, Mr. Armetta and Aspira have been defamed and their

reputations tarnished.

      59.     Upon information and belief, an employee of LCG communicated to Mr. Joe

Lobosco and then conveyed to Ms. Marissa Marinelli (both employees at FCL) that Mrs.

Armetta had been terminated as a result of an internal investigation that was initiated when a

former LCG employee informed LCG of Mrs. Armetta's alleged misconduct. Despite the

information relating to Mrs. Armetta's alleged misconduct, as communicated by LCG, having

absolutely no merit, the fact that LCG is communicating such information to third-parties has not

only defamed Mrs. Armetta and tarnished her personal reputation, but has severely limited her

ability to market herself as a professional and thereby obtain gainful employment.

      60.     Upon information and belief, LCG communicated by company-wide email an

announcement of Mrs. Armetta's departure from LCG, and said announcement may have been

communicated to other third-parties. Insofar as employees of LCG (and external parties privy to

the announcement) were explicitly told that Mrs. Armetta was on administrative leave and may

have been aware that the administrative leave included an internal investigation, said parties may

deduce that her termination was a result of the internal investigation's finding that Mrs. Armetta

had acted improperly, thereby further tarnishing her reputation despite the fact that the stated

allegations were utterly false. This is further evidenced by the fact that LCG instructed all of its

CONFIDENTIAL - Subject to Court Protective Order

employees to cease having any contact with Mrs. Armetta whatsoever, leaving said employees

with the implication that Mrs. Armetta had acted improperly and that they should refrain from

communicating or doing business with Mrs. Armetta, Mr. Armetta, and Aspira as a result of their

purportedly improper conduct.

61.     Several of Mrs. Armetta's colleagues at LCG reached out to her via their personal

email accounts, despite LCG's demand that they not contact her, and stated, among other things,

"just checking in to make sure your OK," "thinking of you and hope you are OK," and "Just

wanted to check how are you doing…and…haven't been able to stop thinking about everything.

I know that you are strong and will get through this just fine." These colleagues were clearly

aware of the situation that Mrs. Armetta and Mr. Armetta were being subjected to, as a result of

the improper actions taken by LCG.

62.     Mrs. Armetta was informed of the above-referenced announcement from a former

colleague at LCG, who stated:

> The announcement just came out that you have left LCG! I am sad to see
> you go and hope this is a good thing for you. You are an incredibly talented
> and professional woman and I appreciate your support over the years. I
> wish you only the best and will be watching for your continued success. If I
> can ever support you in any way, please don't hesitate. You never know
> when our paths may cross again. Thanks again for everything and take
> care!

63.     On or about September 6, 2013, LCG falsely stated that Mrs. Armetta "engaged in

business dealing that were egregious and direct violations of the Company's Code of Conduct."

64.     Additionally, due to the communication of said defamatory statements to external

parties, including printing industry related vendors of LCG, her trade was disparaged insofar as

her ability to promote her qualifications within the industry are now tarnished by the false

allegations of impropriety.

CONFIDENTIAL - Subject to Court Protective Order

65.     Specifically, LCG spoke with Ms. DeWalt, who at the time was a former employee of LCG, during the course of the internal investigation, and made statements to her regarding the allegedly improper conduct of Mrs. Armetta, Mr. Armetta and Aspira.  These statements have defamed the name and reputation of Mrs. Armetta, Mr. Armetta, and Aspira, and have negatively impacted their future business prospects as a result of destroying the working relationship that existed between Ms. DeWalt and Mrs. and Mr. Armetta.

66.     LCG is solely responsible for this unfair and unjust treatment of Mrs. Armetta, and has sullied her reputation and diminished her future earning potential as an expert marketing professional.

67.     In breach of her implied employment contract with LCG, Mrs. Armetta has also been wrongfully denied benefits owed to her as a result of her continuous hard work on behalf of LCG, including the withholding of a bonus that was duly earned over the course of the previous year of her employment.

## FIRST COUNT

### (Defamation)

68.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 – 67 with the same force and effect as if fully set forth herein.

69.     On or about September 6, 2013, LCG falsely stated that Mrs. Armetta "engaged in business dealing that were egregious and direct violations of the Company's Code of Conduct."

70.     LCG published the false statement by including it in a termination letter, which when sent to Mrs. Armetta was copied to Scott Smith, Chief of Human Resources at LCG.

71.     Upon information and belief, LCG published this statement by placing the termination letter in Mrs. Armetta's employment file.

19

CONFIDENTIAL - Subject to Court Protective Order

72.     Upon information and belief, this statement, and/or similar statements have been made by LCG executives to various LCG employees and/or related individuals, vendors, print and marketing industry professionals, and other third parties, as the substance of the statement was the subject of an investigation of Mrs. Armetta conducted by LCG.

73.     Upon information and belief, false and defamatory statements have been made to Mr. Overlock, Mr. Flood, Ms. Marinelli, Ms. DeWalt, and Mr. Lobosco, among other LCG employees and former employees, vendors, industry professionals, and other third parties.

74.     Such false statement(s) has harmed the professional reputation of Mrs. Armetta and lowered her co-workers' views of and esteem for Mrs. Armetta.

75.     Such false statements were made with malicious intent, as LCG's total and reckless disregard for the truth in failing to properly investigate the potential conflict of interest resulted in them taking an adverse position against Mrs. Armetta that was contrary to the facts.

76.     As a result of LCG's defamatory statement(s), Mrs. Armetta has suffered injury in an amount to be determined at trial.

## SECOND COUNT

### (Breach of Contract)

77.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 – 76 with the same force and effect as if fully set forth herein.

78.     LCG has breached their contract with Mrs. Armetta to provide Mrs. Armetta with an approximate $50,000 bonus, as compensation for the work she performed between July 1, 2012 and June 30, 2013.

79.     On or about January 2010, Mrs. Armetta became an at-will employee of LCG.

72

CONFIDENTIAL - Subject to Court Protective Order

80.     At the time Mrs. Armetta's employment began, LCG agreed to provide Mrs. Armetta with the aforementioned bonus upon the completion of assigned duties for LCG over the course of the fiscal year concluding on June 30, 2013.

81.     Such agreement was a valid and enforceable contract between LCG and Mrs. Armetta ("Bonus Contract").

82.     LCG implicitly and explicitly directed Mrs. Armetta, as an LCG employee, to undertake all of the stated actions with regard to Mr. Armetta and Aspira, and is now estopped from denying the existence of the Bonus Contract.

83.     This was an oral at-will employment contract for an indefinite amount of time, and thus is not subject to the Statute of Frauds.

84.     From July 1, 2012 through June 30, 2013 Mrs. Armetta performed and completed such tasks as required under the Bonus Contract.

85.     As such, on June 30, 2013, LCG became obligated under the Bonus Contract to pay Mrs. Armetta approximately $50,000.

86.     To date, LCG has not performed their payment obligation under the Bonus Contract.

87.     As a result of LCG's breach of contract, Mrs. Armetta has suffered damage in the amount of $50,000.

## THIRD COUNT

### (Wrongful Termination)

88.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 – 87 with the same force and effect as if fully set forth herein.

89.     On or about September 6, 2013, LCG wrongfully terminated Mrs. Armetta.

CONFIDENTIAL - Subject to Court Protective Order

90.     Mrs. Armetta was an employee of LCG for approximately three years.

91.     During her time as an employee, Mrs. Armetta performed all duties and tasks associated with her job.

92.     During her employment, Mrs. Armetta was instructed by Ms. DeWalt to use Mr. Armetta and Aspira for various marketing jobs.

93.     Ms. DeWalt also instructed Mrs. Armetta to keep Mr. Armetta involved in LCG's marketing business, but to have Vertis pay Mr. Armetta directly.

94.     Mrs. Armetta followed the instructions of Ms. DeWalt to use Mr. Armetta and have his compensation go through Vertis.

95.     On or about September 6, 2013, LCG sent Mrs. Armetta a termination letter claiming that Mrs. Armetta violated company policy by using Mr. Armetta and Aspira's services in LCG's marketing campaigns, even though she was previously instructed to do so.

96.     Mrs. Armetta's termination of employment on the grounds that she followed the explicit and direct instructions of management is a violation of public policy, as it is in the public's interest to prevent employers from terminating employees for nothing more than following the direction of their supervisors, particularly when the employer's intent is to deprive the employee of a benefit that had already been promised and earned, such as with Mrs. Armetta's bonus payment.

97.     Termination of employment in violation of public policy is wrongful termination, even in the case of at-will employment.

98.     Mrs. Armetta's wrongful termination has caused her damage in an amount to be determined at trial.

22

74

CONFIDENTIAL - Subject to Court Protective Order

## FOURTH COUNT

### (Connecticut Unfair Trade Practices Act)

99.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 – 98 with the same force and effect as if fully set forth herein.

100.     The wrongful conduct and actions of LCG violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a) et seq. ("CUTPA"), which prohibits unfair or deceptive acts or practices in the conduct of any trade or business.

101.     LCG has unfairly terminated Mrs. Armetta as a result of her completing her job as directed by her supervisors, and now seeks to withhold compensation earned by Mrs. Armetta under the Bonus Contract.

102.     LCG has unfairly and deceptively used the alleged conflict of interest as a pretext for terminating Mrs. Armetta without paying her the just compensation for which she is entitled.

103.     The harm caused by LCG's actions extends beyond the employer-employee context, in that LCG's has caused specific and substantial damage to the business and personal reputation of Mrs. Amretta.

104.     The misconduct of LCG, as detailed in this Complaint, offends public policy.

105.     The misconduct of LCG, as detailed in this Complaint, is immoral, unethical and unscrupulous.

106.     The misconduct of LCG, as detailed in this Complaint, has caused substantial injury to Mrs. Armetta in the form of loss of employment and additional financial injury.

107.     LCG engaged in a continuous course of misconduct in the operation of their business in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-

CONFIDENTIAL - Subject to Court Protective Order

110b(a) *et seq*. ("CUTPA"), which prohibits unfair or deceptive acts or practices in the conduct of any trade or business.

108.    The continuing and repeated wrongful conduct, actions, and inactions of LCG violate CUPTA.

109.    Mrs. Armetta has been greatly damaged by the immoral, unethical and unscrupulous misconduct of LCG that was violative of CUTPA, in an amount to be determined at trial.

110.    Pursuant to Conn. Gen. Stat. § 42-110(g)(a), the conduct of LCG warrants the award of punitive damages in favor of Mrs. Armetta in an amount to be determined at trial.

## FIFTH COUNT

### (Unjust Enrichment)

111.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 – 110 with the same force and effect as if fully set forth herein.

112.    LCG was unjustly enriched by Mrs. Armetta in the amount of $50,000 for her Bonus Contract, in addition to a portion of the $284,000,000.00 in profits that LCG obtained as a direct result of her work establishing and supervising the direct mail marketing program.  In the event that work performed by Mrs. Armetta, Mr. Armetta and Aspira was somehow deemed to be unauthorized and a basis for legal action against Mrs. Armetta in the form of termination, LCG must return a portion of the benefit it unjustly received from Mrs. Armetta.  Mrs. Armetta was either a valued employee, growing LCG's acquisition of customers from 8,000 to 32,000 in four years, or her actions were not at LCG's direction.  If it is the latter, and LCG has taken her employment, then they need to give her a portion the monies she created – one or the other.

24

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 95 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 25 of 28
CONFIDENTIAL - Subject to Court Protective Order

113.    LCG now claims they did not agree to pay Mrs. Armetta the $50,000 bonus as agreed to in her Bonus Contract.

114.    LCG would be unjustly enriched if they failed to pay Mrs. Armetta the amount of her bonus due under her Bonus Contract for the excellent work she completed for LCG's benefit, and had been duly earned over the course of the previous fiscal year, which had ended prior to her termination.

115.    LCG gained three years of beneficial services from Mrs. Armetta under her employment contract, in which she was instrumental in increasing direct mailing profits to over $284,000,000 over four years, and supervised a department that was responsible for over 35% of LCG's total annual enrollment, yet has now been denied not only her continuing employment, but also the Bonus Contract she earned.

116.    LCG's decision to deprive Mrs. Armetta of her employment based on the allegation that she was not acting at the direction of LCG management when working with Mr. Armetta and Aspira must result in LCG also being deprived of the benefits for which Mrs. Armetta, Mr. Armetta, and Aspira provided to LCG.  The benefit that LCG derived from the combined efforts of Mrs. Armetta, Mr. Armetta and Aspira includes a portion of the $284,000,000.00 of profits that LCG earned as a result of the direct mail marketing campaign over the four-year course of the business relationship.

117.    LCG gained $284,000,000.00 in profits as a direct result of the work performed by Mrs. Armetta and Mr. Armetta, and the scheme orchestrated by LCG that they now claim was invalid and the basis for terminating Mrs. Armetta's employment and thus depriving her of her compensation.

CONFIDENTIAL - Subject to Court Protective Order

118.   As a direct result of LCG's unjust enrichment, Mrs. Armetta has been damaged in the amount of $50,000 for her unpaid Bonus Contract, in addition to the $284,000,000.00 of profits LCG derived from her work, or an amount to be determined at trial.

## SIXTH COUNT

## (Quantum Meruit)

119.   Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 118 with the same force and effect as if fully set forth here.

120.   LCG was unjustly enriched by Mrs. Armetta in the amount of $50,000 for her Bonus Contract, in addition to a portion of the $284,000,000.00 in profits that LCG obtained as a direct result of her work establishing and supervising the direct mail marketing program.  In the event that work performed by Mrs. Armetta, Mr. Armetta and Aspira was somehow deemed to be unauthorized and a basis for legal action against Mrs. Armetta in the form of termination, LCG must return a portion of the benefit it unjustly received from Mrs. Armetta.  Mrs. Armetta was either a valued employee, growing LCG's acquisition of customers from 8,000 to 32,000 in four years, or her actions were not at LCG's direction.  If it is the latter, and LCG has taken her employment, then they need to give her a portion the monies she created – one or the other.

121.   LCG now claims they did not agree to pay Mrs. Armetta the $50,000 bonus as agreed to in her Bonus Contract.

122.   LCG would be unjustly enriched if they failed to pay Mrs. Armetta the amount of her bonus due under her Bonus Contract for the excellent work she completed for LCG's benefit, and had been duly earned over the course of the previous fiscal year, which had ended prior to her termination.

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 97 of 217
Case 3:13-cv-01464-WWE   Document 18   Filed 11/08/13   Page 27 of 28
CONFIDENTIAL - Subject to Court Protective Order

123.    LCG gained three years of beneficial services from Mrs. Armetta under her employment contract, in which she was instrumental in increasing direct mailing profits to over $284,000,000 over four years, and supervised a department that was responsible for over 35% of LCG's total annual enrollment, yet has now been denied not only her continuing employment, but also the Bonus Contract she earned.

124.    LCG's decision to deprive Mrs. Armetta of her employment based on the allegation that she was not acting at the direction of LCG management when working with Mr. Armetta and Aspira must result in LCG also being deprived of the benefits for which Mrs. Armetta, Mr. Armetta, and Aspira provided to LCG.  The benefit that LCG derived from the combined efforts of Mrs. Armetta, Mr. Armetta and Aspira includes a portion of the $284,000,000.00 of profits that LCG earned as a result of the direct mail marketing campaign over the four-year course of the business relationship.

125.    LCG gained $284,000,000.00 in profits as a direct result of the work performed by Mrs. Armetta and Mr. Armetta, and the scheme orchestrated by LCG that they now claim was invalid and the basis for terminating Mrs. Armetta's employment and thus depriving her of her compensation.

126.    As a direct result of LCG's unjust enrichment, Mrs. Armetta has been damaged in the amount of $50,000 for her unpaid Bonus Contract, in addition to the $284,000,000.00 of profits LCG derived from her work, or an amount to be determined at trial.

127.    LCG was unjustly enriched by Plaintiffs in the amount of $284,000,000.00.

**WHEREFORE, Plaintiff seeks:**

1.      Damages;

2.      Costs;

27

CONFIDENTIAL - Subject to Court Protective Order

3.      Attorney's fees pursuant to C.G.S. § 42-110g;

4.      Punitive damages pursuant to C.G.S. § 42-110g;

5.      Interest; and

6.      Such other and further relief as this Court deems appropriate.

7.      In accordance with C.G.S. § 42-110g(c), a copy of this Complaint has been mailed to

both the Connecticut Attorney General and the Commissioner of Consumer Protection.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.


*COUNSEL FOR PLAINTIFF*
*CARLENE ARMETTA*

By: */s/ Joseph M. Pastore III*
        Joseph M. Pastore III
        Pastore & Dailey LLC
        Firm Juris No. 433711
        4 High Ridge Park
        Stamford, CT 06905
        203-658-8454 (tel)
        203-348-0852 (fax)
                        ***
        The Graybar Building
        425 Lexington Avenue
        Suite 303
        New York, NY 10170
        212-297-6169 (tel)
        212-986-1952 (fax)

CONFIDENTIAL - Subject to Court Protective Order

**F – COMPLAINT -  DAVID ARMETTA AND ASPIRA VS. LCG**

CONFIDENTIAL - Subject to Court Protective Order

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| DAVID ARMETTA and ASPIRA MARKETING DIRECT, LLC, | ) ) ) |
| Plaintiff, | ) ) Case No. 3:13-cv-1461 (VLB) ) |
| vs. | ) ) ) |
| LEARNING CARE GROUP, INC., | ) November 8, 2013 ) ) |
| Defendant. | ) ) |

---

## FIRST AMENDED COMPLAINT

Plaintiffs David Armetta ("Mr. Armetta") and Aspira Marketing Direct, LLC ("Aspira") (collectively, "Plaintiffs"), for its First Amended Complaint against Defendant Learning Care Group, alleges as follows:

### NATURE OF ACTION

1.     This case arises from the Learning Care Group's ("Defendant" or "LCG") internal investigation into the conduct of former employee Carlene Armetta ("Mrs. Armetta"), and the resulting effect that said internal investigation had on the business relationships and reputation of Plaintiffs.  LCG's actions have been malicious, purposeful, and outrageous.

2.     LCG is a national childcare center, operating over 900 daycare centers nationally under brand names such as Childtime Learning Center, Tutor Time, La Petite Academy, The Children's Courtyard and Montessori Unlimited.  LCG is based in Novi, Michigan. While its mission may appear to be altruistic, its practices are cold-hearted economics and corporate gamesmanship.  LCG is a private equity portfolio company, backed by Morgan Stanley Private

1

CONFIDENTIAL - Subject to Court Protective Order

Equity, Inc. ("Morgan Stanley"), and thus provides "childcare" to maximize returns to its investors, such as Morgan Stanley.

3.    Initially, Mrs. Armetta worked for LCG as a consultant in Stamford, Connecticut. Nearly three years ago, she became a full-time employee working for LCG in Stamford, Connecticut. Mrs. Armetta was a highly skilled and valued employee, working at high levels in the LCG marketing group focused on increasing LCG's acquisition of customers for its daycare centers. Mrs. Armetta was originally charged with developing the business-to-business relationships, and then was tasked with building a call center, before becoming responsible for the creation and supervision of the direct mail marketing program.

4.    Despite Mrs. Armetta's good work, LCG now claims that Mrs. Armetta was in violation of a corporate policy related to an undisclosed "conflict of interest." The alleged "conflict" arose as a result of the relationship between Mrs. Armetta, LCG, and Mrs. Armetta's husband, Mr. David Armetta ("Mr. Armetta"). It was well disclosed, open and notorious that Mr. Armetta was in a business relationship with print vendors for LCG, and Mr. Armetta was asked repeatedly by LCG to handle multiple aspects of LCG's direct mail printing and creative marketing. In fact, Mr. Armetta and his company Aspira were integral and transparent members of LCG's marketing team, despite not having a direct employer-employee relationship with LCG. Mrs. Armetta actually worked for Aspira before being hired by LCG, a fact of which LCG was fully aware. Furthermore, Mrs. Armetta's independent contractor agreement with LCG was actually an agreement between Aspira and LCG, and LCG paid Mrs. Armetta compensation through payments to Aspira.

5.    Mr. Armetta's work was done at the direct behest of LCG. In connection with an investigation by LCG into his business, Mr. Armetta and Aspira have provided LCG over 500

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 102 of 217
Case 3:13-cv-01461-VLB   Document 18   Filed 11/08/13   Page 3 of 26
CONFIDENTIAL - Subject to Court Protective Order

pages of documents demonstrating that very point. He worked for LCG 24 hours a day, 7 days a week for 4 years. Mr. Armetta ran the production, marketing, and testing strategy, designing of the new marketing database structure and programming, logo development, outside agency oversight, the creative aspects of LCG's direct mail marketing campaign, as well as negotiated reduced national printing rates and reduced cost and list recommendations. Mr. Armetta did all of this in an overt and transparent fashion, by participating in hundreds of conference calls with LCG and emailing with LCG offices and employees almost daily for years.

6.      Thus, there is no question that the relationship between Mrs. Armetta, Mr. Armetta, Aspira, and LCG was an open and notorious fact among members of LCG's management, as well as significant members of the LCG marketing department with whom Mr. Armetta interacted with.

7.      Mr. Armetta was included on hundreds and hundreds of emails from LCG giving him instructions and asking him to participate in LCG meetings. At no time prior to August 2013 did LCG object to the existence of this business relationship. In fact, the good work done by Mrs. Armetta, Mr. Armetta, and Aspira created over $280 million in profits for LCG in four years.

8.      Upon conclusion of the internal investigation initiated by LCG into this matter, Mrs. Armetta was wrongfully terminated from her position at LCG for an alleged "conflict of interest." This purported "conflict of interest" is supposedly based upon the fact that while Mr. Armetta was running LCG's direct mail printing operation at the explicit direction of LCG, creating over $280 million in profit for LCG, LCG now apparently takes the position that they did not know he was being compensated by the print vendor and must have been working, 24/7 for four years, for free. This is plainly ludicrous. LCG apparently takes the position that because

3

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 103 of 217
Case 3:13-cv-01461-VLB   Document 18   Filed 11/08/13   Page 4 of 26
CONFIDENTIAL - Subject to Court Protective Order

Mrs. Armetta was employed by LCG, Mr. Armetta could not be compensated for four years of work and should have been a full-time 24/7 volunteer. Thus, the purported "conflict of interest" upon which LCG based its termination of Mrs. Armetta was (i) created by LCG for its benefit, (ii) encouraged in writing and in statements by LCG in an open, notorious, and purposeful manner, and (iii) was therefore waived by LCG for the same reasons. This determination of a purported "conflict of interest" and unlawful termination was coincidentally made approximately three weeks before the very first bonus due to Mrs. Armetta in her four years of employment. Depriving Mrs. Armetta of her earned bonus is even more egregious due to the fact that Mr. and Mrs. Armetta had openly and obviously conceptualized, built and driven the very success of the specific programs that created the profits that the bonus was to be based upon.

9.       Equally appalling, the statements made by LCG employees and management as a result of the internal investigation have defamed Mr. Armetta and disparaged his professional reputation. He has been subject to wrongful public ridicule.

10.       LCG has been unjustly enriched by the services provided by Plaintiffs, as it now claims that LCG never authorized any payments to Plaintiffs for their services, that any payments made to Plaintiffs were improper, and to the extent that any payments were made, they were made without the knowledge of LCG's management.

## THE PARTIES

11.       Plaintiff David Armetta is a domiciliary of the State of Connecticut, with a principal residence located at 510 Woodbine Road, Stamford, CT 06903.

12.       Plaintiff Aspira Marketing Direct, LLC is a Connecticut corporation with its principal place of business located at 510 Woodbine Road, Stamford, CT 06903.

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 104 of 217
Case 3:13-cv-01461-VLB   Document 18   Filed 11/08/13   Page 5 of 26
CONFIDENTIAL - Subject to Court Protective Order

13.     Defendant Learning Care Group is a Michigan corporation with its principal place of business located at 21333 Haggerty Road, Suite 300, Novi, MI 48375.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper with the District Court for the State of Connecticut because the parties are fully diverse, and the amount in controversy exceeds $75,000.

## FACTS

15.     In November 2008, Stacy DeWalt ("Ms. DeWalt"), then Chief Marketing Officer of LCG, contacted Mrs. Armetta, who was a former colleague of hers at Pitney Bowes, Inc., to inquire as to Mrs. Armetta's interest in working as an independent contractor for LCG's marketing department.  Mrs. Armetta signed an independent contractor agreement with LCG in February 2009.  Mrs. Armetta signed the acceptance letter using the title "Managing Director, Aspira Marketing Direct."

16.     Mrs. Armetta's work for LCG initially involved a partnership project.  Within two months, Ms. DeWalt expanded Mrs. Armetta's responsibilities to include the development of a call center.

17.     Mr. Armetta and Aspira were not compensated for this work.  Mrs. Armetta was compensated in the form of a per diem payment that was previously negotiated between her and Ms. DeWalt, and memorialized in an independent contractor agreement drafted by Ira Young, LCG's General Counsel and a member of the company's Ethics Committee.  Compensation paid to Mrs. Armetta was invoiced by and paid through Aspira

18.     In August 2009, Ms. DeWalt advised Mrs. Armetta that LCG was unhappy with the quality of work being completed by LCG's current vendor for direct mail marketing, and stated that she needed assistance to ensure that a new direct mail marketing piece and program

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 105 of 217
Case 3:13-cv-01461-VLB   Document 18   Filed 11/08/13   Page 6 of 26
CONFIDENTIAL - Subject to Court Protective Order

was to be designed and mailed within two weeks. Mrs. Armetta discussed with Ms. DeWalt the possibility of Mr. Armetta assisting with this project (through Mr. Armetta's company, Aspira), and Ms. DeWalt directed Mrs. Armetta to contact Mr. Armetta and inquire as to what assistance he could provide.  Mr. Armetta had decades of experience and many industry contacts that he could leverage to ensure the project was completed in the necessary timeframe.

19.     Mr. Armetta contacted Kevin Overlock, an employee of Vertis Communications ("Vertis"), a company in the printing and direct mail marketing business, with whom he had a business relationship over the previous several years.  Mr. Armetta has known Kevin Overlock prior to 1990, and worked with him on many projects since that time.

20.     Mrs. Armetta, with the assistance of Plaintiffs and Vertis, was able to complete the direct mail marketing project within the required two weeks, despite the fact that such a project would normally require at least an eight-week process.  Not only did Mr. Armetta design the direct mail pieces, but he designed the mailing and testing strategy, arranged for and actually purchased the mailing lists for LCG's use, negotiated and coordinated as an approved Vertis broker the pricing and production for the printing and mailing of the entire direct mail project, and oversaw the program since all of these services are what Aspira was in the business of providing for its clients.

21.     Subsequent to the completion of the above-referenced project, and as a result of its success, Vertis, with Mr. Armetta's assistance and oversight, began to acquire substantial printing and marketing work from LCG, all of which Mr. Armetta was an integral member in performing.  This work included, among other things, creative designs to be used in LCG marketing campaigns, the rental and use of direct marketing mailing lists from outside vendors, and the establishment and operation of LCG's direct mail marketing campaigns.

CONFIDENTIAL - Subject to Court Protective Order

22.     At this time, Aspira, the company owned by Mr. Armetta and Mrs. Armetta, was invoicing LCG for the per diem work undertaken by Mrs. Armetta, as well as the additional work being completed by Mr. Armetta.  Aspira was also responsible for renting and billing LCG for the mailing lists as a list manager; and arranging and overseeing the print production through Vertis as a marketing agency.  This invoicing structure was designed with the knowledge and approval of Ms. DeWalt.

23.     As a result of the substantial and high quality work being performed by Mrs. Armetta, and in an effort to reduce their own costs, LCG, through Ms. DeWalt, inquired as to Mrs. Armetta's interest in joining the LCG marketing team as a full-time employee.  Although not interested in the offer initially, Mrs. Armetta was persuaded to enter into this relationship as an employee since she understood that if she didn't become a full-time employee, neither she nor Aspira would be receiving future work from LCG.  During negotiations regarding this employment relationship, taking place between December 2009 and January 2010, Mrs. Armetta inquired as to the status of Mr. Armetta's work if she decided to take the position in LCG's marketing department. Ms. DeWalt responded that it was "no problem," and that she "want[ed] Mr. Armetta involved and to just have him paid through Vertis," because "LCG does not want to write any more checks to Aspira."  She concluded this verbal exchange with the statement "Just get it done. Do what you have to do. We need to get this going."  Mrs. Armetta became an employee of LCG on or around January 28, 2010.

24.     As Mr. Armetta, Mrs. Armetta and Aspira were initially hired as an outside consultant and marketing firm, LCG was certainly aware that they were not only being compensated for their work, but that the normal industry practice of compensating such vendors

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 107 of 217
Case 3:13-cv-01461-VLB   Document 18   Filed 11/08/13   Page 8 of 26
CONFIDENTIAL - Subject to Court Protective Order

for their services most often included the payment of commissions, brokerage fees, and other compensation based on the client's needs.

25.    On February 8, 2010, Ms. DeWalt wrote to Mrs. Armetta and Scott Smith ("Mr. Smith"), the Chief Human Resources Officer and one of two members of LCG's Ethics Committee, stating:

> **"I spoke with Scott today in regard to continuing to contract David/Aspira. He and I will follow up with [the C.E.O.] Bill this week, in the meantime since your official start date passed the work that David is doing on Summer needs to have a SOW and cost for his time. Please have David contact me directly with costs/agreement ASAP"**

26.    The above-referenced communication illustrates that Ms. DeWalt, the chief marketing officer, Mr. Smith, the chief human resources officer and a member of the Ethics Committee, and Bill Davis, the then-current C.E.O. of LCG, were not only aware that Mr. Armetta and Aspira had a business relationship with LCG, which continued after Mrs. Armetta became an employee, but also that the relationship was encouraged by LCG.

27.    The second of the two members of LCG's Ethics Committee, the company's General Counsel Ira Young ("Mr. Young"), was also well aware of the relationship between Mr. Armetta, Aspira, and LCG, as evidenced by the fact that he is included on countless e-mails that specifically discussed the work of Mr. Armetta, including on June 2, 2012, where both Mr. Young and Mr. Armetta participated in a conversation regarding the legal issues involved in using certain pieces of artwork in LCG's marketing materials.

28.    On April 20, 2010, Mr. Armetta and Aspira signed a confidentiality and non-disclosure agreement with LCG, provided by LCG's legal department and drafted by Ira Young, the General Counsel and member of the Ethics Committee.  Mrs. DeWalt was the LCG officer

CONFIDENTIAL - Subject to Court Protective Order

who counter-signed. This again shows that Mr. Young was well aware of the relationship that existed between Mr. Armetta, Aspira, and LCG.

29.     It was not an uncommon occurrence for Mr. Young to participate in e-mail communications that Mr. Armetta was clearly involved in, or even directly related to his work for LCG, including a February 18, 2010 email conversation between Mrs. Armetta, Mr. Armetta, Mr. Young, and three other individuals discussing the use of trademarked material in LCG's advertising, and a January 26, 2011 email conversation discussing LCG's marketing with American Express (and for which the email author began his communication with "Hi Carlene [Armetta], Dave [Armetta], Ira [Young] & Shari [Corona]."

30.     In order to comply with Ms. DeWalt's request regarding the invoicing of Mr. Armetta's work, Mr. Armetta negotiated an independent contractor agreement with Vertis, who was to invoice LCG for Mr. Armetta's and Aspira's providing substantial and varied services.

31.     Although Mr. Armetta's work was being billed by Vertis to LCG, Ms. DeWalt, and therefore LCG, was well aware that Mr. Armetta was an integral part of the marketing department, and was surely not volunteering his time. The costs of Vertis' printing prices did not increase to LCG, but rather were actually reduced in price from the initial print prices that had been negotiated before Mrs. Armetta became an employee of LCG.

32.     Over the course of the next three years, Mr. Armetta and Vertis were integral parties to the development and success of LCG's marketing department, in particular the direct mail marketing campaigns, as well as a proactive "trigger" marketing campaigns, data and analytics that drove all of the success of their marketing efforts for LCG.

90

CONFIDENTIAL - Subject to Court Protective Order

33.     The final decision to place printing and direct mail marketing work with Vertis was not the decision of Mrs. Armetta, but rather a determination made by Ms. DeWalt, the Chief Marketing Officer, in consultation with LCG management.

34.     Likewise, the decision to subsequently move the printing and direct mail marketing work from Vertis to FCL Graphics ("FCL") was not the decision of Mrs. Armetta. That Mrs. Armetta was not the decision-maker with regard to LCG's moving of the print business to FCL is illustrated in a communication from the current C.E.O., Barbara Beck, to an executive at FCL, stating that she was "happy we're shifting business to FCL, our recent Vertis/Quad experience has not been a happy one!"  Clearly, the C.E.O played a role in the selection process for the new vendor, as would Ms. DeWalt, as a c-level executive and supervisor to Mrs. Armetta.

35.     Mr. Lichtenberg stated to Mrs. Armetta in an email on July 24, 2013 "[g]iven that FCL came down to the [price] level of contenders, it does not make sense to change at this point. We already have a learning curve with FCL and I don't want us losing that level of comfort and experience."  This statement is only further evidence that the decision to retain FCL as LCG's print vendor was not the decision of Mrs. Armetta.

36.     On February 24, 2010, in an email communication from Ms. DeWalt to Mr. Armetta, Ms. DeWalt stated **We [LCG] need you fully engaged in [the] fall, so let's connect ASAP and get me a proposal for leading the creative strategy."**

37.     On February 26, 2010, in an email communication between Ms. DeWalt and an outside consultant of LCG (formerly a President of an LCG division), Ms. DeWalt referred to Mr. Armetta as "**our senior creative strategist**."  Mr. Armetta interacted directly with this person and her peers, as Ms. DeWalt couldn't attend the meeting and had Mr. Armetta act in her

CONFIDENTIAL - Subject to Court Protective Order

place. Certainly, a "senior creative strategist" is not a volunteer, and thus would be compensated for his/her work.

38.     As a result of the efforts of Plaintiffs and Vertis, LCG was able to increase its direct mail enrollment rate for students from approximately 8,000 in 2009, to over 32,000 in 2013. In total, this represents a 400% increase in the effectiveness of the direct mailing campaign with the exact same or even slightly reduced annual budget.

39.     As a result of the efforts of Plaintiffs and Vertis, LCG was able to increase its direct mail related profits from approximately $22.5 million in 2009, to approximately $132 million in 2013.  In total, LCG earned more than $280 million in profits as a result of Plaintiffs' and Vertis' achievements.

40.     In October 2012, LCG became aware of the fact that Vertis was in the process of being acquired out of Chapter 11 bankruptcy by a competitor, Quad Graphics ("Quad").  Mrs. Armetta and Ms. DeWalt were concerned with what effect this acquisition would have on the vendor's ability to provide high quality and reliable services to LCG subsequent to the acquisition.

41.     During the same period of time, many of the employees of Vertis were disillusioned with the prospect of working for Quad, and soon thereafter becomes employees of another printing company, FCL.  While Vertis was being acquired by Quad, the printing quality began to suffer and Mrs. Armetta and Ms. DeWalt conducted a test-print run with FCL.  Due to its success, Ms. DeWalt, in consultation with LCG management, determined that LCG should retain FCL to provide printing services going forward, rather than continue their business relationship with Vertis (now Quad).

CONFIDENTIAL - Subject to Court Protective Order

42.     On a January 10, 2013 email from Ms. DeWalt to C.E.O. Barbara Beck, Ms.
DeWalt writes "I met with Stephen Flood and Kevin Overlock today – Stephen is the CEO of
FCL Graphics, the new firm handling our direct mail program and print.  As part of my transition
I asked that he meet with you directly, which he was very excited to do – really just to shake
your hand thank you for the business but most importantly to assure that there is continuity for
future campaigns – they are handling winter very well and Carlene is on top of all of the
elements." Once again, this email is further evidence that the Chief Marketing Officer and
C.E.O. were integral to the decision to shift the printing business to FCL, and the decision was
clearly not made by Mrs. Armetta.

43.     Mr. Armetta, because of his existing business relationship with Kevin Overlock of
FCL (previously of Vertis), entered into a business relationship with FCL to provide similar
services as to those he was previously providing to Vertis.  Ms. DeWalt inquired if key members
of the old Vertis team were moving to FCL.  She specifically requested the entire Vertis team be
brought to FCL with the exception of Shannon Heaman.  This illustrates that her request was
specific and not a blanket statement.  Mr. Armetta had been a driving force of that team since the
inception of this program, so there was no reason to believe that Ms. DeWalt was not inclusive
of him being involved.  Ms. DeWalt insisted that Mrs. Armetta work to retain the services of
such key members for the benefit of LCG.  As Mr. Armetta was an integral member of the
marketing team, Mrs. Armetta understood this directive from Ms. DeWalt to also include
retaining the services of Mr. Armetta and Aspira through FCL.

44.     As with Vertis, the work being performed by Mr. Armetta was invoiced to FCL,
as a vendor who would then invoice LCG for Mr. Armetta's services along with many other FCL
outside vendors and other provided services.

12

CONFIDENTIAL - Subject to Court Protective Order

45.     During the time period in which Mr. Armetta was providing services to LCG, regardless of whether such services were being billed to LCG by Aspira, Vertis, or FCL, Mr. Armetta remained a fully integrated member of the LCG marketing team.  Mr. Armetta was in continuous phone and email communication with many if not all members of the LCG marketing team, as well as members of other LCG departments (e.g. information technology and business intelligence departments), and certain external parties, such as many other LCG contractors, including those introduced to him by other LCG employees, including Ms. DeWalt.

46.     On numerous occasions, after Mrs. Armetta had become an employee of LCG, Mr. Armetta was invited to and attended meetings at LCG's headquarters in Michigan, which included meeting or interacting with such management employees as former Chief Marketing Officer Ms. DeWalt, former Chief Financial Officer Robert Van Hees, current Senior Vice President of Finance Tim Truly, former Chief Information Officer John Hegener, and Vice President of Technology Ahmed Malik.  Furthermore, on at least one occasion Mr. Armetta was in contact with Jim Howland, Chairman of the Board of Directors of LCG, whom he met during in-person meetings at Morgan Stanley involving LCG's marketing campaigns.  At this meeting, Mr. Armetta was introduced as a senior creative strategist, and that he happened to be Mrs. Armetta's husband.

47.     On April 29, 2011, Mrs. Armetta, Ms. DeWalt, and C.E.O. Ms. Beck were involved in an email exchange that clearly illustrates that Ms. Beck was not only aware of Mr. Armetta's business relationship with LCG, but was personally involved in reviewing creative and marketing related work that he was completing on LCG's behalf.  This includes the "sneak peak at the Fall creative" email forwarded by Mrs. Armetta and Mr. Armetta to their supervisor, Ms. DeWalt, and subsequently passed on to Ms. Beck for her review.

CONFIDENTIAL - Subject to Court Protective Order

48.     Other management employees of LCG, such as then-Director of Digital Marketing Ellen Bale, were provided creative work directly from Mr. Armetta, which not only exemplifies the open and notorious nature of their business relationship, but also speaks to the quality and value that Mr. Armetta's work was providing, as evidenced by Ellen Bale's reply of "Thanks. I really like it."

49.     Similarly, for example, LCG Interactive Content Manager Dan Sanborn sent an email to both Mrs. Armetta and Mr. Armetta on June 8, 2011, regarding a new project, and stated "Since I know that you two are heading this initiative up…"  This statement clearly demonstrates the widespread knowledge among LCG employees that Mr. Armetta was not only working for LCG, but that he, along with Mrs. Armetta, held a significant and integral role in running the operations of the marketing department.

50.     In addition to the communications of LCG's employees providing incontrovertible evidence of the open and notorious nature of the business relationship between Mrs. Armetta, Mr. Armetta, Aspira, and LCG, the emails also serve the purpose of exemplifying the high quality of work being completed on behalf of LCG.  In an email from Jodi Johnson, Regional Director of Marketing and Business Development for LCG, to Mrs. Armetta, and courtesy copied to Ms. DeWalt, Ms. Johnson states that she "Wanted to give you some great feedback from South California Directors. They loved the direct mail creative…," and noted that it was "the best they've ever seen."

51.     Throughout Plaintiffs' business relationship with LCG, the management of LCG was well aware that Mr. Armetta, who was clearly the husband of Mrs. Armetta, was providing substantial services to LCG for which he was undoubtedly being compensated.  Moreover, they were aware that Mr. Armetta and Mrs. Armetta were working in the same office space in

14

CONFIDENTIAL - Subject to Court Protective Order

Stamford, CT, and that they completed substantial work for LCG as a team out of said Stamford, CT office.

52.     At no time prior to August 2013 did any employee of LCG raise the issue of a potential conflict of interest due to Mr. Armetta's position as a paid vendor and as Mrs. Armetta's husband.  This arrangement was not only known to the members of LCG's management, but was in fact a direct result of Ms. DeWalt's and management's express directives to establish such a business relationship.

53.     As of November 2013, LCG is refusing to remit payment to FCL for services rendered by FCL, which includes services provided by Mr. Armetta and Aspira, and is therefore withholding payment to Mr. Armetta and Aspira for services provided to LCG.  This refusal to remit payment to FCL, Mr. Armetta and Aspira is without justification, as these parties have provided LCG with a benefit for which they have not been compensated.  Upon information and belief, the amount of compensation due to Mr. Armetta and Aspira from LCG, by way of FCL's invoices to LCG, is several hundred thousand dollars.

54.     In August 2013, for reasons unknown to Plaintiffs, LCG initiated an internal investigation, directed at Mrs. Armetta and involving the alleged conflict of interest. Notwithstanding the clear and convincing evidence that the alleged conflict of interest was expressly authorized by LCG, or in the alternative, that LCG waived the right to challenge said conflict of interest due to the open and notorious nature of Mr. Armetta's relationship with LCG, Mrs. Armetta was wrongfully terminated from her employment with LCG on September 6, 2013.

55.     Mrs. Armetta's termination was without regard to the fact that she not only complied with LCG's corporate policies regarding potential conflicts of interest, but that at all

15

96

Case 3:13-cv-01540-VAB   Document 146   Filed 05/24/16   Page 115 of 217
Case 3:13-cv-01461-VLB   Document 18   Filed 11/08/13   Page 16 of 26
CONFIDENTIAL - Subject to Court Protective Order

times during her employment she acted at the direction of, with the explicit approval of, LCG's management. Any purported conflict of interest was nonsense, and clearly waived.

56.     In essence, LCG courted and encouraged Mr. Armetta and Mrs. Armetta to work for LCG, then proceeded to establish the structure of Mr. Armetta's compensation passing through Vertis, only to later terminate the relationship with both parties on the basis of that structure while never admitting the fact that it was designed at LCG's explicit direction.

57.     Over the course of Mr. Armetta and Mrs. Armetta's relationship with LCG, there were over 275 emails between LCG employees and Mr. Armetta and Aspira pertaining to work product that Mr. Armetta and Aspira were providing to LCG, over 193 emails that included Mrs. Armetta and discussed Mr. Armetta's and Aspira's work, along with countless additional emails that related to everything from the transition from Vertis to FCL as a print vendor (for which Mrs. Armetta was not the decision-maker), Mr. Armetta's role in the LCG marketing department, and the exceptionally high quality of work that Mr. Armetta and Aspira were producing, as well as evidence of the success of their initiatives. For LCG to claim that somehow the management of the firm, and in particular, the Ethics Committee members Mr. Young and Mr. Smith, were unaware of the relationship between Mr. Armetta, Mrs. Armetta, Aspira, and LCG, is simply ludicrous and disingenuous.

58.     As a result of the internal investigation, and the statements made to employees of LCG and external third-parties regarding Mrs. Armetta's and Plaintiffs' alleged misconduct, Plaintiffs were defamed and their reputation tarnished by the false accusation that they acted improperly in the course of their business relationship with LCG.

59.     Numerous individuals who are not employees of LCG and were not involved in LCG management's conducting of the internal investigation have been made aware of the

CONFIDENTIAL - Subject to Court Protective Order

allegations by LCG against Mrs. Armetta, Mr. Armetta and Aspira.  These individuals include

Ms. DeWalt (former Chief Marketing Officer of LCG), Kevin Overlock (a former employee of

Vertis, now an employee at FCL), and Steve Flood (former senior V.P. of operations sales at

Vertis, and former C.E.O. of FCL).  As a result of LCG's communication of utterly false and

defamatory information regarding the termination of Mrs. Armetta from LCG to these

individuals and others, Mrs. Armetta, Mr. Armetta and Aspira have been defamed and their

reputations tarnished.

      60.     Upon information and belief, an employee of LCG communicated to Mr. Joe

Lobosco and then conveyed to Ms. Marissa Marinelli (both employees at FCL) that Mrs.

Armetta had been terminated as a result of an internal investigation that was initiated when a

former LCG employee informed LCG of Mrs. Armetta's alleged misconduct.  Despite the

information relating to Mrs. Armetta's alleged misconduct, as communicated by LCG, having

absolutely no merit, the fact that LCG is communicating such information to third-parties has not

only defamed Mrs. Armetta and tarnished her personal reputation, but has severely limited her

ability to market herself as a professional and thereby obtain gainful employment.

      61.     Upon information and belief, LCG communicated by company-wide email an

announcement of Mrs. Armetta's departure from LCG, and said announcement may have been

communicated to other third-parties.  Insofar as employees of LCG (and external parties privy to

the announcement) were explicitly told that Mrs. Armetta was on administrative leave and may

have been aware that the administrative leave included an internal investigation, said parties may

deduce that her termination was a result of the internal investigation's finding that Mrs. Armetta

and Plaintiffs had acted improperly, thereby further tarnishing their reputation despite the fact

that the stated allegations were utterly false. This is further evidenced by the fact that LCG

CONFIDENTIAL - Subject to Court Protective Order

instructed all of its employees to cease having any contact with Mrs. Armetta whatsoever,

leaving said employees with the implication that Mrs. Armetta had acted improperly and that

they should refrain from communicating or doing business with Mrs. Armetta, Mr. Armetta, and

Aspira as a result of their purportedly improper conduct.

62.     Several of Mrs. Armetta's colleagues at LCG reached out to her via their personal

email accounts, despite LCG's demand that they not contact her, and stated, among other things,

"just checking in to make sure your OK," "thinking of you and hope you are OK," and "Just

wanted to check how are you doing…and…haven't been able to stop thinking about everything.

I know that you are strong and will get through this just fine."  These colleagues were clearly

aware of the situation that Mrs. Armetta and Mr. Armetta were being subjected to, as a result of

the improper actions taken by LCG.

63.     Mrs. Armetta was informed of the above-referenced announcement from a former

colleague at LCG, who stated:

> The announcement just came out that you have left LCG! I am sad to see
> you go and hope this is a good thing for you. You are an incredibly talented
> and professional woman and I appreciate your support over the years. I
> wish you only the best and will be watching for your continued success. If I
> can ever support you in any way, please don't hesitate. You never know
> when our paths may cross again. Thanks again for everything and take
> care!

64.     On or about September 6, 2013, LCG falsely stated that Mrs. Armetta "engaged in

business dealing that were egregious and direct violations of the Company's Code of Conduct."

This statement, without expressly saying so, attributes the wrongful conduct to not just Mrs.

Armetta, but also to Plaintiffs.

65.     Additionally, due to the communication of said defamatory statements to external

parties, including printing industry related vendors of LCG, Plaintiffs' business was disparaged

CONFIDENTIAL - Subject to Court Protective Order

insofar as their ability to promote their qualifications within the industry are now tarnished by the false allegations of impropriety.

66.     Specifically, LCG spoke with Ms. DeWalt, who at the time was a former employee of LCG, during the course of the internal investigation, and made statements to her regarding the allegedly improper conduct of Mrs. Armetta, Mr. Armetta and Aspira.  These statements have defamed the name and reputation of Mrs. Armetta, Mr. Armetta, and Aspira, and have negatively impacted their future business prospects as a result of destroying the working relationship that existed between Ms. DeWalt and Mrs. and Mr. Armetta.

67.     LCG is solely responsible for this unfair and unjust treatment of Mr. Armetta and Aspira, and thereafter has sullied the reputation of and diminished the future earning of these parties as expert marketing professionals.

## FIRST COUNT

### (Defamation)

68.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 67 with the same force and effect as if fully set forth herein.

69.     On or about August 2013, LCG commenced an investigation of Mr. Armetta, Aspira, and Mrs. Armetta.

70.     During such investigation statements were made that Mr. Armetta improperly gained financial benefits by violating LCG company policies.

71.     Such statements are false.

72.     Upon information and belief, such statements have been published to a number of LCG employees, past LCG employees, such as Ms. DeWalt, and to industry vendors who commonly deal with LCG, Mr. Armetta, and Aspira.

19

100

CONFIDENTIAL - Subject to Court Protective Order

73.     Upon information and belief, false and defamatory statements have been made to
Mr. Overlock, Mr. Flood, Ms. Marinelli, Ms. DeWalt, and Mr. Lobosco, among other LCG
employees and former employees, vendors, industry professionals, and other third parties.

74.     Such false statements have harmed the professional reputation of Mr. Armetta and
Aspira and lowered numerous colleagues' and business associates' opinions of Mr. Armetta and
his business.

75.     Such false statements were made with malicious intent, as LCG's total and
reckless disregard for the truth in failing to properly investigate the potential conflict of interest
resulted in them taking an adverse position against Mr. Armetta and Aspira that was contrary to
the facts.

76.     As a result of LCG's defamatory statements, Mr. Armetta has suffered injury in
an amount to be determined at trial.

## SECOND COUNT

### (Commercial Disparagement)

77.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 76 with
the same force and effect as if fully set forth herein.

78.     In August 2013, LCG commenced an investigation of Mr. Armetta, Aspira, and
Mrs. Armetta.

79.     During such investigation statements were made that Aspira improperly used its
business relationship with LCG to over charge LCG and over pay Mr. Armetta in a manner that
violated LCG's company policies.

80.     Such statements are false.

20

CONFIDENTIAL - Subject to Court Protective Order

81.     Upon information and belief, such statements have been published to a number of LCG employees, past LCG employees, such as Ms. DeWalt, and to vendors who commonly deal with LCG, Mr. Armetta, and Aspira.

82.     Such false statements have harmed the business reputation of Aspira and have caused damage to future business opportunities for Aspira.

83.     Such false statements were made with malicious intent, as LCG's total and reckless disregard for the truth in failing to properly investigate the potential conflict of interest resulted in them taking an adverse position against Ms. Armetta and Aspira that was contrary to the facts.

84.     As a result of LCG's false and injurious statements, Aspira has suffered injury in an amount to be determined at trial.

### THIRD COUNT

### (Unjust Enrichment)

85.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 84 with the same force and effect as if fully set forth herein.

86.     LCG was unjustly enriched by Plaintiffs in the amount of $284,000,000.00.

87.     LCG gained $284,000,000.00 in profits as a direct result of the work performed by Mr. Armetta and Aspira, and the scheme orchestrated by LCG that they now claim was invalid and the basis for terminating Mrs. Armetta's employment.

88.     LCG's decision to deprive Mrs. Armetta of her employment based on the allegation that she was not acting at the direction of LCG management when working with Mr. Armetta and Aspira must result in LCG also being deprived of the benefits for which Mrs. Armetta, Mr. Armetta, and Aspira provided to LCG. The benefit that LCG derived from the

21

CONFIDENTIAL - Subject to Court Protective Order

combined efforts of Mrs. Armetta, Mr. Armetta and Aspira includes the $284,000,000.00 of

profits that LCG earned as a result of the direct mail marketing campaign over the four-year

course of the business relationship.

89.    LCG now claims they did not agree to pay Mr. Armetta or Aspira for this work.

90.    LCG claims that any such payments, to the extent they were made, were made

without knowledge they were going to Aspira and/or Mr. Armetta.

91.    LCG claims these payments were improper for Mr. Armetta to receive due to

LCG's company policies.

92.    In the event that work performed by Mrs. Armetta, Mr. Armetta and Aspira was

somehow deemed to be unauthorized and a basis for legal action against Mrs. Armetta in the

form of termination, LCG must return the benefit it unjustly received from Mr. Armetta.  Mr.

Armetta was either a valued contractor, growing LCG's acquisition of customers from 8,000 to

32,000 in four years, or his actions were not authorized by LCG.  If it is the latter, then LCG has

been unjustly enriched by the services he has provided, due to its withholding of payment of his

invoices, and they need to give him the monies that were created as a result of his efforts – one

or the other.

93.    LCG's unjust enrichment has been to the detriment of Mr. Armetta and Aspira.

94.    LCG has been unjustly enriched in the amount of $284,000,000.00 or an amount

to be determined at trial.

## **FOURTH COUNT**

### **(Quantum Meruit)**

95.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1 – 94 with

the same force and effect as if fully set forth herein.

22

CONFIDENTIAL - Subject to Court Protective Order

96.     LCG was unjustly enriched by Plaintiffs in the amount of $284,000,000.00.

97.     LCG gained $284,000,000.00 in <u>profits</u> as a direct result of the work performed by Mr. Armetta and Aspira, and the scheme orchestrated by LCG that they now claim was invalid and the basis for terminating Mrs. Armetta's employment.

98.     LCG's decision to deprive Mrs. Armetta of her employment based on the allegation that she was not acting at the direction of LCG management when working with Mr. Armetta and Aspira must result in LCG also being deprived of the benefits for which Mrs. Armetta, Mr. Armetta, and Aspira provided to LCG.  The benefit that LCG derived from the combined efforts of Mrs. Armetta, Mr. Armetta and Aspira includes the $284,000,000.00 of profits that LCG earned as a result of the direct mail marketing campaign over the four-year course of the business relationship.

99.     LCG now claims they did not agree to pay Mr. Armetta or Aspira for this work.

100.    LCG claims that any such payments, to the extent they were made, were made without knowledge they were going to Aspira and/or Mr. Armetta.

101.    LCG claims these payments were improper for Mr. Armetta to receive due to LCG's company policies.

102.    In the event that work performed by Mrs. Armetta, Mr. Armetta and Aspira was somehow deemed to be unauthorized and a basis for legal action against Mrs. Armetta in the form of termination, LCG must return the benefit it unjustly received from Mr. Armetta.  Mr. Armetta was either a valued contractor, growing LCG's acquisition of customers from 8,000 to 32,000 in four years, or his actions were not authorized by LCG.  If it is the latter, then LCG has been unjustly enriched by the services he has provided, due to its withholding of payment of his

CONFIDENTIAL - Subject to Court Protective Order

invoices, and they need to give him the monies that were created as a result of his efforts – one or the other.

103.    LCG's unjust enrichment has been to the detriment of Mr. Armetta and Aspira.

104.    LCG has been unjustly enriched in the amount of $284,000,000.00 or an amount to be determined at trial.

### FIFTH COUNT

### (Connecticut Unfair Trade Practices Act)

105.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1 - 104 with the same force and effect as if fully set forth herein.

106.    The wrongful conduct and actions of LCG violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a) et seq. ("CUTPA"), which prohibits unfair or deceptive acts or practices in the conduct of any trade or business.

107.    LCG has improperly used its employee, Carlene Armetta's, relationship with her husband to gain professional services for which it expects to utilize at no cost to themselves.

108.    LCG has ruined the business reputation of Mr. Armetta and Aspira with numerous vendors and companies Plaintiffs typically work with.

109.    The misconduct of LCG, as detailed in this Complaint, offends public policy.

110.    The misconduct of LCG, as detailed in this Complaint, is immoral, unethical and unscrupulous.

111.    The misconduct of LCG, as detailed in this Complaint, has caused substantial injury to Mr. Armetta and Aspira in the form of loss of business opportunities and additional financial injury.

CONFIDENTIAL - Subject to Court Protective Order

112.    LCG engaged in a continuous course of misconduct in the operation of their business in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a) *et seq.* ("CUTPA"), which prohibits unfair or deceptive acts or practices in the conduct of any trade or business.

113.    The continuing and repeated wrongful conduct, actions, and inactions of LCG violate CUPTA.

114.    Mr. Armetta and Aspira have been greatly damaged by the immoral, unethical and unscrupulous misconduct of LCG that was violative of CUTPA, in an amount to be determined at trial.

**WHEREFORE, Plaintiffs seek:**

1.    Damages;

2.    Costs;

3.    Attorney's fees pursuant to C.G.S. § 42-110g;

4.    Punitive damages pursuant to C.G.S. § 42-110g;

5.    Interest; and

6.    Such other and further relief as this Court deems appropriate.

7.    In accordance with C.G.S. § 42-110g(c), a copy of this Complaint has been mailed to both the Connecticut Attorney General and the Commissioner of Consumer Protection.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a jury trial on all issues so triable.

CONFIDENTIAL - Subject to Court Protective Order

*COUNSEL FOR PLAINTIFFS*
*DAVID ARMETTA AND ASPIRA*
*MARKETING DIRECT, LLC*

By: /s/ *Joseph M. Pastore III*

    Joseph M. Pastore III
    Pastore & Dailey LLC
    Firm Juris No. 433711
    4 High Ridge Park
    Stamford, CT 06905
    203-658-8454 (tel)
    203-348-0852 (fax)
        ***

    The Graybar Building
    425 Lexington Avenue
    Suite 303
    New York, NY 10170
    212-297-6169 (tel)
    212-986-1952 (fax)

26

CONFIDENTIAL - Subject to Court Protective Order

# G – LOST COMPENSATION AND PROFITS

## CARLENE ARMETTA

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

**Carlene Armetta - Historic Compensation Analysis Excluding Benefits**

| Line Item | 2007 | 2008 | Calendar Year 2009 | 2010 | 2011 | 2012 | 2013 | Aug 2014 YTD |
|---|---|---|---|---|---|---|---|---|
| **1) Pitney Bowes, Inc.** | | | | | | | | |
| Wages, tips, other comp. (W-2 box 1) | $248,416 | $306,713 | $82,464 | $6,145 | | | | |
| Child care paid through the employer (W-2 box 10) | $1,123 | $758 | | | | | | |
| Nonqualified plans (W-2 box 11) | | $28,268 | $4,620 | | | | | |
| Group term life insurance over limit (W-2 box 12 code C) | | $109 | | | | | | |
| 401K retirement plan contribution (W-2 box 12 code D) | $15,500 | $8,486 | | | | | | |
| Total salary and bonus pre-tax | $265,039 | $315,957 | $82,464 | $6,145 | | | | |
| | | | | | | | | |
| **2) Aspira** | | | $145,914 | | | | | |
| | | | | | | | | |
| **3) LCG** | | | | 2010 | 2011 | 2012 | 2013 | |
| Wages, tips, other comp. (W-2 box 1) | | | | $158,674 | $190,105 | $163,885 | $120,980 | |
| Medicare wages and tips (W-2 box 5) | | | | $166,751 | $206,605 | $170,643 | $124,997 | |
| Child care paid through the employer (W-2 box 10) | | | | | $3,000 | $580 | $1,538 | |
| Group term life insurance over limit (W-2 box 12 code C) | | | | $125 | $180 | $276 | $191 | |
| 401K retirement plan contribution (W-2 box 12 code D) | | | | $8,077 | $16,500 | $6,758 | $4,017 | |
| Cost of employer spons. health coverage (W-2 box 12 code DD) | | | | | | $12,448 | $9,134 | |
| Flexible spending account (W-2 box 14) | | | | | $2,000 | $5,000 | $1,731 | |
| SEC 125 benefits (W-2 box 14) | | | | $4,912 | $7,295 | $8,001 | $5,817 | |
| Total salary and bonus before taxes | | | | $171,663 | $218,899 | $184,224 | $134,083 | |
| Percent of year worked | | | | | | | 67% | |
| Annualized | | | | | | | $199,209 | |
| | | | | | | | | |
| **4) Post-LCG Termination** | | | | | | | | $0 |
| | | | | | | | | |
| **Total Compensation excluding benefits** | $265,039 | $315,957 | $228,378 | $177,808 | $218,899 | $184,224 | $134,083 | $0 |
| Percent change | | 19% | -28% | -22% | 23% | -16% | -27% | -100% |

109

CONFIDENTIAL - Subject to Court Protective Order

110

# G - LOST COMPENSATION AND PROFITS

**Carlene Armetta - Historic Compensation Analysis Excluding Benefits**

Notes:

1)  Total salary and bonus before taxes = W-2 box 1 + box 10 + box 12 (except C and DD) + box 14.
2)  Information on the value of benefits paid to Carlene Armetta by the employer was not available prior to 2013.
3)  Pitney Bowes, Inc. information is from CARMSUPP-00025851, CARMSUPP-00025877, CARMSUPP-00025908 and CARMSUPP-00025937.
4)  Aspira information is from CARMSUPP-00025913 to -00025914.
5)  LCG information is from CARMSUPP-00025938, CARMSUPP-00025992, CARSUPP-00026413 and CARSUPP-00026423.
6)  Carlene Armetta received a separate retirement services gross distribution of $28,073 in 2013.  See CARSUPP-00026424.
7)  Carlene Armetta indicated that there was effectively no employer match in her LCG 401k.
8)  2010 LCG income includes a signing bonus of approx. $10,000 per Carlene Armetta.
9)  2011 LCG income includes a bonus of approximately $16,000 per Carlene Armetta.
10) Post-LCG Termination income is from discussions with Carlene Armetta.

CONFIDENTIAL - Subject to Court Protective Order

111

# G - LOST COMPENSATION AND PROFITS

## A - Carlene Armetta Lost Compensation with a Normal Job Loss Recovery

| Years from termination date | 0.16 | 1.32 | 2.32 | 3.32 |
|---|---|---|---|---|
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key dates (discharge and trial judgment) | 9/6/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |
| **But For LCG's Wrongful Acts** | | | | |
| Total compensation before escalation | | | | |
| Salary | $200,000 | $200,000 | $200,000 | $200,000 |
| Bonus | $50,000 | $16,650 | $16,650 | $16,650 |
| Benefits (employer portion) | $8,234 | $8,234 | $8,234 | $8,234 |
| Compensation before escalation | $258,234 | $224,884 | $224,884 | $224,884 |
| Total compensation escalation rate | | 2.5% | 2.5% | 2.5% |
| Escalation period | | 1.00 | 2.00 | 3.00 |
| Total Compensation | $258,234 | $230,506 | $236,268 | $242,175 |
| Compensation excluding benefits | $250,000 | $222,066 | $227,618 | $233,308 |
| **Actual including mitigation** | | | | |
| Salary | $134,083 | $0 | | |
| Bonus | $0 | $0 | | |
| Benefits (employer portion) | $5,617 | $0 | | |
| Total Compensation | $139,700 | $0 | $68,693 | $109,013 |

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

## A - Carlene Armetta Lost Compensation with a Normal Job Loss Recovery

| Years from termination date | 0.16 | 1.32 | 2.32 | 3.32 |
|---|---|---|---|---|
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key dates (discharge and trial judgment) | 9/6/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |

### Lost Compensation = But-For less Actual

| | | | | |
|---|---|---|---|---|
| Total lost compensation - unadjusted | $118,534 | $230,506 | $167,575 | $133,162 |
| | | | | |
| Back pay | $118,534 | $230,506 | $80,318 | |
| Back pay - cumulative | $118,534 | $349,040 | $429,357 | |
| | | | | |
| Front pay | | | $87,257 | $133,162 |
| Discount period | | | 0.32 | 1.13 |
| Discount rate | | | 0.1% | 0.1% |
| Discount factor | | | 1.00 | 1.00 |
| Front pay (discounted) | | | $87,230 | $133,011 |
| Front pay (discounted) cumulative | | | $87,230 | $220,241 |
| Total lost compensation | $118,534 | $230,506 | $167,548 | $133,011 |
| Cumulative | $118,534 | $349,040 | $516,587 | $649,599 |

CONFIDENTIAL - Subject to Court Protective Order

113

# G - LOST COMPENSATION AND PROFITS

**A - Carlene Armetta Lost Compensation with a Normal Job Loss Recovery**

| | | | | |
|---|---|---|---|---|
| Years from termination date | 0.16 | 1.32 | 2.32 | 3.32 |
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key dates (discharge and trial judgment) | 9/6/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |
| | | | | |
| **Prejudgment Interest** | | | | |
| Interest rate | 10.0% | 10.0% | 10.0% | |
| Lost back pay | $118,534 | $230,506 | $80,318 | |
| Years of interest (mid-period convention) | 1.53 | 0.87 | 0.18 | |
| Prejudgment interest | $18,593 | $19,892 | $1,418 | |
| Cumulative | $18,593 | $38,485 | $39,903 | |
| | | | | |
| Total lost compensation damages including interest | | | | |
| Annual | $137,127 | $250,398 | $168,965 | $133,011 |
| Cumulative | $137,127 | $387,525 | $556,490 | $689,501 |

Notes:

1) Carlene Armetta's was discharged from LCG on Sept. 6, 2013.
2) Plaintiff's counsel has asked me to assume that the trial would conclude and the judgment be made on May 15, 2015.
3) Compensation escalation rate is LCG's "average company increase" from LCG-EM00036762.
4) Benefit calculations (see CARMSUPP00026435-26438 and:

| | |
|---|---|
| Total benefits cost per month | $1,397 |
| x 12 = Total benefits cost per year | $16,760 |
| Total cost Jan. 1, 2013 to Sept. 6, 2013 | $11,433 |
| - Portion paid by the employee from W-2 | $5,817 |
| = Employer contrib. through termination | $5,617 |
| Employer contribution % | 49% |
| Employer annual contribution | $8,234 |

5) The 52 week U.S. treasury rate from Federal Reserve statistical release H.15 was used for the discount rate

CONFIDENTIAL - Subject to Court Protective Order

114

# G - LOST COMPENSATION AND PROFITS

## B - Carlene Armetta with No Recovery During Her Expected Tenure at LCG

| | | | | |
|---|---|---|---|---|
| Years from termination date | 0.16 | 1.32 | 2.32 | 3.32 |
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key dates (discharge and trial judgment) | 9/6/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |
| | | | | |
| **But For LCG's Wrongful Acts** | | | | |
| Total compensation before escalation | | | | |
| Salary | $200,000 | $200,000 | $200,000 | $200,000 |
| Bonus | $50,000 | $16,650 | $16,650 | $16,650 |
| Benefits (employer portion) | $8,234 | $8,234 | $8,234 | $8,234 |
| Compensation before escalation | $258,234 | $224,884 | $224,884 | $224,884 |
| Total compensation escalation rate | | 2.5% | 2.5% | 2.5% |
| Escalation period | | 1.00 | 2.00 | 3.00 |
| Total Compensation | $258,234 | $230,506 | $236,268 | $242,175 |
| Compensation excluding benefits | $250,000 | $222,066 | $227,618 | $233,308 |
| | | | | |
| **Actual including mitigation** | | | | |
| Salary | $134,083 | | | |
| Bonus | $0 | $0 | $0 | |
| Benefits (employer portion) | $5,617 | $0 | $0 | |
| Total Compensation | $139,700 | $0 | $0 | $0 |

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

## B - Carlene Armetta with No Recovery During Her Expected Tenure at LCG

| | | | | | |
|---|---|---|---|---|---|
| Years from termination date | 0.16 | 1.32 | 2.32 | 3.32 | |
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 | |
| Key dates (discharge and trial judgment) | 9/6/2013 | | 5/15/2015 | | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** | |

### Lost Compensation = But-For less Actual

| | | | | |
|---|---|---|---|---|
| Total lost compensation - unadjusted | $118,534 | $230,506 | $236,268 | $242,175 |
| | | | | |
| Back pay | $118,534 | $230,506 | $80,318 | |
| Back pay - cumulative | $118,534 | $349,040 | $429,357 | |
| | | | | |
| Front pay | | | $155,951 | $242,175 |
| Discount period | | | 0.32 | 1.13 |
| Discount rate | | | 0.1% | 0.1% |
| Discount factor | | | 1.00 | 1.00 |
| Front pay (discounted) | | | $155,902 | $241,901 |
| Front pay (discounted) cumulative | | | $155,902 | $397,803 |
| Total lost compensation | $118,534 | $230,506 | $236,219 | $241,901 |
| Cumulative | $118,534 | $349,040 | $585,259 | $827,160 |

CONFIDENTIAL - Subject to Court Protective Order

116

# G - LOST COMPENSATION AND PROFITS

## B - Carlene Armetta with No Recovery During Her Expected Tenure at LCG

| | | | | |
|---|---|---|---|---|
| Years from termination date | 0.16 | 1.32 | 2.32 | 3.32 |
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key dates (discharge and trial judgment) | 9/6/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |
| | | | | |
| **Prejudgment Interest** | | | | |
| Interest rate | 10.0% | 10.0% | 10.0% | |
| Lost back pay | $118,534 | $230,506 | $80,318 | |
| Years of interest (mid-period convention) | 1.53 | 0.87 | 0.18 | |
| Prejudgment interest | $18,593 | $19,892 | $1,418 | |
| Cumulative | $18,593 | $38,485 | $39,903 | |
| | | | | |
| **Total lost compensation damages including interest** | | | | |
| Annual | $137,127 | $250,298 | $237,637 | $241,901 |
| Cumulative | $137,127 | $387,525 | $625,162 | $867,063 |

| | |
|---|---|
| Total benefits cost per month | $1,397 |
| x 12 = Total benefits cost per year | $16,760 |
| Total cost Jan. 1, 2013 to Sept. 6, 2013 | $11,433 |
| - Portion paid by the employee from W-2 | $5,817 |
| = Employer contrib. through termination | $5,617 |
| Employer contribution % | 49% |
| Employer annual contribution | $8,234 |

Notes:

1) Carlene Armetta's was discharged from LCG on Sept. 6, 2013.

2) Plaintiff's counsel has asked me to assume that the trial would conclude and the judgment be made on May 15, 2015.

3) Compensation escalation rate is LCG's "average company increase" from LCG-EM00036762.

4) Benefit calculations (see CARMSUPP00026435-26438 and:

5) The 52 week U.S. treasury rate from Federal Reserve statistical release H.15 was used for the discount rate.

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

**Carlene Armetta - Analysis of Re-Employment after Normal Job Loss**

| Line item | Total | Part-time (35 hours or less per week) | Total full-time | Total who reported | Pay Category = Pay of new job relative to lost job / Full-Time 20% or more below | Below but within 20% | Equal or above but within 20% | 20% or more above | Self employed and unpaid family workers |
|---|---|---|---|---|---|---|---|---|---|
| **Displaced long-tenured workers** | | | | | | | | | |
| Private non-agricultural wage and salary jobs | 2,805 | -402 | 2,209 | 1,983 | 589 | 385 | 506 | 308 | 195 |
| Professional and business services | 373 | 31 | 301 | 236 | 56 | 60 | 93 | 36 | 41 |
| Education and health services | 257 | 70 | 176 | 158 | 29 | 30 | 67 | 21 | 11 |
| **Probability of earning lower, equal or higher pay for full-time work** | | | | | | | | | |
| Private non-agricultural wage and salary jobs | | | | 100% | 30% | 19% | 26% | 16% | 10% |
| Professional and business services | | | | 100% | 20% | 21% | 33% | 13% | 14% |
| Education and health services | | | | 100% | 18% | 19% | 42% | 13% | 7% |
| Average | | | | 100% | 23% | 20% | 33% | 14% | 10% |
| Equal or increase in pay | | | 47% | | | | | | |
| Decrease in pay | | | 53% | | | | | | |
| **Probability of finding part-time vs. full time work** | | | | | | | | | |
| Private non-agricultural wage and salary jobs | | 15% | 85% | | | | | | |
| Professional and business services | | 9% | 91% | | | | | | |
| Education and health services | | 28% | 72% | | | | | | |
| Average | | 18% | 82% | | | | | | |
| **Carlene Armetta** | | | | | | | | | |
| Normalized LCG comp. (base+ bonus+ benefits) | $224,884 | | | | | | | | |
| Relative pay description for the new job | | 22hrs/44 hrs | | | | | | | |
| Relative pay for new job | Expected | Part-time | Full-time | | 20% less | 10% less | 5% more | 20% more | $0 or equal |
| **Expected new job compensation** | | | | | | | | | |
| Private non-agricultural wage and salary jobs | $190,101 | $102,978 | $205,956 | | $179,907 | $202,395 | $236,128 | $269,860 | $112,442 |
| Professional and business services | $195,008 | $102,279 | $204,558 | | | | | | |
| Education and health services | $184,648 | $107,638 | $215,276 | | | | | | |
| **Expected compensation if re-employed** | $189,919 | | | | | | | | |

CONFIDENTIAL - Subject to Court Protective Order

118

# G - LOST COMPENSATION AND PROFITS

**Carlene Armetta - Analysis of Re-Employment after Normal Job Loss**

| | |
|---|---|
| **Expected compensation if re-employed** | **$189,919** |
| Probability of re-employment within 0.1 to 3 years: | |
| Women 25 to 54 years | 54.6% |
| Management, business and financial operations occupations | 60.2% |
| Probability of reemployment within 0.1 to 3 years | 57.4% |
| Carlene Armetta termination date | 9/6/2013 |
| 1.5 years from termination | 3/7/2015 |
| **Expected income in 1 month to 3 years if Carlene Armetta suffered a Normal Job Loss** | **$109,013** |

Notes:

1) Data is from U.S. Bureau of Labor Statistics' Displace Worker Table 1. Table 5 and Table 7, January 2012.
2) Part-time versus full-time hours are from the BLS "Labor Force Statistics from the Current Population Survey". Household Data Annual Averages, table 19.
3) The individuals in the Displaced Worker tables:
   - Were in a position for at least three years
   - Were displaced from that position due to a plant or company closing or moving, insufficient work or a position or shift had been abolished.
4) Expected value = the sum of each outcome multiplied by the probability of that outcome occurring.

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

**Marketing Compensation in Carlene Armetta's Market**

| Position | Location | Salary + Bonus Percentiles | | | | | Median total compensation | Mean Annual Wage |
|---|---|---|---|---|---|---|---|---|
| | | 10th | 25th | Median | 75th | 90th | | |
| Top Marketing Executive | Stamford, CT | $160,443 | $218,825 | $282,949 | $385,701 | $479,251 | $362,813 | |
| Marketing Manager | Stamford, CT | $70,462 | $85,813 | $102,673 | $124,348 | $144,081 | $140,845 | |
| Marketing Communication Director | Stamford, CT | $104,228 | $119,506 | $136,286 | $157,102 | $176,054 | $183,396 | |
| CRM Targeted Mktg. Campaign Manager | Stamford, CT | $91,337 | $107,855 | $125,998 | $168,946 | $208,049 | $170,581 | |
| Marketing Managers | Stamford-Norwalk-Bridgeport, CT | | | | | | | $151,090 |

Notes:
1) Salary.com
2) U.S. Bureau of Labor Statistics, Occupation Employment Statistics, May 2013.

119

CONFIDENTIAL - Subject to Court Protective Order

120

# G - LOST COMPENSATION AND PROFITS

**Labor Market Conditions**

| Year | United States Total Average Weeks Unemployed | Median Weeks Unemployed | Unemployment Rate (%) | Civilian Labor Force Participation Rate | Unemployed (Civilian Average) | Bridgeport-Stamford-Norwalk, CT Metro NECTA Unemployment Rate (Civilian) | Unemployed (Civilian Average) |
|---|---|---|---|---|---|---|---|
| 2003 | 19.2 | 10.2 | 6.0 | 66.2 | 8,770,333 | 5.1 | 23,535 |
| 2004 | 19.6 | 9.8 | 5.5 | 66.0 | 8,139,667 | 4.6 | 20,825 |
| 2005 | 18.4 | 8.9 | 5.1 | 66.0 | 7,579,167 | 4.5 | 20,710 |
| 2006 | 16.9 | 8.3 | 4.6 | 66.1 | 7,012,091 | 4.0 | 18,656 |
| 2007 | 16.9 | 8.5 | 4.6 | 66.0 | 7,073,083 | 4.1 | 19,353 |
| 2008 | 17.8 | 9.4 | 5.8 | 66.0 | 8,948,167 | 5.2 | 24,804 |
| 2009 | 24.3 | 15.7 | 9.3 | 65.4 | 14,294,500 | 7.8 | 37,372 |
| 2010 | 33.1 | 21.5 | 9.6 | 64.7 | 14,809,583 | 8.6 | 41,827 |
| 2011 | 39.4 | 21.4 | 8.9 | 64.1 | 13,736,167 | 8.3 | 40,206 |
| 2012 | 39.4 | 19.2 | 8.1 | 63.7 | 12,495,583 | 7.7 | 37,006 |
| 2013 | 36.6 | 16.8 | 7.4 | 63.3 | 11,448,917 | 7.2 | 34,311 |
| Jan-June 2014 | 35.2 | 15.4 | 6.5 | 62.9 | 10,034,500 | 6.6 | 31,362 |
| Latest Month | 32.4 | 13.3 | 6.2 | 62.9 | 9,671,000 | 6.3 | 30,226 |
| 2003-2005 | 19.1 | 9.6 | 5.5 | 66.1 | 8,163,056 | 4.7 | 21,690 |
| 2009-2011 | 32.3 | 19.5 | 9.3 | 64.7 | 14,280 | 8.2 | 39,802 |
| Jan-June 2014 | 35.2 | 15.4 | 6.5 | 62.9 | 10,034,500 | 6.6 | 31,362 |
| July 2014 | 32.4 | 13.3 | 6.2 | 62.9 | 9,671,000 | NA | 30,226 |

Notes:
1) Data is from the U.S. Bureau of Labor Statistics.
2) NECTA = New England City and Town Area.
3) Data is for individuals 16 years of age and over.
4) The unemployment rate for adult women over 20 was 5.7% versuss the national average of 6.2% for July 2014.

CONFIDENTIAL - Subject to Court Protective Order

## G –LOST COMPENSATION AND PROFITS

**Stamford-Norwalk-Bridgeport, CT Metro Area Unemployment Rate**



**Stamford-Norwalk-Bridgeport, CT Metro Area Number of Unemployed**



121

CONFIDENTIAL - Subject to Court Protective Order

## G –LOST COMPENSATION AND PROFITS

### U.S. Weeks Unemployed



### U.S. Labor Force Participation Rate



CONFIDENTIAL - Subject to Court Protective Order

## G –LOST COMPENSATION AND PROFITS

### U.S. Unemployment Rate



### U.S. Unemployed (000s)



CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

Carlene Armetta - Sensitivity Analysis - Normal Job Loss Recovery in a Strong Labor Market (2003-2005)

| Line item | Total | Part-time (35 hours or less per week) | Total full-time | Total who reported | Pay Category = Pay of new job relative to lost job Full-Time | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 20% or more below | Below but within 20% | Equal or above but within 20% | 20% or more above | Self employed and unpaid family workers |
| **Displaced long-tenured workers** | | | | | | | | | |
| Private non-agricultural wage and salary jobs | 2,296 | 212 | 1,901 | 1,800 | 470 | 321 | 536 | 290 | 183 |
| Professional and business services | 262 | 20 | 218 | 206 | 41 | 46 | 65 | 30 | 24 |
| Education and health services | 150 | 24 | 116 | 111 | 29 | 15 | 36 | 21 | 10 |
| **Probability of earning lower, equal or higher pay for full-time work** | | | | | | | | | |
| Private non-agricultural wage and salary jobs | | | | 100% | 26% | 18% | 30% | 16% | 10% |
| Professional and business services | | | | 100% | 20% | 22% | 32% | 15% | 12% |
| Education and health services | | | | 100% | 26% | 14% | 32% | 19% | 9% |
| Average | | | | 100% | 24% | 18% | 31% | 17% | 10% |
| Equal or increase in pay | | | 48% | | | | | | |
| Decrease in pay | | | 52% | | | | | | |
| **Probability of finding part-time vs. full time work** | | | | | | | | | |
| Private non-agricultural wage and salary jobs | | 10% | 90% | | | | | | |
| Professional and business services | | 8% | 92% | | | | | | |
| Education and health services | | 17% | 83% | | | | | | |
| Average | | 12% | 88% | | | | | | |
| **Carlene Armetta** | | | | | | | | | |
| Normalized LCG comp. (base+ bonus+ benefits) | $224,884 | | | | | | | | |
| Relative pay description for the new job | | 20hrs:40 hrs | | | | | | | |
| Relative pay for new job | | | | | 20% less $179,907 | 10% less $202,395 | 5% more $236,128 | 20% more $269,860 | $0 or equal $112,442 |
| Expected new job compensation | | Part-time | Full time | | | | | | |
| Private non-agricultural wage and salary jobs | Expected $197,843 | $104,146 | $208,292 | | | | | | |
| Professional and business services | $199,173 | $103,954 | $207,908 | | | | | | |
| Education and health services | $193,938 | $106,060 | $212,120 | | | | | | |
| **Expected compensation if re-employed** | **$196,985** | | | | | | | | |

CONFIDENTIAL - Subject to Court Protective Order

125

# G - LOST COMPENSATION AND PROFITS

**Carlene Armetta - Sensitivity Analysis - Normal Job Loss Recovery in a Strong Labor Market (2003-2005)**

| | |
|---|---|
| **Expected compensation if re-employed** | **$196,985** |
| Probability of re-employment within 0.1 to 3 years: | |
| Women 25 to 54 years | 69.6% |
| Management, business and financial operations occupations | 71.8% |
| Probability of reemployment within 0.1 to 3 years | 70.7% |
| Carlene Armetta termination date | 9/6/2013 |
| 1.5 years from termination | 3/7/2015 |
| Expected income in 1 month to 3 years if Carlene Armetta suffered a Normal Job Loss | $139,268 |
| **Compensatory damages impact** | **-$49,279** |

Notes:
1) Data is from U.S. Bureau of Labor Statistics' Displace Worker Table 1, Table 5 and Table 7 for 2003 to 2005.
2) The individuals in the Displaced Worker tables:
   - Were in a position for at least three years
   - Were displaced from that position due to a plant or company closing or moving, insufficient work or a position or shift had been abolished.
   Expected value = the sum of each outcome multiplied by the probability of that outcome occurring.

CONFIDENTIAL - Subject to Court Protective Order

# G –LOST COMPENSATION AND PROFITS

## DAVID ARMETTA AND ASPIRA

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

**David Armetta and Aspira – Historic Income Analysis**

| | | Calendar Year | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Armetta D. & M... | | | | Aspira | | | Aspira |
| Line Item | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Average |
| **Income as Reported** | | | | | | | | |
| Sales | $61,192 | $53,669 | $541,072 | $771,955 | $496,627 | $878,094 | $559,342 | $649,418 |
| Cost of goods sold | $9,095 | $13,248 | $198,966 | $159,484 | $21,250 | $21,199 | $68,178 | $93,815 |
| Gross profit | $52,097 | $40,421 | $342,106 | $612,471 | $475,377 | $856,895 | $491,164 | $555,603 |
| Depreciation | $0 | $0 | $0 | $6,015 | $0 | $0 | $0 | $1,203 |
| All other expenses | $29,737 | $38,712 | $196,192 | $37,784 | $34,346 | $42,405 | $266,220 | $115,389 |
| Ordinary business income | $22,360 | $1,709 | $145,914 | $568,672 | $441,031 | $814,490 | $224,944 | $439,010 |
| David Armetta income | $22,360 | $1,709 | $145,914 | $284,336 | $220,516 | $407,245 | $112,472 | $234,097 |
| **Balance Sheet** | | | | | | | | |
| Cash | | | | $584,742 | $441,031 | $814,490 | $224,944 | $516,302 |
| Buildings and depreciable assets | | | | $0 | $0 | $0 | $0 | $0 |
| Total Assets | | | | $584,742 | $441,031 | $814,490 | $224,944 | $516,302 |
| Liabilities | | | | $0 | $0 | $0 | $0 | $0 |
| Partner's capital accounts | | | | $568,672 | $441,031 | $814,490 | $224,944 | $512,284 |
| Liabilities and capital accounts | | | | $568,672 | $441,031 | $814,490 | $224,944 | $512,284 |

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

## David Armetta and Aspira – Historic Income Analysis

| Line Item | Armetta D. & M... 2007 | 2008 | Calendar Year — Aspira 2009 | 2010 | 2011 | 2012 | 2013 | Aspira Average |
|---|---|---|---|---|---|---|---|---|
| **Normalizing Adjustments** | | | | | | | | |
| Deduct extraordinary legal expenses from other expenses | | | | | | | -$241,551 | |
| Add unpaid invoices | | | | | | | $364,681 | |
| **Normalized Income (Includes Unpaid 2013 Invoices)** | | | | | | | | |
| Sales | $61,192 | $53,669 | $541,072 | $771,955 | $496,627 | $878,094 | $924,023 | $722,354 |
| Cost of goods sold | $9,095 | $13,248 | $198,966 | $159,484 | $21,250 | $21,199 | $68,178 | $93,815 |
| Gross profit | $52,097 | $40,421 | $342,106 | $612,471 | $475,377 | $856,895 | $855,845 | $628,539 |
| Depreciation | $0 | $0 | $0 | $6,015 | $0 | $0 | $0 | $1,203 |
| All other expenses | $29,737 | $38,712 | $196,192 | $37,784 | $34,346 | $42,405 | $24,669 | $67,079 |
| Ordinary business income | $22,360 | $1,709 | $145,914 | $568,672 | $441,031 | $814,490 | $831,176 | $560,257 |
| David Armetta income | $22,360 | $1,709 | $72,957 | $284,336 | $220,516 | $407,245 | $415,588 | $280,128 |
| Aspira hourly revenue based on 2,000 hours worked | | | | $284 | $221 | $407 | $416 | |
| David Armetta hourly income based on 2,000 hours | | | | $142 | $110 | $204 | $208 | |
| **Adjusted Balance Sheet** | | | | | | | | |
| Cash | | | | $584,742 | $441,031 | $814,490 | $831,176 | $667,860 |
| Buildings and depreciable assets | | | | $0 | $0 | $0 | $0 | $0 |
| Total Assets | | | | $584,742 | $441,031 | $814,490 | $831,176 | $667,860 |
| Liabilities | | | | $0 | $0 | $0 | $0 | $0 |
| Partner's capital accounts | | | | $568,672 | $441,031 | $814,490 | $831,176 | $663,842 |
| Liabilities and capital accounts | | | | $568,672 | $441,031 | $814,490 | $831,176 | $663,842 |

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

**David Armetta and Aspira - Historic Income Analysis**

| Line Item | Armetta D. & M. 2007 | 2008 | Calendar Year Aspira 2009 | 2010 | 2011 | 2012 | 2013 | Aspira Average |
|---|---|---|---|---|---|---|---|---|
| **Common Size Analysis** | | | | | | | | |
| Sales | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Cost of goods sold | 15% | 25% | 37% | 21% | 4% | 2% | 7% | 14% |
| Gross profit | 85% | 75% | 63% | 79% | 96% | 98% | 93% | 86% |
| Depreciation | 0% | 0% | 0% | 1% | 0% | 0% | 0% | 0% |
| All other expenses | 49% | 72% | 36% | 5% | 7% | 5% | 3% | 11% |
| Ordinary business income | 37% | 3% | 27% | 74% | 89% | 93% | 90% | 74% |
| David Armetta income | 37% | 3% | 13% | 37% | 44% | 46% | 45% | 37% |
| Revenue growth | | | | 43% | -36% | 77% | 5% | 14.3% |
| Return on assets before tax | | | | 97% | 86% | 130% | 101% | 104% |
| Return on capital before tax | | | | 100% | 87% | 130% | 101% | 105% |

Notes

1) 2007 is from CARMSUPP-00025852 to 25876.
2) 2008 is from CARMSUPP-00025878 to 25851.
3) 2009 information is from CARMSUPP-00025909 to -25935.
4) 2010 is from  CARMSUPP-00025974 to 25991.
5) 2011 is from  CARMSUPP-00025993 to 26036.
6) 2012 is from  CARMSUPP-00026067 to 26092.
7) 2013 is from  CARMSUPP-00026093 to 26038.
9) Unpaid invoice totals are from CARMSUPP-00026432 and CARMSUPP-00026431.
10) The legal and professional fee are from Aspira's 2013 tax return detail.

129

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

**Aspira and David Armetta Lost Income**

| | | | | |
|---|---|---|---|---|
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key date (unpaid invoices & trial judgm | 10/28/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |
| **Expected But For LCG's Wrongful Acts** | | | | |
| Sales | $901,059 | $901,059 | $901,059 | $901,059 |
| Cost of goods sold | $44,689 | $44,689 | $44,689 | $44,689 |
| Gross profit | $856,370 | $856,370 | $856,370 | $856,370 |
| Depreciation | $0 | $0 | $0 | $0 |
| All other expenses | $33,537 | $33,537 | $33,537 | $33,537 |
| Ordinary business income | $822,833 | $822,833 | $822,833 | $822,833 |
| David Armetta income | $411,417 | $411,417 | $411,417 | $411,417 |
| Sales growth rate | | 0.0% | 0.0% | 0.0% |
| Growth period | | 1.00 | 2.00 | 3.00 |
| **Actual including mitigation** | | | | |
| Sales | $559,242 | $0 | $135,268 | $598,793 |
| Cost of goods sold | $68,178 | $0 | $49,742 | $189,096 |
| Gross profit | $491,164 | $0 | $85,527 | $409,697 |
| Depreciation | $0 | $0 | $0 | $1,504 |
| All other expenses | $24,669 | $0 | $49,048 | $156,590 |
| Ordinary business income | $466,495 | $0 | $36,479 | $251,604 |
| David Armetta income | $233,248 | $0 | $18,239 | $125,802 |

CONFIDENTIAL - Subject to Court Protective Order

# G - LOST COMPENSATION AND PROFITS

## Aspira and David Armetta Lost Income

| | | | | |
|---|---|---|---|---|
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key date (unpaid invoices & trial judgm. | 10/28/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |

**Lost Profits and Compensation = But-For less Actual**

| | | | | |
|---|---|---|---|---|
| Aspira lost profits | $356,338 | $822,833 | $786,355 | $571,230 |
| David Armetta lost income | $178,169 | $411,417 | $393,177 | $285,615 |
| | | | | |
| Aspira lost profits pre-trial | $356,338 | $822,833 | $288,689 | |
| Aspira lost profits post-trial | | | $497,665 | $571,230 |
| | | | | |
| David Armetta lost income pre-trial | $178,169 | $411,417 | $144,345 | |
| David Armetta lost income post trial | | | $248,833 | $285,615 |
| | | | | |
| Discount period | | | 0.32 | 1.13 |
| Discount rate | | | 21.4% | 21.4% |
| Discount factor | | | 1.06 | 1.25 |
| | | | | |
| Aspira post-trial lost profits - discounted | | | $468,169 | $458,565 |
| David Armetta post-trial lost profits - discounted | | | $234,085 | $229,283 |
| | | | | |
| Aspira lost profits pre-trial | $356,338 | $822,833 | $288,689 | |
| Aspira lost profits post-trial (discounted) | | | $468,169 | $458,565 |
| **Total lost Aspira profits** | **$356,338** | **$822,833** | **$756,858** | **$458,565** |
| Cumulative | $356,338 | $1,179,171 | $1,936,029 | $2,394,595 |
| | | | | |
| David Armetta lost income pre-trial | $178,169 | $411,417 | $144,345 | |
| David Armetta lost income post-trial (discounted) | | | $234,085 | $229,283 |
| **Total David Armetta lost income** | **$178,169** | **$411,417** | **$378,429** | **$229,283** |
| Cumulative | $178,169 | $589,586 | $968,015 | $1,197,297 |

CONFIDENTIAL - Subject to Court Protective Order

132

# G - LOST COMPENSATION AND PROFITS

## Aspira and David Armetta Lost Income

| | | | | | |
|---|---|---|---|---|---|
| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
| Key date (unpaid invoices & trial judgmt | 10/28/2013 | | 5/15/2015 | |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |
| | | | | | |
| **Aspira Prejudgment Interest** | | | | |
| Interest rate | 10.0% | 10.0% | 10.0% | |
| Lost profit pre-trial | $356,338 | $822,833 | $288,689 | |
| Years of interest (mid-period convention) | 1.46 | 0.87 | 0.18 | |
| **Prejudgment interest** | **$53,105** | **$71,009** | **$5,095** | |
| Cumulative | $53,105 | $124,114 | $129,210 | |
| | | | | | |
| **David Armetta Prejudgment Interest** | | | | |
| Interest rate | 10.0% | 10.0% | 10.0% | |
| Lost profit pre-trial income | $178,169 | $411,417 | $144,345 | |
| Years of interest (mid-period convention) | 1.46 | 0.87 | 0.18 | |
| **Prejudgment interest** | **$26,552** | **$35,505** | **$2,548** | |
| Cumulative | $26,552 | $62,057 | $64,605 | |

Notes:
1) Carlene Armetta was discharged from LCG on Sept. 6, 2013
2) Aspira unpaid invoices were dated 10/28/2013 and due upon receipt.
3) Plaintiff's counsel has asked me to assume that the trial would conclude and the judgment be made on May 15, 2015.
4) See the accompanying discount rate analysis
5) 2013 But for income equals actual plus $364,681 in unpaid invoices from CARMSUPP00026431 to 26432.

CONFIDENTIAL - Subject to Court Protective Order

133

# G - LOST COMPENSATION AND PROFITS

## Aspira Discount Rate

| Line Item | | Duff & Phelps Buildup Method |
|---|---|---|
| **Equity** | | |
| Risk-free rate = U.S. Treasury 20-year bond rate (normalized) | | |
| $R_f$ | = | 4.00% |
| Beta = a measure of systematic risk | | |
| B | = | n/a |
| Equity risk premium = incremental return | | |
| $R_p$ | = | 5.00% |
| Industry risk premium | | |
| $I_p$ | = | n/a |
| Specific risk premium = additional risk | | |
| Size | = | n/a |
| Other | = | 12.45% |
| Cost of Equity (rounded) | | 21.4% |
| | | |
| **Debt** | | None |
| | | |
| Determined | | 21.4% |

Notes
1) Data is from Duff and Phelps' 2014 Valuation Handbook with market results through 2013.
2) Risk free rate = Duff & Phelps's normalized long-term risk free rate
3) Equity risk premium = Duff and Phelps 1963 to 2013.
4) Size risk premium = Duff & Phelps total risk premia over the risk free-rate less the equity risk premium.
5) Size risk premium = Duff & Phelps total risk premium based on Aspira's sales.

CONFIDENTIAL - Subject to Court Protective Order

# H – DIRECT MAIL PROGRAM ANALYSIS

CONFIDENTIAL - Subject to Court Protective Order

# H – DIRECT MAIL PROGRAM ANALYSIS

**Direct Mail Program Summary**

| Year and DM Campaign | Unique prospects mailed | Total mailed | Student enrollments | Conversion rate | Total DM cost based on invoice detail produced | Calculated total DM spending | Average DM cost | Reported DM acquisition cost per student enrollment | Calculated acquisition cost per student enrollment | Calculated DM cost per mailing 1 | Calculated DM cost per mailing 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | $F = C \times H$ | $G = (E+F)/2$ | H | $I = E/C$ | $J = E/B$ | $K = F/B$ |
| **FY 2010 - July 1, 2009 to June 30, 2010** | | | | | | | | | | | |
| Fall | 727,666 [a] | 791,741 [a] | 1,978 [a] | 0.27% | $773,869 [a] | $522,667 | $648,268 | $264 [a,e] | $391 | $0.98 | $0.66 |
| Winter | 2,675,624 [a] | 3,013,781 [a] | 6,372 [a] | 0.24% | $1,231,516 [a] | $1,891,337 | $1,561,427 | $297 [a,e] | $193 | $0.41 | $0.63 |
| Summer | 599,923 [a] | 599,923 [a] | NA [a] | NA | $319,968 [a] | $319,968 | $319,968 | | NA | $0.53 | $0.00 |
| Total FY | 4,003,213 | 4,405,445 | 8,350 | NA | $2,335,354 | $2,414,004 | $2,539,663 | $289 | $278 | $0.53 | $0.55 |
| **FY 2011 - July 1, 2010 to June 30, 2011** | | | | | | | | | | | |
| Fall | 1,280,330 [a] | 2,823,477 [a] | 7,399 [a] | 0.58% | $2,187,077 [a] | $2,135,943 | $2,161,510 | $289 [a] | $296 | $0.77 | $0.76 |
| Winter | 1,003,095 [a] | 1,003,095 [a] | 7,149 [a] | 0.71% | $1,091,094 [a] | $750,502 | $920,798 | $105 [a] | $153 | $1.09 | $0.75 |
| Summer | 299,633 [a] | 349,029 [a] | 5,877 [a] | 1.96% | $576,468 [a] | $313,362 | $444,915 | $53 [a] | $98 | $1.65 | $0.90 |
| Total FY | 2,583,058 | 4,175,601 | 20,425 | 0.79% | $3,854,640 | $3,199,807 | $3,527,223 | $157 | $189 | $0.92 | $0.77 |
| **FY 2012 - July 1, 2011 to June 30, 2012** | | | | | | | | | | | |
| Fall | 1,626,470 [a] | 2,610,670 [a] | 15,770 [a] | 0.97% | $2,143,298 [a] | $1,834,524 | $1,988,911 | $116 [a] | $136 | $0.82 | $0.70 |
| Winter | 1,379,138 [a] | 2,102,938 [a] | 10,325 [a] | 0.75% | $1,909,652 [a] | $1,526,035 | $1,717,843 | $148 [a] | $185 | $0.91 | $0.73 |
| Summer | 374,802 [a] | 509,416 [a] | 5,866 [a] | 1.57% | $621,732 [a] | $366,214 | $493,973 | $62 [a] | $106 | $1.22 | $0.72 |
| Total FY | 3,380,410 | 5,223,024 | 31,961 | 0.95% | $4,674,682 | $3,726,773 | $4,200,728 | $117 | $146 | $0.90 | $0.71 |
| **FY 2013 - July 1, 2012 to June 30, 2013** | | | | | | | | | | | |
| Fall | 1,200,000 [c] | 2,479,794 [c] | 17,454 [c] | 1.45% | $1,916,523 [a] | $1,711,016 | $1,813,769 | $98 [e] | $110 | $0.77 | $0.69 |
| Winter | 1,505,783 [c] | 3,047,366 [c] | 14,890 [c] | 0.99% | $1,865,652 [b] | | $1,865,652 | | $125 | $0.61 | NA |
| Summer | 240,000 [c] | 380,000 [c] | 1,558 [c] | 0.65% | | | | | | | |
| Total FY | 2,945,783 | 5,907,160 | 33,902 | 1.15% | | | | | | | |
| **FY 2014 - July 1, 2013 to June 30, 2014** | | | | | | | | | | | |
| Fall | 1,564,297 [c] | 1,564,308 [c] | 2,743 [d] | NMF | | | | | | | |

135

CONFIDENTIAL - Subject to Court Protective Order

# H - DIRECT MAIL PROGRAM ANALYSIS

**Direct Mail Program Summary**

| Year and DM Campaign | Unique prospects mailed | Total mailed | Student enrollments | Conversion rate | Total DM cost based on invoice detail produced | Calculated total DM spending | Average DM cost | Reported DM acquisition cost per student enrollment | Calculated acquisition cost per student enrollment | Calculated DM cost per mailing 1 | Calculated DM cost per mailing 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | $F = C \times H$ | $G = (E+F)/2$ | H | $I = E/C$ | $J = E/B$ | $K = F/B$ |
| Avg. excl. 2014 | 1,076,039 | 1,642,603 | 8,603 | 0.9% | $1,330,623 | $1,227,956 | | $159 | $179 | $0.89 | $0.65 |
| Fall | 1,208,617 | 2,176,421 | 10,650 | 0.8% | $1,755,192 | $1,551,037 | | $192 | $233 | $0.84 | $0.70 |
| Winter | 1,640,910 | 2,291,795 | 9,684 | 0.7% | $1,524,479 | $1,389,291 | | $183 | $164 | $0.75 | $0.70 |
| Summer | 378,590 | 459,592 | 4,434 | 1.4% | $506,056 | $339,788 | | $58 | $102 | $1.14 | $0.54 |

Data Sources:

[a] CARMSUPP-025747-788
[b] CARMSUPP-000026433 Winter 2013 Direct Mail reporting ENHANCED. xlsx8.xlsx
[c] LCG-EM000063325.
[d] LCG-EM00023934.
[e] LCG-EM00006304.xlsx.

Notes:

1) Fall FY 2014 data is through 8.2.2014 - month of the 5 to 7 month campaign.
2) Reasons for differences between columns E and F, G and H and, I and J include, but are not limited to, the following:
   - Calculation of reported per acquisition values before the final number of enrollments were counted.
   - Differences in cost elements (i.e. with vs. without franchises or creative costs or sales tax, etc.)
   - Timing differences (i.e. costs applied to the Winter vs. Fall campaign in a given year).

CONFIDENTIAL - Subject to Court Protective Order

# H - DIRECT MAIL PROGRAM ANALYSIS

**DM Profits and Apportionment**

| Line Item | Calculations | | | | Direct Mail Campaign | | | |
|---|---|---|---|---|---|---|---|---|
| | | Fall FY 2010 | Winter FY 2010 | Fall FY 2011 | Winter Fall FY 2011 | Summer FY 2011 | Fall FY 2012 | Winter Fall FY 2012 |
| **DM Student Enrollments** | | | | | | | | |
| Actual | A | 1,978 | 6,372 | 7,399 | 7,149 | 5,877 | 15,770 | 10,325 |
| Remaining expected | B | - | - | - | - | - | - | - |
| Total DM students enrolled | C = A+B | 1,978 | 6,372 | 7,399 | 7,149 | 5,877 | 15,770 | 10,325 |
| | | | | | | | | |
| Weekly revenue per student | D | $160.31 | $160.31 | $160.31 | $160.31 | $160.31 | $160.31 | $160.31 |
| Average student duration (weeks) | E | 39.8 | 39.8 | 39.8 | 39.8 | 39.8 | 39.8 | 39.8 |
| DM Sales | F = C x D x E | $12,607,600 | $40,614,575 | $47,160,584 | $45,567,106 | $37,459,488 | $100,516,612 | $65,810,654 |
| **Costs** | | | | | | | | |
| Direct Mail costs | G | $648,268 | $1,561,427 | $2,161,510 | $920,798 | $444,915 | $1,988,911 | $1,717,843 |
| Other incremental costs % of revenue | H | 47% | 47% | 47% | 47% | 47% | 47% | 47% |
| Total incremental costs | I = G + (H x F) | $6,573,840 | $20,650,277 | $24,336,985 | $22,337,338 | $18,050,874 | $49,231,719 | $32,648,851 |
| DM Profits (incremental) | J = F - I | $6,033,760 | $19,964,298 | $22,833,599 | $23,229,768 | $19,408,614 | $51,284,893 | $33,161,803 |
| Incremental profit margin | K = J / F | 48% | 49% | 48% | 51% | 52% | 51% | 50% |
| Apportionment: lead generation vs. other | L | 33.33% | 33% | 33% | 33% | 33% | 33% | 33% |
| Remaining profits | M = K x L | $2,011,253 | $6,654,766 | $7,611,200 | $7,743,256 | $6,469,538 | $17,094,964 | $11,053,934 |
| Apportionment for Aspira / D. Armetta contribution | N | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% |
| Apportionment for Carlene Armetta's contribution | O | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% |
| Profits attributable to Aspira / D. Armetta | P = M x N | $686,642 | $2,271,937 | $2,598,464 | $2,643,548 | $2,208,700 | $5,836,221 | $3,773,813 |
| Profits attributable to Carlene Armetta at LCG | Q = O x M | $115,647 | $382,649 | $437,644 | $445,237 | $371,998 | $982,960 | $635,601 |
| Total LCG Unjust Profits before offsetting comp. | L = P + Q | $802,289 | $2,654,586 | $3,036,108 | $3,088,785 | $2,580,699 | $6,819,181 | $4,409,414 |
| Unjust enrichment percent of sales | L / F | 6.4% | 6.5% | 6.4% | 6.8% | 6.9% | 6.8% | 6.7% |
| Unjust enrichment percent of profits | L / J | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% |
| Revenue per enrollment | F / C | $6,374 | $6,374 | $6,374 | $6,374 | $6,374 | $6,374 | $6,374 |
| Profit per enrollment | J / C | $3,050 | $3,133 | $3,086 | $3,249 | $3,302 | $3,252 | $3,212 |
| Unjust enrichment per enrollment | L / C | $406 | $417 | $410 | $432 | $439 | $432 | $427 |

CONFIDENTIAL - Subject to Court Protective Order

138

# H - DIRECT MAIL PROGRAM ANALYSIS

**DM Profits and Apportionment**

| Line Item | Summer FY 2012 | Fall FY 2013 | Winter FY 2013 | Summer FY 2013 | Partial Full FY 2014 | Expected Remainder Fall FY 2014 |
|---|---|---|---|---|---|---|
| **DM Student Enrollments** | | | | | | |
| Actual | 5,866 | 17,454 | 14,890 | 1,558 | 2,743 | - |
| Remaining expected | - | - | - | - | - | 12,899 |
| Total DM students enrolled | 5,866 | 17,454 | 14,890 | 1,558 | 2,743 | 12,899 |
| | | | | | | |
| Weekly revenue per student | $160.31 | $160.31 | $157.05 | $155.55 | $178.84 | $160.31 |
| Average student duration (weeks) | 41.3 | 41.3 | 41.3 | 41.3 | 41.3 | 41.3 |
| DM Sales | $38,837,555 | $115,559,271 | $96,578,997 | $10,008,927 | $20,260,050 | $85,404,681 |
| **Costs** | | | | | | |
| Direct Mail costs | $493,973 | $1,813,769 | $1,865,652 | $618,659 | $254,524 | $1,196,946 |
| Other incremental costs % of revenue | 47% | 47% | 47% | 47% | 47% | 47% |
| Total incremental costs | $18,747,624 | $56,126,627 | $47,257,781 | $5,322,855 | $9,776,748 | $41,337,146 |
| DM Profits (incremental) | $20,089,931 | $59,432,645 | $49,321,216 | $4,686,072 | $10,483,303 | $44,067,535 |
| Incremental profit margin | 52% | 51% | 51% | 47% | 52% | 52% |
| Apportionment: lead generation vs. other | 33% | 33% | 33% | 33% | 33% | 33% |
| Remaining profits | $6,696,644 | $19,810,882 | $16,440,405 | $1,562,024 | $3,494,434 | $14,689,178 |
| Apportionment for Aspira / D. Armetta contribution | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% |
| Apportionment for Carlene Armetta's contribution | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% |
| **Profits attributable to Aspira / D. Armetta** | $2,286,234 | $6,763,435 | $5,612,754 | $533,275 | $1,193,000 | $5,014,885 |
| **Profits attributable to Carlene Armetta at LCG** | $385,057 | $1,139,126 | $945,323 | $89,816 | $200,930 | $844,628 |
| **Total LCG Unjust Profits before offsetting comp.** | $2,671,291 | $7,902,561 | $6,558,078 | $623,091 | $1,393,930 | $5,859,513 |
| Unjust enrichment percent of sales | 6.9% | 6.8% | 6.8% | 6.2% | 6.9% | 6.9% |
| Unjust enrichment percent of profits | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% |
| Revenue per enrollment | $6,621 | $6,621 | $6,486 | $6,424 | $7,386 | $6,621 |
| Profit per enrollment | $3,425 | $3,405 | $3,312 | $3,008 | $3,822 | $3,416 |
| Unjust enrichment per enrollment | $455 | $453 | $440 | $400 | $508 | $454 |

The columns above fall under the heading **Direct Mail Campaign**.

CONFIDENTIAL - Subject to Court Protective Order

# H - DIRECT MAIL PROGRAM ANALYSIS

## DM Profits and Apportionment

| Line Item | Total Reported | Total Reported & Expected | Fall FY 2013 to Fall FY 2014 |
|---|---|---|---|
| DM Student Enrollments | | | |
| Actual | 97,381 | 97,381 | 36,645 |
| Remaining expected | | 12,899 | 12,899 |
| Total DM students enrolled | 97,381 | 110,280 | 49,544 |
| | | | |
| Weekly revenue per student | | | |
| Average student duration (weeks) | | | |
| DM Sales | $630,981,420 | $716,386,101 | $327,811,926 |
| Costs | | | |
| Direct Mail costs | $14,490,250 | $15,687,196 | $5,749,550 |
| Other incremental costs % of revenue | | | |
| Total incremental costs | $311,051,517 | $352,388,663 | $159,821,155 |
| DM Profits (incremental) | $319,929,903 | $363,997,438 | $167,990,771 |
| Incremental profit margin | 51% | 51% | 51% |
| Apportionment: lead generation vs. other | 33% | 33% | 33% |
| Remaining profits | $106,643,301 | $121,332,479 | $55,996,924 |
| Apportionment for Aspira / D. Arnetta contribution | 34.14% | | |
| Apportionment for Carlene Arnetta's contribution | 5.75% | | |
| Profits attributable to Aspira / D. Arnetta | $36,408,023 | $41,422,908 | $19,117,350 |
| Profits attributable to Carlene Arnetta at LCG | $6,131,990 | $6,976,618 | $3,219,823 |
| Total LCG Unjust Profits before offsetting comp. | $42,540,013 | $48,399,526 | $22,337,173 |
| Unjust enrichment percent of sales | 6.7% | 6.8% | 6.8% |
| Unjust enrichment percent of profits | 13.3% | 13.3% | 13.3% |
| Revenue per enrollment | $6,480 | $6,496 | $6,617 |
| Profit per enrollment | $3,285 | $3,301 | $3,391 |
| Unjust enrichment per enrollment | $437 | $439 | $451 |

CONFIDENTIAL - Subject to Court Protective Order

# H - DIRECT MAIL PROGRAM ANALYSIS

**DM Profits and Apportionment**

Notes:

1) DM Student enrollments are historical actual except for the remainder of fall FY 2014 which is based on regression and time series analysis of previous campaigns.

2) Weekly revenue per student is calculated from LCG-EM00063325 for Winter FY 2013, Summer FY 2013 and Partial Fall FY 2014.

3) Weekly revenue per student for the remaining campaigns equals total LCG average.

4) Average weeks enrolled is calculated as follows:

5) a) Monthly average private pay student retention rate = 89.5% for late 2012 / 2013 per CARMPSUPP-0026142, "Learning Care Group Q3 & 9>3 Outlook Review."

   b) Average student monthly churn rate = 1 - monthly retention rate = 1 - 89.5% = 10.5%.

   c) Average student duration in months = 1 / monthly churn rate = 1 / 10.5% = 9.52 months.

   d) Average student duration in weeks = 9.52 months x 4.33 weeks per month = 41.3 weeks.

   e) Repeating this calculation for the prior 12 months with an 89.1% retention rate results in a 39.76 week duration.

   f) Student retention = (Students at end of period - new students during period) / Students at the beginning of the period.

6) Direct Mail costs for Fall and Winter FY 2013 are reported actual.

7) Direct Mail costs for Summer FY 2013 and Fall FY 2014 were based on regression and time series analysis of previous campaigns.

8) Incremental costs as % of revenue are based on my analysis of LCG's financials from  LCG-EM00018803.ppt and CARMSUPP000026136 to 26137 and CARMSUPP-000026433 Winter 2013 Direct Mail reporting ENHANCED. xlsx8.xlsx.

9) I found that no more than 29% of costs varied with sales based on analysis of quarterly data from Q1 FY 2012 through Q3 FY 2013.

10) However, I used LCG's financial / accounting departments Winter FY 2013 value of 47% out of an abundance of caution to not overstate damages.  See and CARMSUPP-000026433 Winter 2013 Direct Mail reporting ENHANCED. xlsx8.xlsx.

140

CONFIDENTIAL – Subject to Court Protective Order

141

# H – DIRECT MAIL PROGRAM ANALYSIS

**1) LCG Comparable School Net Revenue Per Full Time Equivalent Student**

| Period | FY 2013 Month | Net revenue per FTE per week | FTE Students (000s) | Total Enrollees (000s) | Net revenue per enrollee | FTE / Enrollees |
|---|---|---|---|---|---|---|
| 1 | July | $192.1 | 63.60 | 83.6 | $146.14 | 76% |
| 2 | August | $187.7 | 66.60 | 83.6 | $149.53 | 80% |
| 3 | September | $180.8 | 68.80 | | | |
| 4 | October | $180.8 | 69.90 | | | |
| 5 | November | $183.4 | 67.40 | | | |
| 6 | December | $188.0 | 63.50 | 87.7 | $136.12 | 72% |
| 7 | January | $187.4 | 66.10 | 87.7 | $141.24 | 75% |
| 8 | February | $184.1 | 72.20 | 96.7 | $137.46 | 75% |
| 9 | March | $185.2 | 73.00 | 96.7 | $139.81 | 75% |
| Avg. | | $185.5 | 67.90 | 89.33 | $141.72 | 76% |

Source: CARM SUPP-00026139 to –26141, "Learning Care Group Q3 & 9+3 Outlook Review" dated 4/26/2013.

CONFIDENTIAL - Subject to Court Protective Order

142

# H - DIRECT MAIL PROGRAM ANALYSIS

## 2) LCG Revenue Per Student

| | Total centers | Total student capacity | Utilization % | Enrolled students (average) | Revenue (Millions) | Annual Revenue Per Enrollee | Average revenue Per Week |
|---|---|---|---|---|---|---|---|
| Child Time | 231 | 29,273 | | | | | |
| Tutor Time | 188 | 34,955 | | | | | |
| The Children's Courtyard | 49 | 12,407 | | | | | |
| La Petite Academy | 464 | 60,707 | | | | | |
| Montessori Unlimited | 24 | 3,146 | | | | | |
| Total | 956 | 140,488 | 53.3% | 74,880 | $696.6 | $9,303 | $178.90 |

Notes:

1) Data is from LCG-EM00048660.pdf, LCG's "Rating Agency Presentation, April 2013" pp. 14 and 43.

2) Average enrolled students, annual revenue per enrollee and revenue per week are calculated.

**3) Indicated revenue per student:**          **$160.31**

CONFIDENTIAL – Subject to Court Protective Order

# H - DIRECT MAIL PROGRAM ANALYSIS

## LCG Financial Performance

| Line Item | FY 2011 | | | | FY 2012 | | | | FY 2013 | | | Revenue Correlation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | |
| Net revenue | $172.0 | $168.7 | $171.7 | $181.9 | $169.2 | $164.5 | $176.5 | $183.0 | $168.3 | $168.7 | $176.1 | 1.00 |
| Personnel / labor costs | $85.0 | $82.8 | $83.5 | $92.7 | $86.4 | $83.7 | $85.8 | $87.2 | $83.2 | $83.4 | $82.2 | 0.67 |
| Controllable costs | $34.0 | $29.3 | $30.2 | $30.3 | $33.3 | $29.1 | $29.2 | $30.6 | $33.7 | $29.2 | $29.3 | (0.12) |
| Facility / occupancy costs | $31.6 | $32.0 | $31.8 | $31.5 | $31.5 | $31.7 | $31.7 | $31.8 | $31.3 | $31.1 | $31.3 | 0.09 |
| Total operating expenses | $150.7 | $144.1 | $145.5 | $154.5 | $151.2 | $144.5 | $146.7 | $149.6 | $148.2 | $143.7 | $142.8 | 0.47 |
| Gross profit | $21.3 | $24.6 | $26.1 | $27.4 | $18.0 | $20.1 | $29.8 | $33.4 | $20.1 | $25.0 | $33.3 | 0.78 |
| Marketing costs / expenses | $4.4 | $2.8 | $2.2 | $1.2 | $4.2 | $2.7 | $3.2 | $2.0 | $3.8 | $3.1 | $2.9 | (0.56) |
| General and administrative costs | $13.3 | $11.5 | $10.7 | $9.4 | $11.3 | $10.0 | $10.5 | $9.9 | $10.9 | $11.3 | $12.3 | (0.31) |
| Cash operating profit before tax | $3.7 | $10.2 | $13.2 | $16.8 | $2.5 | $7.4 | $16.1 | $21.5 | $5.5 | $10.5 | $18.1 | 0.80 |
| | | | | | | | | | | | | CAGR |
| Revenue Growth | | -2% | 2% | 6% | -7% | -3% | 7% | 4% | -8% | 0% | 4% | 1% |

| Line Item | FY 2011 | | | | FY 2012 | | | | FY 2013 | | | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | |
| Net revenue | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Personnel / labor costs | 49.4% | 49.1% | 48.6% | 50.9% | 51.1% | 50.8% | 48.6% | 47.6% | 49.4% | 49.5% | 46.7% | 49.3% |
| Controllable costs | 19.8% | 17.4% | 17.6% | 16.7% | 19.7% | 17.7% | 16.6% | 16.7% | 20.0% | 17.3% | 16.6% | 17.8% |
| Facility / occupancy costs | 18.4% | 19.0% | 18.5% | 17.3% | 18.6% | 19.3% | 17.9% | 17.4% | 18.6% | 18.4% | 17.8% | 18.3% |
| Total operating expenses | 87.6% | 85.4% | 84.8% | 84.9% | 89.4% | 87.8% | 83.1% | 81.7% | 88.0% | 85.2% | 81.1% | 85.4% |
| Gross profit | 12.4% | 14.6% | 15.2% | 15.1% | 10.6% | 12.2% | 16.9% | 18.3% | 12.0% | 14.8% | 18.9% | 14.6% |
| Marketing costs / expenses | 2.6% | 1.7% | 1.3% | 0.7% | 2.5% | 1.6% | 1.8% | 1.1% | 2.2% | 1.9% | 1.6% | 1.7% |
| General and administrative costs | 7.7% | 6.8% | 6.3% | 5.2% | 6.7% | 6.1% | 6.0% | 5.4% | 6.5% | 6.7% | 7.0% | 6.4% |
| Cash operating profit before tax | 2.1% | 6.1% | 7.7% | 9.2% | 1.5% | 4.5% | 9.1% | 11.8% | 3.2% | 6.3% | 10.3% | 6.5% |

Notes:

Data is from LCG-EM00018803.ppt and CARMSUPP00026136 to 26137.

Controllables include items like food, office supplies, small equipment (i.e. copiers), repairs and maintenance, telephone, utilities, janitorial, and credit card fees.

143

# EXHIBIT 2



FairValue Advisors, LLC
3455 Peachtree Road NE, Ste. 500
Atlanta, Georgia 30326
Phone: 888.212.0495
www.fairvalueadvisors.com

**Amended Assessment of Damages in
David Armetta and Aspira Marketing Direct, LLC
vs. Learning Care Group, Inc.**

**CONFIDENTIAL – Subject to Court Protective Order**

Prepared On:      May 9, 2016

Prepared By:      Daniel Cenatempo CVA, MAFF
                  Executive Director
                  FairValue Advisors, LLC

Submitted To:     Pastore & Dailey LLC
                  4 High Ridge Park, Third Floor
                  Stamford, CT 06905

**TABLE OF CONTENTS**

I.      Introduction           1

II.     Summary of Opinions        4

III.    The Counts and Recovery Principles        7

IV.     Aspira's and David Armetta's Lost Income          9

VI.     LCG's Wrongful Profits           17

Appendices:

A – Qualifications          28

B – Certification          35

C – Statement of Contingent and Limiting Conditions      36

D – Documents Considered         37

E – Lost Compensation and Profits        40

F – Direct Mail Program Analysis        47

# I.   INTRODUCTION

## 1.1   ASSIGNMENT

I, Daniel Cenatempo of FairValue Advisors, LLC, was retained by Aspira Marketing Direct, LLC to assist in quantifying compensatory damages and restitution, if any, in *David Armetta and Aspira Marketing Direct, LLC vs. Learning Care Group, Inc.*   This is case No. 3:13-cv-1461(VLB) in the United States District Court for the District Court of Connecticut, respectively (hereinafter "Case").

I previously produced a damages assessment report for the Case dated August 25, 2014.   Counts in Case were amended in the Second Amended Complaint dated July 8, 2015 (hereinafter the "Complaint").   This report amends and replaces the portions of my August 25, 2014 report that specifically address David Armetta's and Aspira's damages.   I am amending and replacing my previous report due to changes in the counts in the Second Amended Complaint and new information that has become available since the production of my first report.

This report was prepared in accordance with Rule 26(a)(2)(B) Federal Rules of Civil Procedure. It describes my work to date and summarizes my opinions and the basis for those opinions.   My opinions and findings expressed in this report are based upon information obtained during my investigation.   Unless otherwise stated, I assumed the information I obtained from public sources, interviews and the discovery process was accurate.   I reserve the right to issue a supplemental report responding to new information and new opinions that become available to me between the date of this report and the date that I may testify.

This report has been prepared solely to assist the fact finder and the parties to determine the amount of compensatory damages in this Case.   This Report is not intended for any other use. Further, this report is subject to the Certification in Appendix B and Statement of Contingent and Limiting Conditions in Appendix C.

I anticipate preparing various demonstrative exhibits for use at trial as an aid to the fact finder to present my analysis and opinions.   The specific exhibits to be used have not been prepared or determined as of the date of this report.   At this time, I expect that any trial exhibits prepared will be supported by the information contained in this report and / or future amended and

1

supplemental versions of this report, any report on damages that may be submitted on behalf of the defendant, the documents produced to date, and / or documents yet to be produced.

For Brevity, I will refer to:

- Mr. David Armetta as "David Armetta";

- Aspira Marketing Direct, LLC as "Aspira";

- Learning Care Group, Inc. and Childtime Learning Centers as "LCG";

- LCG's fiscal year that runs from July 1st of a given calendar year to June 30th of the following calendar year as "FY."

## 1.2   QUALIFICATIONS AND TESTIMONY

My curriculum vitae ("CV") is provided in Appendix A - Qualifications.

## 1.3   COMPENSATION

FairValue Advisors, LLC is compensated on an hourly basis for the preparation of this Report, and associated depositions and testimony, at a rate not to exceed $350 per hour.  Direct project expenses are charged at cost.  The specific schedule of tasks and associated hourly rates is as follows:

**Compensation Schedule**

| Activity | Hourly Rate |
|---|---|
| Research and administrative activities | $200 |
| Document review and analyses | $275 |
| Deposition and testimony related activities | $350 |

## 1.4   SCOPE OF WORK

The following summarizes the scope of work I performed:

- Reviewed and considered the documents listed in Appendix D – Documents Considered;

2

- Re-reviewed the literature on calculation of compensatory damages for the counts in the Cases;

- Made inquires to and had discussions with David Armetta;

- Performed independent research;

- Analyzed all of this information and determined compensatory damages; and

- Documented my opinions and the bases for my opinions in this report.

## II.    SUMMARY OF OPINIONS

### 2.1    SUMMARY OF OPINIONS

The following summarizes my opinions.    My opinions are based on the investigation, assumptions and methods detailed in the remainder of this report.    I have assumed, as is normal practice when analyzing damages, that LCG would be found liable for the counts in the Complaint.  Based on this assumption, my review and analysis:

1. Aspira lost sales and profits and David Armetta lost income due to the wrongful acts of LCG;

2. Aspira and David Armetta, among others, established a direct mail program for LCG. This program consisted in part of three seasonal mailings to prospective student families. These mailings were done in fall, winter and summer.  Collectively I refer to this overall program as the "Direct Mail Program."  The individual seasonal mailings I refer to as a "Campaign" or as "Campaigns";

3. LCG benefited from the Direct Mail Program from its inception in 2009 through 2014;

4. It enrolled over 97,000 new students which it attributed to the Direct Mail Program;

5. LCG generated $631 million in sales on these enrollments;

6. It generated $319 million in incremental profits on these enrollments and sales;

7. Was expected to generate an additional 12,899 enrollments, $85 million in sales and $44 million in incremental profits on its ongoing Fall FY 2014 Campaign.

8. David Armetta and Aspira were not fully compensated for their work on the Direct Mail Program.

9. LCG was unjustly enriched by the taking the benefits of the Direct Mail Program without fully compensating Aspira and David Armetta.

10. The damages incurred by Aspira are summarized on the following table. Lost compensation and profits are net of mitigating income and for the period from October 28, 2013 through December 31, 2016 – a period of 3.2 years. Note that Aspira's unpaid invoices are part of, and duplicative with, Aspira's lost profits. Further, David Armetta's income is 50% of Aspira's profits. Therefore, David Armetta's lost income would be $1,402,775 after deducting his $2,500 in 2016 mitigating income.

### Aspira's Damages for October 28, 213 through December 31, 2016

| Line Item | Compensatory Damages | Prejudgment Interest | Total |
|---|---|---|---|
| Aspira's unpaid invoices | $364,681 | $105,122 | $469,803 |
| Aspira's lost profits | $2,810,550 | $0 | $2,810,550 |
| Total non-duplicative | $2,810,550 | $105,122 | $2,915,672 |

11. Aspira's unpaid invoices apply to the Unjust Enrichment and Quantum Meruit counts. Aspira's lost profits apply to the Common Law Fraud and Negligent Misrepresentation counts.

12. It is my understanding that LCG can be disgorged of its wrongfully made profits if it is found liable for Common Law Fraud and/or Unjust Enrichment. Therefore, I calculated the share of LCG's profits on the Direct Marketing Program that were attributable to Aspira and David Armetta. My findings are summarized in the following table.

**LCG's Profits On The Direct Mail Program
Attributable to Aspira and David Armetta**

| Line Item | LCG's Profits |
|---|---|
| Total Direct Mail Program (Fall FY 2010 - Fall FY 2014) | $41,422,908 |
| Fall FY 2013 through Fall FY 2014 Campaigns | $19,117,350 |
| Fall FY 2014 Campaign | $6,207,885 |

## 2.2   ASSUMPTIONS

I made the following key assumptions when developing my opinions:

- LCG will be found liable for the Counts in the Complaint;

- The trial will begin on June 20, 2016 and a judgment will be entered on June 24, 2016;

- The Court will award prejudgment interest on the appropriate counts as described under Connecticut general statute Sec. 37-3a. at a rate of 10% per year;

- A share of LCG's profits on the Direct Mail Program can be disgorged under common law fraud and/or unjust enrichment; and

- The fact finder will agree with the David Armetta and Aspira on the proportion of their contributions to the Direct Mail Program relative to others.

The basis for my opinions are presented in the remainder of this report. In order to assist the fact finder, I have provided information on the damages by individual plaintiff, time period and campaign.

6

## III.    THE COUNTS & RECOVERY PRINCIPLES

### 3.1    THE COUNTS

The Counts in the David Armetta's Case:

1.  Unjust Enrichment;

2.  Quantum Meruit;

3.  Common Law Fraud; and

4.  Negligent Misrepresentation.

Details on these Counts are provided in The Second Amended Complaint.

### 3.2    RECOVERY PRINCIPLES

The preceding counts include tort claims and a request for restitution.  The goal of compensatory damages in tort claims is to place the injured party in substantially as good a positions as they occupied prior to the wrong.  There are several general principles for recovery of compensatory damages for tort claims including the following:

- Proximate Cause – Damages must be proximately caused by the wrongful conduct of LCG;

- Reasonable Certainty – Damages must be proven with reasonable certainty and without undue speculation; and

- Mitigation:  The defendants must have acted reasonably to mitigate damages.

Compensatory damages are generally measured by the difference between the plaintiff's performance "but for" the injurious acts of the defendant ("Without The Wrongful Acts") and their actual experience ("Actual").   Without The Wrongful Acts less Actual = Damage.[1]

---

[1] "Recovery of Lost Profits – 6th Edition" and annual supplements by Robert L. Dunn, Law Press Corporation, Westport, CT, 2005 to 2014 at §1.1 to §1.8, §6.33 to §6.36, §7.15, and §7.22.  Pollack, Richard, A, Bouchner, Scott M., Enos, Craig M., Johns, Colin A. and Moyl, John D., "Calculating Lost Profits", AICPA Practice Aid 06-4.

Restitution restores to the plaintiff any benefit that the defendant may have gained from their misconduct (i.e. unjust enrichment).  Economic value to the recipient is generally the standard for measuring restitution.[2]

---

American Institute of Certified Public Accountants, New York, NY, 2006.  Bauman, John A., York, Kenneth H. and Bauman John, H., "Gilbert Law Summaries, Remedies", The BarBri Group, Chicago, IL, 2003.

[2] Ibid.

## IV.  ASPIRA'S AND DAVID ARMETTA'S LOST INCOME

### 4.1  PROFITS AND INCOME WERE LOST DUE TO LCG'S WRONGFUL ACTS

Aspira lost profits and David Armetta lost compensation due to the wrongful acts of LCG. Aspira is a direct marketing firm self-described as follows:

> *"Aspira Marketing Direct is a premier marketing and business services firm, specializing in the creation of innovative and results-driven direct marketing and programs.  Our primary objective is to increase your revenue, and expand your customer base through direct response marketing.  Simply stated, our business is to grow your business.  Our clients have utilized our focused efforts, our strategic capabilities, our state-of-the-art tools and techniques, and our many decades of professional experience to achieve their required and expected results.  The high-profile nature of our clientele attests to our effectiveness, creativity, professionalism and attention to detail."*[3]

My review indicates that:

- David Armetta was an independent design and marketing consultant for approximately 20 years;[4]

- He was 55 years old in September / October 2013;

- He started Aspira on January 14, 2009;[5]

- Since early 2010, Mr. Armetta was the only one working in the Aspira business;

- In 2012, Aspira's revenue and profits had grown to $878,000 and $814,490, respectively;[6]

- Aspira is a domestic limited liability company;[7]

---

[3] www.aspiradirect.com
[4] Based on discussions with David Armetta.
[5] CARMSUPP-00026067.
[6] Ibid.
[7] Online business inquiry to the Connecticut Secretary of State.

- David Armetta's personal share of Aspira's profits, losses, and capital is 50%;

- Therefore, his personal share of 2012 profits were $407,425 (50% of Aspira's total $814,490 income);[8]

- Aspira's business status remains "active" as of the writing of this report;[9]

- Aspira's website, www.aspiradirect.com, remains active as of the writing of this report;

- Aspira hast two outstanding invoices dated 10/28/2013 and totaling $364,681 that FCL will not pay due to the wrongful acts of LCG;[10]

- Aspira and David Armetta lost relationships with companies and individuals they used to work with to serve customers;

- Aspira's revenue and profits fell to and remained at $0 in 2014, 2015 and 2016 year-to-date;

- In turn, David Armetta's personal income from Aspira fell to $0 during this same period;

- David Armetta continues to do business development in the field of direct marketing consulting. He had one engagement in 2016 with "Positive Impressions" that resulted in an invoice for $2,500 on 3/17/2016. This amount had not been collected as of the date of this report;

- In addition, Mr. Armetta has worked as product design and marketing consultant for a pre-revenue company name Whole Brain Innovation, LLC. Mr. Armetta has not yet been compensated for this work. However, he anticipates being compensated in the future if and when Whole Brain Innovation, LLC successfully launches product(s);

- Mr. Armetta does not expect compensation from Whole Brain Innovation, LLC, if any, before 2017; and

---

[8] CARMSUPP-00026075.
[9] Connecticut Secretary of State online.
[10] CARMSUPP-00026432 and CARMSUPP-00026431.

- As a result, neither Aspira nor David Armetta has generated any significant income since 2013.[11]

Aspira and David Armetta were damaged by the wrongful acts of LCG because:

- There is no cause for Aspira's uncollectible invoices other than LCG's unjust enrichment, and quantum meruit;

- There is no cause for David Armetta's or Aspira's loss of income other than LCG's fraud and negligent misrepresentation;

- Further, David Armetta and Aspira have attempted to mitigate these losses;

- Therefore, Aspira's lost profits and David Armetta's lost income were proximately caused by LCG's wrongful acts and are recoverable damages.

## 4.2    ASPIRA AND DAVID ARMETTA LOST INCOME DAMAGES

Aspira's lost profits of $2.81 million between 10/28/2013 and 12/31/2016 after discounting post-trial lost profits for timing and risk.  David Armetta lost $1.4 million during this same period and after discounting post-trial lost income.   Details are provided by year and cumulatively in Appendix E – Lost Compensation and Profits.  Note that David Armetta's lost income damages are duplicative with Aspira's lost profits (i.e., they are not additive if both parties prevail and are awarded damages).

I used the before-and-after method within the "Without Wrongful Acts" vs. "Actual" approach to determine Aspira's and David Armetta's lost profits and income.[12]  The following summarizes the key inputs into my analysis.

---

[11] Based on discussions with David Armetta and a review of Aspira's 2014 tax return.

[12] This is a generally accepted approach / method.  For example, see , see Pollack, Richard A., Bouchner M. Scott, Enos, Craig M., Johns, Colin A. and Moyl, John D., "Calculating Lost Profits", AICPA Business Valuation and Forensic & Litigation Services Section, Practice Aid 06-4, p. 25.  I have replaced the term "But For" with "Without" in order to make it easier for the reader.

**Trial and Judgment Date:**

Plaintiffs' counsel indicated that the trial will conclude and a judgment will be made on June 24, 2016.  Further:

- I calculated lost profits and income using the ex post method;

- Therefore, I intend to review Aspira's and David Armetta's actual and expected profits and income prior to trial and will update my damages to reflect changes, if any.

**Profits and Income But-For the LCG's Wrongful Acts:**

- LCG was Aspira's sole client in the time leading up to the wrongful acts;

- Aspira and David Armetta were expected to work on the LCG Direct Mail Program on an an ongoing basis given:

  o The positive results of the program (see the upcoming section for discussion of the program's results); and

  o LCG's 2013 expectations of continued sales and profit growth through 2018;[13]

- The number of LCG Direct Mail Program mailings were generally increasing over time;

- Aspira's revenue and profits were generally increasing over time;

- David Armetta's annual income was half of Aspira's annual profits;

- Therefore, David Armetta's annual income was generally growing over time;

- David Armetta and Aspira expected to generate new clients based on their results with LCG;

- For example, David Armetta and Aspira were pursuing similar business with Isle of Capri Casinos at the time LCG's wrongful acts occurred;[14]

---

[13] LCG-EM00048660.pdf.  I have requested, but not received, updated financial information for LCG, through Aspira's and David Armetta's counsel.

- Going forward, David Armettta's and Aspira's income was expected to be at least as high as its 2012 and pre-September 6, 2013 levels based on a continuation of business with LCG and / or new clients;

- The economy has grown and the unemployment rate has fallen since 2013;[15]

- The childcare industry has grown since 2013;[16]

- The direct mail advertising industry has grown since 2013;[17]

- However, I limited the duration of Aspira's and David Armetta's "Without the Wrongful Acts" income to the end of 2016; and

- I limited Aspira's and David Armetta's sales, profits and income after 2013 to the average of 2012 and 2013 levels.[18]

**<u>Actual Income:</u>**

- Aspira's sales and profits were $0 in 2014 through 2016 year-to-date;

- Aspira is not expected to recover from the Wrongful Acts or generate any sale or profits in 2016; and

- David Armetta earned $0 in income in 2014 and 2015.   He has earned, but not yet collected, $2,500 in consulting income for 2016.

My findings Without The Wrongful Acts versus Actual are illustrated in the following charts.

---

[14] Discussions with David Armetta.

[15] Economic data from www.bea.gov and www.bls.gov, the "Survey of Professional Forecasters", Federal Reserve Bank of Philadelphia, August 15,2014 and February 12, 2016, and "The Livingston Survey", Federal Reserve Bank of Philadelphia, June 4, 2014 and December 2015.

[16] Day Care In the US, IBISWorld Industry Report 62441, July 2014 and January 2016.

[17] IBISWorld Industry Report 54186, Direct Mail Advertising in the US, February 2016.

[18] It is my understanding that companies and individuals like David Armetta and Aspira are typically paid on a commission basis.  However, I also checked their compensation and sales on an hourly consulting basis for reasonableness.

**Aspira's Sales Were Increasing Over Time**



**Aspira Lost $3.1 Million in Sales Due to LCG's Wrongful Acts**



**Aspira's Profits Were Increasing Over Time**



**Aspira Lost $2.81 Million in Profits Due to LCG's Wrongful Acts**



**David Armetta's Lost $1.4 Million in Income Due To LCG's Wrongful Acts**



# V.  LCG'S WRONGFUL PROFITS

## 5.1  LCG HAD A NUMBER OF MARKETING INITIATIVES

LCG used a number of marketing initiatives and tools to attract, enroll and retain new students including:

- LCG's Direct Mail Program;

- Websites – LCG and its sub-brands including Childtime, Tutor Time, The Children's Courtyard, La Petite Academy, and Montessori Unlimited;

- Social media;

- Call center operations;

- Corporate and affinity partnerships;

- Customer relationship management (hereinafter "CRM") software;

- Customer communications and surveys;

- A portfolio of school locations and brands;

- School based initiatives / local marketing; and

- School frontage and signage.[19]

---

[19] Discussions with the Armettas, a review of LCG and related websites and social media sites and a review of LCG's presentations.  For example, see CARMSUPP-025814 to 025825 and CARMSUPP-00026144 to 026146.

## 5.2    LCG ATTRIBUTED STUDENT ENROLLMENTS TO THE DIRECT MAIL PROGRAM

LCG, in consultation and with the assistance of its print vendors (Vertis and FCL), tracked and reported student enrollments attributable to the Direct Mail Program.   Tracking was done through both a matching process and local school entry of information into LCG's CRM system. To match enrollment to the Direct Mail Program, LCG compared the names of recipients of direct mail pieces to the names of new students enrolled from its billing system.   This process was performed weekly.[20]  Bridget Pietrowicz, who performed internal analytics for LCG, described this matching process as follows:

> *"While I agree that the matching process is not entirely accurate, I think it is also understated overall. The swing we have seen in new enrollments since we launched direct mail more than covers the total enrollments we have matched."*[21]

Further, LCG management reported the number of enrollments attributable to the Direct Mail Program in presentations.  For example:

- LCG proposed a transaction to refinance its existing Senior Secured Revolving Credit Facility and Senior Secured Notes with $255 million of New Senior Secured Credit Facilities.   The transaction was to be financed through a $35 million Revolving Credit Facility and a $220 million term loan;

- In its April 2013 rating agency presentation related to this refinancing transaction, LCG:

  o  Identified the Direct Mail Program among the "Key Action Items" for the "Key Initiative(s)" of "Customer Acquisition";

  o  Indicated that it "Built industry leading sales and marketing capabilities to drive enrollment" and "Designed sophisticated direct mail strategy, with over 5 million pieces mailed annually";

---

[20] Discussions with the Armettas and a review of LCG documents and presentations.   For example, see CARMSUPP-025753.

[21] CARMSUPP 25847.  Ms. Pietrowicz did not recall this email during her deposition or exactly what the meaning of her statement was at the time.  However, she did not expressly contradict the accuracy of the statement.  See her deposition dated 8/4/2014 at pages 25-26.

- o   Informed the rating agency that "LCG Is Executing A Multi-Faceted Strategy To Drive Lead Generation Enrollments and Retention";

- o   Represented to the rating agency that "Direct mail campaigns generated 25k enrollments year to date;"[22]

- LCG had an objective of refinancing and increasing its $36 million Senior Secured Revolving Credit Facility to $40 million to $45 million circa June 2013;

- In its lender presentation for this refinancing transaction, LCG:

  - o   Identified the Direct Mail Program as a "strategic initiative"

  - o   Listed it first among "key initiatives"

  - o   Indicated that management actions included "Customer Acquisition:  Developed sophisticated, response-driven marketing competency", "Built industry leading sales and marketing capabilities to drive enrollment", "Designed sophisticated direct mail strategy, with over 3 million pieces mailed annually";

  - o   Presented the enrollment attributable to the Direct Mail Program for Fall and Winter for fiscal years 2010 through 2012 in a slide titled "Improved direct mail tactics are resulting in greater new enrollments";

  - o   Also presented the enrollment conversion rate and cost per acquisition;[23]

- Expected and actual enrollments attributable to the Direct Mail Program were presented in the "Learning Care Group Q3 & 9 + 3 Outlook Review" dated 4/26/2013.[24]

I summarized the student enrollment that LCG attributed to the Direct Mail Program (hereinafter "DM Students").  The results are summarized in the following table and detailed in Appendix F – Direct Mail Program Analysis.

---

[22] LCG-EM00048660.pdf.
[23] CARMSUPP 0025789, -025796, -025803 and -025814 to 025816.
[24] CARMSUPP-00026132, -26145 and -26160.

**Student Enrollments Attributed to the Direct Mail Program by LCG Increased Each Year Between FY 2010 and  FY 2013**



**Cumulative Student Enrollments Attributed to the Direct Mail Program by LCG Exceed 97,000 Between the Fall FY 2010 and Fall FY 2014 Campaigns[25]**



A review of the mailings and students enrolled by Campaign by year indicates:

---

[25] F = Fall, W = Winter and S = Summer.  Fall 2014 is a partial period (1 of 5 to 7 months).

- Three campaigns were done each fiscal year between 2010 and 2013 - fall, winter and summer;

- The fall and winter Campaigns were each three- to five-times (3x to 5xs) the size of the summer Campaign in terms of total mailings and unique prospects mailed;

- The fall and winter Campaigns each enrolled two-times (2x) as many students as the summer Campaign;

- The number of unique prospects mailed declined over time;

- The number of total mailings increased over time (i.e. more mailings per unique prospect);

- The total students enrolled that were attributed to the Direct Mail Program increased over time;

- The direct mail conversion rate (students enrolled divided by unique prospects mailed) generally increased over time;

- The direct mail cost of acquiring a student generally decreased over time; and

- The direct mail cost per mailing generally increased over time.

Further, the student enrollments from the Direct Mail Program were incremental volume to LCG:

- LCG schools experienced student churn – an ongoing cycle of losing existing and adding new students;

- The monthly churn rate at LCG was 9.8% in FY 2013;[26]

- The students that enrolled due to the Direct Mail Program were a fraction of the total enrollees;

- For example, students enrolled from the Winter FY 2013 Campaign represented 26% of total LCG enrollment during that period;[27]

---

[26] CARMPSUPP-0026142.  Churn rate = 1 – retention rate = 1 – 90.2% = 9.8%.

- LCG's school utilization rate was 52% in FY 2013;[28]

- Therefore, new students from the Direct Mail Program could be added to existing schools without the addition of new school capacity;

- LCG schools would incur only incremental, or variable, costs to serve DM Students;[29]

- Categories of expenses that might increase with incremental DM Students include additional labor and school supplies.

## 5.3    LCG'S PROFITS FROM DIRECT MAIL STUDENTS

Carlene Armetta, David Armetta and Aspira worked to develop and implement LCG's Direct Mail Program.   Carlene Armetta worked on the program as both a consultant with Aspira – before she was retained by LCG as a full-time employee - and as an employee of LCG.   Other individuals and organizations worked with the Armettas and Aspira on the Direct Mail Program. LCG generated enrollment, revenue and profits from the Direct Marketing Program.   As a result, the Direct Mail Program is a benefit conferred to LCG, in part, by Carlene Armetta, David Armetta and Aspira.

The overall Direct Mail Program was implemented in a series of three seasonal Campaigns.   I determined the sales (hereinafter "DM Sales") and profits (hereinafter ("DM Profits") that LCG generated from the overall Direct Mail Program and these individual Campaigns.   The results are summarized in the following table and detailed in Appendix H – Direct Mail Program Analysis.

---

[27] CARNSUPP-00026433
[28] CARMSUPP-00026136
[29] For example, see LCG's accounting / finance department incremental profit analysis for DM Sales in CARMSUPP00026433.



**LCG Generated $716 Million in Sales from the Direct Mail Program
(Actual and Expected for Fall FY 2014)**



**LCG Generated $364 Million in Incremental Profits from the Direct Mail Program
(Actual and Expected for Fall FY 2014)**



However, Aspira was not fully compensated for its work on the Direct Mail Program. If the fact finder determined that the entire Direct Mail Program was a single benefit conferred to LCG,

then LCG's total $364 million in DM Profits would be the benefit of its common law fraud and / or unjust enrichment (subject to apportionment).

Alternatively, if the fact finder viewed each Campaign as an individual benefit conferred to LCG, then the $168 million in DM Profit from the Fall FY 2013 through Fall FY 2014 Campaigns would be the benefit of its common law fraud and / or unjust enrichment (subject to apportionment).  More specifically;

- The Fall, Winter and Summer FY 2013 and Fall FY 2014 Campaigns were implemented in 2013;

- David Armetta and Aspira were compensated by LCG for their work on the Direct Mail Campaign through Vertis Communications, and then FCL Graphics, Inc.;

- As of November 2013, LCG refused to remit payment to FCL for Aspira's portion of services rendered on the Direct Mail Campaign;[30]

- Aspira continues to have two outstanding invoices to FCL totaling $364,681;[31]

- These invoices are primarily for work performed on the fall Campaign (performed in calendar year 2013 for the FY 2014 fall mailing).[32]

Note that I requested additional information on LCG's financial and operating performance and the performance of the Direct Mail Program and Campaigns.  The plaintiffs' counsel informed me that:

- They have requested this information from LCG;

- LCG has not produced additional LCG financial or operating information;

- LCG either stopped tracking or did not produce the ongoing results of the Fall FY 2014 Campaign.

---

[30] The Complaint in David Armetta's Case and discussions with the Armettas.
[31] CARMSUPP-00026432 and CARMSUPP-00026431.
[32] Ibid.

It is my understanding that the courts generally allow negative inferences to be made against defendants, like LCG, in situations where they fail to maintain adequate documentation. However, I did not make any negative inferences against LCG in my sales and profit determination. Rather, I used the best data available to calculate sales, costs and profits. This data is the kind that a typical economist, financial analyst or valuation analyst would normally use in their practice when quantifying past and expected sales and profitability.

## 5.4   APPORTIONMENT

There were factors other than the Direct Mail Program that contributed to the DM Sales and DM Profits identified in the previous section. There were people and organizations other than David Armetta and Aspira that contributed to these sales and profits. Therefore, the DM Profits need to be apportioned to isolate David Armetta's and Aspira's contributions. Apportionment in this case is analogous to Copyright infringement cases where an infringed work is used to advertise another product or service. Within this context, apportionment of LCG's profits only needs to be reasonably supportable as opposed to mathematically exact.[33]

### Factors Other Than the Direct Mail Campaign

Given this background, I apportioned DM profits between the Direct Mail Program and other factors. LCG' presentations, including those that were used in attempts to raise $40 million to $255 million in financing, identify three factors that drive the new student sales and profit cycle: 1) Lead generation; 2) Conversion; and 3) Retention. These three factors lead new student-families to find, enroll in, and remain in LCG schools so that the DM Sales and DM profits were realized. More specifically;

1. <u>Lead generation</u> – The Direct Mail Program was used to identify potential new students and families and made a call to action for student-families to schedule a tour;

2. <u>Conversion</u> – The student-families called to action by the Direct Mail Program scheduled a tour through LCG's call center or made contact directly with a local school. The local

---

[33] Intellectual Property Law: Damages and Remedies, § 2.02 Recovery of Monetary Damages, 2 The Infringer's Profits Attributable to the Infringement, Law Journal Press, New York, NY, February 20, 2013 online edition.

school tour, personnel, facilities and programs and follow up communications were used to obtain enrollment; and

3. <u>Retention</u> – LCG provided services and enacted retention programs that were sufficient to retain DM Students over the period DM Sales and DM profits were generated.[34]

LCG could not generate DM Sales and DM Profits from new student enrollments without any one of these three factors. They are interdependent and, therefore, equally important to LCG's DM Sales and DM Profits as follows;

- Without leads from the Direct Mail Program being generated, LCG would not have the opportunity to convert a lead into new student enrollments;

- Without new student enrollments, there would be no new students to retain long enough to generate significant sales and profits;

- Conversely, without retention, the sales and profits from newly enrolled students would be diminished; and

- Leads would not be translated into sales and profits if LCG did not have an ability to convert them into enrollments.

As a result, I reduced the DM Profits by 67% to account for the contribution of LCG's conversion and retention assets and programs (one-third [1/3] was attributed to Direct Mail Campaign lead generation and the remaining two-thirds [2/3] was attributed to LCG's conversion and retention assets and programs).

**Participants Other than Aspira and David Armetta**

Organizations and individuals other than Aspira and the David Armetta contributed to the Direct Mail Program. Therefore, it is appropriate to further apportion the Direct Mail Sales and Profits for the relative efforts of these other program participants.

---

[34] For example, see CARMSUPP-025815 to 025823, LCG-EM00048660 and CARMSUPP-026142-26146.

It is my understanding that David and Carlene Armetta will testify at trial to their relative contributions to the Direct Mail Program. They have produced this information in CARMSUPP-000263434.xls which indicates:

- David Armetta and Aspira contributed 34.14% or 42.26% of the Direct Mail Program effort;

- Carlene Armetta contributed 5.75% or 7.12% of the effort of the Direct Mail Program as an employee of LCG.

I have requested, but the parties have not produced, information that would allow me to verify the contents of this file. However:

- I have assumed that the information is correct in order to assist the fact finder;

- I further apportioned the DM Profits for David Armetta's /Aspira's relative contributions at 34.14%, respectively; and

- As a result, LCG generated $38.175 million in profit on its Direct Mail Program from its defrauding of David Armetta and Aspira.

Note that I used the lower of the two percentages for David Armetta's / Aspira's out of an abundance of caution to not overstate the damages.

I repeated this process for the Fall FY 2013 through Fall FY 2014 Campaigns in the event that the fact finder determined it was appropriate to limit recovery of LCG's fraudulent profits to the specific Campaigns for which the plaintiffs were not fully compensated. As a result, LCG generated $6.2 million on its Fall FY 2014 Campaigns from defrauding of David Armetta and Aspira.

My findings and their applicability to the specific counts in the complaints are presented in Section II – Summary of Opinions.

Appendices follow.

# A – QUALIFICATIONS



**DANIEL J. CENATEMPO CVA, MAFF**
**Curriculum Vitae**
**(1 of 6)**

**CAREER SYNOPSIS:**

Mr. Cenatempo has over 25 years of experience in economics, valuation and finance. He has testified on intellectual property and business damages and values in U.S. District, state, and local courts in a range of patent, trademark, copyright, trade secret, contract, tort, shareholder, partnership, and tax cases. His experience includes, but is not limited to, the following:

- Economic damages, lost profits, reasonable royalties, price erosion, diminution of value, lost goodwill, and unjust enrichment;

- Valuation of intellectual property, intangibles, businesses, business interests, real property, derivatives, and financial instruments;

- Corporate procurement, budgeting, planning and investment analysis;

- Economic, industry and business research and analysis;

- Technology and intellectual property licensing;

- Negotiation support;

- Due diligence and business investigation;

- Mergers, acquisitions, divestitures, joint-ventures, financing and re-capitalization.

**CERTIFICATIONS:**

2007 - Present    **MASTER ANALYST IN FINANCIAL FORENSICS (MAFF)** with the National Association of Certified Valuators and Analysts (NACVA) with dual concentration in Business and Intellectual Property Damages and Financial Litigation (formerly CFFA).

2002 - Present    **CERTIFIED VALUATION ANALYST (CVA)** with the National Association of Certified Valuators and Analysts (formerly AVA).

2009-2014    **REGISTERED APPRAISER** with the State of Oregon, Department of Administrative Services, Human Resources Division

**EDUCATION:**

1990-1992    **DUKE UNIVERSITY, FUQUA SCHOOL OF BUSINESS, Durham, NC**

Master of Business Administration with focus on Finance, May 1992.

1984-1988    **VILLANOVA UNIVERSITY, Villanova, PA**

Bachelor of Arts in Economics, May 1988 with honors (Cum Laude). Economics Department Research Assistant.

**DANIEL J. CENATEMPO CVA, MAFF**
**(2 of 6)**

**EMPLOYMENT HISTORY:**

| | |
|---|---|
| 2003 - Present | **FAIRVALUE ADVISORS, LLC, Atlanta, GA** |
| | Executive Director (2006 – Present) |
| | Managing Director (2003 – 2006) of predecessor company. |

| | |
|---|---|
| 1995 - 2002 | **JACOBS ENGINEERING GROUP, INC., Atlanta, GA** |
| | Managing Director – Consultancy (2000-2002) |
| | Group Manager – Consultancy Financial & Planning Services (1998-1999) |
| | Senior Consultant (1996-1998) |
| | Consultant (1995-1996). |

| | |
|---|---|
| 1994 - 1995 | **THE MEAD CORPORATION, Atlanta, GA** |
| | Senior Marketing Analyst. |

| | |
|---|---|
| 1992 - 1994 | **FLAGSTAR HOLDINGS INC., Spartanburg, SC** |
| | Senior Analyst, Headquarters (1993-1994) |
| | Assistant Division Controller, Secaucus, NJ (1992-1993). |

| | |
|---|---|
| 1988 - 1990 | **DELOITTE & TOUCHE, Stamford, CT** |
| | Research Associate, Management Consulting Division. |

| | |
|---|---|
| 1984-1988 | **JOSEPH J. CENATEMPO, CPA, Norwalk, CT** |
| | Book Keeper (Summers & Weekends). |

**TESTIFYING EXPERT EXPERIENCE - PAST 13 YEARS:**

- *Wood Resources Recovery, LLC v. Gainesville Renewable Energy Center, LLC*, Circuit Court for the Eighth Judicial Circuit in and for Alachua County, FL;

- *Walrus Brands, L.L.C. v. Peaches Uniforms, Inc.*, United States District Court for the Northern District of Illinois;

- *NewOak Capital, LLC and NewOak Capital Markets, LLC v. Brean Capital, LLC, Brean Strategic Advisors, LLC, Samuel Warren, Bryan Nagy, Patrick Mahon and Alexander Sellinger*, FINRA Dispute Resolution Arbitration, New York, NY;

- *Catholic Health Partners v. CareLogistics, LLC.,* American Arbitration Association, Columbus, OH;

- *Family Christian, LLC, Chapter 11 bankruptcy filing*, United States Bankruptcy Court, Western District of Michigan;

- *Williston Timber Company, Inc. et al. v. Plum Creek Marketing, Inc. et al.*, Circuit Court of the Eight Judicial Circuit in and for Levy County, FL;

- *Gregory Gorno v. American Global Logistics, LLC. et al.*, United States District Court for the Northern District of Georgia, Atlanta Division;

# DANIEL J. CENATEMPO CVA, MAFF
## (3 of 6)

- *Pipeline Technologies, Inc. d/b/a Pipetech International v. Telog Instruments, Inc. and Applied Products Group, LLC*, United States District Court for the District of Arizona;

- *Virtual Studios, Inc. v. Royalty Carpet Mills, Inc.*, United States District Court for the Northern District of Georgia, Rome Division;

- *Chamber of Industry and Commerce Wuppertal-Solingen-Remscheid v. Martha Stewart, Martha Stewart Living Omnimedia, Inc., Emeril Lagasse, et. al.*, United States District Court for the Southern District of Florida;

- *Bernice Abrams, et al. v. Charles A. Aiken et. al.*, United States District Court for the Northern District of Georgia, Atlanta Division;

- *Glock, Inc. v. Maxsell Corporation and Vico Confino*, United States District Court, Northern District of Georgia, Rome Division;

- *Virtual Studios, Inc. v. Beaulieu Group, Inc.*, United States District Court for the Eastern District of Tennessee at Chattanooga;

- *Rapha Products, LLC v. Skullcandy, Inc.*, United States District Court, Northern District of Georgia, Atlanta Division;

- *Judy M. Bloom v. Bronwyn Cosgrove and Docu-Code, Inc.*, Superior Court of Fulton County in the State of Georgia;

- *Ramsey Khalidi; Pamela Khalidi; RK Construction & Development Company; and Khalidi Properties, LLC v. Terracon Consultants, Inc. successor in interest of WPC Engineering Inc.; and William S. Anderson III*, State Court of Chatham County, Savannah, Georgia;

- *Mattress Safe, Inc. v. Just Encase My Mattress, Inc. and Deborah Sloane*, United States District Court, Northern District of Georgia, Atlanta Division;

- *In re The Coca-Cola Co. Shareholder Litigation*, Superior Court of Fulton Country, State of Georgia;

- *Judy Kauffman Goldstein et al. v. Zoran Corporation et al.*, Court of Chancery of the State of Delaware;

- *Georgia-Pacific Consumer Products, LP v. Clatsop County Assessor and the Oregon Department of Revenue*, Oregon State Tax Court;

- *Angela Brown et al., Plaintiffs v. Moe's Southwest Grill, LLC, et al.*, U.S. District Court for the Northern District of Georgia, Atlanta Division;

- *Prima Technologies LTD and Daran Nair v. Prima Tech USA Inc., KMQ Inc. and Kimberley Quinn*, High Court of New Zealand, Auckland Registry;

- *The Loyalton Group, Inc. v. Burton Energy Group, Inc.*, U.S. District Court District of Minnesota;

- *Freres Lumber Company v. Department of Revenue*, Oregon State Tax Court;

- *Swanson Manufacturing Group, LLC v. Department of Revenue*, Oregon State Tax Court;

- *William A. Hoskyns, LLC, et al. v. Debra Gray King, D.D.S., et al.*, The Superior Court of Fulton County of the State of Georgia;

- *Shepherd Management Group, Inc. v. Michael Wilkov, Cantoni LP, Cantoni Properties – Houston, LTD, Cantoni Orange County, Inc. and Cantoni Atlanta, Inc.*, US District Court for the Northern District of Georgia, Atlanta Division;

31

**DANIEL J. CENATEMPO CVA, MAFF**
**(4 of 6)**

- *KRC Rolls v. Lane County Assessor and the Department of Revenue*, Oregon State Tax Court;

- *Discrete Wireless, Inc. v. Coleman Technologies, Inc.*, US District Court for the Northern District of Georgia, Atlanta Division;

- *Michael Putnam and WEP Enterprises, Inc. v. Henkel Consumer Adhesives, Inc.*, U.S. District Court For The Northern District of Georgia, Atlanta Division;

- *SP Newsprint v. Yamhill County Tax Assessor*, Oregon State Tax Court;

- *Auction Management Solutions Inc. v. Manheim Auctions, Inc. et al.*, U.S. District Court For The Northern District of Georgia, Atlanta Division;

- *FHP Holdings, LLC v. Health Insurance Plans of Greater New York, Inc., et al.*, Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida;

- *National Century Financial Enterprises, Inc. et al. v. Steven M. Scott, Rebecca J. Scott, Scott Family Holdings, Beacon Health Plans et al.*, U.S. Bankruptcy Court, Southern District of Ohio, Eastern Division;

- *Optimum Technologies, Inc. v. Home Depot, Inc. et al.*, U.S. District Court For The Northern District of Georgia, Atlanta Division;

- *DOJ Tax & Finance Division v. Pope & Talbot*, dispute resolution proceedings, Oregon State Tax Court;

- *Optimum Technologies Inc. v. Henkel Consumer Adhesives, Inc., et al.*, U.S. District Court For The Northern District of Georgia, Atlanta Division;

- *U.S. Department of Labor v. Confidential Trustee*, U.S. Department of Labor proceedings, Chicago, IL;

- *Boise-Cascade Corp. v. Columbia County Assessor & The Department of Revenue*, Oregon State Tax Court;

- *Georgia-Pacific v. Lincoln County Assessor*, Oregon State Tax Court.

**ARTICLES & PRESENTATIONS – PAST 15 YEARS:**

- "Mock Expert Examination: Using Past Licenses to Calculate Damages" Atlanta Bar Associations' Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2016 (co-author);

- "IP Valuation and Damages Strategies", Atlanta Bar Associations' Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2015 (co-author);

- Copyright, patent, trademark and trade secret damages, Emory University School of Law, March 2015;

- "Apportionment in Copyright and Patent Damages", 20th Annual Intellectual Property Law Institute, Institute for Continuing Legal Education and the State Bar of Georgia conference, September 2014;

- "Damages Update and the Entire Market Value Rule", Atlanta Bar Associations' Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2014 (co-author);

- "Patent Infringement Remedies: Damages", Patent Litigation Class 11, Emory University School of Law;

- "Valuing Intellectual Property – Key Concepts for Counseling Legal Clients", November 2013;

- "Navigating the Entire Market Value Rule: Which Sales Are Really At Risk", Atlanta Bar Association CLE Session, October 2013 (co-author);

- "IP Valuation – Business and Litigation Applications", Atlanta Bar Associations' Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2013;

## DANIEL J. CENATEMPO CVA, MAFF
### (5 of 6)

- "Intellectual Property Valuation – a Tool for Maximizing Returns", the Association of Intellectual Property Firms (AIPF) 2012 Annual Meeting, September 2012;

- "Recent Developments in Damages Law", Atlanta Bar Associations' Eighth Annual Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2012 (co-author);

- "Effective Use of Experts in Patent Litigation", Atlanta Bar Associations' Seventh Annual Intellectual Property SpringPosium, Intellectual Property CLE Conference, April 2011 (co-author);

- "2011 Global Industry Outlook – An Economic and Financial Perspective", *Paper360°*, January 2011;

- "State of the Global Paper & Forest Products Industry", *TAPPI Press*, Q1 and Q3, 2010;

- "Strategic Decision Making Under Uncertainty", Georgia Institute of Technology's Management Development for Enhanced Performance program, 2003 to 2008;

- "Court Clarifies Entire Market Value Rule for Patent Damages – Expert Excluded - Cornell University v. Hewlett Packard Co., Case No. 01-01974 (USD ND NY)", *The Fair Value Examiner*, Summer 2009;

- "Latest FLP Case Yields Mixed Ruling on Bona Fide Transfer Exception: Estate of Valeria M. Miller, Deceased, Virgil G. Miller, Executer, Petitioner, v. Commissioner of Internal Revenue, Respondent. T.C. Memo 2009-119", *The Fair Value Examiner,* Summer 2009;

- "How Much Are Your Clients' Auction Rate Securities (ARS) Worth?", *The Fair Value Examiner*, September 2008;

- "Terminal Value Not Speculative in Indefinite Life Licensing Agreement - Matrix Group Limited, Inc. v. Rawlings Sporting Goods Co., 477 F.3d 583 (8th Cir. 2007) (DE law)", *The Fair Value Examiner*, September 2008;

- "State of the North American Pulp & Paper Industry", Georgia Institute of Technology, annually for 2002 through 2008 (co-author);

- "Clear Value: A Guide to Quantifying, Creating & Capturing Business Values In the Paper & Packaging Industries", 2008;

- "Industry Economic Perspective and Outlook", 2008 ASPI Spring Meeting,  2008;

- "Economic Damages in Commercial Litigation: An Overview", 2007;

- "Patent Valuation: What It Is, And Why It Has Emerged As An Essential Management Tool", *Intellectual Property and The Law,* Troutman Sanders LLP, Spring 2006 Volume XVIII No. 1;

- "Patent Valuation – Key Concepts and Tools For Counseling Clients", State Bar of Georgia, Intellectual Property Law Section, January 2005;

- "Pulp & Paper Industry Update – Financial Performance and the Innovation Imperative", Paper Summit 2004, Georgia World Congress Center, May 2004 (co-author);

- "Industry Competitiveness and The Innovation Imperative", ASPI Annual Conference, March 2004;

- "Pulp & Paper Industry Update and Outlook", TAPPI Conference, November 2003 (co-author);

- "Intellectual Property Valuation Essentials", March 2003;

- "Is Heavy Industry Nudging Stakeholders Toward Their Graves", Global Finance Conference, Feb. 2003;

- "Value Creation and The Innovation Imperative", January 2003;

**DANIEL J. CENATEMPO CVA, MAFF**
**(6 of 6)**

- "Doing the Right Projects", Thornblade Technical Seminar, May 2002;

- "Creating Value In Turbulent Times", Georgia Institute of Technology,  January 2002;

- "Entering New Markets – A Proven Approach", June 2001;

- "Real Options:  Overview & Investment Management Implications", February 2001;

- "Packaging Trends and The Plastics / PET Advantage", NA Polyester Industry Conference, Feb. 2001;

- "Finance Fundamentals and Process Economics Short Course", 1998-2000.

# B - CERTIFICATION

I certify that:

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and Statement of Contingent and Limiting Conditions in Appendix C, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions;

- I have no present or prospective interest in the parties related to this matter;

- I have no bias with respect to any product, service, or party related to this matter;

- My engagement in this assignment was not contingent upon developing or reporting predetermined results;

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined damages amount or direction in damages amount that favors the cause of the plaintiff or defendant, the amount of the damages calculated, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this memorandum.

Signed:

Daniel J. Cenatempo
Executive Director
FairValue Advisors, LLC

# C – STATEMENT OF CONTINGENT AND LIMITING CONDITIONS

This report and related work was performed subject to the following contingent and limiting conditions:

- Except as may be required by law, regulation, or judicial or administrative process, we will not disclose to anyone any information or documents related to the litigation that are identified as confidential.

- FairValue Advisors, LLC (hereinafter "FVA") warrants that it will perform its services in a professional manner.  We make no further warranty of any kind, expressed or implied.

- FVA's maximum liability relating to services rendered under this engagement (regardless of form of action, whether in contract, negligence, or otherwise) shall be limited to the fee paid to FVA for the portion of its services or work product giving rise to liability.  In no event shall FVA be liable for consequential, special, incidental, or punitive losses, damages, or expenses (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

- Please see our engagement letter for additional commercial terms and conditions.

## D – DOCUMENTS CONSIDERED

### COURT DOCUMENTS

1. The First Amended Complaint in *David Armetta and Aspira Marketing Direct, LLC vs. Learning Care Group, Inc.* - Case No. 3:13-cv-1461(VLB) in the United States District Court for the District Court of Connecticut.

2. Plaintiff's Renewed Motion to Amend the First Amended Complaint, 10/23/2014.

3. Second Amended Complaint, 7/8/2015.

### DEPOSITIONS

4. Armetta, Carlene 5/6/2014.

5. Armetta, David, 5/7/2014.

6. Beck, Barbara, 7/29/2014.

7. Calta, Kathy Lyn, 8/5/2014.

8. DeWalt, Stacy, 4/22/2014.

9. Flood, Steven, 8/7/2014.

10. Hendricks, Timothy, 8/4/2014.

11. Howland, James, 7/14/2014.

12. Litchenberg, John, 7/30/2014.

13. Marinelli, Marissa, 8/5/2014.

14. Orr, Andrew, 30(b)(6), 8/1/2014.

15. Overlock, Kevin, 7/23/2014.

16. Perich, Ernie, 8/5/2014.

17. Pietrowicz, Bridget, 8/4/2014.

18. Smith, Scott, 7/31/2014.

19. Young, Ira, 7/22/2014.

20. Young, Ira, 30(b)(6), 8/1/2014.

### DISCOVERY DOCUMENTS

21. CARMSUPP-025747-788.pdf.

22. CARMSUPP-025789-841 OCR.pdf.

23. CARMSUPP-025789-841.pdf.

24. CARMSUPP-00026132-00026178.pdf.

25. CARMSUPP-00026179-00026392 OCR.pdf.

26. CARMSUPP-00026179-00026392.pdf.

27. CARMSUPP-00026433 Winter 2013 Direct Mail reporting ENHANCED.xlsx 8.xlsx.

28. CARMSUPP-00026432.pdf.

29. CARMSUPP-00026434 Direct Mail Program Contributor Calculation (1).xlsx.

30. CARMSUPP-00026435-00026438 (1).pdf.

31. CARMSUPP - 026393 - 418.pdf.

32. CARMSUPP-25847.pdf.

33. CARMSUPP-00025851-00025876.pdf.

34. CARMSUPP-00025877-00025907.pdf.

35. CARMSUPP-00025908-00025935.pdf.

36. CARMSUPP-00025936-00025991.pdf.

37. CARMSUPP-00025992-00026036.pdf.

38. CARMSUPP-00026037-00026092.pdf.

39. CARMSUPP-00026093-00026131.pdf.

40. CARMSUPP-00026419-24.pdf.

41. CARMSUPP-00026425-27.pdf.

42. CARMSUPP-00026428-30.pdf.

43. CARMSUPP-00026431.pdf.

44. LCG_Fiscal Year Overview Spreadsheet_Updated 1.15.13.xls.

45. LCG-EM00018803.ppt.

46. LCG-EM00019709.xlsx.

47. LCG-EM00023934.pdf.

48. LCG-EM00035679.pdf.

49. LCG-EM000036761-2.pdf.

50. LCG-EM00048660.pdf.

51. LCG-EM00063325.xlsx.

52. LCG-EM00065304.xlsx.

53. LCG-EM00077378.pdf.

54. LCG-EM00078256.pdf.

55. Invoice from David Armetta to Positive Impressions, dated 3/17/2016.

56. Aspira Marketing Direct LLC, U.S. Return of Partnership Income, Form 1065.

RESEARCH

57. Connecticut Secretary of State Business Inquiry online.

58. www.aspiradirect.com.

59. www.childtime.com.

38

60. www.childrenscourtyard.com.

61. www.lapetitie.com.

62. www.Montessori.com.

63. Federal Reserve Statistical Release H.15 – Selected Interest Rates.

64. "2016 Valuation Handbook, Guide To Cost of Capital", Preview Version, Duff & Phelps, 2014.

65. "The Livingston Survey", Federal Reserve Bank of Philadelphia, June 2, 2014 and December 10, 2015.

66. "Survey of Professional Forecasters", Federal Reserve Bank of Philadelphia, August 15, 2014 and February 12, 2016.

67. National and state / metro-are real GDP and real GSP data from www.bea.gov;

68. U.S., NY and CT employment data from www.bls.gov.

69. "U.S. Business Cycle Expansions and Contractions", The National Bureau of Economic Research, www.nber.org/cycles.

70. Biery, Mary Ellen, "Growth in the U.S. Day Care Businesses", Forbes.com, 6/15/2014.

71. IBISWorld Industry Report 62441, Day Care in the US, July 2014 and January 2016.

72. IBISWord Industry Report 54186, Direct Mail Advertising in the US, February 2016.

**E –LOST COMPENSATION AND PROFITS**

# E - LOST COMPENSATION AND PROFITS
## Aspira and David Armetta Lost Income

| | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
|---|---|---|---|---|
| Year beginning | | | | |
| Key dates (unpaid invoices & trial judgment) | 10/28/2013 | | | 6/24/2016 |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |

### Expected But For LCG's Wrongful Acts

| | | | | |
|---|---|---|---|---|
| Sales | $924,023 | $901,059 | $901,059 | $901,059 |
| Cost of goods sold | $68,178 | $44,689 | $44,689 | $44,689 |
| Gross profit | $855,845 | $856,370 | $856,370 | $856,370 |
| Depreciation | $0 | $0 | $0 | $0 |
| All other expenses | $24,669 | $33,537 | $33,537 | $33,537 |
| Ordinary business income | $831,176 | $822,833 | $822,833 | $822,833 |
| David Armetta income | $415,588 | $411,417 | $411,417 | $411,417 |
| Sales growth rate | | -2.5% | 0.0% | 0.0% |
| Growth period | | 1.00 | 2.00 | 3.00 |

### Actual including mitigation

| | | | | |
|---|---|---|---|---|
| Sales | $559,342 | $0 | $0 | $0 |
| Cost of goods sold | $68,178 | $0 | $0 | $0 |
| Gross profit | $491,164 | $0 | $0 | $0 |
| Depreciation | $0 | $0 | $0 | $0 |
| All other expenses | $24,669 | $0 | $0 | $0 |
| Ordinary business income | $466,495 | $0 | $0 | $0 |

41

# E - LOST COMPENSATION AND PROFITS
## Aspira and David Armetta Lost Income

| Year beginning | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
|---|---|---|---|---|
| Key dates (unpaid invoices & trial judgment) | 10/28/2013 | | | 6/24/2016 |
| **Year Ending** | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** |

**Lost Profits and Compensation = Without The Wrongful Acts less Actual**

| | 1/1/2013 | 1/1/2014 | 1/1/2015 | 1/1/2016 |
|---|---|---|---|---|
| Aspira lost sales | $364,681 | $901,059 | $901,059 | $901,059 |
| Cumulative lost sales | $364,681 | $1,265,740 | $2,166,798 | $3,067,857 |
| Aspira lost profits | $364,681 | $822,833 | $822,833 | $822,833 |
| Aspira lost profits pre-trial | $364,681 | $822,833 | $822,833 | $394,509 |
| Aspira lost profits post-trial | | | | $428,324 |
| Discount period | | | | 0.26 |
| Discount rate | | | | 23.2% |
| Discount factor | | | | 1.06 |
| Aspira post-trial lost profits - discounted | | | | $405,694 |
| **Total lost Aspira profits (discounted)** | **$364,681** | **$822,833** | **$822,833** | **$800,203** |
| Cumulative | $364,681 | $1,187,514 | $2,010,347 | $2,810,550 |
| | | | | |
| David Armetta discounted lost income | $182,341 | $411,417 | $411,417 | $400,101 |
| Less mitigating income | | | | -$2,500 |
| **David Armetta's lost Income (discounted)** | **$182,341** | **$411,417** | **$411,417** | **$397,601** |
| Cumulative | $182,341 | $593,757 | $1,005,174 | **$1,402,775** |

Notes:
1) Aspira unpaid invoices were dated 10/28/2013 and due upon receipt.
2) Plaintiff's counsel has asked me to assume that the trial would conclude and the judgment be entered on 6/24/2016
3) David Armetta's income is 50% of Aspira's profits.
4) 2013 income Without The Wrongful Acts equals Actual plus $364,681 in unpaid invoices from CARMSUPP00026431 to 26432.
5) See the accompanying discount rate analysis

42

# E - LOST COMPENSATION AND PROFITS

## David Armetta and Aspira - Historic Income

| | Armetta Mktg. & Design | | | | Aspira | | | Aspira |
|---|---|---|---|---|---|---|---|---|
| Line Item | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Average |
| **Income as Reported** | | | | | | | | |
| Sales | $61,192 | $53,669 | $541,072 | $771,955 | $496,627 | $878,094 | $559,342 | $649,418 |
| Cost of goods sold | $9,095 | $13,248 | $198,966 | $159,484 | $21,250 | $21,199 | $68,178 | $93,815 |
| Gross profit | $52,097 | $40,421 | $342,106 | $612,471 | $475,377 | $856,895 | $491,164 | $555,603 |
| Depreciation | $0 | $0 | $0 | $6,015 | $0 | $0 | $0 | $1,203 |
| All other expenses | $29,737 | $38,712 | $196,192 | $37,784 | $34,346 | $42,405 | $266,220 | $115,389 |
| Ordinary business income | $22,360 | $1,709 | $145,914 | $568,672 | $441,031 | $814,490 | $224,944 | $439,010 |
| David Armetta income | $22,360 | $1,709 | $145,914 | $284,336 | $220,516 | $407,245 | $112,472 | $234,097 |
| | | | | | | | | |
| **Balance Sheet** | | | | | | | | |
| Cash | | | | $584,742 | $441,031 | $814,490 | $224,944 | $516,302 |
| Buildings and depreciable assets | | | | $0 | $0 | $0 | $0 | $0 |
| Total Assets | | | | $584,742 | $441,031 | $814,490 | $224,944 | $516,302 |
| Liabilities | | | | $0 | $0 | $0 | $0 | $0 |
| Partner's capital accounts | | | | $568,672 | $441,031 | $814,490 | $224,944 | $512,284 |
| Liabilities and capital accounts | | | | $568,672 | $441,031 | $814,490 | $224,944 | $512,284 |

43

# E – LOST COMPENSATION AND PROFITS

**David Armetta and Aspira – Historic Income**

| Line Item | Arnetta Mktg. & Design | | Calendar Year (Aspira) | | | | | Aspira Average |
|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | |
| **Normalizing Adjustments** | | | | | | | | |
| Deduct extraordinary legal expenses from other expenses | | | | | | | -$241,551 | |
| Add unpaid invoices | | | | | | | $364,681 | |
| **Normalized Income (Includes Unpaid 2013 Invoices)** | | | | | | | | |
| Sales | $61,192 | $53,669 | $541,072 | $771,955 | $496,627 | $878,094 | $924,023 | $722,354 |
| Cost of goods sold | $9,095 | $13,248 | $198,966 | $159,484 | $21,250 | $21,199 | $68,178 | $93,815 |
| Gross profit | $52,097 | $40,421 | $342,106 | $612,471 | $475,377 | $856,895 | $855,845 | $628,539 |
| Depreciation | $0 | $0 | $0 | $6,015 | $0 | $0 | $0 | $1,203 |
| All other expenses | $29,737 | $38,712 | $196,192 | $37,784 | $34,346 | $42,405 | $24,669 | $67,079 |
| Ordinary business income | $22,360 | $1,709 | $145,914 | $568,672 | $441,031 | $814,490 | $831,176 | $560,257 |
| David Armetta income | $22,360 | $1,709 | $72,957 | $284,336 | $220,516 | $407,245 | $415,588 | $280,128 |
| Aspira hourly revenue based on 2,000 hours worked | | | | $284 | $221 | $407 | $416 | |
| David Armetta hourly income based on 2,000 hours | | | | $142 | $110 | $204 | $208 | |
| Aspira revenue trend | | | $547,946 | $635,150 | $722,354 | $809,558 | $896,762 | |
| Aspira profit trend | | | $167,107 | $451,714 | $618,198 | $736,321 | $827,944 | |
| **Adjusted Balance Sheet** | | | | | | | | |
| Cash | | | | $584,742 | $441,031 | $814,490 | $831,176 | $667,860 |
| Buildings and depreciable assets | | | | $0 | $0 | $0 | $0 | $0 |
| Total Assets | | | | $584,742 | $441,031 | $814,490 | $831,176 | $667,860 |
| Liabilities | | | | $0 | $0 | $0 | $0 | $0 |
| Partner's capital accounts | | | | $568,672 | $441,031 | $814,490 | $831,176 | $663,842 |
| Liabilities and capital accounts | | | | $568,672 | $441,031 | $814,490 | $831,176 | $663,842 |

# E - LOST COMPENSATION AND PROFITS

**David Armetta and Aspira – Historic Income**

| Line Item | Arnetta Mktg. & Design | | Calendar Year — Aspira | | | | | Aspira Average |
|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | |
| **Common Size Analysis** | | | | | | | | |
| Sales | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Cost of goods sold | 15% | 25% | 37% | 21% | 4% | 2% | 7% | 14% |
| Gross profit | 85% | 75% | 63% | 79% | 96% | 98% | 93% | 86% |
| Depreciation | 0% | 0% | 0% | 1% | 0% | 0% | 0% | 0% |
| All other expenses | 49% | 72% | 36% | 5% | 7% | 5% | 3% | 11% |
| Ordinary business income | 37% | 3% | 27% | 74% | 89% | 93% | 90% | 74% |
| David Armetta income | 37% | 3% | 13% | 37% | 44% | 46% | 45% | 37% |
| Revenue growth | | | | 43% | -36% | 77% | 5% | 14.3% |
| Return on assets before tax | | | | 97% | 86% | 130% | 101% | 104% |
| Return on capital before tax | | | | 100% | 87% | 130% | 101% | 105% |

Notes

1) 2007 is from CARMSUPP-00025852 to 25876.
2) 2008 is from CARMSUPP-00025878 to 25851.
3) 2009 information is from CARMSUPP-00025909 to -25935.  Carlene Aremtta's compensation was deducted as an expense.
4) 2010 is from  CARMSUPP-00025974 to 25991.
5) 2011 is from  CARMSUPP-00025993 to 26036.
6) 2012 is from  CARMSUPP-00026067 to 26092.
7) 2013 is from  CARMSUPP-00026093 to 26038.
9) Unpaid invoice totals are from CARMSUPP-00026432 and CARMSUPP-00026431.
10) The legal and professional fees are from Aspira's 2013 tax return detail.

45

# E - LOST COMPENSATION AND PROFITS
## Aspira and David Armetta Lost Income

### Discount Rate - Duff & Phelps Build-Up Method

| Line Item | | |
|---|---|---|
| **Equity** | | |
| + Risk-free rate = U.S. Treasury 20-year bond rate (normalized) | | |
| $R_f$ = | | 4.0% |
| + Equity risk premium = incremental return | | |
| $RP_m$ = | | 5.5% |
| + Industry risk premium | | |
| $RP_i$ = | | 2.8% |
| + Size premium | | |
| $RP_s$ = | | 10.9% |
| = Cost of Equity | | 23.2% |

| Line Item | Aspira, normalized | Risk Premium Above the Risk Free Rate | Premium Above the Equity Risk Premia |
|---|---|---|---|
| Sales | $924,023 | 16.8% | 11.3% |
| EBITDA (5-yr avg.) | $560,257 | 15.1% | 9.6% |
| Employees | 1 | 17.2% | 11.7% |
| Average | | | 10.9% |

Notes

1) Data is from Duff and Phelps' 2016 Valuation Handbook with market results through 2015.

2) Risk free rate = Duff & Phelps's normalized long-term risk free rate, p. 3-41.

3) Equity risk premium = Duff and Phelps 1963 to 2015 recommended, p. 3-41.

4) Industry risk premia is based on the SIC 731 for advertising (1.51 full information Beta).

5) Size risk premium = Duff & Phelps average risk premium verus the risk-free rate from Exhibits A-7. A-6, and A-8, as follows:

46

# F – DIRECT MAIL PROGRAM ANALYSIS

# F - DIRECT MAIL PROGRAM ANALYSIS
## Program Summary

| Year and DM Campaign | Unique prospects mailed — A | Total mailed — B | Student enrollments — C | Conversion rate — D | Total DM cost based on invoice detail produced — E | Calculated total DM spending — F = C x H | Average DM cost — G = (E+F)/2 | Reported DM acquisition cost per student enrollment — H | Calculated acquisition cost per student enrollment — I = E/C | Calculated DM cost per mailing 1 — J = E/B | Calculated DM cost per mailing 2 — K = F/B |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FY 2010 - July 1, 2009 to June 30, 2010** | | | | | | | | | | | |
| Fall | 727,666 [a] | 791,741 [a] | 1,978 [a] | 0.27% | $773,869 [a] | $532,667 | $648,268 | $264 [a,c] | $391 | $0.98 | $0.66 |
| Winter | 2,675,624 [a] | 3,013,781 [a] | 6,372 [a] | 0.24% | $1,231,516 [a] | $1,891,337 | $1,561,427 | $297 [a,c] | $193 | $0.41 | $0.63 |
| Summer | 599,923 [a] | 599,923 [a] | NA [a] | NA | $319,968 [a] | $319,968 | $319,968 | | NA | $0.53 | $0.00 |
| Total FY | 4,003,213 | 4,405,445 | 8,350 | NA | $2,325,354 | $2,414,004 | $2,529,663 | $289 | $278 | $0.53 | $0.55 |
| **FY 2011 - July 1, 2010 to June 30, 2011** | | | | | | | | | | | |
| Fall | 1,280,330 [a] | 2,823,477 [a] | 7,399 [a] | 0.58% | $2,187,077 [a] | $2,135,943 | $2,161,510 | $289 [a] | $296 | $0.77 | $0.76 |
| Winter | 1,003,095 [a] | 1,003,095 [a] | 7,149 [a] | 0.71% | $1,091,094 [a] | $750,502 | $920,798 | $105 [a] | $153 | $1.09 | $0.75 |
| Summer | 299,633 [a] | 349,029 [a] | 5,877 [a] | 1.96% | $576,468 [a] | $313,362 | $444,915 | $53 [a] | $98 | $1.65 | $0.90 |
| Total FY | 2,583,058 | 4,175,601 | 20,425 | 0.79% | $3,854,640 | $3,199,807 | $3,527,223 | $157 | $189 | $0.92 | $0.77 |
| **FY 2012 - July 1, 2011 to June 30, 2012** | | | | | | | | | | | |
| Fall | 1,626,470 [a] | 2,610,670 [a] | 15,770 [a] | 0.97% | $2,143,298 [a] | $1,834,524 | $1,988,911 | $116 [a] | $136 | $0.82 | $0.70 |
| Winter | 1,379,138 [a] | 2,102,938 [a] | 10,325 [a] | 0.75% | $1,909,652 [a] | $1,526,035 | $1,717,843 | $148 [a] | $185 | $0.91 | $0.73 |
| Summer | 374,802 [a] | 509,416 [a] | 5,866 [a] | 1.57% | $621,732 [a] | $366,214 | $493,973 | $62 [a] | $106 | $1.22 | $0.72 |
| Total FY | 3,380,410 | 5,223,024 | 31,961 | 0.95% | $4,674,682 | $3,726,773 | $4,200,728 | $117 | $146 | $0.90 | $0.71 |
| **FY 2013 - July 1, 2012 to June 30, 2013** | | | | | | | | | | | |
| Fall | 1,200,000 [c] | 2,479,794 [c] | 17,454 [c] | 1.45% | $1,916,523 [a] | $1,711,016 | $1,813,769 | $98 [c] | $110 | $0.77 | $0.69 |
| Winter | 1,505,783 [c] | 3,047,366 [c] | 14,890 [c] | 0.99% | $1,865,652 [b] | | $1,865,652 | | $125 | $0.61 | NA |
| Summer | 240,000 [c] | 380,000 [c] | 1,558 [c] | 0.65% | | | | | | | |
| Total FY | 2,945,783 | 5,907,160 | 33,902 | 1.15% | | | | | | | |
| **FY 2014 - July 1, 2013 to June 30, 2014** | | | | | | | | | | | |
| Fall | 1,564,297 [c] | 1,564,308 [d] | 2,743 [d] | NMF | | | | | | | |
| | | | | | | | | | | | |
| Avg. excl. 2014 | 1,076,039 | 1,642,603 | 8,603 | 0.9% | $1,330,623 | $1,227,956 | | $159 | $179 | $0.89 | $0.65 |

48

# F - DIRECT MAIL PROGRAM ANALYSIS
## Program Summary

| Year and DM Campaign | Unique prospects mailed | Total mailed | Student enrollments | Conversion rate | Total DM cost based on invoice detail produced | Calculated total DM spending | Average DM cost | Reported DM acquisition cost per student enrollment | Calculated acquisition cost per student enrollment | Calculated DM cost per mailing 1 | Calculated DM cost per mailing 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | $F = C \times H$ | $G = (E+F)/2$ | H | $I = E/C$ | $J = E/B$ | $K = F/B$ |
| Fall | 1,208,617 | 2,176,421 | 10,650 | 0.8% | $1,755,192 | $1,551,037 | | $192 | $233 | $0.84 | $0.70 |
| Winter | 1,640,910 | 2,291,795 | 9,684 | 0.7% | $1,524,479 | $1,389,291 | | $183 | $164 | $0.75 | $0.70 |
| Summer | 378,590 | 459,592 | 4,434 | 1.4% | $506,056 | $339,788 | | $58 | $102 | $1.14 | $0.54 |

Data Sources:
[a] CARMSUPP-025747-788
[b] CARMSUPP-000026433 Winter 2013 Direct Mail reporting ENHANCED_xlsx8.xlsx
[c] LCG-EM00063325.
[d] LCG-EM00023934.
[e] LCG-EM00065304.xlsx.

Notes:
1)   Full FY 2014 data is through 8/2/2014 - month of the 5 to 7 month campaign.
2)   Reasons for differences between columns E and F, G and H and, I and J include, but are not limited to, the following:
    - Calculation of reported per acquisition values before the final number of enrollments were counted.
    - Differences in cost elements (i.e. with vs. without franchises or creative costs or sales tax, etc.)
    - Timing differences (i.e. costs applied to the Winter vs. Fall campaign in a given year).

49

# F - DIRECT MAIL PROGRAM ANALYSIS
## Profits and Apportionment

| Line Item | Calculations | Fall FY 2010 | Winter FY 2010 | Fall FY 2011 | Winter FY 2011 | Summer FY 2011 |
|---|---|---|---|---|---|---|
| DM Student Enrollments | | | | | | |
| Actual | A | 1,978 | 6,372 | 7,399 | 7,149 | 5,877 |
| Remaining expected | B | - | - | - | - | - |
| Total DM students enrolled | C = A+B | 1,978 | 6,372 | 7,399 | 7,149 | 5,877 |
| | | | | | | |
| Weekly revenue per student | D | $160.31 | $160.31 | $160.31 | $160.31 | $160.31 |
| Average student duration (weeks) | E | 39.8 | 39.8 | 39.8 | 39.8 | 39.8 |
| DM Sales | F = C x D x E | $12,607,600 | $40,614,575 | $47,160,584 | $45,567,106 | $37,459,488 |
| Costs | | | | | | |
| Direct Mail costs | G | $648,268 | $1,561,427 | $2,161,510 | $920,798 | $444,915 |
| Other incremental costs % of revenue | H | 47% | 47% | 47% | 47% | 47% |
| Total incremental costs | I = G + (H x F) | $6,573,840 | $20,650,277 | $24,326,985 | $22,337,338 | $18,050,874 |
| DM Profits (incremental) | J = F - I | $6,033,760 | $19,964,298 | $22,833,599 | $23,229,768 | $19,408,614 |
| Incremental profit margin | K = J / F | 48% | 49% | 48% | 51% | 52% |
| Apportionment: lead generation vs. other | L | 33.33% | 33% | 33% | 33% | 33% |
| Remaining profits | M = K x L | $2,011,253 | $6,654,766 | $7,611,200 | $7,743,256 | $6,469,538 |
| Apportionment for Aspira / D. Armetta contribution | N | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% |
| Apportionment for Carlene Armetta's contribution | O | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% |
| Profits attributable to Aspira / D. Armetta | P = M x N | $686,642 | $2,271,937 | $2,598,464 | $2,643,548 | $2,208,700 |
| Profits attributable to Carlene Armetta at LCG | Q = O x M | $115,647 | $382,649 | $437,644 | $445,237 | $371,998 |
| Total LCG Wrongful Profits before offsetting comp. | L = P + Q | $802,289 | $2,654,586 | $3,036,108 | $3,088,785 | $2,580,699 |
| Unjust enrichment percent of sales | L / F | 6.4% | 6.5% | 6.4% | 6.8% | 6.9% |
| Unjust enrichment percent of profits | L / J | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% |
| Revenue per enrollment | F / C | $6,374 | $6,374 | $6,374 | $6,374 | $6,374 |
| Profit per enrollment | J / C | $3,050 | $3,133 | $3,086 | $3,249 | $3,302 |
| Unjust enrichment per enrollment | L / C | $406 | $417 | $410 | $432 | $439 |

# F - DIRECT MAIL PROGRAM ANALYSIS
## Profits and Apportionment

| Line Item | Fall FY 2012 | Winter FY 2012 | Summer FY 2012 | Fall FY 2013 | Winter FY 2013 | Summer FY 2013 |
|---|---|---|---|---|---|---|
| DM Student Enrollments | | | | | | |
| Actual | 15,770 | 10,325 | 5,866 | 17,454 | 14,890 | 1,558 |
| Remaining expected | - | - | - | - | | - |
| Total DM students enrolled | 15,770 | 10,325 | 5,866 | 17,454 | 14,890 | 1,558 |
| | | | | | | |
| Weekly revenue per student | $160.31 | $160.31 | $160.31 | $160.31 | $157.05 | $155.55 |
| Average student duration (weeks) | 39.8 | 39.8 | 41.3 | 41.3 | 41.3 | 41.3 |
| DM Sales | $100,516,612 | $65,810,654 | $38,837,555 | $115,559,271 | $96,578,997 | $10,008,927 |
| Costs | | | | | | |
| Direct Mail costs | $1,988,911 | $1,717,843 | $493,973 | $1,813,769 | $1,865,652 | $618,659 |
| Other incremental costs % of revenue | 47% | 47% | 47% | 47% | 47% | 47% |
| Total incremental costs | $49,231,719 | $32,648,851 | $18,747,624 | $56,126,627 | $47,257,781 | $5,322,855 |
| DM Profits (incremental) | $51,284,893 | $33,161,803 | $20,089,931 | $59,432,645 | $49,321,216 | $4,686,072 |
| Incremental profit margin | 51% | 50% | 52% | 51% | 51% | 47% |
| Apportionment: lead generation vs. other | 33% | 33% | 33% | 33% | 33% | 33% |
| Remaining profits | $17,094,964 | $11,053,934 | $6,696,644 | $19,810,882 | $16,440,405 | $1,562,024 |
| Apportionment for Aspira / D. Armetta contribution | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% | 34.14% |
| Apportionment for Carlene Armetta's contribution | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% |
| Profits attributable to Aspira / D. Armetta | $5,836,221 | $3,773,813 | $2,286,234 | $6,763,435 | $5,612,754 | $533,275 |
| Profits attributable to Carlene Armetta at LCG | $982,960 | $635,601 | $385,057 | $1,139,126 | $945,323 | $89,816 |
| Total LCG Wrongful Profits before offsetting comp. | $6,819,181 | $4,409,414 | $2,671,291 | $7,902,561 | $6,558,078 | $623,091 |
| Unjust enrichment percent of sales | 6.8% | 6.7% | 6.9% | 6.8% | 6.8% | 6.2% |
| Unjust enrichment percent of profits | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% |
| Revenue per enrollment | $6,374 | $6,374 | $6,621 | $6,621 | $6,486 | $6,424 |
| Profit per enrollment | $3,252 | $3,212 | $3,425 | $3,405 | $3,312 | $3,008 |
| Unjust enrichment per enrollment | $432 | $427 | $455 | $453 | $440 | $400 |

# F - DIRECT MAIL PROGRAM ANALYSIS
## Profits and Apportionment

| Line Item | Partial Fall FY 2014 | Expected Remainder Fall FY 2014 | Total Reported | Total Reported & Expected | Fall FY 2013 to Fall FY 2014 |
|---|---|---|---|---|---|
| DM Student Enrollments | | | | | |
| Actual | 2,743 | | 97,381 | 97,381 | 36,645 |
| Remaining expected | - | 12,899 | | 12,899 | 12,899 |
| Total DM students enrolled | 2,743 | 12,899 | 97,381 | 110,280 | 49,544 |
| | | | | | |
| Weekly revenue per student | $178.84 | $160.31 | | | |
| Average student duration (weeks) | 41.3 | 41.3 | | | |
| | | | | | |
| DM Sales | $20,260,050 | $85,404,681 | $630,981,420 | $716,386,101 | $327,811,926 |
| Costs | | | | | |
| Direct Mail costs | $254,524 | $1,196,946 | $14,490,250 | $15,687,196 | $5,749,550 |
| Other incremental costs % of revenue | 47% | 47% | | | |
| Total incremental costs | $9,776,748 | $41,337,146 | $311,051,517 | $352,388,663 | $159,821,155 |
| DM Profits (incremental) | $10,483,303 | $44,067,535 | $319,929,903 | $363,997,438 | $167,990,771 |
| Incremental profit margin | 52% | 52% | 51% | 51% | 51% |
| Apportionment: lead generation vs. other | 33% | 33% | 33% | 33% | 33% |
| Remaining profits | $3,494,434 | $14,689,178 | $106,643,301 | $121,332,479 | $55,996,924 |
| | | | | | |
| Apportionment for Aspira / D. Armetta contribution | 34.14% | 34.14% | 34.14% | | |
| Apportionment for Carlene Armetta's contribution | 5.75% | 5.75% | 5.75% | | |
| Profits attributable to Aspira / D. Armetta | $1,193,000 | $5,014,885 | $36,408,023 | $41,422,908 | $19,117,350 |
| Profits attributable to Carlene Armetta at LCG | $200,930 | $844,628 | $6,131,990 | $6,976,618 | $3,219,823 |
| Total LCG Wrongful Profits before offsetting comp. | $1,393,930 | $5,859,513 | $42,540,013 | $48,399,526 | $22,337,173 |
| | | | | | |
| Unjust enrichment percent of sales | 6.9% | 6.9% | 6.7% | 6.8% | 6.8% |
| Unjust enrichment percent of profits | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% |
| Revenue per enrollment | $7,386 | $6,621 | $6,480 | $6,496 | $6,617 |
| Profit per enrollment | $3,822 | $3,416 | $3,285 | $3,301 | $3,391 |
| Unjust enrichment per enrollment | $508 | $454 | $437 | $439 | $451 |

52

# F - DIRECT MAIL PROGRAM ANALYSIS
## Profits and Apportionment

Notes:

1)  DM Student enrollments are historical actual except for the remainder of fall FY 2014 which is based on analysis of previous campaigns.

2)  Weekly revenue per student is calculated from LCG-EM00063325 for Winter FY 2013, Summer FY 2013 and Partial Fall FY 2014.

3)  Weekly revenue per student for the remaining campaigns equals total FCL average.

4)  Average weeks enrolled is calculated as follows:

5)  a) Monthly average private pay student retention rate = 89.5% for late 2012 / 2013 per CARMPSUPP-0026142.  "Learning Cure Group Q3 & 9+3 Outlook Review."

    b) Average student monthly churn rate = 1 - monthly retention rate = 1 - 89.5% = 10.5%.

    c) Average student duration in months = 1 / monthly churn rate = 1 / 10.5% = 9.52 months.

    d) Average student duration in weeks = 9.52 months x 4.33 weeks per month = 41.3 weeks.

    e) Repeating this calculation for the prior 12 months with an 89.1% retention rate results in a 39.76 week duration.

    f) Student retention = (Students at end of period - new students during period) / Students at the beginning of the period.

6)  Direct Mail costs for Fall and Winter FY 2013 are reported actual.

7)  Direct Mail costs for Summer FY 2013 and Fall FY 2014 were based on regression and time series analysis of previous campaigns.

8)  Incremental costs as % of revenue are based on my analysis of LCG's financials from  LCG-EM00018803.rpt and CARMSUPP00026136 to 26137 and CARMSUPP-000026433 Winter 2013 Direct Mail reporting ENHANCED. xlsx8.xlsx.

9)  I found that LCG's costs and expenses were relatively fixed versus revenue over the range of revenue generated between  Q1 FY 2012 through Q3 FY 2013.

10) However, I used LCG's financial / accounting departments Winter FY 2013 value of 47% out of an abundance of caution to not overstate damages.  See CARMSUPP-000026433 Winter 2013 Direct Mail reporting ENHANCED. xlsx8.xlsx.

53